Procedure 1:22-cv-06913-JGK

**UNITED STATES DISTRICT COURT
SOUTH DISTRICT OF NEW YORK**

_____

_____

MARGARET RATNER KUNSTLER, DEBORAH HRBEK, JOHN GOETZ & CHARLES GLASS,

Requesters, vs.

CENTRAL INTELLIGENCE AGENCY, MICHAEL R. POMPEO, DAVID MORALES GUILLÉN and UNDERCOVER GLOBAL S.L.,

Respondent

**TO THE COURT**

Mr. FERNANDO GARCÍA PÉREZ, Lawyer for Mr. DAVID MORALES GUILLÉN and UNDERCOVER GLOBAL S.L (UC GLOBAL), I appear and as appropriate

**I SAY**

That, by virtue of this letter, this part **OPPOSES** the claim filed by MARGARET RATNER KUNSTLER, DEBORAH HRBEK, JOHN GOETZ & CHARLES GLASS for containing totally false and uncertain facts, based on the following ALLEGATIONS:

**FIRST.** - Regarding paragraphs 11, 12, 13, 14 and 15 of the statement of facts of the lawsuit. The definition given about Wikileaks is completely erroneous and distorted, the reality is that the definition of what Wikileaks does is far from that interpretation, as collected in the wikipedia itself https://en.wikipedia.org/wiki/WikiLeaks specifically in its point 1.2 Purpouse, where it is clearly evidenced that far from following or acting as a journalistic information whose sole purpose is dissent and media manipulation in order to influence public opinion and with a clear intention of destabilizing the interests of Western countries and influencing their national and international policies, most likely in collaboration or support of non-Western intelligence services.

1

All this has been evidenced after the multiple causes, complaints and evidence that this organization, and more specifically its leader Julian Assange, has had to face throughout these years and the reason why he is currently detained pending extradition to the United States of America.

Regarding paragraph 16, the situation that former United States intelligence analyst Chelsea Maning had to face or the events that occurred with the also former intelligence analyst Snowden who fled to Russia (flight managed and directed by Julian Assange) or the hacking of Democratic Party emails undoubtedly show the commission of serious criminal acts in which they endangered not only human lives but a serious interference in the internal affairs of American foreign policy, independent of the political decisions that led to a reduction or annulment of the sentence.

In relation to paragraphs 17 and 18, the act of self-reclusion (asylum) at the Embassy of Ecuador in London, only obeyed one act to evade its responsibilities and confront international justice so that it would respond for the acts committed, unfortunately for him, the decision of his advisers and legal team was completely wrong and the loss of Ecuadorian political support tired of their continuous acts of interference in national and international policies carried out from his embassy against Ecuador itself as well as with third countries, caused his asylum to be revoked and expelled from it.

As for paragraphs 19, 20, 21, 22, 23, 24 and 25, they deal with internal affairs of American politics without legal relevance.

Regarding paragraph 26, it is uncertain that M. Pompeo or the CIA will recruit UC Global. This statement made by the plaintiffs has no real basis and only belongs to the argument created and used by Assange's legal defense to maintain a legal strategy based on lies and media manipulation that allows us to have a basis on which to continue delay the prosecution of Assange.

There are not, nor have there never been, contractual or other links with this or another American intelligence agency, as has already been demonstrated by the British Justice and by the investigation process (four years) to which David Morales has been unfairly subjected, as demonstrated by the Spanish prosecutor's office itself

in its letter of reply to the American justice, and for which he has suffered the administrative, economic and media persecution consequences against his person, his company, his reputation irreparably and has seriously affected both personally and professionally.

In accordance with paragraph 27, UC Global effectively maintained a legal contract with the Ecuadorian State (specifically with its Secretary of Intelligence) for the development of the security activities of the Ecuadorian embassy in London. It is completely wrong and false, that the contract directly included providing protection to the Asylee Assange directly, evidently Assange was part of the contents of the embassy and his personal security would be guaranteed against any threat, but the main and only purpose was to avoid threats that affected the normal and functional development of the embassy (altered by the presence of Assange and his team who And act against any threat that could affect the national or international interests of Ecuador. All this under the constant supervision of the Head of Mission (Ambassador), staff of the Secretary of Intelligence at the Embassy in London and contract administrator in Ecuador. Likewise, all this has been demonstrated in the research carried out in Spain.

With respect to paragraphs 28, 29 and 30, David Morales, as demonstrated in the investigation carried out by the Spanish National Court, it is uncertain that LVSC had nothing to do with these accusations. UC Global maintained a contractual relationship for the provision of services in certain locations with that entity. David Morales, in his functions as CEO of the company, made multiple trips to international trade fairs, meetings or exhibitions, as well as held professional meetings with his clients, either in Las Vegas or in other locations, which he visited to coordinate work or simply to maintain good relationships between customer and supplier. Neither LVSC nor any of its employees requested or requested any information regarding the Ecuadorian embassy in London or about Assange. Julian Assange, much to his regret and that of his legal defense, was not the object of interest to anyone.

Such statements are completely false and they are a complete manipulation and misrepresentation carried out by the Legal Defense

of Assange, as the same ex-employees reported in their oral statements before the Judge of the National Court who questioned them, who confirmed that they were "*rumors*" they made between them, that expressions or comments related to phrases of support and motivation, are used to

In reference to paragraphs 31 and 32, again as has been demonstrated, after the exhaustive investigation to which David Morales has been subjected during these four years, it has not been received or recorded (otherwise he always acted in accordance with both the Fiscal, Economic and Professional Law) that payments, collections, shipments or economic exchanges have occurred from any American entity or intelligence organization. It is another accusation invented by the Legal Defense of Assange with the collaboration of witnesses who manipulate his story in his initial complaint and that then in their oral statements before the Judge do not know or say that they are rumors that they handled with each other, that is, everything was in their "imaginary".

Regarding paragraph 33, no "Operations Unit" was ever created, as a company the company had different departments and specialties, which took care not only of the supervision of the contract in the embassy but also the rest of the work and actions that were carried out with other clients.

The plaintiffs say that the content of their electronic devices was copied, where is the proof that such an intervention has been carried out? Is there any compromised material that has been leaked, tampered with or appeared in any media corresponding to them?

If at any time the inspection of any mobile device or laptop was carried out, it was because the Embassy had already been attempted to enter from unauthorized recorders to unknown volatile substances, so, the staff of the Embassy, UC GLOBAL security, Ecuadorian officials or ambassador proceeded to check any suspicious device or package by express order of SENAIN or the same Embassy, to avoid damage even to J. Assange.

Regarding paragraph 34, 80% of communications in UC Global were made in English (given the evident international profile of the company), regardless of whether or not the language was mastered,

the communications were sent or forwarded, and especially those of technical origin dominated by the Anglo-Saxon language, in the original language.

Likewise, as has been demonstrated in the Spanish investigation, and reaffirmed by the witnesses of Assange's Defense themselves in their interrogations before the Instructor Judge of the National Court, information was never exchanged by streaming with anyone, much less with a server belonging to the CIA or another agency, as reported by the witnesses and it has been demonstrated by David Morales, company were working on a project for the Ecuadorian government that would link the closed circuit of the embassy in London via streaming, but it was never carried out due to technical incapacity, the project being abandoned.

In consideration of paragraph 35, it is false that M. Pompeo agreed with UC Global on a plan for the implementation of control measures at the Embassy of Ecuador in London. The changes made to the CCTV equipment were made at the request of the Ecuadorian Government. As demonstrated in the Investigation in Spain through the documentation submitted by the administrative request by the Secretariat of Intelligence for the budget and acquisition of new camera systems, which would be installed by the technical team of UC Global, as stated in the contract for the provision of services. It should be remembered that all the activities carried out at the embassy were under the supervision of the intelligence officer in the embassy, who informed both the Ambassador and its headquarters in Quito. No action described is an independent decision-making designed and executed by David Morales, which is what the Defense of Assange constantly insists on, on the contrary David Morales/UC Global executed the actions demanded by the contract holder (client, in this case Government of Ecuador).

In correspondence with paragraphs 36, 37 and 38, IF the plaintiffs held meetings or visits with Assange at the embassy, authorized by the Government of Ecuador (Ambassador), lAs they would be registered in the control and access entry registry, they would know the access protocols required by the Ecuadorian authorities in accordance with their laws (since they were not only visible because

they were announced in the access control itself) that were aware of all Assange's visits and work team ... which they accessed without ever having problems, I remind you that the embassy is Ecuadorian sovereign territory and that its actions are subject to its law, they never opposed or criticized them and if they disagreed it was enough not to access it.

The statement made by the plaintiffs that "all the information contained in the devices will be sent to the CIA" is a complete **LIE**. There is no single proof or indication, beyond the imagination of Assange's legal defense. As we have been expressing all this, it has been demonstrated, even denied by the witnesses of Assange's defense themselves, in the investigation carried out in Spain where the Technical Investigation Unit of the Police itself after carrying out the investigation of the electronic equipment of the company and David Morales states that no evidence of such alleged exchanges of information is found.

It is also completely **FALSE** that information from the Ecuadorian embassy or Assange or his lawyers was transmitted or provided by any means to LVSC or any other US intelligence entity.

Regarding paragraph 39, it is also FALSE, that David Morales traveled there a total of sixty (60) to the United States. The investigative unit of the National Court itself has corroborated that David Morales traveled to the USA a total of 12 times (between business and leisure trips) in a total of nine (9) years (attached police report). On the occasion of those business trips to the USA, he obviously sent and communicated both by email and by telephone with his company in Spain using the Wi-Fi connections of the hotels in which David Morales stayed, if that is using American servers to communicate with his employees I think it is completely natural, But wanting to make it see that this means that they corresponded to an illegal activity is excessive even for the conspiracy theory created by Assange's defense in an attempt to have an excuse to avoid extradition.

As for paragraphs 40, 41 and 42, it is a fallacy to claim that Mr. Pompeo authorized or directed actions aimed at strengthening the security device of the Ecuadorian embassy in London, much less that

6

David Morales acted as its agent.All actions were known to the Ecuadorian Government as demonstrated by the exchange of emails between Ambassador Carlos Abab and David Morales, and where it is specified that both the Presidency, Intelligence and Foreign Ministry of Ecuador are aware of the security improvement actions that are taking place at the embassy.

According to paragraph 43, what is the evidence that these alleged acts of obtaining information from the plaintiffs' devices were carried out? A journalistic article published in the newspaper El País, which says it has all the conclusive evidence related to this espionage (audios and videos) but that to date none of them has been presented in the investigation carried out in Spain, beyond some emails taken from the context of private conversations obtained illegally, images that show absolutely nothing related to daily actions at the embassy, which have no origin in the servers of UC Global, or the devices of David Morales, which as reported by the investigative police unit have only been in the device delivered by the main witness, witness who was fired from the company when it was discovered that he tried to sell information about the embassy and Assange to third parties (including the media) who rejected it since it was irrelevant, and that he is currently immersed in other judicial conflicts where he is being investigated for facts related to documentary falsehood and labor intrusion, and where new criminal charges will soon be attributed to him.

With regard to paragraph 44, it is completely false that the plaintiffs were not informed of the actions taking place in Spain since they have been made public and leaked to the press indiscriminately by the Assange's Legal Team, fact confirmed by several journalistic sources, with the appearances and demonstrations of Defense Attorney Aitor Martínez in national and international media, many of them North Americans, being constant. It is an attempt to continue with a cause that is dead and that has no media interest beyond Assange activists who use this issue as an opportunity to criticize Western justice (mainly the United States). The journalistic media El País is only a medium related to the interests of the Defense of Assange to which they directly leak the information managed in the

7

National Court with the intention of misinforming public opinion in search of support.

Regarding section 45, What documents, communications and other information of the defendants have been violated? Where are the tests of these interventions? And what tests do they have that they have been carried out by UC Global, David Morales, M. Pompeo or the CIA?

Regarding paragraphs 46 and 47, returning to the investigation carried out in Spain, forgotten the plaintiffs that regarding the seizure of information, confidential documents as well as communications between client lawyers they are talking about, none of this has been shown to have anything to do with UC Global/David Morales, Not only is there no evidence, but it is also Assange's Defense Attorney (Aitor Martínez) who reports that the only ones responsible for disseminating Mr. Assange's confidential information are the employees and officials of the Embassy of Ecuador and the security company that replaced UC GLOBAL. These actions are carried out by the company PROMSECURITY and that are developed when UC Global has been out of the embassy for a year, attaching a link to the interview and transcript of the most relevant conversation:

https://www.youtube.com/watch?v=wRjDZNTxkSM

"Aitor Martínez: «If you are good benefactors for freedom of expression and for Assange's judicial battle, why do you want money?»

Alejandro Mollá (computer specialist):«Man... because we'll have to eat too.».

José Martín Santos: «Do we give it to someone so that others can benefit? Someone will have to say: listen, if this comes out, someone will have to pay, because like everyone else... Or do you work for free?»

Martínez: «Man, I can't consider this a job either, after all it's illegitimate espionage against a person in a very sensitive situation,

8

some lawyers who are going to do their job are spied on, which is serious too, [the] lawyer-client relationship can't be spied on».

Martín Santos: «Well, but I haven't spied.».

Martínez: «Some doctors who also have privacy coverage that has been spied on them... because that plot I don't know, it leaves the Embassy towards you and there a business is built.... If you finally give it to the press, why do you have to violate my privacy as a lawyer... Apart from my ethical-moral considerations, Kristinn shows me an email that says 'from three million'. I don't know if there will be a mistake, but from three million upwards!»

Martín Santos: «The team said that amount, he and I have not negotiated... Televisa said it was willing to pay 9 million».

Martínez: «And you didn't sell it to him.».

Martín Santos: «No».

Martínez: «Why?»

Mollá: «Because when we get to make that deal, there is an even better one."

Martínez: "With the media?»

Mollá: «No, no, with you.».

Martín Santos: «That begins to be gutted by an American chain that falls into their hands and they start making special programs, putting advertising... and they don't get three, they get 300».

The lawyer, whose notes were photographed during one of his visits to Assange at the Embassy, asks about one of the folders shown to him by the sellers under the label "Comunicaciones Baltasar Garzón". And Martín Santos responds that there are writings from the Embassy to him (Garzón) and references where he appears, as well as communications and letters. "Instead of them spying on you, you spy on them. We give you access to everything," José Martín offered to the editor of Wikileaks.

9

The editor of WikiLeaks and the lawyer tried to rip off their interlocutors if the cameras installed at the Embassy recorded audios. The answer was yes.

Martín Santos: «Now yes».

Martínez: «Do they record audio?»

Martín Santos: «At the moment, yes».

Daniel Sánchez (computer specialist): «Relatively recently».

Martínez: «If you're in a room and one of the cameras is focusing".

Sánchez: «Now he's recording..., but not before.».

Martínez: «There are also microphones?»

Mollá: «Yes, yes, yes, there are microphones.».

Martín Santos: «In some cases, the recording was made with microphones." "Yes, yes, yes, there are microphones in the embassy," the alleged extortionists reiterated.

Assange's representatives questioned that the alleged extortionists had had access to the material without the collaboration of someone from the Embassy, but they failed to decipher the mystery. Martín insisted on presenting himself as a "journalist" and denied that they were spies.

"But who the fuck photographs my legal documents?" says the lawyer. "Well, without a doubt someone who is inside the Embassy... I don't get it from that someone, that someone gives it to another person who makes it reach me," the journalist explained.And the computer specialist Mollá added another piece of information. He said that the two officials who were there on the day the lawyer's folder was photographed "make photographs of everything, scan it and pass it on to the ambassador.... For this to review all the documentation... that's his modus operandi." The audios show that Martín Santos offered the WikiLeaks editor to have real-time access to all the information that occurred at the Embassy. "Instead of them

10

spying on you, you spy on them. It seems crazy, but no," they insisted on their offer.

Not understanding as if both the witnesses of Assange's legal defense, as well as his own Lawyer and how they collect the recordings by the Spanish Police during the extortion attempt made against WikiLeaks, Where the extortionists themselves explain who and how the information seizure actions are carried out, where they come to corroborate that UC Global never had the capacity or was involved in these actions until this abandonment of the service and PROMSECURITY took charge of it.

In consideration of paragraphs 48 and 49, it is false that the staff of UC Global in the embassy have stolen or extracted information from the plaintiffs' phones and much less that it was being sent to the CIA.

According to paragraph 50, all these demonstrations and persecution to which David Morales/UC Global has been unjustifiably subjected by the plaintiffs, in particular, as well as the Legal Defense of Assange and certain media, has caused David Morales not only great emotional anguish and anxiety, To him and his family environment, derived mainly from uncertainty and concerns, more knowing that David Morales is in an oncological process that has been dragging for years, If not, irreparable damage has been caused to him professionally and diminishing his economic capabilities mainly due to the unfair measures taken against him, And for which all the people involved in this plot created "ad oc" to confuse public opinion and the justice agencies in the UK, USA and Spain in favor of Assange must answer for it.

**SECOND-**. Summary and conclusions of the investigation of the complaint of J. Assange, for crimes of espionage, bribery and money laundering, against David Morales Guillén and UC Global carried out by the National Court of Madrid:

1.- Non-existence of any crime of money laundering: there is no evidence of money laundering by UC GLOBAL or Mr. David Morales Guillén.

2.- Lack of bribery: there is no evidence or indication of any attempt to extortion or bribe any official or employee to obtain a contract for the provision of services.

3.- Absence of any AUDIO recording by Uc Global beyond the test ordered by the Embassy of Ecuador and in which J does not participate. Assange or any lawyer.

All images and audios that refer to or participate J. Assange are copies manipulated by one of the witnesses dated in 2019 and 2020, as certified by the police unit in charge of reviewing the evidence provided by J. Assange so there is no image or audio in the devices intervened to UC GLOBAL where Mr. Assange and his lawyers.

4.- Lack of any web-portal to send data: in the investigation of the National Court in Madrid, Mr. Assange's own witnesses stated that it was impossible and a connection was never made via web portal or streaming to communicate the security cameras with an outside connection.

5.- Absence of participation of the CIA or any other intelligence service, or payments of any kind in favor of Mr. Morales or third parties.

**THIRD-**. About the complainants MARGARET RATNER KUNSTLER, DEBORAH HRBEK, JOHN GOETZ & CHARLES GLASS do not appear in any UC GLOBAL's own document except for their listing in the controls and visitor access at the Embassy of Ecuador in London and appearing only in work recordings provided by the protected witness No. 1 and Mr. Assange.

Obviously there is no order from Mr. Morales to employees to obtain images or conversation recording of whistleblowers, much less make copies of their mobile devices, manipulate their information or send it to the CIA. After more than 3 years of police and judicial investigation in Spain, there is no evidence or relationship of Mr. Morales or UC GLOBAL with Mr. Mike Pompeo or the CIA.

For this reason, the same National Court of Madrid recently communicated to its liaison in the United States of the rogatory commission that it intends to take a statement to Mike Pompeo and

J. Evanina in Spain, who has no evidence or evidence beyond the same witnesses proposed by J. Assange.

**FOURTH -**. Finally, we want to highlight three relevant facts known during the investigation of the National Court of Madrid, apart from the absence of any evidence presented by Mr. MARGARET RATNER KUNSTLER, DEBORAH HRBEK, JOHN GOETZ & CHARLES GLASS:

A. NO EVIDENCE OF UC GLOBAL ESPIONAGE IN FAVOR OF THE CIA

In response to the US authorities, the National Court of Madrid clearly recognizes the absence of any relationship between UC GLOBAL security services and the sale of information to US agencies, tIt also acknowledges that there is no evidence or direct testimony of acts of espionage except what was stated by the witnesses of J. Assange, witnesses who in his two judicial statements do not provide clear evidence of any sale of confidential information on the contrary, the judicial statements of the three witnesses of J. Assange is a continuous contradiction to ridicule.

We attach as DOCUMENT No. 1 the aforementioned answer, paying attention to sheet No. 18-21 of the document (2583-2586 of the sheet of the instruction).

B. RESOLUTION OF JUDGE VANESSA BARAITSER DATED JANUARY 4, 2021

In this resolution, the Magistrate acknowledges that they found no crime in the actions of UC GLOBAL and Mr. David Morales while they were in charge of the security of the Embassy of Ecuador in London, on the contrary, he expresses his surprise and concern about Mr. J. Assange in his accusations against UC GLOBAL and Mr. David Morales. We refer to pages No. 64-68 (paragraphs 181-192), this being provided as DOCUMENT No. 2.

C. ACTS OF ESPIONAGE COMMITTED BY MR. J. ASSANGE AT THE ECUADOR EMBASSY IN LONDON

Apart from recording Mr. J. Assange and his collaborators numerous job interviews, broadcast live from the Embassy, share journalistic

13

information, etc. Mr. J. Assange tried to obtain recordings of other people's conversations, especially diplomats by installing hidden devices in meeting rooms or toilets, as well as trying to install acoustic devices to capture other people's meetings.

For this reason, the Embassy of Ecuador ordered both its staff and the UC GLOBAL security to intervene and prohibit the entry of any recording device to anyone who was not a direct collaborator of Mr. J. Assange or trusted by the Embassy, reporting any attempted intrusion or suspicious device. We provide as proof of the above UC GLOBAL report where you can see the collaborators of J. Assange installing hidden microphones, early in the morning, in the meeting room of the Embassy as DOCUMENT No. 3.

I AM LIABLE TO THE COURT that you consider the above allegations and dismiss the request made by the defense of MARGARET RATNER KUNSTLER, DEBORAH HRBEK, JOHN GOETZ & CHARLES GLASS because it does not provide a single objective indication of the reported facts, as well as because he intends to investigate again, now through the complaint of various journalists, some facts already investigated in Spain without having obtained any incriminating evidence.

The plaintiffs have not provided a single indication of:

- Capture, dissemination or manipulation of your conversations by UC GLOBAL.

- Not Relationship, of any kind, of UC GLOBAL and Mr. David Morales with the CIA or Mr. Mike Pompeo.

Therefore, it does not proceed to ask for any jury judgment since opinions, conjectures and fantasies cannot even have the legal quality of evidence, The petition must be dismissed with the imposition of judicial costs and damages to all plaintiffs for recklessness and bad faith.

In New York, on November 17, 2022

Signed by Fernando García Pérez

Lawyer for David Morales Guillén and Undercover Global S.L

Case 1:22-cv-06913-JGK   Document 20   Filed 11/29/22   Page 15 of 15