

**JUDICIARY OF**

**ENGLAND AND WALES**

### District Judge (Magistrates' Court) Vanessa Baraitser
### In the Westminster Magistrates' Court

**Between:**

## THE GOVERNMENT OF THE UNITED STATES OF AMERICA

**Requesting State**

**-v-**

## JULIAN PAUL ASSANGE

**Requested Person**

**INDEX**                                                                          Page

A. Introduction                                                                    2
   a.     The Request                                        2
   b.     Procedural History (US)                    3
   c.     Procedural History (UK)                    4

B. The Conduct                                                                     5
   a.     Second Superseding Indictment         5
   b.     Alleged Conduct                            9
   c.     The Evidence                               15

C. Issues Raised                                                                   15

D. The US-UK Treaty                                                                16

E. Initial Stages of the Extradition Hearing                                       25
   a.  Section 78(2)                                           25

   b.  Section 78(4)                                           26
       I.    Section 78(4)(a)                    26
      II.   Section 78(4)(b)                         26
         i.   Section 137(3)(a): The Conduct      27
        ii.  Section 137(3)(b): Dual Criminality  27

|  |  | The first strand (count 2) | 33 |
|  |  | The second strand (counts 3-14,1,18) and Article 10 | 34 |
|  |  | The third strand (counts 15-17, 1) and Article 10 | 43 |
|  |  | The right to truth/ Necessity | 50 |
|  | iii. | Section 137(3)(c): maximum sentence requirement | 53 |

| F. | Bars to Extradition | | 53 |
|  | a. Section 81 (Extraneous Considerations) | | 53 |
|  |  | I.   Section 81(a) | 55 |
|  |  | II.  Section 81(b) | 69 |
|  | b. Section 82 (Passage of Time) | | 71 |

| G. | Human Rights | | 76 |
|  | a. Article 6 | | 84 |
|  | b. Article 7 | | 82 |
|  | c. Article 10 | | 88 |

| H. | Health – Section 91 | | 92 |
|  | a. Prison Conditions | | 93 |
|  |  | I.   Pre-Trial | 93 |
|  |  | II.  Post-Trial | 98 |
|  | b. Psychiatric Evidence | | 101 |
|  |  | I.    The defence medical evidence | 101 |
|  |  | II.   The US medical evidence | 105 |
|  |  | III.  Findings on the medical evidence | 108 |
|  | c. The Turner Criteria | | 111 |
|  |  | I.    A substantial risk | 112 |
|  |  | II.   The capacity to resist the impulse to suicide | 114 |
|  |  | III.  The risk he will succeed whatever steps are taken | 115 |

| I. | Abuse of Process | | 120 |
|  | a. Zagrewski Abuse | | 121 |
|  | b. The new allegations (excising the Request) | | 132 |

| J. | Orders | | 134 |

## A. INTRODUCTION

The Request

1. This is a request made by the Government of the United States of America ("the US") for the extradition of Julian Paul Assange. The US is represented by James Lewis QC, Claire Dobbin and Joel Smith. Mr. Assange is represented by Edward Fitzgerald QC, Mark Summers QC, Ben Cooper QC and Florence Iveson.

2. The United States of America ("the USA") is a Category 2 territory for the purposes of the Extradition Act 2003 ("the EA 2003"). The request is therefore governed by the provisions of Part 2 of the EA 2003, the Extradition Act 2003 (Commencement and Savings) Order 2003 and the Extradition Act 2003 (Designation of Part 2 Territories) Order 2003.

3. On 29 July 2020 the Secretary of State issued a certificate under s.70(8) of the EA 2003 certifying that the request for extradition is valid and that it has been made in the approved way.

**Procedural History (US)**

4. On 21 December 2017, a federal magistrate judge, in the Commonwealth of Virginia, issued a criminal complaint against Mr. Assange, charging him with conspiracy contrary to Title 18 of the US Code (the "U.S.C."), section 371. The offence alleged to be the object of the conspiracy was computer intrusion (Title 18 U.S.C. Section 1030).

5. On 6 March 2018, a federal grand jury returned an indictment against Mr. Assange charging him with conspiracy (contrary to Title 18, U.S.C. section 371) to commit unlawful computer intrusion (contrary to section 1030(a)(1) and (2)). The US submitted via diplomatic channels a provisional arrest request in relation to this charge.

6. On 23 May 2019, a federal grand jury returned a superseding indictment containing 18 counts alleging further offences related to the obtaining, receiving and disclosure of "National Defense Information" (contrary to the provisions of Title 18, U.S.C. sections 793(g), 793(b), 793 (c), 793 (d) and 793 (e)). On the same date, a warrant was issued by the US District Court for the Eastern District of Virginia, for the arrest of Mr. Assange for the offences specified in the superseding warrant. On 6 June 2019 the US submitted via diplomatic channels a request for Mr. Assange's extradition based on the charges in

the superseding indictment. The was supported by an affidavit of Kellen Dwyer dated 4 June 2019.

7. On 24 June 2020 a federal grand jury in Alexandria, Virginia returned a second superseding indictment charging Mr. Assange with 18 counts summarised below. On 20 July 2020 a request for extradition based upon the second superseding indictment was issued. It is supported by five declarations of Gordon Kromberg dated 17 January 2020 ("Kromberg first declaration"), 19 February 2020 ("supplemental Kromberg declaration"), 12 March 2020 ("second supplemental Kromberg declaration"), and 24 March 2020 ("third supplemental Kromberg declaration") and 17 July 2020 ("fourth supplemental Kromberg declaration"). On 7 September 2020 the initial extradition request was discharged and the extradition proceedings were opened.

## Procedural History (UK)

*Chronology*

8. The history of these extradition proceedings is as follows:

   a. On 2 December 2010, a European Arrest Warrant ("an EAW") was issued by a Swedish judicial authority, in respect of Mr. Assange, for offences of unlawful coercion, rape and molestation;

   b. On 7 December 2010, Mr. Assange was arrested in this jurisdiction pursuant to the EAW;

   c. On 14 December 2010, he was granted conditional bail;

   d. On 24 February 2011, following contested proceedings, extradition to Sweden was ordered. He was released on bail with a duty to surrender to this court on 29 June 2012. He failed to return to court and a warrant was issued by Westminster Magistrates' Court for his arrest;

   e. On 30 May 2012, the Supreme Court rejected his appeal against the extradition order;

   f. On 14 June 2012, his application for leave to reopen the appeal was refused;

   g. On 19 June 2012, he entered the Embassy of Ecuador in London, where he remained for the next seven years;

   h. On 12 August 2015, three of the allegations in Sweden became time barred, the allegation of rape remained outstanding;

   i. On 19 May 2017, the Swedish prosecutor announced that she was discontinuing the prosecution against Mr. Assange;

j.  On 21 December 2017, Mr. Assange was granted diplomatic status by the Ecuadorian government;

k.  On 22 December 2017, a diplomatic note from the US requested Mr. Assange's provisional arrest pursuant to a criminal complaint;

l.  On 22 December 2017, Westminster Magistrates' Court issued a warrant for Mr. Assange's arrest.

m.  On 6 March 2018, a federal grand jury in the US returned an indictment against Mr. Assange, charging him with conspiracy to commit unlawful computer intrusion;

n.  On 11 April 2019, Mr. Assange was arrested at the Ecuadorian embassy and brought before Westminster Magistrates' Court where he was convicted of an offence under s.6(1) of the Bail Act 1976 and committed to the Crown Court for sentence;

o.  On 1 May 2019, Mr. Assange was sentenced at the Crown Court at Southwark, to imprisonment for 50 weeks;

p.  On 23 May 2019, a superseding indictment was returned in the US;

q.  On 24 June 2020, a second superseding indictment was returned charging Mr. Assange with the 18 counts summarised below;

r.  On 29 July 2020, the Secretary of State issued a certificate certifying that the request was valid;

s.  On 7 September 2020, Mr. Assange was arrested on the new request and brought before the court.

9. The evidential hearing took place in February and September 2020, with the first part heard between 24 February and 28 February 2020 at the Woolwich Crown Court and the second part between 7 September 2020 and 1 October 2020 at the Central Criminal Court. Closing submissions were received in writing, by the defence on 6 November and 1 December 2020 (in reply) and by the US on 20 November 2020. Judgment was reserved to 4 January 2021.

10. On 11 April 2019 Mr. Assange was remanded into custody and he has remained in custody throughout these proceedings.

## B. CONDUCT

**Second Superseding Indictment**

11. The second superseding indictment contains the following 18 counts:

a. *Count 1: Conspiracy to Obtain, Receive, and Disclose National Defense Information, contrary to Title 18, U.S.C. section 793(g),* punishable by a maximum penalty of ten years' imprisonment. It is alleged that, between 2009 and 2015, outside any particular state or district of the US, Mr. Assange conspired with others known and unknown to commit the following offences: (i) first, to obtain documents relating to national defence including Guantánamo Bay detainee assessment briefs ("the detainee assessment briefs"), US Department of State cables ("the diplomatic cables"), and Iraq rules of engagement files; (ii) to receive and obtain documents relating to the national defence, including the detainee assessment briefs, the diplomatic cables and the Iraq rules of engagement files; (iii) to "communicate" the detainee assessment briefs, the diplomatic cables and the Iraq rules of engagement files to the extent that they contained the names of individuals in Afghanistan, Iraq and elsewhere in the world who risked their safety and freedom by providing information to the US and its allies, from those with lawful possession to those not entitled to receive them; (iv) with Bradley Manning (now known as Chelsea Manning and hereafter referred to as 'Ms. Manning'), to "communicate" the detainee assessment briefs, the diplomatic cables, and Iraq rules of engagement files, and for Mr. Assange to "communicate" to "certain individuals" and the public (unspecified) documents containing the names of individuals in Afghanistan, Iraq and elsewhere in the world who risked their safety and freedom by providing information to the US and its allies, from those in unauthorised possession of these documents to those not entitled to receive them.

b. Count 2: *Conspiracy to Commit Computer Intrusion contrary to Title 18 U.S.C, section 371,* punishable by a maximum penalty of five years' imprisonment. It is alleged that, between 2009 and 2015, outside any particular state or district of the US, Mr. Assange conspired with others, both known and unknown, to access a computer without authorisation in order to obtain classified information, believing that the information would be used to the injury of the US or to the advantage of a foreign nation; intentionally accessed a protected computer without authorisation in order to obtain information; knowingly caused the transmission of information causing

damage and specified loss to the computer;  and intentionally  accessed a protected computer causing the same specified loss.

c.  Counts 3 and 4: *Unauthorised Obtaining of National Defense Information contrary to Title 18, U.S.C, section 793(b)*, punishable  by a maximum  penalty of ten years' imprisonment.  It is alleged that, between November 2009 and May 2010, outside any particular state or district of the US, Mr. Assange knowingly  and unlawfully  obtained, aided, abetted, counselled, induced, procured and wilfully  caused Ms. Manning  to receive and obtain the following  documents, classified as secret: diplomatic  cables (Count 3) and Iraq rules of engagement files (Count 4). It is alleged that he had reason to believe that the information  would be used to damage the interests of the US or used to the advantage of a foreign nation.

d.  Count 5: *Unauthorised Obtaining of National Defense Information contrary to Title 18, U.S.C. section 793(c)* punishable  by a maximum  penalty of ten years' imprisonment.  It is alleged that, between November 2009 and May 2010, outside any particular state or district of the US, Mr. Assange knowingly  and unlawfully  attempted to receive and obtain information,  stored on the Secret Internet Protocol Network ("SIPRNet"), classified  as secret and relating to national defence. It is alleged that he had reason to believe that the information  would be used to damage the interests of the US or used to the advantage of a foreign nation.

e.  Counts 6, 7 and 8: *Unauthorised Obtaining of National Defense Information contrary to Title 18, U.S.C, section 793(c)* punishable  by a maximum  penalty of ten years imprisonment.  It is alleged that between November 2009 and May 2010, outside any particular state or district of the US, Mr. Assange knowingly  and unlawfully  received and obtained documents connected with the national defence and classified as secret the following  documents: detainee assessment briefs (Count 6) the diplomatic  cables (Count 7) and the Iraq rules of engagement (Count 8). It is alleged that he knew or had reason to believe that at the time he received and obtained this information,  it had been obtained by a person in breach of Chapter 37 of Title 18 of the U.S.C.

f.  Counts 9 - 11: *Unauthorised Disclosure of National Defense Information contrary to Title 18, U.S.C section 793(d)*, punishable  by a maximum  penalty of ten years' imprisonment.  It is alleged that, between November 2009 and May 2010, outside any particular state or district of the US, Mr. Assange, together with others unknown,

aided, abetted, counseled, induced, procured and wilfully caused Ms. Manning who had lawful possession of, and access to, the following documents classified as secret, to transmit them to him: detainee assessment briefs (Count 9), diplomatic cables (Count 10) and Iraq rules of engagement files (Count 11).

g. Counts 12 - 14: *Unauthorised Obtaining of National Defense Information contrary to Title 18, U.S.C, section 793(e),* punishable by a maximum penalty of ten years' imprisonment. It is alleged that, between November 2009 and May 2010, outside any particular state or district of the US, Mr. Assange, together with others unknown, aided, abetted, counseled, induced, procured and wilfully caused Ms. Manning, who had unauthorised possession of, and access to, the following documents classified as secret and related to the national defence, to transmit them to him: detainee assessment briefs (Count 12), diplomatic cables (Count 13) and Iraq rules of engagement files (Count 14).

h. Counts 15 - 17: *Unauthorised Disclosure of National Defense Information contrary to Title 18, U.S.C section 793(e),* punishable by a maximum penalty of ten years imprisonment. It is alleged that, between July 2010 and April 2019, outside any particular state or district of the US, Mr. Assange, having unauthorised possession of, access to and control over the following documents relating to national defence, communicated these documents to persons not authorised to receive them, by distributing and then publishing them and causing them to be published on the internet: significant activity reports from the Afghanistan war (Count 15), significant activity reports from the Iraq war (Count 16) and diplomatic cables (Count 17). The documents are alleged to have contained the names of individuals who risked their safety and freedom by providing information to the US and their allies.

i. Count 18: *Unauthorised Obtaining of National Defense Information contrary to Title 18, U.S.C section 793(b),* punishable by a maximum penalty of ten years' imprisonment. It is alleged that, between November 2009 and May 2010, outside any particular state or district of the US, Mr. Assange, together with others unknown aided, abetted, counseled, induced, procured and wilfully caused Ms. Manning to obtain detainee assessment briefs. It is alleged that he had reason to believe the information would be used to damage the interests of the US or used to the advantage of a foreign nation:

**The Alleged Conduct**

*Allegations against Mr. Assange relating to Ms. Manning*

12. In 2009, Ms Manning was an intelligence analyst in the US Army. She was deployed to the Forward Operating Base Hammer in Iraq. Ms Manning held a "Top Secret" security clearance and had signed a classified information non-disclosure agreement. Between January and May 2010, she downloaded the following documents, many of which were classified as secret: approximately 250,000 diplomatic cables, approximately 75,000 Afghanistan significant activity reports (also known as the Afghan war logs), approximately 400,000 Iraq significant activity reports (also known as the Iraq war logs) and approximately 800 detainee assessment briefs, and provided them to Mr. Assange and WikiLeaks. Documents are classified as secret if their unauthorised disclosure could reasonably be expected to cause serious damage to the national security.

13. It is alleged that WikiLeaks solicited material by publishing a list of information it wished to obtain, its "Most Wanted Leaks". In November 2009 this list included: "*Bulk Databases*" including "*Intellipedia*", (a non-public CIA database) and classified "*Military and Intelligence*" documents. In December 2009, Mr. Assange and a WikiLeaks affiliate gave a presentation to the 26th Chaos Communication Congress in which WikiLeaks described itself as "*the leading disclosure portal for classified, restricted or legally threatened publications*." In 2009 Mr. Assange spoke at the "Hack in the Box Security Conference" in Malaysia in which he made reference to a "*capture the flag*" hacking contest and noted that WikiLeaks had its own list of flags that it wanted captured.

14. It is alleged that Ms. Manning responded to the list by searching databases or servers, using a US classified information-network search engine, for information which corresponded to it. For example, on 28 November 2009, Ms. Manning searched "Intelink," a classified Department of Defence ("DoD") network search engine, for "retention+of+interrogation+videos." The following day she searched the classified network for "detainee+abuse," which was consistent with an entry on the list for "Detainee abuse photos withheld by the Obama administration". On 8 December 2009, she ran several searches on Intelink relating to Guantánamo Bay detainee operations, interrogations, and standard operating procedures ("SOPs") consistent with an entry on

the list for "*Guantánamo Bay operating and interrogation Standard Operating Procedures*". It is stated that many of the classified document that Ms. Manning provided to Mr. Assange were uploaded through a Secure File Transfer Protocol ("SFTP") connection to a cloud drop box operated by Wikileaks and into a specific directory which had been created for Ms Manning. Ms. Manning used the SFTP connection to upload 250,000 diplomatic cables to the cloud drop box.

15. On 22 March 2010, she downloaded the Iraq rules of engagement files from SIPRNet, and between 28 March and 9 April 2010 she downloaded the diplomatic cables, all of which were consistent with the materials WikiLeaks sought.

16. Between November 2009 and May 2010, Ms. Manning was in direct contact with Mr. Assange using a chatlog (the "Jabber communications"). On 8 March 2010, it is alleged that Mr. Assange agreed to assist Ms. Manning in cracking a password hash stored on a DoD computer. Mr. Assange indicated that he was "*good"* at "*hash-cracking"* and that he had rainbow tools (a tool used to crack Microsoft password hashes). Ms. Manning provided him with an alphanumeric string. This was identical to an encrypted password hash stored on the Systems Account Manager (SAMS) registry file of a SIPRNet computer, used by Ms. Manning, and associated with an account that was not assigned to any specific user. Mr. Assange later told her that he had no luck yet and asked for more "*hints.*" It is alleged that, had they succeeded in cracking the encrypted password hash, Ms. Manning might have been able to log on to computers connected to the classified SIPRNet network under a username that did not belong to her, making it more difficult for investigators to identify her as the source of the disclosures. It is specifically alleged that Mr. Assange entered into this agreement to assist Ms Manning's ongoing efforts to steal classified material.

17. Other communications on the chatlog included:

    a. On 7 March 2010, Ms. Manning asked Mr. Assange how valuable the detainee assessment briefs would be. After confirming that Mr. Assange thought they had value, Ms. Manning told Mr. Assange that she was "*throwing everything [she had] on JTF GTMO [Joint Task Force, Guantánamo] at [Assange] now.*" Mr. Assange responded, "*ok, great*!"

    b. On 8 March 2010, when Ms. Manning brought up the "OSC" (the CIA Open Source Center), Mr. Assange replied, "*that's something we want to mine entirely, btw,*"

    c.  On 10 March 2010, Ms. Manning told Mr. Assange in reference to the detainee assessment briefs that "*after this upload, that's all I really have got left.*" In response to this statement, Mr. Assange replied, "*curious eyes never run dry in my experience*".

    d.  The Jabber communications also show them discussing measures to prevent the discovery of Ms. Manning as Mr. Assange's source, such as clearing logs, the use of a "cryptophone', and a code phrase to use if something went wrong.

18. During 2010 and 2011 Wikileaks published the materials which had been obtained from Ms. Manning.

*Damage caused by the "Manning" disclosures*

19. It is alleged that disclosing the Iraq rules of engagement files would allow enemy forces in Iraq to anticipate actions or responses by US armed forces and to carry out more effective attacks. It is alleged that the unredacted diplomatic cables included the names of people, including journalists, religious leaders, human rights activists and political dissidents, who provided information to the US government in circumstances where they expected their identity to be treated as confidential and who had put their personal safety at great risk by providing information to the US. The Afghanistan and Iraq significant activity reports contained the names of local Afghans and Iraqis who had provided information to the US and coalition forces. It is alleged that Mr. Assange published these reports knowing that it put these named individuals at serious risk of harm.

20. It is alleged that as a result of the Wikileaks publications, hundreds of people were identified by US forces as being "*at risk*":some were relocated; some have "*disappeared*" (although the US cannot prove that their disappearance was the result of being outed by WikiLeaks); and some have been arrested or investigated by the countries in which they live. The US provides examples of diplomatic cables containing source names at §486 of their closing submissions: C1 revealed the identity of an Afghan source who gave details of a planned attack on coalition forces; C2 identified an Afghan source who identified a weapons supplier; D1 identified Iraqi sources who provided information on an IED attack; D2 identified an Iraqi source who had turned in weapons to coalition forces and faced threats as a result; A1 identified an Iranian source who required protection.

21. On 2 May 2011, a raid by US Armed Forces on the compound of Osama Bin Laden in Abbottabad, Pakistan, revealed correspondence to show that Bin Laden had obtained the Afghanistan significant activity reports and diplomatic cables from the WikiLeaks website. On 30 July 2010, the New York Times published an article entitled "*Taliban Study WikiLeaks to Hunt Informants*" stating that after the release of the significant activity reports, a member of the Taliban had contacted the New York Times and stated: "*we are studying the report. We knew about the spies and people who collaborate with US forces. We will investigate through our own secret service whether the people mentioned are really spies working for the US. If they are US spies then we will know how to punish them*".

22. The request states that Mr. Assange knew of the dangers. For example, in an interview with the US television programme 60 Minutes, when asked about the above newspaper report, he stated, "*the Taliban is not a coherent outfit, but we don't say that it is absolutely impossible that anything we ever publish will ever result in harm – we cannot say that*". In August 2010, in an interview at the Frontline Club in London, Mr. Assange called it "*regrettable*" that sources disclosed by WikiLeaks "*may face some threat as a result*". In the same interview he stated, "*we are not obliged to protect other people's sources, military sources or spy organisation sources, except from unjust retribution*" adding, "*there are numerous cases where people sell information or frame others or are engaged in genuinely traitorous behaviour. Actually, that is something for the public to know about*". On 27 November 2010, shortly before he published the diplomatic cables, he was informed by the US State Department's legal adviser that their publication would "*place at risk the lives of countless innocent individuals - from journalists to human rights activists and bloggers to soldiers to individuals providing information to further peace and security*".

*Allegations not related to Ms. Manning*

23. It is alleged that Mr. Assange and WikiLeaks also sought to enter into agreements with a number of identified (but unnamed) computer hackers, to access parliamentary phone call audio recordings from another "NATO country", to access the computer of a former Wikileaks associate (Teenager), to access the computer systems of a cyber security company (Gnosis/Teenager), to access two hundred US and state government email

accounts (Laurelai), to access the computer systems of a company called Intelligence Consulting Company (Sabu and Hammond) and to access data from two US police associations (Hammond).

*Teenager*

24. In early 2010, Mr. Assange met a 17-year old in "NATO country 1" ("Teenager"). It is alleged that Mr. Assange and Teenager failed in a joint attempt to decrypt a file stolen from a "NATO country 1" bank. On or before summer 2010, Mr. Assange put Teenager in charge of WikiLeaks's Internet Relay Chat ("IRC") channel. He also asked Teenager to hack into computers to obtain information including audio recordings of phone conversations between high-ranking officials, including members of the Parliament, of the government of "NATO country1". It is alleged that, in September 2010, Mr. Assange directed Teenager to hack into the computer of a former Wikileaks associate and delete chat logs of statements made by Mr. Assange. When Teenager asked how that could be done, Mr. Assange told him that the WikiLeaks associate could "*be fooled into downloading a trojan,*" and asked Teenager about the operating system the WikiLeaks associate used.

25. It is alleged that Mr. Assange kept Ms. Manning informed about these hacking activities: on 5 March 2010, he told her that he had received stolen bank documents from a source (Teenager); on 10 March 2010, he told her that, in response to a "*list of things we wanted*", a source had provided him with four months of recordings from phones located within the Parliament of a "NATO country 1"; on 17 March 2010, he told her that he had used the access, given to him by a source, to obtain unauthorised access a government website used to track police vehicles, in "NATO country 1".

'*Gnosis*'

26. It is alleged that "Laurelai" and Kayla, both described as hackers and members of the hacking group 'Gnosis', contacted Teenager and told him that they were willing to commit computer intrusions on behalf of WikiLeaks. In January 2011, Mr. Assange approved an arrangement for the Gnosis group to provide its services to Wikileaks. On 7 February 2011, Teenager told Mr. Assange that Gnosis had hacked a US Cybersecurity Company. On 11 February 2011, Teenager provided Mr. Assange with computer code that Kayla had obtained through hacking. On 15 March 2011, Laurelai emailed WikiLeaks

(through Teenager) a list of approximately two hundred purported passwords to US and state government email accounts.

*"LulzSec"*

27. On 24 May 2011, a television network aired a documentary about WikiLeaks which included negative coverage. On 29 May 2011, members of a group calling itself LulzSec which included Kayla, Sabu, and Topiary, publicly claimed that, in retaliation, they had hacked into the network's computers and published passwords used by its journalists, affiliates, and employees. Teenager told Topiary, *"[m]y main purpose here is mainly to create some kind of a connection between LulzSec and Wikileaks"* and Topiary had replied, *"if we do get a /massive/ cache of information, we'd be happy to supply you with it."* Teenager later added, *"WikiLeaks cannot publicly be taking down websites, but we might give a suggestion of something or something similar, if that's acceptable to LulzSec.* On 7 June 2011, Sabu was arrested.

28. On 29 December 2011, Jeremy Hammond, a hacker affiliated with LulzSec and another group, AntiSec, told other hackers on an IRC channel called "#Lulzxmas" that information, hacked from a company the Intelligence Consulting Company, was being sent to WikiLeaks. Hammond told Sabu that he had been "partnering" with someone at WikiLeaks whom he believed was Mr. Assange. In the same chat, Hammond informed a person named elChe and others in the group, *"JA almost done copying the files."* Hammond also told elChe that there should be *"no leaks about this partnering."*

29. On 31 December 2011, WikiLeaks tweeted "*#antisec owning Law enforcement in 2012.*" It included links to emails and databases confirming that Hammond and AntiSec had hacked two US state police associations. On 3 January 2012, WikiLeaks tweeted a link to information which LulzSec/AntiSec had hacked and published in 2011 headed, "*Anonymous/Antisec/Luzsec releases in 2011.*" In January 2012, Hammond told Sabu that "JA" had provided Hammond with a script to search the emails stolen from Intelligence Consulting Company, and that "JA" would provide the script to associates of Hammond as well. Hammond also introduced Sabu via Jabber to "JA." In January and February 2012, Sabu used the chatlog Jabber to communicate with Mr. Assange. On 27 February 2012, WikiLeaks began publishing emails that Hammond and others hacked from the Intelligence Consulting Company. On 27 February 2012 Hammond told Sabu, "*we started giving JA*" materials that had been obtained from other hacks. On 28 February 2012

Hammond complained to Sabu that the incompetence of his fellow hackers was causing him to fail to meet estimates he had given to Mr. Assange about the amount of hacked information he expected to provide to WikiLeaks, stating, "*can't sit on all these targets dicking around when the booty is sitting there ... especially when we are asked to make it happen with WL. We repeated a 2TB number to JA. Now turns out it's like maybe 100GB. Would have been 40-50GB if I didn't go and get all the mail from [foreign cybersecurity company]*." Hammond then asked for help with ongoing computer intrusion committed by his associates against victims including a US law enforcement entity, a US political organisation, and a US cybersecurity company. In March 2012, Hammond was arrested.

*"Snowden"*

30. In June 2013, media outlets reported that Edward J. Snowden had leaked numerous documents taken from the National Security Agency and was in Hong Kong. It is alleged that, to encourage leakers and hackers to provide stolen materials to WikiLeaks, Mr. Assange and others at WikiLeaks openly displayed their attempts to assist Snowden to evade arrest.

**Evidence**

31. I have been provided with a vast amount of evidence in this case, which is summarised in the consolidated annex to this decision. It is inevitable that I only make reference to a small portion of that evidence where it is directly relevant to the issues that I have to determine.

32. Initially, the US objected to the admissibility of some defence evidence on the basis that it was not relevant to the proceedings. The defence arguments against extradition are numerous, complex and, in some instances, novel. I took the view that the court would be better placed to decide on the relevance of witnesses after it had heard from them. I indicated to the parties that I would admit the defence evidence *de benne esse* and determine its relevance at the end of the case, having invited the parties' views. In the event, the US decided not to object formally to the evidence and no rulings on admissibility were required from the court.

**C. ISSUES RAISED**

33. The following issues were raised on behalf of Mr. Assange:

    a. That the UK-US Extradition Treaty prohibits extradition for a political offence and this court therefore lacks jurisdiction to hear this case;

    b. That the allegations do not meet the "dual criminality" requirements of section 137 of the EA 2003;

    c. That extradition would be unjust and oppressive by reason of the lapse of time, pursuant to section 82 EA 2003;

    d. That extradition is barred by reason of extraneous considerations, pursuant to section 81(a) and (b) of the EA 2003;

    e. That extradition is in breach of the European Convention on Human Rights ("the ECHR") and should be refused, pursuant to section 87 of the EA 2003:

        i. Article 3 (inhuman and degrading treatment);

        ii. Article 6 (denial of a right to a fair trial);

        iii. Article 7 (it would involve a novel and unforeseeable extension of the law);

        iv. Article 10 (right to freedom of expression);

    f. That extradition should be refused because it would be unjust and oppressive by reason of Mr. Assange's mental condition and the high risk of suicide pursuant to section 91 of the EA 2003;

    g. That extradition would be an abuse of process:

        i. The request misrepresents the facts [*Castillo v Spain* [2005] 1 WLR 1043, *Spain v Murua* [2010] EWHC 2609 (Admin), and *Zakrzewski v Regional Court in Lodz, Poland* [2013] 1 WLR 324];

        ii. The prosecution is being pursued for ulterior political motives and not in good faith [*R (Bermingham and Others) v Director of the Serious Fraud Office* [2007] QB 727 and *R (Government of the USA) v Bow Street Magistrates' Court* [2007] 1 WLR 1157 ("*Tollman*")].

## D.  THE UK-US EXTRADITION TREATY

*Submissions of the parties*

34. Article 4 of the extradition treaty between the UK and the US ("the 2003 UK-US treaty") provides that extradition shall not be granted if the offence for which extradition is

requested is a political offence. The defence submits that the offences in this request are political offences, for reasons set out below, and that the request is therefore made in breach of express terms of the treaty. The defence submits that, since the incorporation of the ECHR into English law, a court must decide the lawfulness of detention pursuant to Article 5(4) of the ECHR. In an extradition context, in the case of *R (Kashamu) v Governor of Brixton Prison* [2002] QB 887, the court confirmed that the lawfulness of a person's detention under Article 5 will depend on whether the detention is lawful under English domestic law, complies with the general requirements of the Convention and is not open to criticism for arbitrariness (§32). The defence submits that where a request is made in breach of the very treaty which governs the legality of a requested person's extradition, it would violate the rule of law and render their detention both arbitrary and inconsistent with Article 5 of the ECHR.

35. The defence further submits that this amounts to an abuse of process. Article 1 of the 2003 UK-US treaty states that "*the Parties agree to extradite to each other, pursuant to the provisions of this treaty*" and the defence submits that a UK court should be expected to honour the protections that the treaty guarantees. The defence supports its submission by reference to two cases in which an abuse of process was found following a prosecution in breach of the terms of the Convention Relating to the Status of Refugees ("the 1951 Refugee Convention"). In *R v Uxbridge Magistrates Court, ex parte Adimi* [2001] QB 667, the defendant had been prosecuted in breach of protections provided by Article 31 of the 1951 Refugee Convention. The prosecution was found to be an abuse of process even though the 1951 Refugee Convention was not incorporated into English law. The case was upheld and applied in *R v Asfaw* [2008] 1 AC 1061. Further, where detention and the extradition proceedings as a whole stand and fall together, the defence submits that the court must prevent its process from abuse by discharging the request. Support for this is found in the observations of Lord Mance in *Pomiechowski v District Court of Legnica, Poland* [2012] 1 WLR 1604), where he stated at §§24-26:

> "...As the Board [in Fuller] made clear the abuse alleged went, in that case also, to the extradition as much as to any prior detention...Where detention and the extradition proceedings as a whole stand and fall together, according to whether or not they involve an abuse of process, then Fuller suggests that article 5.4 may be an effective means by which a root and branch challenge to extradition may be pursued..."

36. The defence also relies on the case of *R v Mullen* [2000] QB 520 in which the court found that the British authorities initiated and subsequently assisted in and procured the

deportation of a defendant, who was wanted by the police in England for criminal offences, by unlawful means. He had been denied access to a lawyer, contrary to Zimbabwean law and internationally recognised human rights. Following conviction for the offences, the court quashed the decision on the basis that the prosecution itself had been an abuse of process.

37. Regarding the term "political offences" the defence submits that almost all of the offences alleged against Mr. Assange are brought under the Espionage Act 1917 (now codified in title 18 U.S.C. chapter 37 "Espionage and Censorship"). It is submitted that the "defining legal characteristic" of all 18 offences is an intention to obtain or disclose US government state secrets in a manner that was damaging to the security of the government. The defence point in particular to the distinction between the concept of a "purely political offence", that is an offence against the state or directed solely against the political order, and a "relative political crime", that is a common crime which can be shown to be "political" in the context in which it occurred. Various attempts have been made in the authorities and by commentators to describe the terms "political offence" and "espionage". the defence submits that as espionage is by definition a crime directed against the political order of the state, it is an example of a purely political offence. For example, it is alleged that Mr. Assange's purpose was to damage "*the work of the security and intelligence of the US'* and to '*damage the capability of the armed forces of the USA to carry out their tasks; and endanger the interests of the United States of America abroad" (Dwyer request, §4).* Even if these allegations are considered to be common crimes, the conduct is directed against the interests of the state and will nevertheless amount to a political offence.

38. The US in response submits that a treaty cannot alter UK law unless incorporated by statute and that a court has no power to enforce its terms (see for example comments of Lord Templeman and Lord Oliver to this effect in *JH Rayner (Mincing Lane) Ltd v Department of Trade and Industry* [1990] 2 AC 418 set out below). Where the words of a statute are clear, it is these that must be applied, regardless of the terms of a treaty (see *R v Secretary of State for the Home Department, Ex parte Brind* [1991] 1 A.C. 696 and *R v Lyons* [2003] 1 AC 976) and confirmed in an extradition context in *Norris v The Secretary of State for the Home Department* [2006] EWHC 280 (Admin), below). The US submits that the EA 2003 provides a self-contained regime for extradition, contains

no device for the incorporation of the term of an extradition treaty and abolished the protection for political offences provided by previous Extradition Acts. Where bilateral treaties have been relied on in cases (see *R. v Governor of Pentonville Prison Ex p. Sinclair* [1991] 2 A.C. 64 and *R (In Re Guisto* (FC) [2004] 1 A.C. 101), the treaty had been expressly incorporated into domestic law.

39. In relation to abuse of process, the US points out that Simon Brown LJ subsequently doubted that his conclusion in *Adimi*, (that it would be an abuse of process to bring a prosecution when this would breach the terms of a treaty), could be relied upon (see *R (European Roma Rights) v Prague Immigration Officer* [2004] QB 811). Both cases involved Article 31 of the 1951 Refugee Convention. In the extradition context, however, the High Court in *Arranz v The 5th Section of the National High Court of Madrid, Spain* [2016] EWHC 3029 (Admin) ("*Arranz*") expressly rejected the argument that Article 31 created a legitimate expectation which was enforceable in domestic law.

40. Finally, the US argues that any political offence exception would not apply in any event. Wikileaks which describes itself as an "*intelligence agency of the people*", was engaged in obtaining classified materials from numerous countries, it was not locked in a battle with a single state as classically described by the authorities on political exception. The US reminds the court that any publishing charges against Mr. Assange are limited to documents containing the unredacted names of sources.

*Discussion*

41. The defence has not established that the 2003 UK-US treaty confers rights on Mr. Assange which are enforceable in this court.

42. First, it is established in *JH Rayner (Mincing Lane) Ltd v Department of Trade and Industry* [1990] 2 AC 418 ("*Raynor*") that the provisions of a treaty do not in themselves confer rights on an individual. It is only after a treaty has been incorporated into domestic law, as occurred when the ECHR was incorporated into domestic law by the Human Right Act 1998, that the treaty confers rights enforceable in a court.

43. In relation to the court's duty to enforce legislation not the provisions of a treaty, Lord Templeman stated at page 476E:

> "Losing the construction argument, the appellants put forward alternative submissions which are unsustainable. Those submissions, if accepted, would involve a breach of the British constitution and an invasion by the judiciary of the functions of the Government and of Parliament. The Government may negotiate, conclude, construe, observe, breach, repudiate or terminate a treaty. Parliament may alter the laws of the United Kingdom. The courts must enforce those laws; judges have no power to grant specific performance of a treaty or to award damages against a sovereign state for breach of a treaty or to invent laws or misconstrue legislation in order to enforce a treaty."

44. In relation to the fact that a treaty does not alter laws made by Parliament, Lord Templeman stated at page 476H,

> "A treaty to which Her Majesty's government is a party does not alter the laws of the United Kingdom. A treaty may be incorporated into and alter the laws of the United Kingdom by means of legislation; except to the extent that a treaty becomes incorporated into the laws of the United Kingdom by statute; the courts of the United Kingdom have no power to enforce treaty rights and obligations at the request of a sovereign government or at the request of a private individual."

45. In relation to a treaty not conferring rights enforceable in a court in the UK, Lord Templeman stated at page 481B,

> "The courts of the United Kingdom have no power to enforce, at the behest of any sovereign state or at the behest of any individual citizen of any sovereign state, rights granted by a treaty or obligations imposed in respect of a treaty by international law."

46. On a treaty not conferring right on an individual unless it has been incorporated into English law, Lord Oliver stated at page 500B:

> "As a matter of constitutional law of the United Kingdom, the Royal Prerogative, while it embraces the making of treaties, does not extend to altering the law or conferring rights upon individuals or depriving individuals of rights which they enjoy in domestic law without the intervention of Parliament. Treaties, as it is sometimes expressed, are not self-executing. Quite simply, a treaty is not part of English law unless and until it has been incorporated into the law by legislation. So far as individuals are concerned, it is res inter alios acta from which they cannot derive rights and by which they cannot be deprived of rights or subjected to obligations; and it is outside the purview of the court not only because it is made in the conduct of foreign relations, which are a prerogative of the Crown, but also because, as a source of rights and obligations, it is irrelevant."

47. On a court not having the power to enforce a provision contained within a treaty but omitted from legislation, Lord Oliver at page 512A stated:

> "If the treaty contained such a provision and Parliament had not seen fit to incorporate it into municipal law by appropriate legislation, it would not be for the courts to supply what Parliament had omitted and thus to confer on the Crown a power to alter the law without the intervention of the legislature".

48. Secondly, *The Queen on the Application of Ian Norris v The Secretary of State for the Home Department* [2006] EWHC 280 (Admin) ("*Norris*") confirms that the principles set out in *Raynor* above apply in the extradition context. *Norris* concerned the terms of the UK-US extradition treaty of 1972, the predecessor to the 2003 UK-US treaty. The President of the Queen's Bench Division considered whether a statutory instrument, which included the US as a designated territory and which, as a result removed certain obligations imposed on the US by the 1972 treaty, should be enforced. In deciding that the statutory instrument should be enforced, notwithstanding its contradiction with the treaty, the President stated at paragraph 44:

> "Mr Jones was unable to show any previous authority in the United Kingdom which suggested that the 1972 Treaty, standing alone, created personal rights enforceable by its individual citizens. The treaty specified the circumstances in which the governments of the United Kingdom and US agreed that extradition would, or would not, take place and they bound themselves to a series of pre-conditions which would govern the extradition process. Thereafter, the rights of citizens of the United Kingdom were governed by domestic legislative arrangements which ensured that the extradition process should be subject to judicial oversight, in an appropriate case, extending as far as the House of Lords in its capacity as the final appellate court. The treaty reflected the relationship agreed between the United Kingdom and the US for the purposes of extradition, rather than the municipal rights of United Kingdom citizens, enforceable against their own government. In brief, therefore their rights were provided and guaranteed, not by treaty, but by domestic legislation."

49. This confirms the nature of an extradition treaty, as an agreement between governments which reflects their relationship for the purposes of extradition. It is made between sovereign states on the proviso that it is not governed by the domestic law of either state. *Norris* also provides a clear example, within an extradition context, of the court enforcing the provisions of domestic legislation notwithstanding the terms of a treaty.

50. Thirdly, when it enacted the EA 2003, Parliament clearly took the decision to remove the political offences bar which had previously been available to those facing extradition. As the US point out, it cannot then be for this court to act against this clear intention, by re-instating the bar through the enforcement of the provisions of a treaty. Under all previous extradition legislation from 1870 until 1989, a political offence exception was expressly included. Section 3(1) of the Extradition Act 1870 read:

> (1) A fugitive criminal shall not be surrendered if the offence in respect of which his surrender is demanded is one of a political character, or if he prove to the satisfaction of the police magistrate or the court before whom he is brought on habeas corpus, or to the Secretary of State, that the requisition for his surrender has in fact been made with a view to try or punish him for an offence of a political character.

51. Section 6(1) of the Extradition Act 1989 read:

**6.— General restrictions on return.**
(1)  A person shall not be returned under Part III of this Act, or committed or kept in custody for the purposes of return, if it appears to an appropriate authority—
(a)  that the offence of which that person is accused or was convicted is an offence of a political character;

52. Against this background, in which the protection appeared in successive Extradition Acts (such previous legislation as Mr. Fitzgerald accepted, providing an aid to the statutory construction of the current Extradition Act), the removal of this bar is a clear indication that Parliament no longer intended for the protection to be available.

53. The EA 2003 created a new extradition regime, described in *Norris* as a "*wide-ranging reform of the law*" (§45). As the US points out, it is a prescriptive regime, setting out the sole statutory basis on which a court is obliged to deal with matters, and does so in a series of imperative steps the court must follow. These steps no longer include a consideration of the political character of an offence, and there is no opportunity, within the scheme of the EA 2003, to raise this as an objection to extradition. The EA 2003 retained the bar to extradition where the request is made for the purpose of prosecuting the requested person on the basis of their political opinions, pursuant to section 81 (the political opinion bar), but removed the protection for offences which have the character of a political offence.

54. Nor should the court re-instate the protection, by implying it into section 81 of the EA 2003 (the political opinion bar). In previous Extradition Acts, these two protections were provided for separately. When the EA 2003 was passed, Parliament decided to re-enact only one of these protections (the political opinion exception). It is not for the courts to re-introduce the political offence provisions, using section 81. Nor did Parliament choose to amend the EA 2003 to reflect the terms of the 2003 UK-US treaty which had been signed on 31 March 2003, or to amend it after it had been ratified in 2007.

55. All of this indicates a deliberate intention by Parliament to remove this protection.

56. Fourthly, the defence submits that this protection is "*one of the most fundamental protections recognised in international and extradition law*". However, its removal from most modern extradition treaties is noted by the authors of *Nicholls Montgomery Knowles*, 3rd ed., as an "*international trend*". They go on to acknowledge that it was also removed from the EA 2003 at §5.41: '*...In the EA 2003 Parliament took this process to its*

*conclusion by removing entirely the political offence exception to extradition for both Category 1 and Category 2 countries...'.*

57. Fifthly,  the defence relies on the *Adimi* and *Afwar* cases to demonstrate that courts have previously  found that treaty provisions  not yet incorporated into domestic law can nevertheless create a legitimate  expectation that they will be honoured, in particular in relation to Article 31 of the 1951 Refugee Convention.  However, as the US has pointed out, Simon Brown LJ who gave the judgment of the court in *Adimi* returned to the issue in *R (European Roma Rights) v Prague Immigration Officer* [2004] QB 811 and at §51 expressly commented that his views on this topic "*are to be regarded as at best superficial*" and that "*the conclusion I reached there* [in *Adimi*]*, with regard to the legitimate expectations of asylum seekers to the benefits of article 31, is suspect.*"

58. Further, in the subsequent case of *Arranz,* in which it was argued that Article 31 of the Refugee Convention  provided a defence to extradition, the High Court, rejected this argument and made clear that it did not accept that the ratification of an international treaty is capable of creating an enforceable, legitimate  expectation of compliance with its terms. Leggatt J, giving  the judgment of the court reiterated the basic principle  that a treaty to which the UK is a party does not, and cannot, change domestic law or confer rights on individuals  without the intervention of Parliament, stating at §62:

> "A difficulty with the argument that article 31 provides Mr Troitiño with an immunity which we have not considered so far is that article 31 is a provision of an international treaty which forms part of international law and not of UK law. It is a basic principle of UK construction law that a treaty to which the UK is a party does not and cannot change domestic law or confer rights on individuals without the intervention of Parliament: see *Rayner* and *Miller* ---"

59. He went on to confirm that an unincorporated treaty cannot found a legitimate  expectation that its terms will be enforced, stating, at §69:

> "We are not able to accept that an unincorporated treaty provision is capable, without more, of founding a legitimate expectation which is enforceable in English law. If that were the case, it is hard to see why, for example, the European Convention on Human Rights did not give rise to directly enforceable rights in UK law without the need to enact the Human Rights Act. Yet an argument that the Convention, as an international treaty, could have any effect in domestic law otherwise than through its incorporation through the mechanism of the Human Rights Act was given short shrift by the House of Lords in *R v Lyons* [2003] 1 AC 976, where Lord Hoffmann described it as "a fallacy" (para 40)".

60. Sixthly, the defence submits that a failure to enforce the political  offence protection would lead to a disparity  between the treatment of UK and US citizens. The disparity  comes about from the different systems operated by the UK and US in relation to international

law, with the US operating a monist system and the UK a dualist system. The monist system, does not require international law to be incorporated into national law, but allows it to have effect automatically; the act of ratifying a treaty immediately incorporates it into national law. A dualist system sees domestic and international law as operating on different planes, with the reception of international law into domestic law depending upon its acceptance through legislation or by the judges through the common law. As a result, a person requested from the UK by the US would not be able to rely on the political offence exception whilst a US citizen requested by the UK can. Such a disparity, the defence submits, would be inconsistent with the international rule of law. However, as the US points out, the extradition process created by Parliament for UK citizens does not require reciprocity or mutuality and it is not for this court to create an enforceable domestic right in order to achieve this end.

61. For these reasons I am satisfied that any apparent breach of a term of the 2003 UK-US treaty would not render Mr. Assange's detention arbitrary and inconsistent with Article 5 of the ECHR. Whilst it is obviously desirable for both governments to honour the terms of a treaty they have agreed, Parliament has made its intentions clear. The source of law-making remains with Parliament and the executive does not have the power to alter this through the provisions of a treaty. The 2003 UK-US treaty does not create enforceable rights and any breach in its terms does not provide a sound basis for arguing that Mr. Assange's detention is unlawful or that the extradition proceedings should in consequence fall.

62. Nor is it an abuse of process for the US to seek extradition for such an offence. There is no authority which requires this court to reinstate the political offence protection, either upon reliance on the terms of a treaty or through its powers to find an abuse of process. All of the same factors outlined above mean that this argument must fail.

63. In light of this, there is no need for me to determine whether the allegations in this request amount to "political offences".

## E. INITIAL STAGES OF THE EXTRADITION HEARING

64. Section 78 of the EA 2003 places a duty on the judge dealing with the extradition request to decide a number of matters. So far as it is relevant, section 78 states:

> **Initial stages of extradition hearing**
> **[…]**
> (2) The judge must decide whether the documents sent to him by the Secretary of State consist of (or include)—
>> (a) the documents referred to in section 70(9);
>> (b) particulars of the person whose extradition is requested;
>> (c) particulars of the offence specified in the request;
>> (d) in the case of a person accused of an offence, a warrant for his arrest issued in the category 2 territory;
>> (e) in the case of a person alleged to be unlawfully at large after conviction of an offence, a certificate issued in the category 2 territory of the conviction and (if he has been sentenced) of the sentence.
> […]
> (4) If the judge decides that question in the affirmative he must decide whether—
>> (a) the person appearing or brought before him is the person whose extradition is requested;
>> (b) the offence specified in the request is an extradition offence;
>> (c) copies of the documents sent to the judge by the Secretary of State have been served on the person.
> […]

## SECTION 78(2)

65. No challenge was made under section 78(2)(a) of the EA 2003. I am satisfied that the documents sent to me by the Secretary of State consist of those specified in section 70(9).

66. No challenge was made under section 78(2)(b) of the EA 2003. I am satisfied that the documents sent to me by the Secretary of State contain the particulars of Mr. Assange.

67. No challenge was made under section 78(2)(c) of the EA 2003. I am satisfied that, in relation to each count, the request provides sufficient particulars to enable Mr. Assange to understand, with sufficient certainty, the substance of the allegations against him. The allegations are set out in detail above.

68. No challenge was made under section 78(2)(d) of the EA 2003. I am satisfied that the documents sent to me by the Secretary of State include a warrant for Mr. Assange's arrest issued in the US.

## SECTION 78(4)

## Section 78(4)(a): the first issue

69. No challenge was made under section 78(4)(a) of the EA 2003. I am satisfied that the person whose extradition is requested is Mr. Assange.

**Section 78(4)(b): the second issue**

70. Pursuant to section 78(4)(b) of the EA 2003, I must decide whether the offences specified in the request are extradition offences.

71. Section 137 of the EA 2003 provides the following definition of extradition offence:

> **137 Extradition offences: person not sentenced for offence**
> (1) This section sets out whether a person's conduct constitutes an "extradition offence" for the purposes of this Part in a case where the person—
>                    (a) is accused in a category 2 territory of an offence constituted by the conduct, or
> […]
> (2) The conduct constitutes an extradition offence in relation to the category 2 territory if the conditions in subsection (3), (4) or (5) are satisfied.
> (3) The conditions in this subsection are that—
>                    (a) the conduct occurs in the category 2 territory;
>                    (b) the conduct would constitute an offence under the law of the relevant part of the United Kingdom punishable with imprisonment or another form of detention for a term of 12 months or a greater punishment if it occurred in that part of the United Kingdom;
>                    (c) the conduct is so punishable under the law of the category 2 territory
>
> …
> (7A) References in this section to "conduct" (except in the expression "equivalent conduct") are to the conduct specified in the request for the person's extradition.

72. In this case, the conditions in section 137(3)(a) – (c) are satisfied.

**Section 137(3)(a) – the conduct offered in the Category 2 territory**

73. In *Office of the King's Prosecutor (Brussels) v Cando Armas* [2005] UKHL 67, Lord Hope of Craighead stated at §35:

> "the test of whether conduct occurs in the category 1 territory is satisfied for the purposes of section 65(3) so long as its effects were intentionally felt there, irrespective of where the person was when he did the acts which constituted such conduct."

74. The conduct in this case occurred in the US because the publication of the materials caused harm to the interests of the US.

Section 137(3)(b) – dual criminality

75. The US submits that the alleged conduct would amount to offences under English law. The following provisions are relevant:

---

**Official Secrets Act 1911**
**1.— Penalties for spying.**
(1) If any person for any purpose prejudicial to the safety or interests of the State—
    (a) approaches, [inspects, passes over][1] or is in the neighbourhood of, or enters any prohibited place within the meaning of this Act; or
    (b) makes any sketch, plan, model, or note which is calculated to be or might be or is intended to be directly or indirectly useful to an enemy; or
    (c) obtains, [collects, records, or publishers,][1] or communicates to any other person [any secret official code word, or pass word, or][1] any sketch, plan, model, article, or note, or other document or information which is calculated to be or might be or is intended to be directly or indirectly useful to an enemy;
he shall be guilty of felony [...][2]

10.— Extent of Act and place of trial of offence.
(1) This Act shall apply to all acts which are offences under this Act when committed in any part of His Majesty's dominions, or when committed by British Officers or subjects elsewhere.


**Official Secrets Act 1920**
**7. Attempts, incitements, &c**
Any person who attempts to commit any offence under the principal Act or this Act, or solicits or incites or endeavours to persuade another person to commit an offence, or aids or abets and does any act preparatory to the commission of an offence under the principal Act or this Act, shall be guilty of a felony or a misdemeanour or a summary offence according as the offence in question is a felony, a misdemeanour or a summary offence, and on conviction shall be liable to the same punishment, and to be proceeded against in the same manner, as if he had committed the offence.

8.— Provisions as to trial and punishment of offences.
(1) Any person who is guilty of a felony under the principal Act or this Act shall be liable to penal servitude for a term of not less than three years and not exceeding fourteen years.


**Official Secrets Act 1989**
**1.— Security and intelligence.**
(1) A person who is or has been—
    (a) a member of the security and intelligence services; or
    (b) a person notified that he is subject to the provisions of this subsection,

is guilty of an offence if without lawful authority he discloses any information, document or other article relating to security or intelligence which is or has been in his possession by virtue of his position as a member of any of those services or in the course of his work while the notification is or was in force.

(2) The reference in subsection (1) above to disclosing information relating to security or intelligence includes a reference to making any statement which purports to be a disclosure of such information or is intended to be taken by those to whom it is addressed as being such a disclosure.

(3) A person who is or has been a Crown servant or government contractor is guilty of an offence if without lawful authority he makes a damaging disclosure of any information, document or other article relating to security or intelligence which is or has been in his possession by virtue of his position as such but otherwise than as mentioned in subsection (1) above.

---

(4)  For the purposes of subsection (3) above a disclosure is damaging if—

(a)  it causes damage to the work of, or of any part of, the security and intelligence services; or

(b)  it is of information or a document or other article which is such that its unauthorised disclosure would be likely to cause such damage or which falls within a class or description of information, documents or articles the unauthorised disclosure of which would be likely to have that effect.

(5)  It is a defence for a person charged with an offence under this section to prove that at the time of the alleged offence he did not know, and had no reasonable cause to believe, that the information, document or article in question related to security or intelligence or, in the case of an offence under subsection (3), that the disclosure would be damaging within the meaning of that subsection.

## 2.—Defence.

(1)  A person who is or has been a Crown servant or government contractor is guilty of an offence if without lawful authority he makes a damaging disclosure of any information, document or other article relating to defence which is or has been in his possession by virtue of his position as such.

[…]

## 5.—Information resulting from unauthorised disclosures or entrusted in confidence.

(1)  Subsection (2) below applies where—

(a)  any information, document or other article protected against disclosure by the foregoing provisions of this Act has come into a person's possession as a result of having been—

(i)  disclosed (whether to him or another) by a Crown servant or government contractor without lawful authority; or

(ii)  entrusted to him by a Crown servant or government contractor on terms requiring it to be held in confidence or in circumstances in which the Crown servant or government contractor could reasonably expect that it would be so held; or

(iii)  disclosed (whether to him or another) without lawful authority by a person to whom it was entrusted as mentioned in sub-paragraph (ii) above; and

(b)  the disclosure without lawful authority of the information, document or article by the person into whose possession it has come is not an offence under any of those provisions.

(2)  Subject to subsections (3) and (4) below, the person into whose possession the information, document or article has come is guilty of an offence if he discloses it without lawful authority knowing, or having reasonable cause to believe, that it is protected against disclosure by the foregoing provisions of this Act and that it has come into his possession as mentioned in subsection (1) above.

(3)  In the case of information or a document or article protected against disclosure by sections 1 to 3 above, a person does not commit an offence under subsection (2) above unless—

(a)  the disclosure by him is damaging; and

(b)  he makes it knowing, or having reasonable cause to believe, that it would be damaging;

and the question whether a disclosure is damaging shall be determined for the purposes of this subsection as it would be in relation to a disclosure of that information, document or article by a Crown servant in contravention of section 1(3), 2(1) or 3(1) above.

(4)  A person does not commit an offence under subsection (2) above in respect of information or a document or other article which has come into his possession as a result of having been disclosed—

(a)  as mentioned in subsection (1)(a)(i) above by a government contractor; or

(b)  as mentioned in subsection (1)(a)(iii) above,

unless that disclosure was by a British citizen or took place in the United Kingdom, in any of the Channel Islands or in the Isle of Man or a colony.

(5)  For the purposes of this section information or a document or article is protected against disclosure by the foregoing provisions of this Act if—

(a)  it relates to security or intelligence, defence or international relations within the meaning of section 1, 2 or 3 above or is such as is mentioned in section 3(1)(b) above; or

(b)  it is information or a document or article to which section 4 above applies;

and information or a document or article is protected against disclosure by sections 1 to 3 above if it falls within paragraph (a) above.

(6)  A person is guilty of an offence if without lawful authority he discloses any information, document or other article which he knows, or has reasonable cause to believe, to have come into his possession as a result of a contravention of section 1 of the Official Secrets Act 1911.

**S.7 - the authorisation of disclosures**.
(3)  For the purposes of this Act a disclosure made by any other person is made with lawful authority if, and only if, it is made —
(a)  to a Crown servant for the purposes of his functions as such; or
(b)  in accordance with an official authorisation."
"Official authorisation" is defined to mean an authorisation duly given by a Crown servant or by or on behalf of a prescribed body or a body of a prescribed class. These expressions are defined in section 12. A "Crown servant" includes any minister, civil servant, member of the armed forces or constable, and any holder of an office or body or member of a body prescribed by the secretary of state. In section 13 "disclose" and "disclosure" are defined to include parting with possession of a document.

**Computer Misuse Act 1990**
**1.— Unauthorised access to computer material.**
(1)  A person is guilty of an offence if—
(a)  he causes a computer to perform any function with intent to secure access to any program or data held in any computer [or to enable any such access to be secured][1] ;
(b)  the access he intends to secure [or to enable to be secured][1] is unauthorised; and
(c)  he knows at the time when he causes the computer to perform the function that that is the case.

4.—  Territorial scope of [ offences under [this Act]2]1.
(1)  Except as provided below in this section, it is immaterial for the purposes of any offence under [section 1, 3 or 3ZA]3 above—
(a)  whether any act or other event proof of which is required for conviction of the offence occurred in the home country concerned; or
(b)  whether the accused was in the home country concerned at the time of any such act or event.

(2)  Subject to subsection (3) below, in the case of such an offence at least one significant link with domestic jurisdiction must exist in the circumstances of the case for the offence to be committed.
(3)  There is no need for any such link to exist for the commission of an offence under section 1 above to be established in proof of an allegation to that effect in proceedings for an offence under section 2 above.

**Human Rights Act 1998**
**6. Acts of public authorities**
(1)  It is unlawful for a public authority to act in a way which is incompatible with a Convention right.

**European Convention of Human Rights**
**Article 10: Freedom of expression**
1. Everyone has the right to freedom of expression. This right shall include freedom to hold opinions and to receive and impart information and ideas without interference by public authority and regardless of frontiers. This Article shall not prevent States from requiring the licensing of broadcasting, television or cinema enterprises.

2. The exercise of these freedoms, since it carries with it duties and responsibilities, may be subject to such formalities, conditions, restrictions or penalties as are prescribed by law and are necessary in a democratic society, in the interests of national security, territorial integrity or public safety, for the prevention of disorder or crime, for the protection of health or morals, for the protection of the reputation or rights of others, for preventing the disclosure of information received in confidence, or for maintaining the authority and impartiality of the judiciary

76. The court has to be satisfied, to the criminal standard, that the conduct would constitute an offence under the law of England and Wales (section 137(3)(b)).

*Submissions of the parties*

77. The defence argues that Mr. Assange is accused of doing no more than engaging in the ordinary and lawful conduct of the investigative journalist, conduct protected by Article 10 of the ECHR. The defence argues that, to attract criminal liability, Mr. Assange's conduct must be a criminal act which is separate from the actions of a whistle-blower. It submits that it is without precedent to argue that, because a whistle-blower commits an offence by leaking information to the press, anyone who encourages, facilitates or assists that act is legally liable as a conspirator in that crime. In support of this submission it called witnesses including Professor Feldstein, Trevor Timm and Nicolas Hager who spoke about the work of investigative journalists. Professor Feldstein considered that the list of "Most Wanted Leaks" posted by WikiLeaks was merely a bolder and more imaginative form of newsgathering, differing only in degree from the kind of solicitations journalists routinely post on social media sites. He stated "*[g]"ood reporters don't sit around waiting for someone to leak information, they actively solicit it*" and these activities are '*not only consistent with standard journalistic practice, they are its lifeblood*'. Trevor Timm, co-founder and executive director of the Freedom of the Press Foundation (the FPF), stated that Mr. Assange pioneered the use of the encrypted digital dropbox to protect whistleblowers and that the FPF has itself developed a similar tool. Cloud drop boxes are widely used by media organisations across the world including the New York Times, Wall Street Journal and Associated Press. The defence also submits that the hash-cracking agreement was merely an attempt to protect the anonymity of Ms. Manning as his source. Professor Feldstein described the protection of confidential sources as not only standard practice but "*a crucial professional and moral responsibility for reporters*".

78. Further it is argued that the defences of necessity and duress of circumstances are available to Mr. Assange and that because the burden is on the prosecution to disprove these defences, extradition should not take place until this court is satisfied "*beyond all doubt*" that these defences "*cannot possible avail*" him. The defence relies on *Cleveland v Government of the United States of America* [2019] 1 WLR 4392 and *Assange v Swedish*

*Prosecution Authority* [2011] EWHC 2849 (Admin).  The defence cautions against the court ignoring a defence which it submits is not available to a US court.

79. In addition, the defence submits that there is an extensive body of international materials concerning the "right to the truth", the public's right to know about the existence of the violations of human rights disclosed in these materials and the State's duty not to conceal them. It argues that UK law recognises and gives effect to this principle, for example in the 'iniquity' rule in the civil law of contempt, in relation to the Freedom of Information Act 2000 and in the defences provided by s.170 of the Data Protection Act 2018.  The defence called evidence to demonstrate the significance of the WikiLeaks revelations and the US government's involvement in serious criminal activity revealed by the publications.

80. Finally, in relation to the publishing of hundreds of thousands of documents by WikiLeaks, the defence submits that this prosecution is fundamentally inconsistent with press freedoms. Article 10 of the ECHR would sanction these disclosures, as the risk of harm to a small number of sources, described by the defence as "*unintentional, small and unsubstantiated*", would be weighted against the risk of harm to "*millions*", whom the defence describe as "*potentially subject to global-scale ongoing war crimes and torture*".

81. The US notes that the defence does not argue that the conduct set out in the request is insufficient to constitute the charges identified. It submits that the defence arguments are based on the fundamental mischaracterisation of the prosecution case, re-iterating that Mr. Assange is prosecuted for complicity in Ms. Manning's unlawful obtaining of the material and conspiring with hackers to commit computer intrusions for the benefit of Wikileaks. He is said to have personally encouraged not only the provision of national security information but also computer hacking more generally, to provide himself and Wikileaks with stolen information. In relation to the publishing counts, the request sets out in detail not just the damaging nature of the disclosures but also that Mr. Assange knew that the dissemination of the names of individuals endangered them.

82. It submits that section 5 of the Official Secrets Act ("OSA") 1989 expressly applies to individuals, which includes publishers, who are not the original leaker of the information. It complies with Article 10 because it only criminalises those who disclose protected materials which are damaging and which they have disclosed knowing, or having

reasonable cause to believe, would be damaging. It submits that the prosecution case is expressly brought on the basis that Mr. Assange disclosed materials that no responsible journalist or publisher would have disclosed.

83. In relation to "necessity", the US submits that the defence impermissibly relies on material outside the request to make this argument. It submits that necessity is not an essential ingredient of the English offences referred to above, but a defence that may be raised at trial and therefore not a matter for the extradition court. It submits that, in any event, no defence of necessity could arise in relation to the "obtaining" allegations because Mr. Assange could not know the content of information not yet received and, in relation to the "publishing" allegations, because he disclosed the unredacted names of sources, knowingly putting their lives at risk.

*Discussion*

84. The request alleges 18 separate, but closely interconnected, offences. The conduct can sensibly be divided into separate strands. The first strand alleges a broad conspiracy with Ms. Manning and other unnamed persons to commit computer intrusion (count 2). The second strand alleges that Mr. Assange aided and abetted Ms. Manning in her unlawfully obtaining and disclosing materials to Mr. Assange, that he received documents from Ms. Manning after he had assisted her to obtain them unlawfully (counts 6- 8 and 18), that he assisted Ms. Manning to obtain and disclose these documents to himself (counts 9 – 14), and conspired with Ms. Manning to gain unauthorised access to a government computer under a user name that did not belong to her (counts 5). The third strand relates to the publishing of documents which contained the names of informants (counts 15 – 17). Count 1 is a broad conspiracy charge relating to all of the above activity which does not require separate consideration. As it is alleged that the conduct within each strand is closely interconnected and concerns the same criminal enterprise, it is not necessary to demonstrate a separate extradition offence for each of the counts (see *Tapin v USA* [2012] EWCA 22 (Admin)).

**The First Strand (Count 2)**

85. This conduct would amount to offences in English law namely: conspiracy with Ms. Manning and the computer hackers Teenager, Laurelai, Kayla, Jeremy Hammond, Sabu and Topiary to gain unauthorised access to a computer, contrary to section 1 of the Criminal Law Act 1977 and section 1 of the Computer Misuse Act 1990; and aiding and abetting the same people to gain unauthorised access to a computer contrary to section 1 of the Computer Misuse Act 1990.

86. In relation to Ms. Manning, it is alleged that the shared common purpose of the conspiracy was for Ms. Manning to circumvent a password protected restriction on a government SIPRNet computer in order to access the account without authorisation. The acts in furtherance of this conspiracy were the provision of the alphanumeric string to Mr. Assange and his attempt to "crack" it.

87. In relation to the computer hackers Teenager, Laurelai, Kayla, Jeremy Hammond, Sabu and Topiary, it is alleged that Mr. Assange and WikiLeaks entered into agreements with each person to gain unauthorised access to data held on computers, including parliamentary phone call audio recordings from a country identified only as "NATO country 1", the computer of a former Wikileaks associate (Teenager), the computer systems of a cyber security company (Gnosis/Teenager), two hundred US and state government email accounts (Laurelai), the computer systems of Intelligence Consulting Company (Sabu and Hammond) and two US police associations (Hammond).

88. It is irrelevant for the purposes of section 1 of the Computer Misuse Act 1990 that Ma and these individuals were located outside England and Wales.

***The Second Strand (Counts 3-4, Count 5, Counts 6-8, Counts 9-14, Count 18, Count 1)***

89. In the second strand, counts 3-4, counts 6-8 and count 18 relate to Mr. Assange aiding and abetting Ms. Manning to disclose to him, unlawfully, the diplomatic cables, the Iraq rules of engagement and the detainee assessment briefs. Counts 9 - 14 relate to the transmission of the same documents. Count 1 is an overarching conspiracy relating to Mr. Assange unlawfully obtaining unspecified national defence documents. Count 5 is an overarching allegation that Mr. Assange attempted to obtain national defense information stored on a government SIPRNet computer.

*The English offences*

90. The equivalent charges identified are:

    a. Attempting, soliciting, inciting, persuading, aiding or abetting an offence contrary to section 1 of the OSA 1911 together with section 7 of the Official Secrets Act 1920;

    b. Conspiracy contrary to section 1 of the Criminal Law Act 1977 in relation to section 1 of the OSA 1911;

    c. Conspiracy contrary to section 1 of the Criminal Law Act 1977 in relation to section 1(1) of the OSA 1989;

    d. Aiding and abetting an offence contrary to section 1(1) of the OSA 1989;

    e. Conspiracy contrary to section 1 of the Criminal Law Act 1977 in relation to section 1(3) of the OSA1989;

    f. Aiding and abetting an offence contrary to section 1(3) of the OSA 1989;

    g. Conspiracy contrary to section 1 of the Criminal Law Act 1977 in relation to section 2 of the OSA 1989;

    h. Aiding and abetting an offence contrary to section 2 of the Official Secrets Act 1989.

*The alleged conduct*

91. Ms. Manning's conduct is capable of amounting to offences contrary to section 1 of the OSA 1911 and sections 1(1), 1(3) and 2 of the OSA 1989. Mr. Assange's alleged conduct assisted or encouraged her in the commission of these offences or amounted to a conspiracy to commit the same.

*Ms. Manning's conduct: section 1(1) of the OSA 2011*

92. Ms. Manning obtained classified national security documents which might be directly or indirectly useful to an enemy and communicated them to Mr. Assange. Although there is a requirement that she did this for a purpose prejudicial to the safety or interests of the state, pursuant to section 1(2) of the 1911 Act the Crown does not need to establish any particular act tending to this purpose. It can readily be inferred from the nature of the

materials she was obtaining and communicating that they would reasonably be expected to cause damage to the national security of the state.

*Ms. Manning's conduct: section 1(1) of the OSA 1989*

93. Ms. Manning signed a classified information non-disclosure agreement, analogous to a notification under section 1(1)(b). She made disclosures of materials and information which related to security or intelligence and which were in her possession by virtue of her position or in the course of her work.

*Ms. Manning's conduct: section 1(3) of the OSA 1989*

94. Ms. Manning, as a member of the armed forces, was (on transposition) the equivalent of a Crown servant. She made disclosures of materials and information which related to security and intelligence which were in her possession of by virtue of her position. It can readily be inferred from the nature of the materials that their unauthorised disclosure would be damaging to the work of the security and intelligence services. The US has described the many ways in which the disclosures made by Ms. Manning were in fact damaging.

*Ms. Manning's conduct: section 2 of the OSA 1989*

95. The elements of this offence are the same as for section 1(3) OSA 1989, save that the information must relate to defence rather than security and intelligence services.

*Mr. Assange's conduct in aiding and abetting the above offences*

96. Mr. Assange is accused of aiding and abetting Ms. Manning in her theft and disclosure of the information, as an accessory to her offending. The defence submits that no offence is committed by Mr. Assange unless he has engaged in a criminal activity separate from Ms. Manning's act of whistle-blowing. However, in my judgment, Mr. Assange's alleged activities went beyond the mere encouragement of a whistle-blower.

97. Tseehe design and purpose of WikiLeaks, it is alleged, was to obtain protected information and publish it. Mr. Assange was willing to achieve this, it is alleged, through computer hacking, both by engaging in hacking activities himself but also by recruiting and soliciting others to do the same. This is amply demonstrated in the request in his work with various hacking groups. His work with Ms. Manning, it is alleged, was part of this plan.

98. For months, Mr. Assange was communicating with Ms. Manning via the social media platform "Jabber". On 10 March 2010 when she told him she had nothing left to give him in reference to the detainee assessment briefs, he commented "*curious eyes never run dry in my experience.*" After this comment, she went on to upload hundreds of thousands more classified documents, such as the 250,000 diplomatic cables on 10 April 2010. He told her that in relation to the CIA Open Source Centre materials this is something he wished to "*mine entirely*". He provided Ms. Manning with a SFTP connection to a cloud drop box operated by WikiLeaks, in a specific directory that WikiLeaks had designated for her use. She uploaded the cables to this cloud drop box.

99. As part of his assistance to Ms. Manning, he agreed to use the rainbow tools, which he had for the purpose of cracking Microsoft password hashes, to decipher an alphanumeric code she had given him. The code was to an encrypted password hash stored on a Department of Defence computer connected to the SIPRNet. It is alleged that had they succeeded, Ms. Manning might have been able to log on to computers connected to the network under a username that did not belong to her. This is the conduct which most obviously demonstrates Mr. Assange's complicity in Ms. Manning's theft of the information, and separates his activity from that of the ordinary investigative journalist.

100. At the same time as these communications, it is alleged, he was encouraging others to hack into computers to obtain information. This activity does not form part of the "Manning" allegations but it took place at exactly the same time and supports the case that Mr. Assange was engaged in a wider scheme, to work with computer hackers and whistle blowers to obtain information for Wikileaks. Ms. Manning was aware of his work with these hacking groups as Mr. Assange messaged her several times about it. For example, it is alleged that, on 5 March 2010 Mr. Assange told Ms. Manning that he had received stolen banking documents from a source (Teenager); on 10 March 2010, Mr. Assange told Ms. Manning that he had given an "intel source" a "list of things we wanted"

and the source had provided four months of recordings of all phones in the Parliament of the government of NATO country-1; and, on 17 March 2010, Mr. Assange told Ms. Manning that he used the unauthorised access given to him by a source, to access a government website of NATO country-1 used to track police vehicles. His agreement with Ms. Manning, to decipher the alphanumeric code she gave him, took place on 8 March 2010, in the midst of his efforts to obtain, and to recruit others to obtain, information through computer hacking.

101. Mr. Assange, it is alleged, had been engaged in recruiting others to obtain information for him for some time. For example, in August 2009 he spoke to an audience of hackers at a "Hacking at Random" conference and told them that unless they were a serving member of the US military they would have no legal liability for stealing classified information and giving it to Wikileaks. At the same conference he told the audience that there was a small vulnerability within the US Congress document distribution system stating, "*this is what any one of you would find if you were actually looking*". In October 2009 also to an audience of hackers at the "Hack in the Box Security Conference" he told the audience, "*I was a famous teenage hacker in Australia, and I've been reading generals' emails since I was 17*" and referred to the Wikileaks list of "flags" that it wanted captured. After Ms. Manning made her disclosures to him he continued to encourage people to take information. For example, in December 2013 he attended a Chaos computer club conference and told the audience to join the CIA in order to steal information stating "*I'm not saying don't join the CIA; no, go and join the CIA. Go in there, go into the ballpark and get the ball and bring it out*".

102. In relation to Ms. Manning, it is alleged that Mr. Assange was engaged in these same activities. During their contact over many months, he encouraged her to obtain information when she had told him she had no more to give him, he identified for her particular information he would like to have from the government database for her to provide to him, and, in the most obvious example of his using his computer hacking skills to further his objective, he tried to decipher an alphanumeric code she sent to him. If the allegations are proved, then his agreement with Ms. Manning and his agreements with these groups of computer hackers took him outside any role of investigative journalism. He was acting to further the overall objective of WikiLeaks to obtain protected information, by hacking if necessary. Notwithstanding the vital role played by the press

in a democratic society, journalists have the same duty as everyone else to obey the ordinary criminal law. In this case Mr. Assange's alleged acts were unlawful and he does not become immune from criminal liability merely because he claims he was acting as a journalist.

103. The defence argues that Mr. Assange's agreement to decipher the alphanumeric code was no more than a journalist's attempt to protect Ms. Manning's anonymity, which, it is suggested was Mr. Assange's moral responsibility. However, this effort to decipher code did not protect Ms. Manning from exposure as the source of information already provided to WikiLeaks. It sought to enable her to avoid detection for unauthorised access to an account she had not yet achieved. Mr. Kromberg's evidence on this is clear. He stated that stealing hundreds of thousands of documents from classified databases was a multistep process. For example, Ms. Manning had to extract large amounts of data from the database, move the stolen data onto a government computer, in this case her SIPRNet computer, exfiltrate the stolen documents from the government computer to a non-government computer, in this case her personal computer, and transmit the documents to Mr. Assange and Wikileaks. The ability to use a computer or a computer account that was not easily attributable to Ms. Manning would assist to prevent her from being discovered.

104. Mr. Kromberg illustrated the point: army forensic investigators were able to find important forensic evidence on the Bradley-Manning user account contained on the SIPRNet computers that Ms. Manning was using which included files she had viewed and saved and scripts that she had stored whilst signed into the SIPRNet computer under her own username. Ms. Manning had used a custom script created with a programme called Wget to download the diplomatic cables from the Net Centric Diplomacy database. At Ms. Manning's trial, the army introduced forensic evidence showing that the Wget script had been stored on a SIPRNet under the Bradley-Manning user profile. If Mr. Assange had successfully cracked the password hash to the FTP account, it is alleged, Ms. Manning could have used the account for her on-going theft of information, and investigators might not have been able to attribute the theft to her.

105. Where the US offences relate to the knowing and intentional receipt of information by Mr. Assange (counts 6-8) the equivalent offences are the same. Mr. Assange's complicity

in Ms. Manning obtaining and disclosing the information to him necessarily involves his intentional receipt of it.

106. In relation to section 1(3) of the OSA 1989, the same conduct is relied upon. The offence is distinct in that it requires the prosecution to demonstrate that the disclosure was damaging. The US has described the many ways in which the disclosures made by Ms. Manning and subsequently published by Mr. Assange were damaging (see above). When Mr. Assange encouraged and assisted Ms. Manning, it can readily be inferred that he was aware of the nature of the information Ms. Manning sought to access and disclose to him, and that this was likely to damage the work of the security and intelligence services.

107. In relation to section 2 of the OSA 1989, the elements of the offence are the same as for section 1(3) of the OSA 1989 save that they relate to defence information.

*Conspiracy*

108. For similar reasons, the agreement between Mr. Assange and Ms. Manning for her to obtain and disclose the information would amount to a conspiracy to commit the same.

*Article 10*

109. The above provisions must be read and given effect to, in a way which is compatible with the ECHR.

110. The defence does not accept that *Regina v Shayler* [2002] UKHL 11 ("*Shayler*") is good law. However, the defence accepts that this court is bound to follow it. In *Shayler* the House of Lords considered Article 10 in the context of section 1(1) of the OSA 1989. Mr. Shayler, a former member of the Security Services, disclosed a number of documents to journalists from the Mail on Sunday classified at levels ranging from "Classified" to "Top Secret". He was charged with the unlawful disclosure of documents contrary to sections 1 and 4 of the OSA 1989. At a preparatory hearing, Moses J found that a public interest defence for his disclosure was not available and found sections 1 and 4 of the OSA 1989 to be compatible with Article 10. Mr. Shayler appealed to the Court of Appeal (Criminal Division) which upheld the judge's rulings ([2001] 1 WLR 2206) and then to the House

of Lords.  Lord Bingham acknowledged the role of the press in exposing abuses and miscarriages of justice (§21) however, he considered that the restrictions imposed by these provisions were directed to legitimate objectives and came within the qualification specified in Article 10(2). He also confirmed that neither a public interest defence nor a national interest defence were available to the charge.

111. At §23 Lord Bingham confirmed that Article 10 is not an absolute right:

> "Despite the high importance attached to it, the right to free expression was never regarded in domestic law as absolute…..The European Convention similarly recognises that the right is not absolute: Article 10(2) qualifies the broad language of Article 10(1) by providing, so far as relevant to this case:

> "The exercise of these freedoms, since it carries with it duties and responsibilities, may be subject to such formalities, conditions, restrictions or penalties as are prescribed by law and are necessary in a democratic society, in the interests of national security, territorial integrity or public safety, for the prevention of disorder or crime, … , for the protection of the … rights of others, for preventing the disclosure of information received in confidence…"

112. At §20 he determined that there was no public interest defence to the charges but that this did not make the legislation incompatible with Article 10:

> "It is in my opinion plain, giving sections 1(1)(a) and 4(1) and (3)(a) their natural and ordinary meaning and reading them in the context of the OSA 1989 as a whole, that a defendant prosecuted under these sections is not entitled to be acquitted if he shows that it was or that he believed that it was in the public or national interest to make the disclosure in question or if the jury conclude that it may have been or that the defendant may have believed it to be in the public or national interest to make the disclosure in question. The sections impose no obligation on the prosecution to prove that the disclosure was not in the public interest and give the defendant no opportunity to show that the disclosure was in the public interest or that he thought it was. The sections leave no room for doubt, and if they did the 1988 white paper quoted above, which is a legitimate aid to construction, makes the intention of Parliament clear beyond argument".

113. At §17 he considered that Mr. Shayler's submissions for why he had made the disclosures did not afford him a defence of necessity or duress of circumstances:

> "The appellant's case, put very broadly, is understood to be that he was appalled at the unlawfulness, irregularity, incompetence, misbehaviour and waste of resources in the service, which he thought was failing to perform its public duty; he believed that unless these failings were exposed and remedied dire consequences would follow; and he therefore believed it in the public and national interest to make the disclosure he did. This omnibus contention may or may not afford him a defence under the OSA 1989, depending on whether a public interest defence is available; but it is not within measurable distance of affording him a defence of necessity or duress of circumstances".

114. At §25 he re-stated the need for the security or intelligence service to be secure including by being able to keep information secret:

> "There is much domestic authority pointing to the need for a security or intelligence service to be secure. The commodity in which such a service deals is secret and confidential information. If the service is not secure those working against the interests of the state, whether terrorists, other criminals or foreign agents, will be alerted, and able to take evasive action; its own agents may be unmasked; members of the service will feel unable to rely on each other; those upon whom the service relies as sources of information will feel unable to rely on their identity remaining secret; and foreign countries will decline to entrust their own secrets to an insecure recipient: see, for example, Attorney General v Guardian Newspapers Ltd (No 2) [1990] 1 AC 109 , 118C, 213H–214B, 259A, 265F; Attorney General v Blake [2001] 1 AC 268 , 287D–F."

115. The defence submits that the criminalisation of the "gathering of information" offends the core notion of Article 10. It refers to a number of cases which support this: obstacles should not be created to the gathering of information:  (*Tarsasag v Hungary* (2011) 53 EHRR 3); very strong reasons are required for justifying restrictions on political speech (*Dyuldin & Kislov v Russia* [2007] ECHR 685; gathering of information is an essential preparatory step in journalism and an inherent protected part of press freedom (*Stunt v Associated Newspapers* [2018] 1 WLR 6060); obstacles created in order to hinder access to information which is of public interest may discourage those working in the media from pursuing such matters (*Szurovecz v Hungary* (2020) 70 EHRR 21) and where gathering and disclosure by journalists of confidential information is concerned, the courts have consistently considered that it had been confronted with an interference with the rights protected by Article 10 (*Girleanu v Romania* (2019) 68 EHRR 19).

116. I note however the case of *Brambilla and others v. Italy*, application 22567/09, 23 June 2016, in which three journalists were convicted of offences after intercepting carabinieri radio communications in order to obtain information on crime scenes for the purposes of reporting. The European court re-iterated that notwithstanding the vital role played by the media in a democratic society, journalists cannot, in principle, be released from their duty to obey the ordinary criminal law on the basis that, as journalists, Article 10 affords them a cast-iron defence. Journalists have "duties and responsibilities" and the scope of these responsibilities depends on their situation and the "technical means" they use. At §54 the court stated:

> "In other words, a journalist cannot claim an exclusive immunity from criminal liability for the sole reason that, unlike other individuals exercising the right to freedom of expression, the offence in question was committed during the performance of his or her journalistic functions"

117. Mr. Assange, it is alleged, was not concerned with the gathering of information, but like the journalists in *Brambilla*, complicit in unlawfully taking it. Ms. Manning stated in her plea allocution statement at her court martial that she believed that if the public had access

to this information it could spark a domestic debate on the role of the military and on US foreign policy. Whatever her beliefs, the House of Lords in *Shayler* sets out why a motivation to act in the public interest would not avail her under section 1 of the OSA 1989. A Crown servant has other routes available to spark the intended debate, through lawful and authorised disclosure, and where this is refused without adequate justification, by requesting that the decision for refusal is reviewed by a court.

118. The object of section 1 of the OSA 1989 is to deter members of the security forces from disclosing secrets and the scheme of the Act vests responsibility for authorising disclosure in trusted people who are in a position to make an objective assessment of the public interest. The scheme of the OSA would be undermined if the disclosures made by a Crown servant, in this case by Ms. Manning to Mr. Assange, were treated differently to the disclosures of her co-conspirator. To find otherwise would be to provide a route to disclosure by a Crown servant which Parliament through the scheme of the Act has expressly denied. Had Mr. Assange decided not to assist Ms. Manning to take the information in the various ways described above, and merely received it from her, then the Article 10 considerations would be different. This is considered below.

### The Third Strand (Counts 15 – 17, and Count 1 again)

119. The third strand relates to Mr. Assange publishing documents on the WikiLeaks website.

### The alleged conduct

120. These counts relate specifically to the Afghanistan significant activity reports (75,000 published by WikiLeaks on 25 July 2010), the Iraq significant activity reports (400,000 published by WikiLeaks on 22 October 2010), and the diplomatic cables (250,000 published in unredacted form by WikiLeaks on 2 September 2011). In relation to all of the documents in the third strand, the charges only apply to documents which contained the names of informants.

### The English offence - section 5 of the OSA 1989

121. Section 5 of the OSA 1989 imposes criminal liability on a third party who comes into possession of information which has been disclosed to them by a Crown servant without lawful authority and who further discloses it in the circumstances prescribed by section 5. It applies to any individual, including a journalist, who is not a Crown servant, a contractor or a notified person, and it applies when protected information is published which caused damage to the work of the security and intelligence services. If the original disclosure is by a Crown servant, as, on transposition, it is here, then it is irrelevant, for the purposes of section 5 where the disclosure took place.

*Article 10 ECHR*

122. The defence submits that Mr. Assange's disclosures are protected by Article 10. It submits that notwithstanding the risk of harm from the disclosures, which, they suggest, is to a small number of sources and describe as "*unintentional, small and unsubstantiated*", it would be protected by free speech in light of the risk of harm from non-disclosure to "*millions*". It sought to demonstrate the significance of the WikiLeaks revelations and what it has called the scale of the crimes against humanity, through the oral evidence of witnesses including Clive Stafford Smith, Professor Feldstein, Nicholas Hager, Daniel Ellsberg and through the written evidence of witnesses including Dean Yates, Andy Worthington, Khaled El-Masri and Patrick Cockburn. These witnesses gave evidence of the US government's involvement in serious criminal activity revealed by the publications.

123. The US emphasises that the "publishing" charges are expressly limited to documents which contained the names of human sources. It submits that, whilst Article 10 protects the "responsible" journalist, Mr. Assange knew that the dissemination of the informants' names could endanger them and disclosed their names in an unconsidered and indiscriminate manner.

*Discussion*

124. Mr. Assange's Article 10 rights are engaged. Section 5 of the OSA 1989 must be read and given effect to in a way that is compatible with Convention rights. The Article 10 right to freedom of expression is not absolute. Interference with the right may be justified

if it is prescribed by law, has one or more of the legitimate aims specified in Article 10(2), is necessary in a democratic society for achieving such an aim, and is proportionate to the legitimate aim or aims pursued.   Here the restriction on the right to free speech is prescribed by law by virtue of section 5 of the OSA 1989. Its objective is to safeguard national security by preventing the disclosure of information relating to the work of the security and intelligence services and therefore directed to the aim of preserving national security. The question is whether the interference with Mr. Assange's Article 10 rights is "necessary in a democratic society".

125. The government's white paper which underpinned the OSA 1989 proposed that unauthorised disclosure of information should be prohibited.  It proposed that this should apply to any person, including a journalist, but where the person was not a member and former member of the services, the prohibition should be limited by requiring the prosecution to prove to the criminal standard that the disclosure was likely to damage the operation of the security and intelligence services and that the discloser knew or could reasonably be expected to know that the disclosure would cause such damage. The OSA gave general effect to the proposals in the white paper and section 5 requires the prosecution to prove that the person disclosing the information did so without lawful authority; that he did so knowing or having reasonable cause to believe that it was information protected against disclosure by the Act; that publishing the information was damaging in that it caused damage to the work of the security and intelligence services or was likely to have that effect; and that he published the information knowing or having reasonable cause to believe that it would be damaging.

126. The European Court of Human Rights ("the ECrtHR") has long recognised that there are circumstances in which it will be necessary to suppress the release of information for one of the purposes identified in Article 10(2). In *Stoll v Switzerland* (2008) 47 EHRR 59 at §102, the World Jewish Congress, Swiss banks and other interested parties conducted negotiations concerning compensation due to Holocaust victims for unclaimed funds deposited in Swiss bank accounts. The newspaper Sonntags-Zeitung published two articles by the applicant which contained extracts from a strategy document marked "confidential" which had been written by the Swiss Ambassador to the US. The person who had obtained and leaked the information was never identified and the applicant had not acted illegally in obtaining it. The ECrtHR did not accept that the penalty imposed on the applicant was aimed at protecting national security, but found that his conviction

pursued the aim of preventing the "disclosure of information received in confidence" within the meaning of Article 10(2). It found the conviction and penalty to be proportionate to the legitimate aim pursued, and found no violation of Article 10 of the Convention. The court stated at § 102:

> "The Court further reiterates that all persons, including journalists, who exercise their freedom of expression undertake "duties and responsibilities", the scope of which depends on their situation and the technical means they use (see, for example, Handyside v. the United Kingdom, 7 December 1976, § 49 in fine, Series A no. 24). Thus, notwithstanding the vital role played by the press in a democratic society, journalists cannot, in principle, be released from their duty to obey the ordinary criminal law on the basis that Article 10 affords them protection. Paragraph 2 of Article 10 does not, moreover, guarantee a wholly unrestricted freedom of expression even with respect to press coverage of matters of serious public concern (see, for example, Bladet Tromsø and Stensaas v. Norway [GC], no. 21980/93, § 65, ECHR 1999-III, and Monnat v. Switzerland, no. 73604/01, § 66, ECHR 2006-X)."

127. In *Gîrleanu v Romania* (2019) 68 EHRR 19, the applicant, who was a local correspondent for the Romanian national newspaper România liberă, received on a CD a copy of secret documents leaked from a Romanian military base in Afghanistan. He decided not to publish it as he feared possible damage to national security but saved it on a hard drive and later shared it with two other people. The ECrtHR accepted that this activity was part of a journalistic investigation, and whilst it confirmed the importance of protecting free expression, particularly for matters of public interest, it also stated that where this relates to journalists the protection was subject to the proviso that it was exercised in good faith in accordance with the tenets of responsible journalism. At §84 of the decision it stated:

> "As regards the level of protection, there is little scope under art.10(2) of the Convention for restrictions on freedom of expression in two fields, namely political speech and matters of public interest. Accordingly, a high level of protection of freedom of expression, with the authorities thus having a particularly narrow margin of appreciation, will normally be accorded where the remarks concern a matter of public interest. However, the protection afforded by art.10 of the Convention to journalists is subject to the proviso that they act in good faith in order to provide accurate and reliable information in accordance with the tenets of responsible journalism. The concept of responsible journalism, as a professional activity which enjoys the protection of art.10 of the Convention, is not confined to the contents of information which is collected and/or disseminated by journalistic means. That concept also embraces the lawfulness of the conduct of a journalist, and the fact that a journalist has breached the law is a relevant, albeit not decisive, consideration when determining whether he or she has acted responsibly"

128. There is an inevitable tension between the democratic requirement of openness, and the need to keep some matters secret (see the committee report of 1972 considering an alternative to the OSA 1911, Cmnd 5104). On the one hand, there is the fundamental right of free expression, a right for the public to know what is being done in their name and the vital importance of the press in exposing abuses and miscarriages of justice by reporting

information they have received. On the other hand, there is a strong public interest in keeping the security or intelligence service secure. As Lord Bingham in *Shayler* pointed out, the commodity in which an intelligence service deals is secret and confidential information, and at §25 of his judgment, "if the service is not secure those working against the interests of the state, whether terrorists, other criminals or foreign agents, will be alerted, and able to take evasive action; its own agents may be unmasked; members of the service will feel unable to rely on each other; those upon whom the service relies as sources of information will feel unable to rely on their identity remaining secret; and foreign countries will decline to entrust their own secrets to an insecure recipient".

129. When considering the proportionality of the interference, Parliament has sought to strike a balance between these competing interests. For those who are not Crown servants, it limits its application to the unauthorised disclosure of information which has caused damage, and to those who know or can reasonably be expected to know that their disclosure would cause such damage. It places the burden of proving these elements firmly on the prosecuting authorities.

130. In this case, Mr. Assange chose to disclose documents which contained the unredacted names of informants. This falls squarely within the sort of information that Lord Bingham identified as needing to remain secret and confidential, namely the identity of those upon whom the service relies as sources of information, who need to feel able to rely on their identity remaining secret. A summary of examples of the harm caused by the disclosure of their identities is set out above. As Mr. Kromberg points out, well over one hundred people were placed at risk from the disclosures and approximately fifty people sought and received assistance from the US. For some, the US assessed that it was necessary and advisable for them to flee their home countries and that they, their spouses and their families were assisted in moving to the US or to safe third countries. Some of the harm suffered was quantifiable, by reference to their loss of employment or their assets being frozen by the regimes from which they fled, and other harm was less easy to quantify. It is alleged that Mr. Assange was well-aware of the danger to these informants; examples of his comments from 2010 are included above. In addition, it is alleged that his disclosures harmed national defence by deterring informants willing to trust the government to keep their details safe in the future.

131. The defence submits that, by disclosing Ms. Manning's materials, Mr. Assange was acting within the parameters of responsible journalism. The difficulty with this argument is that it vests in Mr. Assange the right to make the decision to sacrifice the safety of these few individuals, knowing nothing of their circumstances or the dangers they faced, in the name of free speech. In the modern digital age, vast amounts of information can be indiscriminately disclosed to a global audience, almost instantly, by anyone with access to a computer and an internet connection. Unlike the traditional press, those who choose to use the internet to disclose sensitive information in this way are not bound by a professional code or ethical journalistic duty or practice. Those who post information on the internet have no obligation to act responsibly or to exercise judgment in their decisions. In the modern era, where "dumps" of vast amounts of data onto the internet can be carried out by almost anyone, it is difficult to see how a concept of "responsible journalism" can sensibly be applied.

132. To illustrate this point, in stark contrast to Mr. Assange's final, indiscriminate disclosure of all of the data, newspapers who had worked with him from both sides of the Atlantic condemned his decision. These traditional news media outlets contrasted their own careful editorial decisions not to publish these names, with what they describe as a "data dump" carried out by Mr. Assange. The Guardian published the following report on 2 September 2011 (put in evidence to both Professor Feldstein and Mr. Timm):

> "WikiLeaks has published its full archive of 251,000 secret US diplomatic cables without redactions, potentially exposing thousands of individuals named in the documents to detention, harm or putting their lives in danger. The move has been strongly condemned by the five previous media partners, the Guardian, the New York Times, El Pais, Der Spiegel and Le Monde who have worked with WikiLeaks publishing carefully selected and redacted documents." …. "We deplore the decision of WikiLeaks to publish the unredacted State Department cables which may put sources at risk, the organisations said in a joint statement. Our previous dealings with WikiLeaks were with a clear basis that we would only publish cables which had been subjected to a thorough joint edited and clearance process. We will continue to defend our previous collaborative publishing endeavour. We cannot defend the needless publication of the complete data. Indeed, we are united in condemning it."

133. The New York Times published the following condemnation on 25 July 2012:

> "The Times and the other news organizations agreed at the outset that we would not disclose — either in our articles or any of our online supplementary material — anything that was likely to put lives at risk or jeopardize military or antiterrorist operations. We have, for example, withheld any names of operatives in the field and informants cited in the reports. We have avoided anything that might compromise American or allied intelligence-gathering methods such as communications intercepts. We have not linked to the archives of raw material. At the request of the White House, The Times also urged WikiLeaks to withhold any harmful material from its Web site."

134. The New York Times magazine published the following comments on 26 January 2013:

> "Assange was openly contemptuous of the American government and certain that he was a hunted man. He told the reporters that he had prepared a kind of doomsday option. He had, he said, distributed highly

encrypted copies of his entire secret archive to a multitude of supporters, and if WikiLeaks was shut down, or if he was arrested, he would disseminate the key to make the information public."

"While we assumed we had little or no ability to influence what WikiLeaks did, let alone what would happen once this material was loosed in the echo chamber of the blogosphere, that did not free us from the need to exercise care in our own journalism. From the beginning, we agreed that in our articles and in any documents we published from the secret archive, we would excise material that could put lives at risk. Guided by reporters with extensive experience in the field, we redacted the names of ordinary citizens, local officials, activists, academics and others who had spoken to American soldiers or diplomats. We edited out any details that might reveal ongoing intelligence-gathering operations, military tactics or locations of material that could be used to fashion terrorist weapons."

"He was angry that we declined to link our online coverage of the War Logs to the WikiLeaks Web site, a decision we made because we feared — rightly, as it turned out — that its trove would contain the names of low-level informants and make them Taliban targets"

"As for the risks posed by these releases, they are real. WikiLeaks's first data dump, the publication of the Afghanistan War Logs, included the names of scores of Afghans that The Times and other news organizations had carefully purged from our own coverage. Several news organizations, including ours, reported this dangerous lapse, and months later a Taliban spokesman claimed that Afghan insurgents had been perusing the WikiLeaks site and making a list. I anticipate, with dread, the day we learn that someone identified in those documents has been killed."

135. The law already constrains in various ways what may be published in order to avoid damage to private interests. For example, the High Court recently awarded damages against the Associated Newspaper Ltd, after the MailOnline website published an article, reporting on the arrest of the claimant in the aftermath of the Manchester Arena bombing, and disclosing details capable of leading to his identification (*Alaedeen Sicri v Associated Newspapers Limited*, [2020] EWHC 3541 (QB)). Free speech does not comprise a 'trump card' even where matters of serious public concern are disclosed (see *Stoll* above), and it does not provide an unfettered right for some, like Mr. Assange, to decide the fate of others, on the basis of their partially informed assessment of the risks.

136. As the request makes clear, those who provided information to the US did so at great risk to their personal safety. Many lived under repressive regimes and provided information about conditions within their own countries and human rights abuses from their governments. The level of concern for these sources can be seen in the extensive efforts made to locate and notify them. The request describes how some people deemed at risk could not be located; for some the US assessed that the act of warning them might draw further attention to their relationship with the US and place them in greater danger; others were not notified because it would have posed an unacceptable risk to the US forces to do so.

137. The UK has been urged to ensure that its powers under the OSA 1989 are exercised only to protect information which genuinely relates to matters of national security and to limit

their applications to instances where it has been shown that there has been a need to suppress the release of information (see *Stoll* above at§42). This prosecution is limited to documents containing the identities of informants. In my judgment, notwithstanding the vital importance in guaranteeing freedom of the press, the provisions of the OSA 1989, where they are used to prosecute the disclosure of the names of informants, are necessary in a democratic society in the interests of national security.

### The Right to Truth/ Necessity

138. The defence have not established that the principle of the "right to the truth" is a legal rule that is recognised in either international law or domestic law. They identify no international convention or treaty that enshrines it as a free-standing legal right, still less one that has been ratified by the government and incorporated into domestic law. I accept that the phrase "right to the truth" appears in UN resolutions adopted by several UN bodies, but I have been provided with no authority to demonstrate that this translates into a right enforceable in English courts. I therefore reject the defence submissions that this principle would render Mr. Assange's acts lawful in this jurisdiction.

139. The defence submits that Mr. Assange's conduct in exposing war crimes has proven necessary to prevent both 'danger to life' and 'serious injury'. It submits that to find dual criminality the court must be satisfied that this is not correct, to the standard that there can be no possible argument that it is.

140. The US submits that the defence elide the defence of necessity with a public interest defence, which as the House of Lords in *Shayler* has made clear, does not exist under the OSA 1989. It submits that the defence relies impermissibly on material outside the extradition request. In any event, this is a defence, to be dealt with at trial rather than in extradition proceedings.

### Discussion

141. First, as the US points out, dual criminality must be determined only by examining the documents constituting the extradition request. In *United States of America v Shlesinger* [2013] EWHC 2671 (Admin) the President of the Queen's Bench states at §12:

"It is clear that the scheme of the Act, and such authority as there is, lead to the very clear conclusion that in determining the issue of dual criminality the court examines the documents constituting the extradition request. It determines on the basis of that material whether the conduct alleged in the documents constitutes an offence under the law of England and Wales. It is not permissible for a requested person to put in evidence contradicting what is set out in the extradition request, unless he can bring himself within the very narrow exception to which we refer at paragraphs 14 and following below. The court must proceed to determine the issue of dual criminality on what is set out in the extradition request alone".

142. The defence bases its submission on evidence outside the extradition request, namely the materials themselves and defence expert evidence. For reasons given below the defence has not brought itself within the very narrow exception referred to in the *Shlesinger* case (the *Zakrzewski* submissions on abuse of process) and has not otherwise established a basis for introducing this evidence in this context.

143. Secondly, I accept the US's submission that the defence of necessity is not an ingredient of any of the above offences. It would only need to be determined if the defence discharges its evidential burden to raise it; and it is difficult to see how the requested person would be able to do this without (impermissibly) calling evidence on the issue. In addition, there is clear authority for the proposition that the extradition proceedings should not usurp the function of a trial court to determine substantive defences raised. In *re Evans* [1994] 1 W.L.R. 1006, 1013 -1015 Lord Templeman, setting out the role of the stipendiary magistrate in extradition proceedings, stated:

"The magistrate will first consider whether the equivalent conduct would constitute an offence against the equivalent law of the United Kingdom…The magistrate is not concerned with proof of the facts, the possibilities of other relevant facts, or the emergence of any defence; these are matters for trial.…Again the magistrate is not concerned with proof of the facts, the possibility of other relevant facts or the emergence of any defence; these are matters for trial in the foreign state."

144. The defence attempts to limit Lord Templeman's reference to "any defence" by submitting that the phrase only refers to defences where the defendant bears a legal burden. The defence submits that Lord Templeman was not seeking to include defences where there is only an evidential or persuasive burden on the defendant. I reject these submissions. A defendant is still required to raise this defence, and on the basis of evidence; if a judge decides that the relevant burden is discharged, the defence is left to a tribunal of fact to determine. These are obviously matters for consideration by the trial court.

145. Thirdly, in any event, Mr. Assange has not discharged the evidential burden in this case. Lord Woolf in *Shayler* (in the Court of Appeal) reviewed the authorities on the defence of necessity and provided the following guidance:

> ".. So in our judgment the way to reconcile the authorities to which we have referred is to regard the defence as being available when a defendant commits an otherwise criminal act to avoid an imminent peril of danger to life or serious injury to himself or towards somebody for whom he reasonably regards himself as being responsible. That person may not be ascertained and may not be identifiable. However if it is not possible to name the individuals beforehand, it has at least to be possible to describe the individuals by reference to the action which is threatened would be taken which would make them victims absent avoiding action being taken by the defendant. The defendant has responsibility for them because he is placed in a position where he is required to make a choice whether to take or not to take the action which it is said will avoid them being injured. Thus if the threat is to explode a bomb in a building if defendant does not accede to what is demanded the defendant owes responsibility to those who would be in the building if the bomb exploded".

146. However, Mr. Shayler could not identify any incident which was going to create a danger to members of the public which his actions were designed to avoid but was seeking to "blow the whistle" on the past conduct of M15 and its agents. As Lord Woolf states at §66:

> "[Mr. Shayler] cannot identify the action by some external agency which is going to create the imminent (if not immediate) threats to the life and limb of members of the general public as a result of the security services alleged abuses and blunders. This is a fundamental ingredient of the defence. Without it, it is impossible to test whether there was sufficient urgency to justify the otherwise unlawful intervention…There is no close nexus between his disclosure and the possible injury to members of the public."

147. The parallels with this case are obvious. In relation to the "obtaining" charges Mr. Assange did not know the content of the material until it was in his possession and so cannot argue that he obtained it in order to prevent harm to others. In relation to the publishing charges, like Mr. Shayler, Mr. Assange was disclosing information about the past conduct of the US government and its agencies in order to seek their reform. He has not provided evidence of any individual incident which was going to create a danger to members of the public which his disclosure was designed to avoid. Nor, like Mr. Shayler, is he able to describe individuals by reference to the actions which it was threatened would be taken unless he acted to avoid it; or identify a class of people for whom he reasonably regarded himself as responsible and in relation to whom he was required to make a choice whether or not to take action to avoid them being injured. The materials related to past conduct by the US. Whilst he expressed a wish to expose criminal conduct of the sort revealed by the Manning disclosures, such a wish does not amount to a defence. Nor is a "public interest" defence available under the OSA 1989; this was made clear by the House of Lords in *Shayler*.

Section 137(3)(c) – maximum sentence

148. The conduct is punishable with imprisonment or another form of detention for a term of 12 months or more in the US. The maximum sentence for each alleged offence is set out above.

**Section 78(4)(c): the third issue**

149. No challenge was made under section 78(4)(c) of the EA 2003. I am satisfied that copies of the documents sent to me by the Secretary of State have been served on Mr. Assange.

150. I must therefore go on to consider whether any of the bars to extradition in section 79 of the EA 2003 are applicable.

## F. BARS TO EXTRADITION

**Section 80 – Double jeopardy**
**Section 81 – Extraneous considerations**
**Section 82 – Passage of time**
**Section 83 – Hostage-taking considerations**
**Section 83A – Forum**

151. Mr. Assange does not seek to argue that his extradition is barred by operation of section 80, section 83 or section 83A of the EA 2003. However, he does raise challenges under section 81 and section 82 of the EA 2003.

**Extraneous Considerations - Section 81**

152. Section 81 provides:

> **Section 81 – Extraneous considerations**
> "A person's extradition to a category 2 territory is barred by reason of extraneous considerations if (and only if) it appears that—
> (a) the request for extradition (though purporting to be made on account of the extradition offence) is in fact issued for the purpose of prosecuting or punishing him on account of his race, religion, nationality, gender, sexual orientation or political opinions, or

> (b) if extradited he might be prejudiced at his trial or punished, detained or restricted in his personal liberty by reason of his race, religion, nationality, gender, sexual orientation or political opinions."

153. It is common ground that Mr. Assange bears the burden of proving that extradition is barred by section 81 of the EA 2003. Section 81(a) is concerned with an examination of past events and in this case the defence is required to demonstrate that the request is made for the purpose of prosecuting or punishing Mr. Assange on account of his political opinions. The standard of proof under this limb is the civil standard (see section 206 of the EA 2003). Under the second limb, section 81(b) requires there to be "substantial grounds for thinking" or "a serious possibility" or "a reasonable chance" that the warrant was issued for a prohibited purpose or that extradition might result in any of the adverse consequences set out at section 81(b). This is less than the balance of probabilities but something more than "a matter of mere possibility" (*Fernandez v Government of Singapore* [1971] 1 WLR 987 at 993-994 approved in *Hilali v National Court of Madrid* [2006] EWHC 1239 (Admin) at §62).

## Section 81(a)

*Submissions of the parties*

154. The defence submits that the Trump administration reversed a previous decision taken under the Obama administration not to prosecute Mr. Assange. Secondly, it submits that executive pressure was imposed on prosecutors from Attorney General Sessions and "almost certainly" the president to bring this criminal complaint and then to escalate the charges. It submits this was part of the administration's war on journalists and whistle-blowers. Thirdly it submits that this prosecution is unprecedented; the tenuousness and controversial nature of the allegations support a conclusion that the request is politically motivated. Fourthly, it submits that the US's alleged interference with Mr. Assange whilst at the Ecuadorian embassy by surveillance and monitoring are the actions of "*a lawless state bent on adopting any means necessary to bring him down*".

155. The US submits that Mr. Assange is being prosecuted because he has committed serious criminal offences; the allegations are narrow in compass and there is a proper objective basis for them. It submits that adverse comments by politicians identified by the defence do not make the prosecution politically motivated and the evolution of the case against

Mr. Assange as described by Mr. Kromberg as quite common. It submits that the grant of diplomatic asylum by Ecuador was an improper attempt to circumvent UK law and that the US was entitled to take steps to ensure Mr. Assange was arrested on leaving the embassy and to discuss his position with Ecuador. Monitoring Mr. Assange at the embassy may have related to the US's wider concerns about the risks he posed or a concern to know his movements.

*Discussion*

156. In summary, I accept that Mr. Assange has political opinions, outlined and explained to the court by defence witness including Professor Rogers, Noam Chomsky and Daniel Ellsberg (see Consolidated Annex). However, I am satisfied that the federal prosecutors who decided to bring these charges did so in good faith. There is insufficient evidence to establish that a decision was made not to prosecute Mr. Assange under the Obama administration; after Ms. Manning was convicted and sentenced in 2013 the investigation against Mr. Assange continued until a complaint was brought in December 2017. There is insufficient evidence that prosecutors were pressurised into bringing charges by the Trump administration; there is little or no evidence to indicate hostility by President Trump towards Mr. Assange or Wikileaks, throughout his election campaign he repeatedly and publicly praised Wikileaks, and although the intelligence community have spoken in hostile terms about Mr. Assange and Wikileaks, the intelligence community do not speak for the administration. I do not find the nature of the charges to be indicative of improper motives by prosecutors, and I consider it pure conjecture to draw inferences from the timing of these charges or the amendment of the indictment. Finally, the allegations of US interference at the Ecuadorian Embassy in London are currently being investigated by a court in Spain and I do not think it appropriate to make findings of fact on the basis of partial and untested evidence. I deal with each of these issues below.

<u>No decision not to prosecute in 2013</u>

157. The defence relies on a Washington Post article from November 2013 written by Sari Horwitz, a later article from the same newspaper dated 24 May 2019 and the opinions of defence witnesses Eric Lewis and Thomas Durkin. In her article, Ms. Horwitz reports former Department of Justice ("DOJ") spokesman Matthew Miller saying "*If you are not*

*going to prosecute journalists for publishing classified information, which the department is not, then there is no way to prosecute Assange*". In her view, the Justice Department has "*all but concluded it will not bring charges against WikiLeaks founder Julian Assange…*" The article of 24 May 2019 reports that two prosecutors argued against bringing the charges and opines that "*The internal Justice Department debate over how or whether to prosecute Assange stretched back to the Obama administration, which ultimately decided that such charges were a bad idea but did not formally close the case*". Both Eric Lewis and Thomas Durkin stated that the evidence indicated that Attorney General Holder made a decision not to prosecute under the Obama administration; both pointed out that the report in the Washington Post in November 2013 was never corrected by officials; and Mr. Lewis considered Ms. Horwitz to be very well regarded and knowledgeable with sources that are "*highly important*".

158. The US replies that the 2013 article does not support the defence account as it confirms that a formal decision had not been made and that a grand jury remained impanelled.  It submits that the comments of Attorney General Holder are no more than a statement of DOJ policy.

159. The US relies on two judgments of a US District Court which made findings that the investigations into Wikileaks were ongoing in 2015 and 2016.  In *Elec. Privacy Info. Ctr. v. Department of Justice* 82 F. Supp. 3d 307 (D.D.C. 2015), Electronic Privacy Information Centre (EPIC) made a freedom of information request regarding the surveillance of individuals who supported Wikileaks.  The court noted the background: "*On November 28, 2010, WikiLeaks published numerous classified United States government documents that had been provided to it by Private Bradley Manning. The Department of Justice immediately initiated an investigation into the possible unauthorized released of classified information*." Both the FBI and the CRM (the criminal division of the DOJ) held "*responsive records*" as part of their investigation into the disclosure, and the court found that the defendant agencies had "provided sufficient specificity as to the status of the investigation, and sufficient explanation as to why the investigation is of long-term duration", concluding that the criminal investigation was ongoing.

160. In *Plaintiff, v. U.S. Department of Justice, et al.* 234 F. Supp. 3d 26 (D.D.C. 2017), a similar freedom of information request was made by Ms. Manning in 2016. Again, the FBI made it clear that the investigation of the publication of the material leaked by Ms. Manning was ongoing. The court agreed stating:

> "To show the existence of an ongoing investigation, Defendants have offered two declarations from David M. Hardy, Section Chief of the Record/Information Dissemination Section of the FBI's Records Management Division. See Hardy Decl.; Defs.'Reply in Supp. of Mot. for Summ. J. and Opp'n to Pl.'s Cross-Mot. for Summ. J., ECF No. 16, Second Decl. of David M. Hardy, ECF No. 16-1 [hereinafter 2d Hardy Decl.]. In his first declaration, Hardy states that "[t]he records responsive to plaintiff's request are part of the FBI's active, ongoing criminal investigation into the ... disclosure of classified information [on the WikiLeaks website]." Hardy Decl. 33–34. He further asserts that "release of these records would interfere with pending and prospective enforcement proceedings." Id. 41. After Plaintiff questioned how an ongoing investigation could relate to her—given that she already had been prosecuted, convicted, and sentenced, see Pl.'s Cross-Mot. at 14–15—Hardy submitted a second declaration, clarifying that the ongoing investigation focuses not on Plaintiff, but rather on civilian involvement in the publication of classified information. 2d Hardy Decl. 6 ("To be clear, the FBI's investigation is focused on any civilian involvement in plaintiff's leak of classified records that were published on the Wikileaks website, although plaintiff's conduct is pertinent to the FBI's investigation")."

161. The US points out that Mr. Assange's US lawyer, Mr. Pollack, was aware of the investigation, writing to the Attorney General Loretta Lynch in the following terms:

> "As recently as March 15 2016, the Department of Justice in a publicly filed court document confirmed that this investigation continues to this day". On May 19 2016, in a subsequent publicly filed pleading, the Department reiterated the ongoing nature of the investigation…"
>
> ….
>
> "Despite the fact that the Department has continually publicly confirmed through court filings and statements to the press that it is conducting an on-going criminal investigation of Mr Assange, the Department has provided me no substantive information whatsoever about the status of the investigation."

*Discussion*

162. I am satisfied that no decision was made under the Obama administration, whether to prosecute or not to prosecute Mr. Assange. After Ms. Manning was convicted and sentenced in 2013 for her role in disclosing the information, the investigation against Mr. Assange continued until charges were brought in December 2017.

163. First, the "Sari Horwitz article" does not provide evidence of a formal decision being made in 2013:

   a. Ms. Horwitz relied upon unnamed "*justice officials*", unnamed "*U.S. officials*" and a former spokesman for the Department. In fact, Mr. Miller had left the DOJ two years earlier and official sources declined to provide a comment.

b.  Ms. Horwitz reports that "*a formal decision* [not to prosecute] *has not been made*" and that "*a grand jury investigating Wikileaks remains empanelled*". This undermines the defence submission that a positive decision had been made not to prosecute.

c.  In his comments to Ms. Horwitz, Mr. Miller did no more than confirm DOJ policy that it did not prosecute journalists for publishing classified information. The Department re-stated the same policy when it announced its decision to bring charges on 19 May 2019 but explained that Mr. Assange was prosecuted because he had not acted as a journalist when he published the names of human sources.

164. Secondly, the opinions of defence witnesses Eric Lewis, Thomas Durkin, Professor Feldstein were based on material already before me and did not take the matter further.

165. Thirdly, the decisions of federal courts in 2015 and 2016 are clear findings by US district courts that an investigation into these allegations was ongoing. Both courts received evidence from the FBI (and in relation to the 2015 case from the CRM) that the investigation was on-going and made a finding that it was. On the basis of a letter written by Mr. Assange's criminal lawyer to the DOJ, his lawyer was also aware of this.

166. Fourthly, as Mr. Kromberg points out, Mr. Assange made public statements acknowledging the ongoing investigation between 2013 and 2017. For example, on 15 September 2016 Wikileaks tweeted "*if Obama grants Manning clemency, Assange will agree to US prison in exchange -despite its clear unlawfulness*". On 12 January 2017 Wikileaks tweeted "*If Obama grants Manning clemency Assange will agree to US extradition despite clear unconstitutionality of DOJ case*". According to Mr. Kromberg, attached to each tweet was a letter from Mr. Assange's lawyer to Attorney General Loretta Lynch acknowledging that the criminal investigation was now "*nearly six-year[s]-old*" and asking for it to be brought to an end. One of his lawyers, Ms. Robertson, in relation to events that took place on 15 August 2017, confirmed that "*there was an ongoing criminal investigation and there had been reports of a sealed indictment. Mr. Assange had been granted asylum by Ecuador because of this and he remained in the embassy to protect himself from US extradition*.". Mr. Assange's decision to remain in the Ecuadorian embassy after the Swedish charges had been formally withdrawn on 19 May 2017, is implicit acknowledgement that he was aware that the decision had not been made.

167. Fifth, reports that the investigation has remained dormant since 2013 are not supported by evidence. The request does not disclose, and is not required to disclose, the evidence on which it is based and the prosecutors have not disclosed, and are not required to disclose, the investigation history of the case, at least until this forms part of their pre-trial obligations. I note Mr. Kromberg's statement that the US authorities are still reviewing the 134,000 cables allegedly disclosed by Wikileaks between 23 August and 30 August 2011. The evidence on which the charges are based is not yet in the public domain and accounts in the news media and by defence witnesses that it has remained the same since 2013 is pure conjecture.

168. Sixthly a grand jury remained empanelled throughout this investigation period, and long after 2013, supporting the US position that the allegations were still being investigated.

169. The evidence does not disclose that any decision was made by the Obama administration concerning Mr. Assange's prosecution. That being so, there cannot have been a reversal of any decision by the Trump administration.

<u>Executive pressure was imposed on prosecutors</u>

170. The defence submits that under the Trump administration there has been unprecedented interference by government in the criminal justice process, referring for example to the prosecution of the Chinese company Huawei. They submit that the prosecution against Mr. Assange is part of the president's war on leakers and journalists and also part of the administration's overall agenda to deter foreigners from exposing or investigating war crimes by the US.

171. The US submits that these charges are brought on a proper basis. It argues that any suggestion that the prosecution is part of a wider "war" on journalism depends on the Trump administration having reversed a previous decision not to prosecute, and this has not been made out. The US submits that the denunciations of Mr. Assange by other officials are no more than statements of policy. It submits that there is no basis for the attack on the integrity of federal prosecutors made by the defence.

*Discussion*

172. There is no evidence that federal prosecutors were pressurised by the Trump administration into bringing charges. Nor is there evidence that the federal prosecutors who brought these charges have acted in bad faith.

173. First, there is little or no evidence to indicate hostility by President Trump towards Mr. Assange or Wikileaks. His reported comments suggest that he was well-disposed towards them both:

    a. During his election campaign in 2016, the President spoke in positive terms about Wikileaks. For example, on 10 October 2016 at a campaign rally he said "*I love Wikileaks*"; on 11 October 2016 he said *"Wikileaks shows something I've been warning everybody about for a long time: the media is simply an extension of Hillary Clinton's campaign*"; on 12 October 2016, he said "*This Wikileaks stuff is unbelievable. It tells you the inner heart. You gotta read it*"; on 29 October 2016 he said "*This Wikileaks is fascinating*"; and on 4 November 2016 he said "*As I was getting off the plane they were just announcing new Wikileaks and I wanted to stay there but I didn't want to keep you waiting. Let me run back into the plane to find them*". After taking office, the Washington Times on 20 November 2018 reports him saying "*I don't know anything about* [Mr. Assange] *really*" and on 11 April 2019 he is reported as saying, "*I know nothing about Wikileaks. It's not my thing. It's not my deal in life*".

    b. On 2 December 2010 Mr. Trump is reported to have said "*I think there should be like a death penalty or something*" in reference to Mr. Assange. However, this comment was made long before the positive statements about Wikileaks reported above and related to the "leaking of taxes" rather than to national security breaches.

    c. It is widely reported that President Trump has been critical of the media. The American Committee to Protect Journalists recorded that in his second year of office, the President sent 1,339 tweets about the media that were critical, insinuating, condemning or threatening (bundle H tab 2). The report noted that the most targeted outlets were the New York Times, CNN and Fox News. It reported that, since taking office, he has insulted individual journalists via twitter 48 times and the Fox broadcaster Megyn Kelly was a primary target after she questioned his derogatory language against women. However, there is no evidence that this general hostility towards the media translated into any particular hostility towards Wikileaks and Mr.

Assange. President Trump's comments, above, demonstrate either a positive view of Wikileaks and Mr. Assange or latterly a more neutral view.

d.  The defence alleges that President Trump has interfered in the prosecution of the Huawei Chief Financial Officer, or has put pressure of prosecutors to abandon prosecutions or ensure the reduction of sentences for allies such as Roger Stone and Michael Flynn. Whether or not these allegations are true, they do not establish that pressure was brought to bear in this case. As indicated, the president's comments suggest that he was well-disposed or neutral towards Mr. Assange and Wikileaks.

e.  The defence suggests that President Trump initiated an offer of a pardon, through Republican Congressman Dana Rohrabacher, in exchange for the name of his source for the 2016 election publications in August 2017. If this offer came from the President, it undermines the defence assertion that he was aggressively pursuing a prosecution against Mr. Assange, and shows him readily abandoning it for some other perceived gain.

f.  The defence points to President Trump's 'America First' policy, his views on the entitlement of the US to resort to torture and waterboarding in the national interest and his denunciations of the International Criminal Court (the ICC). The defence argues that Mr. Assange's free speech agenda and his revelation of war crimes put him in the cross hairs of this administration. However, it is pure conjecture to link US policies to improper pressure to prosecute Mr. Assange and there is no evidence to support this theory. It is speculation. These policies did not lead to the prosecution of other internet publishers that disclosed the same "Manning" materials, such as New York based Cryptome or The Internet Archive. This sort of speculation has led to some surprising theories from defence witnesses such as the suggestion from Eric Lewis that: "*the Manning leaks [of 2010/2011] appear to have been resurrected to deflect attention away from the 2016 leaks and to attack an unpopular foreigner and try to put him in jail for the rest of his life*".

174. Secondly, although the intelligence community has spoken in hostile terms about Mr. Assange and Wikileaks, this unsurprising given that he disclosed a vast number of their

classified documents. However, the intelligence community does not speak on behalf of the president or his administration.

a. The defence submits that Mike Pompeo was leading the pursuit of this prosecution. They rely in particular on a speech from 13 April 2017 during which he described Wikileaks as a "*non-state hostile intelligence agency*" and stated, "*we have to recognise that we can no longer allow Assange and his colleagues the latitude to use free speech values against us. To give them the space to crush us with misappropriated secrets is a perversion of what our great Constitution stands for. It ends now*". However, at this time Mr. Pompeo was Director of the Central Intelligence Agency ("the CIA"). After his appointment to Secretary of State in April 2018 there are no reports of hostile comments made in relation to Mr. Assange or to Wikileaks.

b. The defence points to comments made by Attorney General Sessions a week after Mr. Pompeo's speech in April 2017 that "[journalists] *cannot place lives at risk with impunity*," that prosecuting Assange was a "*priority*" for the new administration, and that if "*a case can be made, we will seek to put some people in jail*." However, as the US points out, these comments appear to be no more than statements of what is perhaps obvious, and conditional on whether criminal liability can be established. There is nothing sinister in bringing a prosecution "*if a case can be made*".

175. Thirdly, there is no evidence that federal prosecutors were put under pressure over whether to bring charges against Mr. Assange:

a. The defence relies on a news report in the New York Times dated 20 April 2017. This refers to a "*law enforcement official*" who spoke "*on the condition of anonymity because the details of the discussions remain secret.*" On his or her account "*senior Justice Department officials had been pressuring prosecutors in the Eastern District of Virginia to outline an array of possible charges*." The limitation of the evidential value of this report is obvious: the source of the information is anonymous and the provenance of their information unknown. This news report does not provide a firm foundation for these defence submissions.

b. The defence accepts there was "vigorous debate" over the decision to return the superseding indictment. However, this prosecution tests the boundaries of protections under the First Amendment of the US Constitution and it is hardly surprising that there

was internal disagreement amongst prosecutors. The fact that the decision was preceded by debate and discussion is not only evidence of a healthy exchange of views between prosecutors, it undermines the defence suggestion that it was a decision imposed from above. The defence references to prosecutors resigning their posts over the issue, appears to be based on The Washington Post article of 24 May 2019, which identifies that two prosecutors James Trump and Daniel Grooms advocated against Espionage Act charges. The report, which relies on information from "*people familiar with the matter*", stated that by the time a decision was made to prosecute Mr. Assange, James Trump had offered his opinion and was no longer part of the discussions, and Daniel Grooms had left the Justice Department for unrelated reasons. There is no suggestion that either prosecutor resigned their posts in protest over the decision to bring charges.

c.  Federal prosecutors are bound by principles, similar to those which bind the Crown Prosecution Service in this jurisdiction, to ensure the fair and effective exercise of prosecutorial discretion, which includes the requirement to act without political bias or motivation. Mr. Kromberg is one of the prosecutors involved in this case. He states unequivocally that this prosecution is founded on objective evidence of criminality. I have been given no reason to believe that Mr. Kromberg or his colleagues have acted in bad faith and contrary to these obligations and responsibilities.

d.  On 19 May 2019 the DOJ issued remarks from the briefing announcing the superseding indictment explaining its decision to bring charges. The Department re-stated its policy not to target journalists for their reporting but made plain that its decision was based on Mr. Assange being "*no journalist*", pointing in particular to his decision to publish human source names.

176. Fourthly, the change in the nature of the charges and the increase in their number is not indicative of improper motives for this prosecution.

a.  The defence submits that the US manipulated the extradition process by ratcheting up the charges to ensure the US request would take precedence over the Swedish EAW and that the number of counts was increased to increase the potential sentence. The brief history of proceedings set out above shows that by the time the US made a request for Mr. Assange's provisional arrest on 21 December 2017, the Swedish

prosecutor had already withdrawn the Swedish charges (on 19 May 2017). The defence submits that, on 13 May 2019, the Swedish authorities announced that they intended to re-open their preliminary investigation and interview Mr. Assange. However, the announcement only concerned further investigation; there was no indication that this would lead to proceedings being re-instigated or to the re-issue of an EAW, and no fresh proceedings in fact followed. There was therefore no extant Swedish request when the superseding indictment was issued on 23 May 2019. The suggestion that the superseding indictment was returned to ward off a possible threat from a competing request from Sweden is pure conjecture.

b. Mr. Kromberg pointed out that it is quite common for a case to be initially charged with a single crime, and then followed by one or more superseding indictments that add charges; this practice permits a case to be initiated with limited evidence, whilst the investigation is ongoing. I have no reason to doubt that this is correct.

<u>The unprecedented nature of the prosecution</u>

177. The defence submit that the tenuous and controversial nature of these allegations and the fact they are unprecedented are additional reasons for finding political motivation.

178. The US denies that the prosecution is unprecedented. Mr. Kromberg pointed out that the DOJ has long viewed the intentional outing of intelligence sources as generally outside the protection of the First Amendment and provided a summary of the US caselaw to support this. He cited the opinions of the Department's Office of Legal Counsel from 1980 and 1981 which considered that proposed legislation, later to become the Intelligence Identities Protection Act, and which in certain circumstances criminalised the intentional public disclosure of the names of intelligence agents and sources, was consistent with First Amendment rights.

*Discussion*

179. I have found that Mr. Assange's conduct is capable of amounting to an offence in England and Wales. It follows that I do not accept that the mere fact charges are brought in the US demonstrates that they are brought in bad faith.

180. Cases which raise novel issues of law are not uncommon. For example, in 2001, in the US, a court considered the operation of the First Amendment in relation to a radio station which had published information obtained through an unlawful wiretapping by an unidentified third party (*Bartnicki v. Vopper*, 532 U.S. 514 2001, referred to by both parties). In 2006, a court considered the position of Mr. Rosen (and his co-defendant Weissman) who were prosecuted for passing classified information from a whistle-blower to the press (*US v Stephen Rosen* [2006] 455 Supp 2d 602). In Mr. Assange's case, a US court will have to grapple with the boundaries of free speech in relation to sensitive information in the age of the internet. However, the mere fact that the prosecution tests these boundaries, does not demonstrate that they are brought in bad faith.

Allegations regarding US interference in the Ecuadorian Embassy

181. The defence submits that the actions taken by the US against Mr. Assange whilst he was in the Ecuadorian embassy were the actions of a lawless state. They point to the US engaging in unlawful surveillance including monitoring conversations with his lawyers, and a reported plot to kidnap and poison him. They rely on the evidence of two anonymous witnesses who worked for Undercover Global, a private security firm owned by David Morales. The witnesses gave evidence about an agreement between Mr. Morales and Sheldon Adelson, an American casino magnate and financial backer of President Trump, to monitor Mr. Assange at the embassy. They described Mr. Morales making covert sound and video recordings across the embassy, with special attention paid to Mr. Assange's lawyers, and providing these to his "American friends" which the defence submits are the US government. They also argue that the US bullied and bribed the Ecuadorian authorities to ensure Mr. Assange's expulsion from the embassy.

182. The US submits that Mr. Assange was in the embassy as a result of his own unlawful conduct. It submitss that the UK has never recognised the grant of diplomatic asylum and that the US would have been entitled to negotiate Mr. Assange's position and take steps to ensure that he was arrested. It submits that if international law was violated in the embassy it is for Ecuador to assert this and Ecuador has raised no complaint. It submits that, even if Mr. Assange was surveilled, as the defence allege, this does not demonstrate that the prosecution is politically motivated as it may equally be evidence of a legitimate

and proper concern about the risks Mr. Assange posed and to know his whereabouts and movements.

*Discussion*

183. First, this allegation is currently under investigation by the Spanish High Court, the Audiencia Nacional. Mr. Morales has been arrested and interviewed; his home address and offices have been searched; Mr. Assange has provided evidence to the Spanish authorities pursuant to a European investigation order; and the Spanish authorities are in the process of seeking responses from the US government to their enquiries. This court has no access to the information discovered from this investigation. Mr. Morales has had no opportunity to offer an alternative narrative to that given by the two anonymous witnesses. In my judgment, it would be inappropriate for this court to make findings of fact on allegations still being investigated in Spain and on the basis of partial and incomplete evidence.

184. Secondly, the defence alleges that the US has disregarded international law by unlawfully entering the Ecuadorian embassy and violating the sanctity of the protection it has provided. I am not aware of an objection or complaint raised by Ecuador either to the US or to the UK authorities. Neither the Ecuadorian government nor its officials accuse the US of wrongdoing and no account is offered for the alleged presence of monitoring equipment in its embassy. The allegation made by the defence involves sensitive issues between states, including the extent to which one state consented to the surveillance of its embassy by another.

185. This point is underlined by news media reports from 2018 suggesting that the arrangements for monitoring and surveillance of its embassy were made by Ecuador rather than the US. For example, the Guardian reported that Ecuador had bankrolled a multi-million-dollar spy operation to protect and support Mr. Assange at its embassy. An article in the Guardian of 15 May 2018 reports:

> "It was against this febrile backdrop that Correa authorised a secret programme named "Operation Guest". It was later renamed "Operation Hotel". The guest was Assange, politely referred to as el huésped.
>
> The goal, at first, was to stop detectives bursting into the modest ground-floor embassy and dragging Assange away.

But documents seen by the Guardian show it developed into something more complex. The aim seems to have changed from protecting Assange – which propped up WikiLeaks in the process – to spying on him. According to the documents, the counter-espionage effort began nearly six years ago when a team secretly installed CCTV cameras in the Ecuadorian Embassy. They covered the entrance lobby, a meeting room and the mini-balcony from which Assange would periodically address supporters. The agents filmed everyone who came in and out, and kept watch on the street.

[…]

None of this came cheap. The documents set out how Ecuador's intelligence agency, known as Senain, hired an international security company. Its bill in 2012 was $55,000 (£40,000) a month, paid from a "special expenses" government budget.

[…]

Every month, the security company sent a confidential list of Assange's visitors to the Ecuadorian president. There were additional "extraordinary" reports. Sometimes, the company included stills from secret video footage of interesting guests, plus profiles and analysis…"

186. Whilst this is not evidence, it demonstrates the need for caution before making findings of fact about US involvement in a spying operation, on the basis of partial information.

187. Thirdly, if the US was involved in the surveillance of the embassy there is no reason to assume this related to these proceedings. The US would be aware that privileged communications and the fruits of any surveillance would not be seen by prosecutors assigned to the case and would be inadmissible at Mr. Assange's trial as a matter of US law. Mr. Kromberg set out the procedures which prevent prosecutors from receiving and viewing privileged materials. He also set out the US statutory provisions and case law which would enable Mr. Assange to apply to exclude any evidence at his trial which is based on privileged material.

188. A possible alternative explanation for US surveillance (if there was any) is the perception that Mr. Assange remained a risk to their national security. In February 2016: WikiLeaks published a series of documents which are said to have shown National Security Agency bugging meetings and intercepting communications with the leaders of governments from around the world; in March 2017, Wikileaks published "vault 7" which contained "*a trove of CIA hacking tools"* revealing the sophisticated software and techniques to break into electronics and described as "*the largest ever publication of confidential documents on the [Central intelligence] agency*" (see reports from the Washington Post of October 2017 and the New York Times of 20 April 2017). It reported that Wikileaks continues to publish document which have included "*classified Pentagon and State Department materials"*. A CNN report from 15 July 2019, entitled "Security reports reveal how Assange turned an embassy into a command post for election meddling", stated "[d]*espite being confined to the embassy while seeking safe passage to Ecuador, Assange met with Russians and world-class hackers at critical moments, frequently for hours at a time. He also acquired*

*powerful new computing and network hardware to facilitate data transfers just weeks before WikiLeaks received hacked materials from Russian operatives*".

189. The defence submits that the US bribed Ecuador to expel Mr. Assange from the embassy. They rely on the evidence of Cassandra Fairbanks, a journalist based in Washington DC who stated that in October 2018 she was part of a direct message group containing a number of people who worked for President Trump or were close to him in other ways. The group included Richard Grenell US Ambassador to Germany, and Arthur Schwartz, whom she described as "*a wealthy GOP donor who does communications for the Ambassador and works as an informal adviser to Donald Trump Jr*". Ms. Fairbanks shared an interview she had conducted with Mr. Assange's mother with this group. Thereafter, on 30 October 2018, she received an angry phone call from Mr. Schwartz who told her that Mr. Assange was not going to be pardoned. He said it would be the "*Manning case*" that he would be charged with and that "*they would be going after Chelsea Manning*". He also told her that the US government "*would be going into the embassy to get Assange*" and when she expressed her concern that this would amount to kidnapping he had said "*not if they let us*". On 10 September 2019, during a further conversation with Mr. Schwartz, he had told her Ambassador Grenell had coordinated for Mr. Assange to be removed from the embassy and on direct orders from the president.

190. However, Mr. Schwartz, as described by Ms. Fairbanks, is a wealthy Republican Party donor and an informal adviser to Donald Trump Jr. He has never been a US government official or formally connected with the Trump administration. Donald Trump Jr., to my knowledge, has never held a political appointment in his father's administration. I could not guess at the provenance or reliability of the information Mr. Schwartz gave to Ms. Fairbanks and did not find it to be of great significance.

191. I found no evidence to support the bullying or bribery of Ecuador suggested by the defence. There are numerous public reports in which President Moreno explained that the reason the protection of asylum was removed from Mr. Assange, was his violation of the conditions of his asylum and in particular Mr. Assange's continuing intervention in the affairs of other states. I have set out above examples of disclosures that Wikileaks continued to make whilst Mr. Assange was at the embassy. The UK Secretary of State for the Home Department made the following comments on Mr. Assange's arrest in April 2019:

"The Wikileaks founder was arrested at the Ecuadorean Embassy this morning after Government of Ecuador revoked his asylum status. Assange has spent the last seven years taking refuge in the embassy, to avoid extradition, first to Sweden, on a rape charge since dropped, but more recently to the USA.

The President of Ecuador said that Ecuador had "reached its limit on the behaviour of Mr Assange" who is accused of continued intervention in the affairs of other states, and political activity, which is not allowed while claiming asylum."

192. The defence has not established that Mr. Assange has been the target of a politically motivated prosecution. I have no doubt that the intelligence community regard him as a threat to the national defence; they have openly stated this view. However, there is no indication that this has translated into hostility from the Trump administration or that officials from the administration put improper pressure on federal prosecutors to bring these charges. I have no reason to find that prosecutors did not make their decisions in good faith.

## **Section 81(b)**

193. The defence submits that the US is taking the position that Mr. Assange has no First Amendment rights as a foreigner, for which they rely on comments by Mr. Pompeo from 21 April 2017 and the statement by Mr. Kromberg that the prosecution may argue this at his trial. They also submit that Mr. Assange will be held in especially harsh prison conditions as a result of his political opinions; and that this trial, sentence and detention will take place in the context of a criminal justice system that lends itself to political manipulation.

194. The US submits that any prejudicial statements made by politicians can be mitigated within the trial process to ensure that it is fair, and that the fact that arguments may be put forward by the prosecution regarding his status as a foreign national, does not demonstrate that Mr. Assange will be prejudiced at his trial or punished on account of his nationality

*Discussion*

195. First, the opinion of Mr. Pompeo when Director of the CIA, that Mr. Assange will not benefit from the protection of the US Constitution, is in my view immaterial. So too is Mr. Kromberg's suggestion that the prosecution may raise this as an argument at trial. It

will be for the US court to determine the proper application of the law to Mr. Assange and according to objective criteria. No authority has been provided which supports the notion that a US court would remove the protections of the US Constitution for someone in Mr. Assange's position, who is physically within their jurisdiction and facing a criminal trial before their courts. I discuss this in more detail below.

196. Secondly, I have been given no reason to believe that any of the comments relied upon by the defence will have "*irretrievably prejudiced the presumption of innocence and his prospects of a fair trial*" as the defence suggests. In short, President Trump while in office has never denounced Mr. Assange as his comments have been well-disposed or neutral towards him. Mike Pompeo strongly denounced him when he was the Director of the CIA but this is not surprising in light of the nature and extent of the leaked materials, and he has not repeated his condemnation since his elevation to Secretary of State. Attorney General Sessions indicated his wish for Mr. Assange to be prosecuted but added the important caveat "*if a case could be made*". US courts have procedures which enable a judge to ensure the selection of a fair and impartial jury and when properly directed would be perfectly capable of disregarding the strongly worded comments of Mr. Pompeo. This is dealt with below in relation to Article 6 of the ECHR.

197. Thirdly, there is no evidence that Mr. Assange would be subject to harsh detention conditions on the basis of his political opinions or nationality. I set out below the objective criteria in the Code of Federal Regulations ("CFR") at §501.2 for the imposition of special administrative measures. Administrative segregation or protective custody could result from safety concerns arising out Mr. Assange's notoriety, but this would not be based on his belief and opinions or on the fact that he is Australian.

198. Fourthly, I have been given no reason to consider that the US criminal justice system in general or the judge designated to hear this case in particular, will be manipulated for political purposes at the behest of the executive or the CIA.

199. For these reasons the defence has not met the test under section 81(b) in this case.

## G. PASSAGE OF TIME – SECTION 82

200. Section 82 of the EA 2003 provides:

> **82. Passage of time**
> A person's extradition to a category 2 territory is barred by reason of the passage of time if (and only if) it appears that it would be unjust or oppressive to extradite him by reason of the passage of time since he is alleged to have –
>       (a)  committed the extradition offence (where he is accused of its commission), or
>       (b)  become unlawfully at large (where he is alleged to have been convicted of it).

201. The meaning of the phrase "unjust or oppressive" was considered by the House of Lords in *Kakis v Government of Cyprus* [1978] 1 WLR 779 and, more recently, in *Gomes v the Government of Trinidad and Tobago* [2009] UKHL 21. At page 782H and following, Lord Diplock said this in Kakis:

> "'Unjust' I regard as directed primarily to the risk of prejudice to the accused in the conduct of the trial itself, 'oppressive' as directed to hardship to the accused resulting from changes in his circumstances that have occurred during the period to be taken into consideration. But there is room for overlapping and between them they would cover all cases where to return him would not be fair. Delay in the commencement or conduct of extradition proceedings which is brought about by the accused himself by fleeing the country, concealing his whereabouts, or evading arrest, cannot in my view be relied upon as a ground for holding it to be either unjust or oppressive to return him. Any difficulties that he may encounter in the conduct of his defence in consequence of the delay due to such causes are of his own choice and making. Save in the most exceptional circumstances, it would be neither unjust nor oppressive that he should be required to accept them. As respects delay which is not brought about by the acts of the accused himself, however, the question of where responsibility lies for the delay is not generally relevant. What matters is not so much the cause of such delay as its effect, or rather the effects of those events which would not have happened before the trial of the accused if it had taken place with ordinary promptitude".

202. In the case of *Gomes* Lord Brown of Eaton under Heywood said this at paragraph 31:

> "The other main question discussed at some length during the argument is what approach should be adopted to the concepts of injustice and oppression within the meaning of section 82. This is of course touched on in the first sentence of Diplock para 1 and, so far as concerns oppression, it is worth noting too Lord Diplock's statement (at page 284) that 'the gravity of the offence is relevant to whether changes in the circumstances of the accused which have occurred during the relevant period are such as would render his return to stand his trial oppressive'. That said, the test of oppression will not easily be satisfied. Hardship, a comparatively common place consequence of an order for extradition, is not enough."

203. A person cannot rely on this bar to extradition if he has been responsible for the delay by either fleeing the country, concealing his whereabouts or deliberately evading arrest. In *Wojciech Wisniewski (and others) v Poland* [2016] EWHC 386 (Admin), Lloyd Jones LJ gave guidance on the issues of when a person becomes a fugitive at §58:

> "Fugitive" is not a statutory term but a concept developed in the case law, in particular in Gomes and Goodyer which elaborates the principle stated in Kakis. In the context of Part 1 of the 2003 Act it describes a status which precludes reliance on the passage of time under section 14. Before this rule can apply, a person's status as a fugitive must be established to the criminal standard (Gomes and Goodyer at [27])......
> [59] On behalf of the appellants, Mr. Jones submits that in the passage in his speech in Kakis referred to in Gomes and Goodyer as Diplock 1, Lord Diplock was limiting the concept of a fugitive to cases where the person had fled the country, concealing his whereabouts or evading arrest. However, I consider that these were merely examples of a more general principle underlying Kakis and Gomes and Goodyer. Where a person has knowingly placed himself beyond the reach of a legal process he cannot invoke the

passage of time resulting from such conduct on his part to support the existence of a statutory bar to extradition. Rather than seeking to provide a comprehensive definition of a fugitive for this purpose, it is likely to be more fruitful to consider the applicability of this principle on a case by case basis."

204. Thus, if the requesting state can prove that the requested person has knowingly placed himself beyond the reach of the legal process, then the period flowing from this is effectively discounted for delay purposes.

*Submissions of the parties*

205. The defence submit that there has been a long passage of time since the allegations arose and no explanation for bringing the charges as late as December 2017. They submit the delay is culpable and a factor to be taken into account when considering the "unjust and oppressive" test. The defence returns to its submission that there has been an earlier decision not to prosecute in 2013 and argues that a previous inconsistent decision is a significant factor in determining the test. They submit that there is prejudice to Mr. Assange in reconstructing the events of 2010 and 2011 and that the late presenting of the second superseding indictment has presented him with insuperable problems in meeting the allegations. They refer to the deterioration in his mental health in the intervening period between 2010 and the present.

206. The US points out that the indictment covers offending up to 2015 (counts 1 and 2), and 2019 (counts 15 to 17). It submits that Mr. Assange is a fugitive on the basis that he lived in the embassy for seven years for the express purpose avoiding the prosecution he now faces and that it is not open to him to argue that he has suffered prejudice or oppression as a result of taking this course. It submits that changes to Mr. Assange's family life were made in the full knowledge of its precarious foundations and that there is nothing out of the ordinary in his personal circumstances.

*Discussion*

207. The history of proceedings is set out above. An investigation took place between 2011 and December 2017, when a complaint was first filed and the US requested the provisional arrest of Mr. Assange. Although an indictment was returned on 6 March 2018, the charges were not finally settled until the second superseding indictment of 24 June

2020. The relevant period for the purposes of section 82 is the period between the alleged commission of the offences and the extradition hearing.

208. First, Mr. Assange has been a fugitive from British justice since 29 June 2012. When he entered the Ecuadorian embassy on 19 June 2012, he did so in order to avoid an extradition order made by Westminster Magistrates' Court for his removal to Sweden.

209. Westminster Magistrates' Court has already considered and rejected an argument that Mr. Assange had reasonable grounds for taking the course he did, because he feared being sent to the US. On 13 February 2018, the Senior District Judge (Chief Magistrate), rejected Mr. Assange's application that it was not in the public interest that proceedings against him should be initiated following his failure to return to court to answer his bail. She stated the following at §§14 and 15 of her decision:

> "I accept that Mr Assange had expressed fears of being returned to the United States from a very early stage in the Swedish extradition proceedings but, absent any evidence from Mr Assange on oath, I do not find that Mr Assange's fears were reasonable. I do not accept that Sweden would have rendered Mr Assange to the United States. If that had happened there would have been a diplomatic crisis between the United Kingdom, Sweden and the United States which would have affected international relationships and extradition proceedings between the states.
>
> 15. Rather than rendering Mr Assange to the United States, if the US had initiated a request to extradite Mr Assange from Sweden, Sweden would have contacted this court and the judiciary here would have had to consider the request. Mr Assange would then have been able to raise any bars to extradition including fair trial and conditions of detention."

210. As the US points out, although Mr. Assange was granted diplomatic asylum by the Ecuadorian government, the UK had been clear from 2012 that it does not accept the principle of diplomatic asylum and regarded it as an improper attempt by Mr. Assange to circumvent UK law. The Foreign Secretary made the following statement on the Ecuadorian government's decision to offer political asylum to Mr. Assange:

> "It is a matter of regret that instead of continuing these discussions they have instead decided to make today's announcement. It does not change the fundamentals of the case. We will not allow Mr Assange safe passage out of the UK, nor is there any legal basis for us to do so. The UK does not accept the principle of diplomatic asylum. It is far from a universally accepted concept: the United Kingdom is not a party to any legal instruments which require us to recognise the grant of diplomatic asylum by a foreign embassy in this country. Moreover, it is well established that, even for those countries which do recognise diplomatic asylum, it should not be used for the purposes of escaping the regular processes of the courts. And in this case that is clearly what is happening."

211. Secondly, in my judgment Mr. Assange became a fugitive from US justice when the US requested his provisional arrest on 22 December 2017 and an English arrest warrant was

issued on the same date. Before that dated he was under no obligation to attend at a police station or court in response to summonses or as a condition of bail. After that date, on his own account he remained at the Ecuadorian embassy for the express purpose of avoiding the US proceedings.

212. However, I do not find the delay between the alleged commission of the offences and the bringing of the complaint to be culpable delay. I note that the investigation period was relatively lengthy. However, an investigation of this kind poses difficult problems for investigators in light of the vast amounts of data involved, the complications that arise from much of the information being classified as secret, the difficulties in following the electronic trails as information is moved, to name but a few of the issues. I note for example that according to Mr. Kromberg the US authorities are still reviewing the 134,000 cables allegedly disclosed by Wikileaks between 23 August and 30 August 2011. In any event Mr. Assange remained in the Ecuadorian embassy during almost the whole period of the investigation, out of reach of the investigating authorities and on his own case, deliberately so.

213. In any event the defence have not established that either injustice or prejudice have resulted from this delay.

214. The defence makes a general assertion that there are grave problems in attempting to reconstruct and prove the sequence of events which led to the publication of the materials. However, this is exactly the task undertaken by the defence in these proceedings. There has been no indication from the detailed, forensic examination of events leading up to the disclosures in 2011 and presented to this court, that they have been hampered in their task by the passage of time. They rely on the statement of Ms. Peirce, who complains about surveillance of her meetings with Mr. Assange at the Ecuadorian embassy in 2017 and 2018 and the seizure of legally privileged materials. However, the US response to this is clear: the fruits of any surveillance will not be seen by prosecutors assigned to the case and would be inadmissible at Mr. Assange's trial as a matter of US law. Finally, they state that Mr. Assange faces real difficulty in rebutting allegations that individuals in various countries were exposed to danger as a result of his disclosures. The prosecution will have the burden of establishing this on the basis of evidence. If the defence encounters genuine difficulties in testing or challenging this, it is reasonable to assume that the US has a

procedure which enables evidence to be excluded within the trial process, where reliance upon it would be unfair, whether by virtue of the passage of time or for any other reason.

215. In relation to oppression, this is a test not easily satisfied and mere hardship is not enough. Mr. Assange's decision to establish a family life and the inevitable impact his extradition will have on his partner and children is sadly nothing out of the ordinary in the context of extradition proceedings. I deal with the impact of incarceration on his mental health below.

216. I reject the defence submissions that his extradition is barred by virtue of the passage of time. I must therefore go on to consider whether section 84 of the EA 2003 is applicable.

**Section 84 – a prima facie case**

217. I am satisfied that the USA is designated for the purposes of sections 71(4), 74(5), 84(7) and 86(7) of the 2003 Act by order made by the Secretary of State. I therefore do not need to decide whether there is evidence which would be sufficient to make a case requiring an answer, and I must proceed under section 87 of the EA 2003.

**G. SECTION 87 – HUMAN RIGHTS**

218. Mr. Assange challenge's his extradition on the basis that it would not be compatible with his Convention rights within the meaning of the Human Rights Act 1998.

**Article 3**

219. For reasons given below I have dealt with Mr. Assange's health pursuant to section 91 EA 2003.

**Article 6**

220. Article 6 provides:

> **Article 6**
> "1. In the determination of his civil rights and obligations or of any criminal charge against him, everyone is entitled to a fair and public hearing within a reasonable time by an independent and impartial tribunal established by law. Judgment shall be pronounced publicly but the press and public

> may be excluded from all or part of the trial in the interests of morals, public order or national security in a democratic society, where the interests of juveniles or the protection of the private life of the parties so require, or to the extent strictly necessary in the opinion of the court in special circumstances where publicity would prejudice the interests of justice.
>
> 2. Everyone charged with a criminal offence shall be presumed innocent until proved guilty according to law.
>
> 3. Everyone charged with a criminal offence has the following minimum rights:
>
> (a)  to be informed promptly, in a language which he understands and in detail, of the nature and cause of the accusation against him;
> (b)  to have adequate time and facilities for the preparation of his defence;
> (c)  to defend himself in person or through legal assistance of his own choosing or, if he has not sufficient means to pay for legal assistance, to be given it free when the interests of justice so require;
> (d)  to examine or have examined witnesses against him and to obtain the attendance and examination of witnesses on his behalf under the same conditions as witnesses against him;
> (e)  to have the free assistance of an interpreter if he cannot understand or speak the language used in court."

221. In the US the Sixth Amendment to the Constitution provides:

> "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

222. The test to be applied is whether Mr. Assange can show there is a real risk that he will suffer a flagrant denial of justice in America (*Soering v United Kingdom* (1989) 11 EHRR 439). The term "flagrant denial of justice" has been found to be synonymous with a trial which is manifestly contrary to the provisions of Article 6 or the principles embodied therein (see for example *Ahorugeze v Sweden* (2012) 55 EHRR 2, at §§114-115). The burden of proof is on the requested person.

223. The defence argue that the system of plea-bargaining, swingeing sentences and overloaded indictments is designed to secure guilty pleas and increase a defendant's exposure to higher sentences. They submit that the jury pool for the location of Mr. Assange's trial is comprised almost entirely of government employees and government contractors. They submit that the prosecution will rely on evidence from Ms. Manning which was obtained through coercion and whilst she was being subjected to inhuman treatment and torture They submit that Mr. Assange's trial will be prejudiced irretrievably by the public denunciations of Trump administration officials. Finally, they submit that the possibility that Mr. Assange's sentence can be enhanced on the basis of unproven

allegations, even if acquitted of those same allegations at trial, exposes him to a real risk that his Article 6 rights will be breached.

224. The US submits that the use of plea bargaining will not give rise to a breach of Article 6 unless so coercive that it vitiates entirely the defendants right not to incriminate himself (*Babar Ahmad v United Kingdom* (2010) 51 E.H.R.R), which is not established in this case. It submits that the prospect of jury selection from a pool of government employees is remote and that, in any event, Mr. Assange would benefit from a wide range of procedural guarantees to ensure the impartiality of the jury. It submits that the arguments regarding an unjust sentencing regime are, in reality, a submission as to specialty which should be raised before the Secretary of State pursuant to section 95 of the EA 2003. Finally, it submits that in relation to Ms. Manning there is no evidence that she would be unwilling to testify for Mr. Assange or that she would not be compellable by him to give evidence at his trial and the fact that she was willing to undergo contempt or committal proceedings rather than testify does not render Mr. Assange's trial unfair.

*Public denunciations*

225. The defence submits that Mr. Assange trial is prejudiced irretrievably by the fact of public denunciations by senior government officials. For reasons given above, this submission is simply not supported by the evidence. In any event, the US has set out the clear checks and balances available to a defendant in challenging jurors and ensuring their impartiality, set out below.

*The jury pool*

226. The defence submission that it is guaranteed that the jury pool will be comprised almost entirely of government employees or government contractors is untenable. They rely on the evidence of Bridget Prince, an investigator and researcher for a company called One World Search. It is common ground that Mr. Assange's trial is likely to take place in the Alexandria Division of the Eastern District of Virginia. This Division consists of six counties: Arlington, Fairfax, Fauquier, Loudoun, Prince William and Stafford. Ms. Prince stated that there is a high concentration of government contractors working in the military and intelligence sectors in the Northern Virginia area and many are based in Fairfax

county.  She stated that, in a list of the top fifty employers in the Alexandria Division, there are six government agencies.

227. However, as Mr. Kromberg pointed out, there are 1,100,000 people living in Fairfax county alone, and the jury could be drawn from any of the six counties.  Given this large pool of potential jurors, the suggestion that twelve impartial individuals could not be empanelled is hard to sustain.

228. In any event, Mr. Kromberg set out the well-established procedural guarantees in place to ensure the impartiality of the jury. All prospective jurors will be questioned carefully as to what they have seen, read, or heard about the case and whether they have formed any opinion or impression. No juror will be qualified to serve unless the presiding judge is satisfied that he or she is able to put aside any previously formed opinions or impressions, is prepared to pay careful and close attention to the evidence, and is able to render a fair and impartial verdict, based solely on the evidence. In addition, the procedural rules allow a defendant ten peremptory challenges to "*strike [a] juror without cause*" which can be used where bias is suspected by the defence. The defence did not produce evidence that challenged the use or effectiveness of these procedural safeguards or argue that the court will not exercise proper oversight of the selection process.

*Plea bargaining*

229. The defence submits that the US federal system operates to secure pleas through coercive plea-bargaining powers. Dr. Eric Lewis gave an account of the US plea bargaining system, concluding "*the combination of the power of individual prosecutors to reduce or inflate charges and the cudgel of severe sentences available at trial mean that defendants who choose not to waive their right to trial face much higher sentences than those who accept guilty plea arrangements*".

230. However, this system was considered in some detail by the ECtHR in *Babar Ahmad v United Kingdom* (2010) 51 E.H.R.R (the 2010 admissibility decision).  At §168 the court confirmed that plea bargaining, in which a defendant receives a reduction in his or her sentence for a guilty plea in advance of trial, is neither unlawful nor improper:

"In the Court's view, it would appear that plea bargaining is more common in the United States than in the United Kingdom or other Contracting States. However, it is a common feature of European criminal justice systems for a defendant to receive a reduction in his or her sentence for a guilty plea in advance of trial or for providing substantial co-operation to the police or prosecution (for examples of plea bargains in the Court's own case law see Slavcho Kostov v Bulgaria (28674/03) November 27, 2008 at [17]; Ruciński v Poland (33198/04) February 20, 2007 at [12]; Albo v Italy (2006) 43 E.H.R.R. 27 at [22], February 17, 2005; Erdem v Germany (2002) 35 E.H.R.R. 15). Often, early guilty pleas will require the prosecution and the defence to agree the basis of that plea. For that reason, the fact that the prosecution or trial judge indicates the sentence which the defendant would receive after pleading guilty at an early stage and the sentence the defendant would receive if convicted at trial cannot of itself amount to oppressive conduct. Therefore. there is nothing unlawful or improper in that process which would raise an issue under art.6 of the Convention".

231. The court noted that, in the US system a defendant is protected against entering into an agreement unless he does so voluntarily stating at §169:

"in the federal criminal justice system, a measure of protection is provided to defendants by the role of the sentencing judge whose task it is to ensure that the plea agreement is entered freely and voluntarily. That procedure would apply to the applicants should they choose to enter into a plea bargain".

232. Mr. Kromberg confirmed the role of the court in overseeing this process. He stated that the US Constitution requires that a guilty plea is a voluntary expression a defendant's choice. Pursuant to Rule 11(b)(2) of the Federal Rules of Criminal Procedure (FRCP), a trial court is required to ensure that a guilty plea is made voluntarily and rule 11(b)(3) of the FRCP prohibits a US federal court from entering a judgment upon a guilty plea without determining that there is a factual basis for it. I am not aware of any attempt by prosecutors to enter into discussions with Mr. Assange about sentence at this early stage and there is no evidence that a plea agreement has been offered to him.

233. In relation to the submission that the indictment is overloaded, the defence rely on the evidence of Eric Lewis who stated:

"But the evidence to date demonstrates that the DOJ has every intention of punishing Mr Assange as harshly as possible and that it has the power to do so. The DOJ initiated a single five-year maximum charge against Mr Assange over seven years after the alleged offense (an indictment which remained under seal until April 2019), and thereafter it added 17 counts of violations of the Espionage Act for the same underlying conduct as the original single charge. Indeed, just in the last month, the DOJ filed a second superseding indictment which added new conspiracy allegations. Presumably such information to buttress the non-Espionage Act counts was included to have additional "relevant conduct" (see below) that could be used to enhance sentencing on counts on which Mr Assange may be convicted, even if he is acquitted on others".

234. However, there is no credible evidence to support this opinion. For reasons already given, I have found no reason to find that federal prosecutors have improper motives for

bringing these charges or to find that they have acted contrary to their obligations and responsibilities of impartiality and fairness.

*Unjust sentencing procedure*

235. The defence submits that Mr. Assange's sentence can be enhanced on the basis of unproven allegations.

236. The issue of a US court "upwardly enhancing" a sentence for an extradition offence, to include other offences for which extradition had been refused, was considered by the High Court in *Welsh and another v Secretary of State* [2006] EWHC 156 (Admin). Ousely J., giving the judgment of the court, considered the issue of "upward enhancement" in the context of the specialty arrangements. After a review of the approach by US courts to sentencing in extradition cases, he made the following general comments at §112 and §113:

> "It certainly seems alien to English criminal procedure that the sentence for one offence can be enhanced by reference to matters so serious as those engaged here without a trial, and that is a matter which had concerned the Supreme Court, in the context of mandatory increases above the standard statutory range. […]
> 113…It is possible to disagree with its merits or effects, but the approach is a legitimate one to what constitutes punishment for the offence of which someone has been convicted. In a domestic US case, in which the same procedure is adopted, they are clearly seeking to punish the defendant for the crime of which he has been convicted. The fact that they can take a broader approach to what is relevant to sentencing than the UK Courts might do, and adopt a different procedure for determining facts does not mean that there is a breach of specialty. They are still punishing the defendant, and certainly on their legitimate perception, for the offence for which the defendant has been tried, the extradition offence in an extradition case.
> […]
> The Act cannot have been intended to halt extraditions to the USA on the basis of a sentencing practice which its case law suggests has been in place since before its independence. I see force in the approach of the US Courts that if this sentencing practice was seen by the UK or other countries as breaching treaty obligations, there would have been a clarification in the superseding Treaties, but instead there is nothing which excludes that practice".

237. Although no Article 6 issue was raised in that case, these remarks confirm the court's view that the US approach to determining what is relevant to sentencing is broader than the procedure adopted in the UK, but is nonetheless legitimate. If the defence was right, the availability of sentence enhancement would render ALL extradition requests by the US doomed to failure. This cannot be the case.

238. In addition, I note that this same argument was unsuccessfully advanced by Mr. Fitzgerald, upon the same evidence of Mr. Eric Lewis, in the Grand Court of the Cayman

Islands in *MacKellar v United States of America* No. 06385/2017 at paragraphs [64] to [76]. Permission to appeal was rejected by Mrs Justice Dobbs who identified and set out the matters a US judge would have to be satisfied about before a sentence could be increased and noted the safeguards in place to ensure there was no denial of justice.

239. With reference to this specific case, the defence has not identified any particular conduct outside the conduct in the request which would result in a court "upwardly enhancing" Mr. Assange's sentence.

*Chelsea Manning*

240. The defence submits that Mr. Assange will be liable to be tried on the basis of evidence obtained from Ms. Manning by inhuman treatment and torture.

241. Ms. Manning was detained from 27 January 2011 until her release on 17 May 2017 and returned to prison for contempt on 8 March 2019. There is no foundation for the defence submission that evidence given by Ms. Manning was given as a result of her having been subjected to torture, and there is no evidence that this request is based on evidence connected with Ms. Manning's detention. Further, the defence submits that it will be deprived of her evidence following her refusal to testify to the grand jury which led to the contempt proceedings. However, as the US points out, there is no evidence to indicate that Ms. Manning will refuse to testify for the defence at trial or, if she does refuse, there is no evidence that she is not a compellable witness for the defence.

*Conclusion*

242. None of the issues raised by the defence either individually or cumulatively would result in contravention of Article 6. I have no reason to doubt that the usual constitutional and procedural protections will be applied to ensure that Mr. Assange receives a fair trial.

**Article 7**

243. Article 7 of the ECHR states:

| **Article 7** |
| --- |

> (1) No one shall be held guilty of any criminal offence on account of any act or omission which did not constitute a criminal offence under national law at the time when it was committed. Nor shall a heavier penalty be imposed than the one that was applicable at the time the criminal offence was committed.
> (2) This Article shall not prejudice the trial and punishment of any person for any act or omission which, at the time when it was committed, was criminal according to the general principles of law recognised by civilised nations".

244. The overarching aim of Article 7 is to provide a safeguard against arbitrary prosecution, conviction and punishment.

245. In *R (Ullah) v Special Adjudicator* [2004] AC 323, Lord Steyn suggested, obiter, that where a person is seeking to prevent their enforced removal from the UK on Article 7 grounds, the test is whether their removal would create a real risk of a 'flagrant denial' of Article 7. In *Arranz v Spanish Judicial Authority* [2013] EWHC 1662 (Admin), Sir John Thomas P found '*some force in the argument*' that the approach under Article 7 should be the same as the approach under Article 3 (i.e. that an extradition will be unlawful if there are substantial grounds for believing there is a real risk that it would give rise to a violation of Article 7 in the receiving state) but added that '*it must be for the Supreme Court to determine whether it should reconsider the guidance given by Lord Steyn in a case where Article 7 is actually in issue*' (para 38). The defence argues that, even on a "flagrant denial" threshold, the test is met. I will proceed on the basis that Lord Steyn's guidance has not yet been reconsidered by the Supreme Court and that it is therefore for the defence to show that there would be a real risk of a flagrant denial of Article 7.

246. In *S.W. v. the United Kingdom* (1996) 21 E.H.R.R. 363, the ECrtHR recognised that, in common law systems, the law may be developed by the courts and applied to circumstances not foreseen when a provision was enacted, and that Article 7 should not be read as outlawing this process of clarification, provided the development could reasonably be foreseen. It stated at § 34/36:

> "There will always be a need for elucidation of doubtful points and for adaptation to changing circumstances. Indeed, in the United Kingdom, as in the other Convention States, the progressive development of the criminal law through judicial law-making is a well entrenched and necessary part of legal tradition. Article 7 of the Convention cannot be read as outlawing the gradual clarification of the rules of criminal liability through judicial interpretation from case to case, provided that the resultant development is consistent with the essence of the offence and could reasonably be foreseen".

247. It set out the test for foreseeability at § 35/33:

> "From these principles it follows that an offence must be clearly defined in the law. In its aforementioned judgment the Court added that this requirement is satisfied where the individual can know from the wording of the relevant provision and, if need be, with the assistance of the courts' interpretation of it, what acts and omissions will make him criminally liable."

248. In the more recent case of *Kafkaris v Cyprus* (2009) 49 E.H.R.R. 35, this test for foreseeability was confirmed,  the court stating at §142:

> "Accordingly, many laws are inevitably couched in terms which, to a greater or lesser extent, are vague and whose interpretation and application are questions of practice. The role of adjudication vested in the courts is precisely to dissipate such interpretational doubts as remain. Article 7 of the Convention cannot be read as outlawing the gradual clarification of the rules of criminal liability through judicial interpretation from case to case, "provided that the resultant development is consistent with the essence of the offence and could reasonably be foreseen".

249. The defence submits that the elements of both the 18 U.S.C. §793 and Computer Fraud and Abuse Act (the CFAA) offences are so broad and vague that they do not meet the standards of accessibility and foreseeability required by Article 7. Eighteen U.S.C. §793 has been criticised by courts in the US for its incomprehensibility and vagueness. Executive orders determine the scope of classification and this has led to the classification of information, disclosure of which could not reasonably be expected to cause damage. The CFAA contains the same language as §793 and suffers from the same problems of vagueness. Previous "vagueness" challenges to these provisions do not assist with the application of the provisions to Mr. Assange's circumstances.

250. The defence also submits that the 18 U.S.C. §793 is sufficiently imprecise and broad as to allow it to be selectively applied to "leakers" on a case-by-case basis. The prosecution of journalists for obtaining or publishing state secrets has never occurred before and when these allegations arose, it was wholly unforeseeable that charges could be brought. In any event it is apparent from its legislative history that it was never the intention of the legislation to include the activities of the press. The defence adds that Mr. Assange will not be provided with the constitutional protections of the Fifth Amendment, as he is not a US citizen.

251. The US submits that it is unsustainable to suggest that Assange did not know, or could not have foreseen, that his conduct in assisting Ms. Manning's criminal activity, including his attempt to crack a password, and then disclosing the names of informants to the world at large, might be against the criminal law. It submits that, like Mr. Assange, numerous people have been charged in the US with conspiracy to commit computer hacking even

though they had engaged in this to obtain newsworthy information for political purposes. Regarding the CFAA, it submits that Mr. Assange's attempt to crack an encrypted password hash for Ms. Manning falls uncontroversially within its provisions. In any event, Mr. Assange is not at risk of being prosecuted on the basis of an arbitrarily uncertain criminal law because he is protected by the "void for vagueness" protections under the Fifth Amendment to the US Constitution.

*Discussion*

252. I am satisfied that the flagrant denial threshold has not been reached in this case. This is primarily because Mr. Assange's Article 7 rights are protected in America by the US Constitution and, in particular, by the Fifth Amendment.

253. The Fifth Amendment, inter alia, prohibits a person from being deprived of their liberty without due process of law ("due process clause"). It states:

> "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation".

254. Pursuant to this constitutional protection, two related but distinct doctrines have been developed by US courts; (i) the doctrines of "vagueness", which is directed at lack of sufficient clarity and precision in a statute; and (ii) the doctrine of "overbreadth" which invalidate statutes which "infringe on expression to a degree greater than justified by the legitimate governmental need" (see *United States v. Morison,* 844 F.2d 1057). The vagueness doctrine is premised on the principle that due process of law requires the government to provide potential defendants with fair warning that their conduct may be proscribed, and that vague statutes may encourage arbitrary and discriminatory enforcement (see *US v Rosen*). As the court in *Morison* (above) stated, "*[i]t is sufficient . . . to satisfy requirements of 'reasonable certainty' that while the prohibitions of a statute may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest.*" The due process clause and the development of the "void for vagueness" and "overbreadth" doctrines appear to provide the same protections to a defendant in the US as Article 7 of the ECHR provides here.

255. The defence does not criticise the US legal system or its processes. This court expects that a US court will consider challenges, to the vagueness or overbreadth of these provisions, fairly and diligently. I am told that challenges of this nature can be made either at the pre-trial stage or during the substantive trial and the defence has a statutory right of appeal against any ruling made by the lower court and a further discretionary right of appeal to the Supreme Court.

256. An example of US courts applying these doctrines in relation to 18 U.S.C. §793 can be seen in the Court of Appeals decision in *United States v. Morison,* 844 F.2d 1057. The defendant was a naval intelligence officer who transmitted classified satellite photographs of Soviet naval preparations to a British periodical. He was charged, inter alia, with offences contrary to 18 U.S.C. §793(d) and (e). The court rejected both vagueness and First Amendment challenges to the provisions. The court set out the principles underpinning the vagueness doctrine:

> "it has been repeatedly stated that a statute which "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." It noted also that "[i]t is sufficient, though, to satisfy requirements of "reasonable certainty," that while "the prohibitions [of a statute] may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest … [and they] will not be struck down as vague, even though marginal cases could be put where doubts might arise." Arnett v. Kennedy, 416 U.S. 134, 159, 40 L. Ed. 2d 15, 94 S. Ct. 1633 (1974)2".

257. It went on to explain:

> "..in any event, it is settled beyond controversy that if one is not of the rare "entrapped" innocents but one to whom the statute clearly applies, irrespective of any claims of vagueness, he has no standing to challenge successfully the statute under which he is charged for vagueness. Parker v. Levy, supra, 417 U.S. at 756. Finally, the statute must be read in its entirety and all vagueness may be corrected by judicial construction which narrows the sweep of the statute within the range of reasonable certainty."

258. In relation to the claim of overbreadth, the court acknowledged that the doctrine is an exception to the "traditional" rules of practice not recognised outside the context of the First Amendment; however, it was a "strong medicine" to be applied.

259. The court ultimately rejected Mr. Morrison's claims under both doctrines. It found the statute itself to be both constitutionally overbroad and vague, however considered that this was remedied by the trial judge limiting the scope of the term "information relating to the national defence" in its directions to the jury. The court concluded:

"The notice requirement insures that speakers will not be stifled by the fear they might commit a violation of which they could not have known. The district court's limiting instructions properly confine prosecution under the statute to disclosures of classified information potentially damaging to the military security of the United States. In this way the requirements of the vagueness and overbreadth doctrines restrain the possibility that the broad language of this statute would ever be used as a means of punishing mere criticism of incompetence and corruption in the government. Without undertaking the detailed examination of the government's interest in secrecy that would be required for a traditional balancing analysis, the strictures of these limiting instructions confine prosecution to cases of serious consequence to our national security."

260. The case demonstrates the approach a US court would take if these arguments were advanced by Mr. Assange. It shows that courts have long been alive to the issues of vagueness and overbreadth in relation to 18 U.S.C. §793 and have already interpreted it as subject to limitations which have confined its ambit.

261. It is difficult to see how Mr. Assange will be exposed to a real risk of suffering a violation of his Article 7 right in the US. A US court will make a principled determination of any vagueness and overbreadth in relation to the provisions of 18 U.S.C. §793 and the CFAA. It will take account of the ambit of the provisions themselves and any refinements to their interpretation from judicial rulings (for example which occurred in *Morrison*, above). If, on the basis of its analysis, it finds the language of the statute so broad or vague that it does not meet the standards of accessibility and foreseeability, it will find the provisions unconstitutional and therefore unenforceable. If need be any lower court rulings will be reviewed by the senior courts.

262. For this reason, there is no need for an extradition court to embark on the detailed discussion on accessibility and foreseeability invited by the defence. A US court is well equipped to interpret its own legislation and reach a conclusion that is compatible with Mr. Assange's constitutional rights. Through this process, I am satisfied that his Article 7 rights will be fully protected.

263. The defence submits that Mr. Assange will fall outside the protections of the US Constitution as he is not a US citizen. However, there is no basis for reaching this conclusion. The defence relies on the recent U.S. Supreme Court decision in *USAID v Alliance for Open Society* (2020) 140 SC 2082). The case concerned foreign affiliate organisations that were receiving funds from the US government in order to fight the spread of HIV/ AIDS abroad. It was a policy requirement by the US that such organisations should have a policy explicitly opposing prostitution and sex trafficking before funds would be allocated to them. The US government did not enforce the policy

against U.S. organisations but continued to apply it to foreign affiliates. The plaintiffs sought to invoke the First Amendment to bar the government from enforcing this policy against their legally distinct foreign affiliates. The Supreme Court, in rejecting the plaintiffs' claim, referred in the course of its judgment to it being long settled, as a matter of American constitutional law, that foreign citizens, outside US territory, do not possess rights under the US Constitution. However, the plaintiffs' foreign affiliates, were foreign organisations, operating abroad. Mr. Assange, at the time he asserts a right under the US Constitution will be on US soil facing a criminal trial before a US court. No authority has been provided which supports the notion that a person in his position would not have the protections of the US Constitution. It would be surprising if there were such an authority, as this would enable a US court to remove the right to due process at trial, on the sole basis of a person's nationality.

264. The defence submits that Mr. Kromberg expressly stated that this was an argument federal prosecutors would consider making at trial. In fact, he stated:

> "Without binding the United States to any position here, however, we could advance a number of arguments in response to those challenges. For example, concerning selective prosecution, the United States could argue that because of Assange's unprecedented conduct, there are no other similarly situated individuals, and even if there were, there was no invidious decision to prosecute. Concerning any First Amendment challenge, the United States could argue that foreign nationals are not entitled to protections under the First Amendment, at least as it concerns national defense information, and even were they so entitled, that Assange's conduct is unprotected because of his complicity in illegal acts and in publishing the names of innocent sources to their grave and imminent risk of harm".

265. Thus, the prosecution may or may not make this argument before the court. If they do, it appears to relate to the application of the First Amendment rather than to the general application of the US Constitution; the argument may be limited to the application of the First Amendment only so far as it applies to national defence information; and in any event, it will be for a court to determine on its merits. None of this raises a real risk that a court would find that Mr. Assange will not be protected by the US Constitution in general or by the due process clause of the Fifth Amendment in particular.

266. The defence has not discharged its burden to establish a real risk of a 'flagrant denial' of Mr. Assange's Article 7 rights if he is extradited to face trial in America.

**Article 10**

267. Article 10 of the ECHR states:

> **Article 10**
> "1. Everyone has the right to freedom of expression. This right shall include freedom to hold opinions and to receive and impart information and ideas without interference by public authority and regardless of frontiers. This Article shall not prevent States from requiring the licensing of broadcasting, television or cinema enterprises.
> 2. The exercise of these freedoms, since it carries with it duties and responsibilities, may be subject to such formalities, conditions, restrictions or penalties as are prescribed by law and are necessary in a democratic society, in the interests of national security, territorial integrity or public safety, for the prevention of disorder or crime, for the protection of health or morals, for the protection of the reputation or rights of others, for preventing the disclosure of information received in confidence, or for maintaining the authority and impartiality of the judiciary."

268. The applicable test is found in the case of *R (Ullah) v Special Adjudicator* [2004] 2 AC 323. In relation to qualified rights, Lord Bingham, giving the lead judgment stated:

> "While the Strasbourg jurisprudence does not preclude reliance on articles other than article 3 as a ground for resisting extradition or expulsion, it makes it quite clear that successful reliance demands presentation of a very strong case.
> […]
> The correct approach in cases involving qualified rights such as those under articles 8 and 9 is in my opinion that indicated by the Immigration Appeal Tribunal (Mr C M G Ockelton, deputy president, Mr Allen and Mr Moulden) in Devaseelan v Secretary of State for the Home Department [2002] IAT 702, [2003] Imm AR 1, paragraph 111:
>
> "The reason why flagrant denial or gross violation is to be taken into account is that it is only in such a case — where the right will be completely denied or nullified in the destination country — that it can be said that removal will breach the treaty obligations of the signatory state however those obligations might be interpreted or whatever might be said by or on behalf of the destination state"."

269. Thus, the defence must establish that extradition would result in the flagrant denial or gross violation of Mr. Assange's Article 10 rights, such that they would be completely denied or nullified in the United States.

*Submissions of the parties*

270. The defence submits that a US court is bound to conclude that the First Amendment will prevent this prosecution, and this is a sure indicator that Article 10 is engaged. It repeats its submissions that the prosecution is seeking to criminalise ordinary journalistic activity. In relation to the publishing allegations, the US Constitution curtails only very limited forms of speech and there are numerous examples of the publication of informants' names without the suggestion of criminality. It also points out that safeguards provided by the OSA 1989 which resulted in the House of Lords finding that it was compliant with Article

10 would not be available to Mr. Assange in the US, including the requirement for the Attorney General to give permission for any prosecution, and the provisions which enables a Crown servant to seek official authorisation to disclose, the refusal of which can be judicially reviewed.

271. The US submits that the First Amendment provides no protection for journalists who violate the criminal law as Mr. Assange has done (*Bartnicki* (above)). It submits that it is unrealistic to suggest that Mr. Assange is in an analogous position to a responsible journalist or publisher in light his alleged activities. It submits that Article 10 protects responsible and lawful journalism and Mr. Assange is "no journalist" on the basis of his conduct; this explains why he is the only person who has been charged in this case. It submits that it is unrealistic to suggest that the authorisation process provided for by the OSA 1989 would have allowed the revelation of source names; in any event, there are whistle-blowing avenues open to members of the military in the US.

*Discussion*

272. First, in relation to any suggestion that the First Amendment will not apply to Mr. Assange, I repeat my observations above. I have not been referred to any authority which supports the proposition that a foreign national, who is on US soil and facing trial before a US court, would be denied the protections provided by the US Constitution. This was not the decision of the U.S. Supreme Court in *USAID v Alliance for Open Society* (2020) 140 SC 2082).

273. Secondly, in relation to the defence submission that Mr. Assange's conduct was lawful, I have already determined not only that Mr. Assange's conduct would be capable of constituting criminal offences in England and Wales but also that his prosecution in this jurisdiction would not be prevented by the operation of Article 10. This clearly demonstrates that prosecution of Mr. Assange for the same conduct in the US would not involve any nullification of his Article 10 rights.

274. Thirdly, the First Amendment to the US Constitution protects freedom of speech, providing a similar protection to that given by Article 10. It states:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances".

275. As noted above, the defence does not criticise the US legal system, and I accept that the challenges raised by the defence on free speech will properly be considered. As I have noted, the defence can raise these issues at the pre-trial stage or during the substantive trial and there is a statutory right of appeal against rulings made by the lower court, and a further discretionary right of appeal to the Supreme Court. This court trusts that upon extradition, a US court will properly consider Mr. Assange's right to free speech and determine any constitutional challenges to their equivalent legislation.

276. Fourthly, in relation to the defence submission that US statutes do not contain equivalent safeguards for whistle-blowers, the US identifies the whistle-blowing avenues which would have been available to Ms. Manning in 2010. The defence complain that this evidence was not introduced formally or put to defence witnesses, however, these avenues are contained in statutory provisions available to all, and the defence have had ample opportunity in their closing submissions to comment on this material. In any event, the cache of documents disclosed in this case is rightly described as "vast" and contained the names of informants. I accept that it is unrealistic to argue that authorisation might have been given to their disclosure or that a court might sanction their disclosure upon judicial review.

277. The defence has failed to discharge its burden of establishing that extradition would constitute a flagrant denial of Mr. Assange's rights so that they would be completely denied or nullified.

## H.  SECTION 91 – OPPRESSION DUE TO HEALTH

278. Section 91 of the EA 2003 provides:

> **Section 91**
> (1) This section applies if at any time in the extradition hearing it appears to the judge that the condition in subsection (2) is satisfied.
> (2) The condition is that the physical or mental condition of the person is such that it would be unjust or oppressive to extradite him.
> (3) The judge must—
> (a) order the person's discharge, or

(b) adjourn the extradition hearing until it appears to him that the condition in subsection (2) is no longer satisfied".

279. Section 91 of the EA 2003 bars extradition if it is unjust or oppressive by reason of a person's health. In the case of *Turner v Government of the USA* [2012] EWHC 2426 (Admin), Aikens LJ summarised the relevant test at §28 of his judgment:

(1) The court has to form an overall judgment on the facts of the particular case.
(2) A high threshold has to be reached in order to satisfy the court that a requested person's physical or mental condition is such that it would be unjust or oppressive to extradite him.
(3) The court must assess the mental condition of the person threatened with extradition and determine if it is linked to a risk of a suicide attempt if the extradition order were to be made. There has to be a "substantial risk that [the appellant] will commit suicide". The question is whether, on the evidence, the risk of the appellant succeeding in committing suicide, whatever steps are taken is sufficiently great to result in a finding of oppression.
(4) The mental condition of the person must be such that it removes his capacity to resist the impulse to commit suicide, otherwise it will not be his mental condition but his own voluntary act which puts him at risk of dying and if that is the case there is no oppression in ordering extradition.
(5) On the evidence, is the risk that the person will succeed in committing suicide, whatever steps are taken, sufficiently great to result in a finding of oppression?
(6) Are there appropriate arrangements in place in the prison system of the country to which extradition is sought so that those authorities can cope properly with the person's mental condition and the risk of suicide?
(7) There is a public interest in giving effect to treaty obligations and this is an important factor to have in mind."

280. In *Kakis v Government of the Republic of Cyprus* [1978] 1 WLR 799, Lord Diplock, explained the term "unjust or oppressive" in the context of section 91 at p.782:

"73. In our view, the words in s 91 and s 25 set out the relevant test and little help is gained by reference to the facts of other cases. We would add it is not likely to be helpful to refer a court to observations that the threshold is high or that the graver the charge the higher the bar, as this inevitably risks taking the eye of the parties and the court off the statutory test by drawing the court into the consideration of the facts of the other cases. The term "unjust or oppressive" requires regard to be had to all the relevant circumstances, including the fact that extradition is ordinarily likely to cause stress and hardship; neither of those is sufficient. It is not necessary to enumerate these circumstances, as they will inevitably vary from case to case as the decisions listed at para 72 demonstrate. We would observe that the citation of decisions which do no more than restate the test under s 91 or apply the test to facts is strongly to be discouraged ..."

*Relationship between section 91 and Article 3*

281. In *Polish Judicial Authority v Mariusz Wolkowicz* [2013] EWHC 102 (Admin), the court considered the appellant's risk of suicide in an extradition context. It determined the issue under section 25 of the EA 2003 (the Part 1 equivalent of section 91) without reference to Article 3, stating at §1:

"Although it will be necessary to refer to the argument raised under Article 3 of the ECHR, the relevant provision in relation to proceedings under an EAW is s.25 of the Extradition Act 2003..."

282. The appellants had submitted that there was a difference between the approach to sections 25/ section 91 of the EA 2003 on the one hand, and the way in which the risk of suicide should be considered under Article 3, on the other. The court responded to this submission at §12:

> "[…] It is not necessary to say any more than that this is a point that does not arise in the present appeals or is likely to arise in other cases. The issue will be determined, as is evident from what we have stated, by the degree of risk of suicide and the measures in place to prevent suicide succeeding."

283. In *Lauri Love v United States of America* (2018) EWHC 172, the court considered the impact of US prison detention conditions on the appellant's mental health. It determined the issue pursuant to section 91 and thereafter decided that consideration of Article 3 was unnecessary.

284. The natural place to consider Mr. Assange's risk of suicide therefore is under section 91 of the EA 2003.

## Prison Conditions

285. The detention conditions in which Mr. Assange is likely to be held are relevant to Mr. Assange's risk of suicide.

### Pre-Trial

286. It is not disputed, that on arrival in the US, Mr. Assange will be brought before a federal magistrate judge, and if he is remanded into custody, the US Marshals Service ("USMS") will be responsible for his pre-trial detention. Nor is it disputed that, if he is detained in custody, he will likely be held at the William G Truesdale Adult Detention Centre (the "ADC") in Alexandria, Virginia. The ADC houses federal prisoners through a contract with the USMS. There are seven categories of accommodation at this jail: general population; administrative segregation (ADSEG); disciplinary segregation and pre-hearing segregation; medical segregation; protective custody; and critical care mental health unit. Staff at the ADC will complete a risk assessment and use an objective point scale to make a recommendation about where Mr. Assange should be housed. Mr.

Kromberg stated that it is "possible" that Mr. Assange could be placed in protective custody because of his notoriety and "possible" that he could be placed in ADSEG.

*Is there a real risk that Mr. Assange will be subject to special administrative measures?*

287. Special administrative measures ("SAMs") are imposed to protect national security information. Their imposition is governed by article 501.2. of the Code of Federal Regulations (the CFR). Pursuant to this Code, before SAMs can be imposed, the head of a member agency of the US intelligence community must certify that (i) the unauthorised disclosure of classified information would pose a threat to the national security and (ii) that there is a danger that the inmate will disclose such information. Upon direction of the Attorney General, the director of the Bureau of Prisons ("BOP") may authorise the warden to implement such measures as are reasonably necessary. According to the Code this may ordinarily include housing the inmate in administrative detention or limiting certain privileges, including correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to prevent the disclosure of classified information.

288. The defence witness, Dr. Eric Lewis represented Ahmed Abu Khatallah, an inmate detained in a SAMs regime at the ADC for a period of years. He considered there to be a material risk that SAMs "or a close variant of them" could be imposed on Mr. Assange on the basis that the charges brought are of considerable seriousness and are alleged to implicate national security.

289. The defence witness Maureen Baird, who had been employed as Senior Executive Service (SES) warden at the Metropolitan Correctional Center in New York ("the MCC") between 2014 and 2016 was familiar with the pre-trial SAMs regime. She considered SAMs to be "*very much on the table*" as, in her experience, if it were ruled out then Mr. Kromberg would not have referred to it at all. She also considered that Mr. Assange would meet the criteria on the basis that he is charged with an espionage crime, the political nature of his case, and the national security elements of his revelations. The US points out that her qualifications do not enable her to give evidence on this issue as she has no experience of SAMs being imposed in espionage cases at the MCC.

290. The US submits that such measures are taken exceptionally and applied rarely. According to Mr. Kromberg a tiny fraction of federal inmates are subject to SAMs: on 1 September 2020, 47 of the 156,083 inmates in BOP custody were under SAMS. Nevertheless, he described pre-trial SAMs for Mr. Assange as "*possible*". The US submits that, even if subject to SAMs, it is impossible to predict the precise measures that would be imposed; for example, in *Abdulmutallab v Sessions*, a case involving post-trial SAMs, the defendant was permitted visits with immediate family and other authorised individuals, he was permitted to communicate with non-terrorist prisoners and to request additional contacts evaluated on a case by case basis.

*Discussion*

291. This case was opened on the basis that it related to one of the largest compromises of classified information in the history of the US. The views of the intelligence community are articulated by Mike Pompeo, then head of the CIA, in a speech on 13 April 2017. He described Wikileaks as a '*hostile non-state intelligence service*'. He told the audience that Russian military intelligence had used Wikileaks to release data it had obtained through cyber operations against the Democratic National Committee and that Russia's primary propaganda outlet had actively collaborated with Wikileaks. He stated that Mr. Assange "*and his ilk*" make common cause with dictators and that "*Wikileaks will take down America any way they can*". He told the audience, "*we have to recognise that we can no longer allow Assange and his colleagues the latitude to use free speech values against us. To give them the space to crush us with misappropriated secrets is a perversion of what our great Constitution stands for. It ends now*". I have rejected the defence submission that this hostility translated into improper pressure on federal prosecutors to bring charges. However, it does demonstrate that as recently as 2017, Mr. Assange and Wikileaks were viewed by the intelligence community as an on-going threat to national security.

292. It is alleged that Mr. Assange and Wikileaks have continued to disclose classified information: the indictment itself covers offending up to April 2019 (counts 15 to 17); in February 2016, WikiLeaks published a series of documents which are said to have shown the National Security Agency bugging meetings and intercepting communications with the leaders of governments from around the world; in March 2017, Wikileaks published "vault 7" which contained "*a trove of CIA hacking tools* described as "*the largest ever*

*publication of confidential documents on the [Central Intelligence] agency*" (see reports from the Washington Post of October 2017 and the New York Times of 20 April 2017). It reported that Wikileaks continues to publish documents which have included "*classified Pentagon and State Department materials*". A CNN report from 2019 confirmed that Mr. Assange has continued to meet with Russians and "world-class" hackers and has acquired powerful new computing and network hardware to facilitate data transfers whilst at the Ecuadorian Embassy.

293. Two anonymous Spanish witnesses gave an account of the US authorities engaging in the unlawful surveillance of Mr. Assange at the Ecuadorian Embassy. They alleged that the US authorities discussed more extreme measures such as kidnapping or poisoning Mr. Assange. I have declined to make findings of fact regarding whether this took place, as the allegations are currently being investigated in Spain. I merely note here that if the allegations are true, they demonstrate a high level of concern by the US authorities regarding Mr. Assange's ongoing activities.

294. No assurances have been given that Mr. Assange will not be subject to pre-trial SAMs. Mr. Kromberg acknowledged that their imposition is possible.

295. Taking these factors into account, I consider there to be a real risk that Mr. Assange will be subject to restrictive special administrative measures.

*Conditions in pre-trial SAMs*

296. Mr. Kromberg provided limited information on conditions at the ADC subject to pre-trial SAMs. He stated that Mr. Assange would not be held in solitary confinement, that he would have access to "*other parts of the ADC*" and that it would not impact his ability to meet with his lawyers.

297. The only direct evidence on pre-trial SAMs came from Dr Eric Lewis. He had represented Ahmed Abu Khatallah who had been held in pre-trial SAMs at the ADC between 2015 and 2018. Dr Lewis described Mr. Khatallah's experience of SAMs in the following terms:

> "Mr Khatallah was confined to a small, spare cell for some 23 hours per day. Because SAMs prisoners are isolated from all other prisoners at all times, he was only permitted to leave his cell for meetings with counsel (when the floor was cleared for his transport in leg and arm shackles from his cell to a dedicated room where he was subject to surveillance at all times) or for exercise, which generally took place in the middle of the night when all other prisoners were asleep and the exercise area was empty. He frequently declined exercise rather than be awakened to walk around a darkened empty area. He was not permitted to retain any documents in his cell".

298. Ms. Baird gave evidence of her experiences of pre-trial SAMs as SES Warden at the MCC between 2014 and 2016.  She described detainees confined to their cells for 24-hours per day; recreation time took place in isolation and in a small barren indoor cell and was often declined; outside contact was limited to approved family member for 30 minutes or two 15-minute phone calls per month; mail sometimes took months to arrive and was routinely screened. In her words at §11:

> "Inmates were in solitary confinement, technically, for 24-hours per day. There was absolutely no communication, by any means, with other inmates. The only form of human interaction they encountered was when correctional officers opened the viewing slot during their inspection rounds of the unit, when institution staff walked through the unit during their required weekly rounds, or when meals were delivered through the secure meal slot in the door. One-hour recreation was offered to inmates in this unit each day; however, in my experience, often times an inmate would decline this opportunity because it was much of the same as their current situation. The recreation area, in the unit, consisted of a small barren indoor cell, absent any exercise equipment" (§11)

299. Ms. Baird confirmed that Jeffrey Epstein committed suicide at the jail last year. Before that, there had been no suicides during the previous 13 years.

300. Ms. Lindsay Lewis, a US criminal defence attorney, confirmed conditions in pre-trial detention for SAMs prisoners at the MCC. She currently represents Mostafa Kamel Mostafa (formerly known as Abu Hamza). He is serving a life sentence of imprisonment in BOP custody imposed on 9 January 2015, having been convicted of serious terrorist related offences. He is severely disabled with a double upper-arm amputation and blindness in one eye. He was held subject to pre-trial SAMs at the MCC New York and post-conviction, he is still subject to SAMs at the Administrative Maximum Security prison ("the ADX"), Florence. Ms. Lewis visited Mr. Mostafa many times at the MCC and described her clients conditions:  he was not allowed to associate with other prisoners even when outside his cell; after his extradition in October 2012 until January 2013, he was given only two legal calls with counsel and communication by email was prohibited; he was unable to communicate with his lawyers by e-mail; legal visits were not assured as the unit could only accommodate a limited numbers of legal visitors or she was turned away for more standard reasons such as lockdowns.

**Post-Trial**

301. If Mr. Assange is convicted and sentenced to a term of imprisonment, the BOP will be responsible for designating a post-sentencing facility for his detention.

***Is there a real risk that Mr. Assange will be housed at the ADX Florence?***

302. Mr. Kromberg considerd it "*purely speculative*" to conclude that Mr. Assange would be designated to the ADX. He stated, "*In short, sentencing and facility designations are difficult to predict, and, as a result, it is purely speculative to conclude that Assange would receive a life sentence and/or be designated to the ADX.*" He stated that the philosophy of the BOP is to house all inmates in the least restrictive environment appropriate for the inmate. He stated that the ADX Florence is the most secure prison in the federal system and designed to safely house the BOP's most violent, predatory and escape-prone prisoners with only 300 of the 129,000 prisoners in the BOP's custody housed there.

303. It is an agreed fact that there are currently nine inmates subject to a SAMs for espionage, of which four are housed at the ADX Florence, one at MCC New York, two at FCI Terre Haute, one at FCI Hazelton, and one at FMC Carswell.

304. For the defence, Ms. Baird stated that once a decision is made to impose SAMs post-conviction, there are few choices for where the inmate will be housed: if he is not gravely ill, requiring placement at a Federal Medical Centre ("FMC"), she initially stated the only option is placement at the ADX Florence but later accepted that placement in other parts of the prison system was also possible. She was unaware of the agreed fact that, of the nine individuals who are detained for espionage offences and subject to SAMs, only four are housed at the ADX Florence.

305. The criteria for the imposition of SAMs are the same post-conviction as it is for pre-trial. I have already found there to be a real risk that Mr. Assange will be subject to these restrictive measures. Many inmates subject to SAMs (although not all) are held at the ADX Florence and half of those subject to SAMs and convicted of espionage offences

are housed there. In my judgment there is a real risk that Mr. Assange will be designated to the ADX, Florence.

### Conditions in the ADX Florence for inmates subject to post-trial SAMs

306. Mr. Kromberg provided the following overview: inmates subject to SAMs are housed on the H-Unit; they receive a minimum of 10 hours of out-of-cell exercise per week; generally, they "*recreate individually*" in secure single recreation areas; they consume their meals in their cells; they receive up to four monthly social telephone calls and may receive up to five social visits. The inmates incarcerated in H Unit have the opportunity to participate in a 3-phase special security unit program (SSU Program). Phase 1 is the baseline phase. An inmate may be permitted 2 non-legal telephone calls per month, access to a commissary list and art and hobby craft items, and escorted shower time on the inmate's range—the common area outside of a cell— 3 times each week. After approximately 12 months, phase 2 can be achieved. In phase 2, an inmate may be permitted 3 non-legal telephone calls per month and access to an expanded commissary list and additional art and hobby craft items and are allowed to be out of their cells without an escort 5 times each week. Phase 3 typically requires a modification of the SAMs to allow inmates to have physical contact with one another. In phase 3, inmates are allowed to be out on the range together; they eat a meal together and engage in recreational activities, including watching television, reading and playing cards; they may shower at any time they are on the range; and they continue to have access to the expanded art and hobby craft list and a further expanded commissary list. Inmates housed in the SSU are reviewed annually by the Attorney General to determine if their SAMs status should be renewed or modified.

307. In *Babar Ahmad v United Kingdom* (2012) 56 E.H.R.R. 1 the ECrtHR conducted a thorough review of the conditions in post-trial detention at the ADX Florence and the effect of SAMs in the context of a challenge under Article 3 of the ECHR. The court accepted that the purpose of the regime in phase 1 on the H-Unit was to prevent all physical contact between an inmate and others, and to minimise social interaction between detainees and staff. It found, however, the resulting isolation to be partial and relative. Mr. Ahmad (the first applicant) had been diagnosed with post-traumatic stress disorder, which had worsened in the prison unit where he was detained. Mr. Ahsan (the third

applicant) had been diagnosed with Asperger's syndrome, recurrent depressive disorder which had included severe depressive episodes, and obsessive-compulsive disorder in conjunction with other anxiety symptoms. A psychiatrist had predicted a high risk of serious depression leading to suicide if he were to be extradited and placed in solitary confinement for a long period. Mr. Bary (the fifth applicant) had a recurrent depressive disorder and had suffered several mental breakdowns whilst in detention in the UK and his most recent psychiatrist's report assessed his current episode as moderate to severe. Nevertheless, the court found that it did not appear that the psychiatric services which are available at the ADX Florence would be unable to treat the various mental health problems suffered by the applicants. It did not find that the material conditions in which the applicants were held, taking account of their mental health issues, breached their Article 3 rights.

308. In Mr. Assange's case, none of the defence witnesses had visited the ADX, Florence. Each however produced and commented on "open source" material which I have read.

309. Particular reliance was placed on the report of the *Centre for Constitutional Rights in conjunction with the Allard K. Lowenstein International Human Rights Clinic* ("the Darkest Corner") 2017. This provided the following description of conditions at the ADX Florence for inmates subject to SAMs: prisoners are generally allowed a total of 10 hours outside their cell per week; however this time is spent alone in a small indoor room or a cage hardly bigger than their cell; inmates are forbidden from communicating with other prisoners, for example, by yelling though the walls; communications with people outside the prison are usually restricted to their lawyers and a few immediate family members who must be cleared by the US government; SAMs typically restricts prisoners to writing one letter per week to a single family member and this may not exceed three double-sided sheets of paper, forwarded to FBI agents for approval; over time, the delays in receiving mail can degrade the quality of communication between a prisoner and his family to the point where it can feel worthless; phone calls are severely restricted and contemporaneously monitored; during non-legal in-person visits no physical contact is allowed, with conversations taking place thorough a thick glass barrier and prisoners shackled and chained at their wrists, ankles and to the ground; 14-days advance notice is required for visits, and these can take months to coordinate because SAMs prisoners cannot use a visiting room when any other prisoner is present.

310. The defence also produced a report of the *USP Florence ADX Inspection by the Corrections Information Council ("CIC")* dated 31 October 2018 (date of inspection 26-27 April 2017).   A response by the BOP was provided in 2018. The CIC noted that psychological services are offered primarily through self-help packets and information provided by video; there were only 5 individual therapy slots available across the prison; and participants in group therapy are kept in individual cages and remained shackled. It expressed concern that those self-harming or who have attempted suicide were described by staff as "*just getting attention many times*" and that "*inmates who are disciplined are less likely to commit self-harm again*". It noted that rates of documented instances of inmates 'threatening Bodily Harm' was 8.7/100 compared to the overall BOP rate of 0.9/100. The report documents one inmate reporting that he suffered from depression and bipolar disorders but who was taken off medication in January 2017 following which he attempted suicide and, by April 2017, he had yet to receive any medication. It documents another inmate being taken off psychotropic medication following his attempted suicide by swallowing pills. At the time of the inspection one inmate was on suicide watch. Staff reported that the facility had two or three suicide attempts in the past year and the last completed suicide was on 25 December 2015.

311. The BOP, in its response, stated that medical, psychological and mental health services are available for all inmates and that most mental health patients receive evaluations, follow up and medication review weekly from at least one department. It confirmed that if warranted, inmates are transferred to an FMC. It stated that the BOP has a robust screening programme to ensure inmates with serious mental illness are not placed at the ADX Florence. An inmate may be removed from the ADX at any point if his mental health and security needs can be managed in a different setting.

**The Psychiatric Evidence**

**The defence medical evidence**

*Professor Kopelman*

312. Professor Kopelman is an emeritus professor of neuropsychiatry at Kings College London and, until 31 March 2015, a consultant neuropsychiatrist at St Thomas's Hospital. He prepared two reports dated 17 December 2019 and 13 August 2020. He saw Mr. Assange between 30 May 2019 and November 2019 for his report of 17 December 2019; he then saw him on 31 January 2020 and 3 March 2020 (and briefly on 13 February) for his report of 13 August 2020. He carried out a comprehensive investigation of Mr. Assange's psychiatric history, including conversations with his mother and father, his oldest friend, a former work colleague and his current partner. He accessed Mr. Assange's medical records from HMP Belmarsh and from the Royal Melbourne Hospital (2002 to 2006). He discussed the case with Professor Mullins who had interviewed Mr. Assange in 1996 and had provided a psychiatric report in unrelated court proceedings.

313. At the time of his December 2019 report, Professor Kopelman diagnosed Mr. Assange with a recurrent depressive disorder, which was severe in December 2019, and sometimes accompanied by psychotic features (hallucinations) and often with ruminative suicidal ideas. He also diagnosed post-traumatic stress disorder (PTSD) relating to an incident when Mr. Assange was 10 years old; generalised anxiety disorder with symptoms that overlap with features of the depression and PTSD; and traits of autism spectrum disorder (ASD). By the time of his August 2020 report he found that Mr. Assange's depression had subsided to 'moderate' severity; The auditory hallucinations were much less prominent and less troubling and the somatic hallucinations had been abolished. His symptoms in December 2019 included loss of sleep, loss of weight, impaired concentration, a feeling of often being on the verge of tears, and a state of acute agitation in which he was pacing his cell until exhausted, punching his head or banging it against a cell wall. Mr. Assange reported suicidal ideas during this period, telling Professor Kopelman that life was not worth living, that he had been thinking about suicide "*hundreds of times a day*", and had a "*constant desire*" to self-harm or commit suicide. He told Professor Kopelman that he had called the Samaritans virtually every night and on two or three occasions, when they had not been available had made superficial cuts to his thigh and abdomen to distracted him from his sense of isolation. He described suicidal plans which Professor Kopelman considered to be "*highly plausible*".

314. Professor Kopelman attributed the improvement in Mr. Assange's mental health to his move from the relative isolation of the healthcare unit to the general population wing; the

start of psychotherapy sessions with the prison's forensic psychologist, Dr. Jane Corson; and the introduction of quetiapine alongside his anti-depressants. Mr. Assange remained moderately depressed with symptoms including feelings of worthlessness, hopelessness, and helplessness; after lockdown, he felt "*very depressed, very bleak*,"; his sleep was disrupted with morbid dreams; he was preoccupied by the conditions of incarceration that he would face in the US and by the recent suicide of his friend, Peter Tonoli, and attempted suicide of Chelsea Manning.

315. Professor Kopelman described Mr. Assange's psychiatric history. Notably, in 1991, he was admitted to hospital for a week after slashing his wrist. He has had three previous episodes of depression. There is a family history of depression and both his paternal uncle and maternal grandfather committed suicide.

316. Professor Kopelman considered that, if housed in conditions of segregation and solitary confinement, Mr. Assange's mental health would deteriorate substantially resulting in persistently severe clinical depression and the severe exacerbation of his anxiety disorder, PTSD and suicidal ideas. He has not tolerated the relative isolation of the healthcare unit well. Various protective factors available to him in the UK would be absent: for example, he speaks to his partner by telephone nearly every day and, before lockdown, was visited by her and his children, various friends, his father, and other relatives and has called the Samaritans helpline on numerous occasions. He considered there to be an abundance of known risk factors indicating a very high risk of suicide including the intensity of Mr. Assange's suicidal preoccupation and the extent of his preparations. Although the imminence of extradition or extradition itself would trigger the attempt, its cause would be Mr. Assange's clinical depression. He stated, "*I am as confident as a psychiatrist ever can be that, if extradition to the United States were to become imminent, Mr. Assange will find a way of suiciding*".

317. Professor Kopelman's assessment of a severe depression and the presence of psychotic features was challenged. It was suggested that Mr. Assange had a strong incentive to feign or exaggerate his symptoms and that there was suspicion surrounding reports that he read scientific journals including the British Medical Journal (the BMJ). More generally, the US strongly suggested that Professor Kopelman had failed in his duty to be impartial by deliberately concealing the information that he had been told about Mr. Assange's partner

Stella Morris, and their children. In his first report, Professor Kopelman described Ms. Morris's connection to Mr. Assange as follows "*she was employed by Mr. Assange in February 2011, when he needed someone to research the Swedish case*". In fact, Ms. Morris was (and still is) Mr. Assange's partner and the mother of two of his children. This became public knowledge in April 2020, in the context of a bail application. The US also challenged his reliability as an expert witness on the basis of his reference to the ICD and DSM (World Health Organisation classification guidelines) as "*those bloody books*" and his inability to recall relevant ICD diagnostic criteria or the meaning of the acronym "ACCT" (assessment, care in custody and teamwork). The US was critical of what it considered to be selective details extracted from the prison medical notes and argued that he had betrayed impartiality in his comment, "*I included things that might be against my argument*" and his refusing to agree that Mr. Assange's behaviour, as recorded in his medical notes, was inconsistent with his self-report that he was thinking of suicide a hundred times a day. It also suggested that changes in emphasis from contemporary handwritten notes to his written report and failure to include information which were contrary to his diagnosis, showed partiality.

*Dr. Crosby*

318. Dr Crosby is an American physician whose focus is on the care of asylum seekers and refugees. Between October 2017 and January 2020 Dr. Crosby had undertaken six clinical interviews and evaluations of Mr. Assange. In her opinion, Mr. Assange is suffering from major depression, possibly with psychotic features. Over the time she has known him, his symptoms of depression have become severe and his risk of self-harm and suicide has markedly increased. In her opinion, Mr. Assange is at extremely high risk of self-harm or completed suicide if he remains in his current conditions or is extradited to the US.

*Dr. Deeley*

319. Dr. Deeley is a consultant developmental neuropsychiatrist at the National Autism Unit, Bethlem Royal Hospital. He observed Emma Woodhouse conduct an autism diagnostic observation schedule (ADOS) assessment over 2 hours, on 17 January 2020, and conducted his own telephone interview with Mr. Assange, on 9 July 2020, in three sessions for a total of 6 hours. In his opinion Mr. Assange is suffering from a depressive

condition of a fluctuating nature. When he interviewed Mr. Assange in July 2020, he found him to be suffering a moderate depressive episode of the condition, and found that he met the diagnostic criteria for an autism spectrum disorder albeit that his was "*a high functioning autistic case*" and Asperger's syndrome disorder. Dr. Deeley described Mr. Assange as an intelligent and determined individual who "*knows how to kill himself*". He has a strong awareness of his reputational standing as a public figure, and was sensitive to being demeaned or humiliated. He would perceive his extradition not only as unjust but as a form of exemplary punishment and humiliation, which he would find intolerable. He would also find methods employed in US jails to prevent suicide, such as being placed in a restraining jacket, to be intolerable. Mr. Assange's propensity for analytic and systematic thought, with extreme focus, has resulted in him minutely considering the likely sequence of events and, in his opinion, Mr. Assange would kill himself rather than face these events. He stated that the absence of serious suicide attempts at HMP Belmarsh should not be taken as evidence that his risk of suicide is low or could be adequately managed. In his opinion, if Mr. Assange were extradited to the US the risk of attempted suicide would be high.

320. Dr. Deeley's diagnosis of autism spectrum disorder was challenged. It was suggested that this condition had not prevented Mr. Assange running Wikileaks as a global enterprise; public speaking; or presenting a television chat show in 2011 ("The Julian Assange Show") for the TV programme 'Russia Today'. Nor had it prevented him establishing intimate relationships. The US challenged Dr. Deeley's basis for his diagnosis, for example, stating in closing submissions, "*you do not have to be any sort of medical expert to know that the diagnosis of a trait based upon the hearsay evidence that as a child Assange would 'look intently at the complex pattern scarves when she draped over the neck covering his crib in hot weather' is flawed*".

**The US medical evidence**

*Dr. Blackwood*

321. Dr. Blackwood is a consultant forensic psychiatrist with the South London and Maudsley NHS trust and is based at HMP Wandsworth. He interviewed Mr. Assange on 11 March 2020 and 18 March 2020 for a total of four hours. When he interviewed Mr. Assange in March 2020, Dr. Blackwood considered him to be moderately depressed, but

found further improvement in his mood state in his medical notes between March and July 2020. Dr. Blackwood found no evidence of marked somatic syndrome or psychotic symptomatology. He did not consider that a diagnosis of PTSD was warranted. He did not consider that Mr. Assange met the diagnostic threshold for an autism spectrum disorder.

322. Dr. Blackwood confirmed that Mr. Assange was placed on an ACCT on arrival at the prison; on 18 May 2019 he was admitted to the healthcare unit; and, on 21 December 2019, he was returned to ordinary location. Dr. Blackwood found Professor Kopelman's diagnosis of severe depressive episode with psychotic features in December 2019 to be rather at odds with Mr. Assange's social functioning shown in his notes. Dr. Blackwood considered Mr. Assange's premorbid personality as having a "*rather self-dramatising and narcissistic aspect*" and that his medical notes indicated a more ordinary clinical picture of depression. He noted that his consultant psychiatrist, Dr. Daly, has never viewed Mr. Assange as sufficiently depressed or suicidal to merit external review by or transfer to secure psychiatric services and noted that his medical notes contained numerous entries stating that Mr. Assange was not suicidal or exhibiting any self-harm ideas. However, he also noted entries recording Mr. Assange regularly accessing the ward's Samaritans phone, some references to suicidal ideation and self-harm (telling Dr Corson that he had secreted a kettle cord in his cell four months previously) and, in December 2019, that staff recorded him sleeping under his bed as he did not hallucinate if he slept there.

323. Dr. Blackwood noted that Mr. Assange's history revealed a single episode of self-harming behaviour (the cut to the wrists as a young adult) but no suicidal behaviours. There is little other evidence of impulsive acts or of difficulties with self-control. There have been no episodes of self-harming behaviour or suicide attempts during his period of imprisonment at Belmarsh. He accepted there was some risk of a suicide attempt linked to extradition but this did not reach a "*substantial risk*" threshold and having read Mr. Kromberg's declarations he considered the risk could be appropriately managed in the Virginia state system. The conditions in the ADSEG unit and SAMs were put to him and he agreed that, if they applied, they would impact Mr. Assange's mood. Nevertheless, he considered that, even in these conditions Mr. Assange's mood state would be modifiable and any suicidal risk treatable. He considered that Mr. Assange had proved himself to be a very resilient and resourceful person. Mr. Assange's current mental state did not remove

his capacity to resist the impulse to commit suicide and even in a worsened depressive state he would retain this capacity.

324. Dr. Blackwood's evidence was challenged. It was suggested that his view was contrary to other expert opinion on diagnosis and risk. It was suggested that he had taken Mr. Kromberg's evidence at face value in considering the conditions Mr. Assange would face in the US and that his assessment of Mr. Assange's current mental state did not address the further risk of deterioration in conditions outlined by the defence witnesses.

*Professor Fazel*

325. Professor Fazel is a Fellow of the Royal College of Psychiatrists and a specialist in forensic psychiatry. He has a specialisation in prison suicide, having published extensively on this topic and has carried out a number of empirical studies looking at suicide in prisoners. He interviewed Mr. Assange on 16 March 2020 for around two hours and conducted a telephone assessment for two hours on 29 June 2020. He made a clinical diagnosis of depression of moderate severity and considered the pattern of a depression to be predominately moderate in nature. He noted that Professor Kopelman had characterised Mr. Assange's depression as severe in December 2019 and considered it possible that improvements to his condition had been caused by treatment with quetiapine, his removal from healthcare to a less isolated setting and his increase in social and legal support. He did not characterise Mr. Assange's depression as psychotic. He considered that Mr. Assange's reported bizarre sensations on his body, which stopped by the time of his first assessment and have not returned, may have been somatic hallucinations or heightened sensitivity due to severe anxiety. He agreed with the view that Mr. Assange has some autistic-like traits.

326. Professor Fazel describes Mr. Assange's suicide risk as "*currently high*". He identified risk factors which include suicidal ideation, an underlying clinical depression, and hopelessness; however, he considered the risk to be manageable and modifiable by conversations with his partner, with the Samaritans, and by a positive perception of the progress of his case. Extradition would increase the suicide risk but the risk may be modifiable, depending on unknown circumstances such as a worsening of his clinical depression, lack of engagement with treatment, a deterioration in his legal position, and

reduced access to sources of family and social support. Mr. Assange's capacity to self-manage, for example by phoning the Samaritans, taking his medication and engaging with psychological treatment, is not consistent with the idea that his mental condition is so severe that he cannot resist suicide.

327. Professor Fazel did not consider Mr. Assange's risk factors to be strongly predictive, as they are prevalent in male prisoners, and suicide remains a very rare outcome; even putting them together did not necessarily translate into a high probability of suicide. He considered it important to contextualise risk: in describing a risk as "*high*" he simply meant an elevated risk of suicide compared to prisoners of similar age and gender. He also stated that a suicide risk is dynamic which means that it changes in relation to circumstances. He confirmed that environmental factors, including solitary confinement, were closely associated with self-harm but that this should not be conflated with suicide. He agreed with statistics from Professor Baron-Cohen that suicidal ideas are increased in a person with an autistic spectrum disorder but found it important not to conflate "ideas of self-harm" with actual "self-harm", or "suicide". He also considered it necessary to consider the baseline rate of suicide in people with autistic disorder before considering an increase in risk.

### Daniel Guedalla

328. Mr. Guedalla is a solicitor at Birnberg Peirce Ltd. He produced a copy of the prison adjudication report, which confirmed that, on 5 May 2019 at 15.30 during a routine search of the cell solely occupied by Mr. Assange, inside a cupboard and concealed under some underwear, a prison officer found "*half of a razor blade*".

## Findings on the medical evidence

329. First, I did not accept that Professor Kopelman failed in his duty to the court when he did not disclose Ms. Morris's relationship with Mr. Assange. Criminal Procedure Rule 19.2 provides that an expert must help the court to achieve the overriding objective (to deal with cases justly) by giving an objective unbiased opinion on matters within his or her area of expertise. In his first report of 17 December 2019 Professor Kopelman described Ms. Morris as follows "*Ms Morris is a UK resident of Swedish nationality. She took a degree in Law and Politics at the School of Oriental and African Studies in London,*

*and then an MSc in Oxford. She was employed by Mr. Assange in February 2011, when he needed someone to research the Swedish case. She also works with a very prominent Spanish lawyer, dealing with asylum matters, and acts as a legal researcher and coordinator*." This is misleading  as, by this time Ms. Morris was Mr. Assange's partner and mother of two of his children.  In the same report, he states: "*Subsequently, Mr. Assange commenced a close relationship with another woman, which is of continuing huge importance and support to him. This woman has remained very supportive, which greatly helped his morale in the embassy. She has two children*".  This is misleading as it implies  that Mr. Assange was not the father of the two children.  Professor Kopelman was aware that Mr. Assange's children  were a significant  factor in the assessment of his risk of suicide, as Mr. Assange had told him  in August 2019 "*The only things stopping [me] from suicide were the "small chance of success" in his case, and an obligation to his children*".

330. In my judgment  Professor Kopelman's decision to conceal their relationship  was misleading  and inappropriate  in the context of his obligations  to the court, but an understandable  human response to Ms. Morris's predicament.  He explained  that her relationship  with Mr. Assange was not yet in the public  domain and that she was very concerned  about her privacy.  After their relationship  became public,  he had disclosed it in his August 2020 report. In fact, the court had become aware of the true position  in April 2020, before it had read the medical evidence or heard evidence on this issue.

331. Regarding  the suggestion  of partiality,  I did not find Professor Kopelman's inadvertent reference to his "argument"  rather than his "opinion"  to be sinister.  I did not find that any discrepancy  between his contemporaneous  notes and his final report amounted  to an attempt to alter the information  or impression  given to him by his interviewees  but to have resulted from inadvertence or error.  The contemporaneous  notes were made available to the US on request,  and there would be no advantage to Professor Kopelman in deliberately amending  information  which was available for all to see.  Nor did I find his inability to recall from memory the diagnostic  ICD criteria or the meaning of the acronym ACCT to be "strange",  as the US suggests,  or to cast doubt on his expertise;  his evidence to the court was not a test of his memory or his ability to recollect information  that could easily be found in a book. I did not find Professor Kopelman's summary of the medical notes to be misleading;  the notes were voluminous,  running  to 351 pages and only a broad overview  of their content was possible.  His summary included  entries recording  an

absence of self-harm or suicidal thoughts as well as signs of Mr. Assange's depression. Finally, the US submitted that it was strange that the finding of a razor blade should only be recorded as a disciplinary infraction rather than related to a suicide attempt, and that "*enormous*" weight had been given to the incident by Professor Kopelman. However, I noted that Professor Kopelman recorded this incident faithfully and without embellishment. I did not find that he gave the incident undue weight but that he considered it as one of very many factors indicating Mr. Assange's depression and risk of suicide. In short, I found Professor Kopelman's opinion to be impartial and dispassionate; I was given no reason to doubt his motives or the reliability of his evidence.

332. Secondly, I accepted Professor Kopelman opinion that Mr. Assange suffers from a recurrent depressive disorder, which was severe in December 2019, and sometimes accompanied by psychotic features (hallucinations), often with ruminative suicidal ideas. Professor Kopelman is an experienced neuropsychiatrist with a long and distinguished career. He was the only psychiatrist to give evidence who had assessed Mr. Assange during the period May to December 2019 and was best placed to consider at first-hand his symptoms. He has taken great care to provide an informed account of Mr. Assange background and psychiatric history. He has given close attention to the prison medical notes and provided a detailed summary annexed to his December report. He is an experienced clinician and he was well aware of the possibility of exaggeration and malingering. I had no reason to doubt his clinical opinion.

333. Thirdly, I accepted Dr. Deeley's opinion that Mr. Assange suffers from autism Spectrum disorder albeit "*a high functioning autistic case*" and Asperger's syndrome disorder. Dr. Deeley is an experienced developmental neuropsychiatrist and the only expert to give evidence with a specialism in autistic spectrum conditions. Dr. Deeley carried out a lengthy assessment over 3 sessions for a total of 6 hours (albeit by telephone) and observed Emma Woodhouse, a neurodevelopmental specialist, conduct an autism diagnostic observation schedule (ADOS) assessment over 2 hours. He was quite able to maintain and explain his diagnosis under robust cross-examination. I noted also that both Professor Kopelman and Professor Fazel had recorded autistic-like traits in Mr. Assange.

334. Fourthly, I preferred the expert opinions of Professor Kopelman and Dr. Deeley to those of Dr. Blackwood. Dr. Blackwood did not accept Professor Kopelman diagnosis of severe

depressive episode with psychotic features (from 2019) and he did not consider that Mr. Assange met the diagnostic threshold for an autism spectrum disorder.

335. Dr. Blackwood is a consultant forensic psychiatrist based at HMP Wandsworth. His assessment of Mr. Assange took place over a relatively short period within a single week. Dr. Blackwood gave an opinion of Mr. Assange's pre-morbid personality, finding a "*rather self-dramatising and narcissistic aspect*" to it and describing Mr. Assange's default position as "*assert[ing] himself strongly when "under fire*". However, this judgement was made following limited contact with Mr. Assange. Professor Kopelman, who made no such assessment, on the other hand, had carefully gathered information through a series of interviews with those who knew Mr. Assange well, including both parents, his current partner, and close friends and colleagues and was likely to have a fuller picture of his pre-morbid personality.

336. Dr. Blackwood provided a broad overview of the prison medical notes and opined that they revealed a more ordinary clinical picture of depression. However, his summary of the notes was significantly less detailed than the summary provided by Professor Kopelman and he did not appear to have access to all relevant notes. For example, he stated that the reason Mr. Assange was admitted to the healthcare unit on 18 May 2019 was for "*safeguarding concerns*" following the emergence of video footage of Mr. Assange recorded by another prison on a mobile phone. However, Dr. Blackwood had not read the notes from an ACCT review carried out at 2.30pm on the date of his admission to healthcare, which stated that Mr. Assange was finding it hard to control his thoughts of self-harm and suicide. In addition, his opinion regarding the severity of Mr. Assange's depression in 2019 was contrary to the opinion of the other psychiatrists who gave evidence. In particular, Professor Fazel, who gave evidence for the US, did not dispute that Mr. Assange's depression was severe at the time he was assessed in 2019.

**The Turner Criteria**

**A substantial risk**

337. I am satisfied that the risk that Mr. Assange will commit suicide is a substantial one.

338. First, this is the view of Professor Kopelman. Taking account of all of the information available to him, he considered Mr. Assange's risk of suicide to be very high should extradition become imminent. This was a well-informed opinion carefully supported by evidence and explained over two detailed reports. I do not find there to be any quantifiable difference between a "very high risk" and the "substantial" risk identified in the case of *Turner*.

339. Secondly, Dr. Deeley also considered Mr. Assange's risk of suicide to be substantial. His view of risk was partly informed by his diagnoses of autism spectrum disorder and Asperger's syndrome. These conditions are characterised in part by rigidity and inflexibility of thought and he considered that Mr. Assange's propensity for analytic and systematic thought with extreme focus has led him to minutely examine the likely sequence of events should he be extradited and face trial, leading Mr. Assange to conclude that he would kill himself rather than face these conditions.

340. Thirdly, if detained subject to the full restrictions of pre-trial SAMs, Mr. Assange will be housed in conditions of significant isolation. Contact with his family will be limited to one monitored 15-minute phone call per month. Any time out of his cell will be was spent exercising in a small room or cage alone. He will be forbidden from communicating with other prisoners. If SAMs continues post-trial at the ADX Florence, then this level of isolation will be maintained. As the ECrtHR acknowledged, the purpose of this regime is to prevent all physical contact between an inmate and others, and to minimise social interaction between inmates and staff. Phase 1 inmates at the ADX are restricted to two non-legal telephone calls per month. They "*recreate individually*" in secure single recreation areas. All of the expert psychiatric witnesses agreed this would have a deleterious impact on Mr. Assange's mental health.

341. Fourthly, Dr. Blackwood did not address Mr. Assange's possible detention conditions in the US. He stated that there is no solitary confinement at the ADC in Alexandria (where Mr. Assange is likely to be housed pre-trial) but did not take account of the possibilities that he would be held in partial isolation. Asked about this in cross-examination, he accepted that "*his suicide risk may increase in a much more deleterious environment without access to things which he values*".

342. Fifthly, according to Dr. Deeley, the absence of previous serious suicide attempts at HMP Belmarsh should not be taken as evidence either that Mr. Assange's risk is low or that the risk can be adequately managed. He reminded the court that Mr. Assange currently has the benefit of protective factors which, before lockdown, included regular visits from his partner (three times a week) and children (twice a week), visits from his father and other family members, visits from a wide network of friends and supporters. During lockdown, he has had access to a telephone in his cell for 90 minutes each day; he has had access to and frequently uses the prison Samaritans phone; he has established a trusting therapeutic relationship with the prison In-Reach psychologist; and he has been housed with other prisoners in the general population since leaving the relative isolation of the healthcare unit.

343. Sixthly, Professor Fazel has authored papers on suicides in prison, and cautioned against being too ready to evaluate a suicide risk. He identified Mr. Assange's current risk factors, including his current suicidal ideation, his underlying clinical depression, his feelings of hopelessness and his self-report of suicidal plans to Dr. Corson. He considered Mr. Assange's risk to be high, but explained that a high risk meant high compared to other male prisoners of similar age which in the prison population is 100 in 100,000 in England and Wales. His own research confirmed that a depression diagnosis increased the risk of prison suicide by fourfold. However, he considered that probabilistic estimates of suicide risk are not reliable and the risk factors for suicide were not strongly predictive; even putting them together does not translate into a high probability of suicide. He also considered risk to be dynamic and dependent on changes in circumstances.

344. Mr. Assange faces the bleak prospect of severely restrictive detention conditions designed to remove physical contact and reduce social interaction and contact with the outside world to a bare minimum. He faces these prospects as someone with a diagnosis of clinical depression and persistent thoughts of suicide. Whilst I found Professor Fazel's approach to risk to be helpful, I accepted Professor Kopelman's view that statistics and epidemiology take you only so far. As he puts it, whether the evaluation of risk is "high" or "very high" the risk is one which is "very real".

345. Seventhly, notwithstanding the strong and constant support he receives from his family and friends, Mr. Assange has remained either severely or moderately clinically depressed throughout his detention at HMP Belmarsh. He has remained on an ACCT, the care

planning process for prisoners identified as being at risk of suicide or self-harm, since his arrival at HMP Belmarsh, aside from a brief period at the end of December 2019. His prison medical notes record numerous occasions on which he had told the In-Reach prison psychologist, Dr. Corson, and other medical staff (for example a prison nurse) that he had suicidal or self-harming thoughts, felt despairing or hopeless and had made plans to end his life. He has made frequent requests for access to the prison's Samaritans phone. On 5 May 2019, half of a razor blade was found in his cell, inside a cupboard and concealed under some underwear. Shortly after this, on 19 May 2019, an ACCT review stated that Mr. Assange was finding it hard to control the thoughts of self-harm and suicide. In the healthcare wing, concerns about his health and his suicidality led to a plan for him to be monitored with observations nocturnal checks. Mr. Assange is prescribed anti-depressants (citalopram and mirtazapine) and a low dose of quetiapine (used as an anti-depressant, mood stabiliser or anti-psychotic, with a mildly sedating effect in low doses). I accept that there are entries in the notes which indicate a much better mood and lighter spirits at times, however the overall impression is of a depressed and sometimes despairing man, who is genuinely fearful about his future.

346. For all of these reasons I find that Mr. Assange's risk of committing suicide, if an extradition order were to be made, to be substantial.

**The capacity to resist the impulse to suicide**

347. I am satisfied that Mr. Assange's suicidal impulses will come from his psychiatric diagnoses rather than his own voluntary act. There was some discussion about whether this notion was a medical concept; Professor Kopelman preferring the idea of a suicidal impulse arising directly out of a psychiatric diagnosis; Dr. Blackwood considering the word "impulse" and the phrase "ability to resist an impulse" to be an acceptable psychological and psychiatric word constructs; and Professor Fazel preferring to think about the issue in terms of the risks and pressures which lead to suicide.

348. Professor Kopelman considered that Mr. Assange's suicidal impulses arose directly out of his psychiatric diagnoses. Whilst the imminence of extradition or extradition itself would trigger the attempt, this would not be its cause; it was Mr. Assange's mental disorder that would lead to an inability to control his wish to commit suicide. Dr. Deeley

considered that extradition would worsen Mr. Assange's symptoms of depression and anxiety, and his Asperger's syndrome diagnosis would render him less able to manage them. He considered that the intense focus associated with Asperger's syndrome would lead to Mr. Assange ruminating about his predicament, increasing his anxiety and worsening his symptoms of depression. In these circumstances, he stated, his risk of attempted suicide would be high. Professor Fazel offered no settled opinion on the issue: he agreed that severe depression and isolation might reduce Mr. Assange's capacity to resist suicide although he would not say substantially reduce, and other factors would also have to be considered. Dr. Blackwood did not consider that Mr. Assange's combination of disorders would "*speak to*" removing his capacity. Mr. Assange had told him of the profound degree of psychological suffering he expected to experience in administrative segregation and had wondered whether suicide would represent a rational choice. He had told Dr. Blackwood that he distinguished between suicidal acts which he viewed as rational (that of his grandfather, when considering himself as a burden to his children) and those which were predominantly irrational (that of his then barrister, John Jones, in the context of a severe depression) and viewed his potential suicide in those imagined extreme conditions as rational.

349. However, for reasons given above, I preferred the opinions of Professor Kopelman and Dr. Deeley over those of Dr. Blackwood. Professor Kopelman gave his clear and unequivocal view that Mr. Assange's suicidal impulses will come from his psychiatric condition rather than his own voluntary act. For reasons already given, I have already rejected Dr. Blackwood's more optimistic view of Mr. Assange's mental health, and no doubt his opinion on capacity was informed by these views. I had no reason to doubt the informed and careful opinion of Professor Kopelman on this issue.

**The risk he will succeed in committing suicide whatever steps are taken**

*Evidence of mental health care in the BOP generally*

350. Dr. Leukefeld provided a statement for the US. She is a psychologist employed as the administrator of the psychology services branch in the central office of the BOP. In this capacity, she has oversight of services and programs including mental health services, and psychological rehabilitation programs in the BOP. She provided an overview of their

mental health services. She pointed to their policy on 'Treatment and Care for Inmates with Mental Illness', updated in 2014, which guides the provision of BOP health services. She confirmed that the BOP houses and treats a significant number of inmates with a wide variety of mental illnesses, many with similar diagnoses to Mr. Assange, and considered that inmates with mild social skills deficits function very well. On his arrival, he would be assessed by a BOP psychologist and medical staff. An internal auditing system ensures internal review at each institution on an annual basis and a review is conducted by BOP auditors at least every 3 years. In most BOP institutions, doctoral level psychologists function as front-line providers of mental health services to inmates.

351. Regarding the management of suicide risk, Dr. Leukefeld provided an overview of the standard suicide prevention strategies employed by BOP. It has a comprehensive suicide prevention program which addresses issues such as screening, identification of risk, referral of "at risk" inmates, assessment of risk and immediate intervention. It has a national suicide prevention program which every BOP institution follows. Individual and group therapy are available at every BOP institution. She described the process of early identification of those who are at-risk, which includes screening new prisoners within 24 hours of arrival. Interventions to manage risk include increased observation, safety planning, individual or group therapy, suicide watch, medication adjustments, peer support, residential treatment, and inpatient hospitalisation. A detailed tracking system embedded in the electronic medical records ensures those at risk are tracked and identified throughout their detention. Staff are trained to identify suicide risk and report it and where intervention is required the BOP emphasises that it must occur in the least restrictive environment. If warranted, the BOP will place an inmate on suicide watch, which she described as a short-term tool, essentially for restricting the means of suicide and only used when this is the least restrictive environment available to maintain safety and when imminent risk is present.

*Evidence on mental health care pre-trial at the ADC*

352. For the US, Mr. Kromberg provided a summary of the health care resources available at the ADC. He stated that mental health treatment is provided by contract with the Alexandria Community Services Board which includes therapists, counsellors, social workers, and a clinical psychologist and is available to all inmates, regardless of where

they are housed. In addition, the ADC employs a psychiatrist who providers 20 hours of psychiatric services per week. After-hours services are available and are provided by the Alexandria CSB Emergency Services team. Whilst at the ADC, Mr. Assange could be seen by an outside mental health professional, subject to approval by the USMS.

353. For the defence, Yancy Ellis, an experienced attorney, gave evidence. His clients reported regularly that they only had sporadic access to a psychiatrist for medication and medication adjustments and deteriorated faster than the adjustments could be made, although he also confirmed that he had never interviewed the psychiatrist or psychologist who attends the jail. Several clients went back and forth between the jail and state hospitals before their cases were completed. Mr. Sickler, head the Justice Advocacy Group LLC in Alexandria, Virginia, also gave evidence for the defence. He considered that Mr. Assange should expect to receive only the most limited medical services at the ADC with psychiatrists used mainly to develop the most cost-effective medication regime. He stated the jail did not provide counselling or interactive therapy services but did not disagree with the staffing levels described by Mr. Kromberg. He accepted that detainees had access to medication and access if needed to someone to talk to. He accepted that those who needed ongoing psychiatric care would probably be moved to the FMC Butner. He considered the ADC to be a very well-run jail. He accepted that there had been no successful suicides at the ADC since its last inspection in 2017 and did not know when the last successful suicide had been before that. He considered that the ADC had "*a stellar record*" on preventing suicide.

*Evidence of mental health care at the ADX Florence*

354. Dr. Leukefeld stated that, based on Mr. Assange's medical reports, the BOP would be able to provide appropriate care to him. In light of the possible diagnosis of autism spectrum disorder, the BOP has a specific residential program for those with significant intellectual or social impairments, although she accepted that programmes would have to be consistent with custody requirements. In the event of an acute episode of illness, Mr. Assange could be transferred to a federal medical centre (FMC) where he would be treated as an inpatient by a multidisciplinary medical team including psychiatrists, psychologists and social workers. Designation to the ADX Florence is specifically precluded if there is a "serious mental illness" (as defined in BOP's policy on 'Treatment and Care for Inmates

with Mental Illness') unless extraordinary security concerns mean the inmate cannot be managed at any other institution. There are currently only 14 such inmates within the prison population and they are provided with specialised programming. The ADX psychology services are consistently fully staffed, with 6 psychologists, a drug treatment specialist and a psychology technician. Mental health treatment is available in both individual and group therapy settings regardless of where the inmate is housed and is conducted in private. Inmates subject to SAMs still have access to medication or individual counselling, and group therapy is permitted when there is approval from the agency that requested the SAMs. The 'Turning Point' program provides inmates in restricted housing with cognitive behavioural treatment and other resource materials.

*Discussion*

355. I am satisfied that, if he is subjected to the extreme conditions of SAMs, Mr. Assange's mental health will deteriorate to the point where he will commit suicide with the "*single minded determination*" described by Dr. Deeley.

356. First, Professor Kopelman offers the firm opinion that he is as confident as a psychiatrist can ever be that Mr. Assange will find a way to commit suicide. This opinion is based on a clinical evaluation following hours of clinical assessment with Mr. Assange, and a detailed knowledge of his history and circumstances.

357. Secondly, though it is by no means certain that SAMs will be imposed on Mr. Assange, and, if it is, there are a range of measures the authorities can consider, nevertheless, for reasons already given, it is my judgment that there is a real risk that he will be kept in the near isolated conditions imposed by the harshest SAMs regime, both pre-trial and post-trial.

358. Thirdly, many of the protective factors currently in place at HMP Belmarsh would be removed by these conditions. Mr. Assange's health improved on being removed from relative isolation in healthcare. He has been able to access the support of family and friends. He has had access to a Samaritans phoneline. He has benefited from a trusting relationship with the prison In-Reach psychologist. By contrast, a SAMs regime would severely restrict his contact with all other human beings, including other prisoners, staff and his family. In detention subject to SAMs, he would have absolutely no

communication with other prisoners, even through the walls of his cell, and time out of his cell would be spent alone. Ms. Baird, from her experiences as an SES warden at the MCC, described the only form of human interaction coming from correctional officers who open the viewing slot during their inspection rounds of the unit, from institution staff walking through the unit during their required weekly rounds, or when meals are delivered through the secure meal slot in the cell door. The 'Darkest Corner' reported inmates finding their communication with family to be so limited and degraded through delay and constant monitoring, as to render it worthless. Whilst Dr. Leukefeld and Mr. Kromberg set out BOP policies and programmes on mental health treatment, the CIC report of 31 October 2018 described the practical reality at the ADX Florence, where psychological services are offered primarily through self-help packets and videos, where slots for individual therapy are limited, and where group therapy for prisoners subject to SAMs takes place from individual cages and with prisoners shackled. Ms. Baird confirmed that any program offered to a prisoner subject to SAMs would take place in isolation.

359. Fourthly, Dr. Leukefeld has set out measures which could be taken to prevent suicide including suicide risk assessment, staff training to identify suicide risk and suicide watch. However, Mr. Assange undoubtedly has the intellect to circumvent these suicide preventative measures; in order to avoid suicide watch or increased isolation at HMP Belmarsh, he has already adopted a strategy of disguising his suicidal thoughts. Professor Kopelman noted that he had been reluctant to discuss his mental state with prison staff partly because he has been fearful of being placed in more isolated conditions or on constant watch. Dr. Blackwood noted that, during a review by a prison nurse in September 2019, Mr. Assange had stated that he had to be careful about what he said, as being placed on constant watch would be like torture to him.

360. Fifthly, I have no doubt that Mr. Assange has the "determination, planning and intelligence" (also ascribed to Mr. Love in *Lauri Love v United States of America* (above)). Dr. Deeley described his intense focus and the rigidity and inflexibility of his thoughts, which characterise his autistic spectrum disorder, which in his opinion will increase this determination. As Professor Kopelman put it, Mr. Assange will not only find a way to suicide but it will be executed "*with the single-minded determination of his ASD/Asperger's*". He has already made suicidal plans which Professor Kopelman considered to be "*highly plausible*" and taken steps to plan for his death including by

preparing a Will and requesting absolution from the Catholic priest who attends the prison.

361. Nor, it seems, is it possible to prevent suicide where a prisoner is determined to go through with this. Others have succeeded in recent years in committing suicide at BOP jails: at the ADX in Florence, the *Corrections Information Council ("CIC")* report of 31 October 2018 recorded a completed suicide that had taken place two years before their visit; Jeffrey Epstein committed suicide at the MCC jail in August 2019. Ms. Manning was hospitalised after an attempted to commit suicide at the ADC jail in 2020. As Professor Kopelman stated, suicide protocols cannot prevent suicide, and, as Ms. Baird put it "*the suicide prevention strategy of the BOP is very good but it doesn't always work*". Faced with conditions of near total isolation and without the protective factors which moderate his risk at HMP Belmarsh, I am satisfied that the procedures described by Dr. Leukefled will not prevent Mr. Assange from finding a way to commit suicide.

362. I accept that oppression as a bar to extradition requires a high threshold. I also accept that there is a strong public interest in giving effect to treaty obligations and that this is an important factor to have in mind. However, I am satisfied that, in these harsh conditions, Mr. Assange's mental health would deteriorate causing him to commit suicide with the "*single minded determination*" of his autism spectrum disorder.

363. I find that the mental condition of Mr. Assange is such that it would be oppressive to extradite him to the United States of America.

364. In the light of this decision, following *Wolkowicz* and *Love*, a consideration of Article 3 of the ECHR is unnecessary.

## I.    ABUSE ARGUMENTS/EXCISING THE REQUEST

365. It is settled law that staying an extradition for abuse of process is a residual jurisdiction which will not need to be exercised if other bars to extradition are available (*Loncar v County Court of Vukovar, Croatia* [2015] EWHC 548 (Admin). It is therefore unnecessary to consider this ground in light of my decision to discharge Mr. Assange

under section 91 of the EA 2003.   However, for completeness, I consider below two further arguments raised by the defence.

**Zakrzewski abuse**

*Submissions of the parties*

366. The defence submits that the particulars in this request contain significant and deliberate factual misstatements. They submit that the allegations that Ms. Manning's disclosures were causally solicited by the Wikileaks draft "Most Wanted List" is contradicted by the evidence given by Ms. Manning at her court martial and from publicly available information.  They submit that the passcode hash allegation is contradictory to the evidence of US government witnesses before the court martial. They submit that the allegation that Wikileaks deliberately put lives at risk by disclosing unredacted materials is factually inaccurate.

367. The US submits that the defence points are trial issues and not for this court to consider

*Discussion*

368. In *Zakrzewski v Regional Court in Lodz, Poland* [2013] 1 WLR 324, Lord Sumption giving the lead judgment of the court identified the circumstances in which a particular form of abuse may arise. He did so with reference to the principle that the validity of an EAW (the Part 1 equivalent to a Part 2 request) depends on whether the prescribed particulars are to be found in it and not on whether they are correct. He emphasised, however, that this did not mean that nothing could be done if the prescribed particulars in a warrant either were or became incorrect. He referred to the inherent right of an English court, as the executing court, to ensure that its process is not abused. At §12 he quoted from an earlier decision from Sir Anthony May, President, in which he had said:

> "The court's task -- jurisdiction, if you like -- is to determine whether the particulars required by section 2(4) have been properly given. It is a task to be undertaken with firm regard to mutual co-operation, recognition and respect. It does not extend to a debatable analysis of arguably discrepant evidence, nor to a detailed critique of the law of the requesting state as given by the issuing judicial authority. It may, however, occasionally be necessary to ask, on appropriately clear facts, whether the description of the conduct alleged to constitute the alleged extradition offence is fair, proper and accurate."

369. Lord Mance agreed with that statement at §13, subject to four observations:

"The first is that the jurisdiction is exceptional. The statements in the warrant must comprise statutory particulars which are wrong or incomplete in some respect which is misleading (though not necessarily intentionally). Secondly, the true facts required to correct the error or omission must be clear and beyond legitimate dispute. The power of the court to prevent abuse of its process must be exercised in the light of the purposes of that process. In extradition cases, it must have regard, as Sir Anthony May observed, to the scheme and purpose of the legislation. It is not therefore to be used as an indirect way of mounting a contentious challenge to the factual or evidential basis for the conduct alleged in the warrant, this being a matter for the requesting court. Third, the error or omission must be material to the operation of the statutory scheme. No doubt errors in some particulars (such as the identity of the defendant or the offence charged) would by their very nature be material. In other cases, the materiality of the error will depend on its impact on the decision whether or not to order extradition. The fourth observation follows from the third. In my view, [counsel] was right to submit to Sir Anthony May in <u>Murua</u> that the sole juridical basis for the inquiry into the accuracy of the particulars in the warrant is abuse of process."

## The Most Wanted List

370. The request alleges that, on its website, Wikileaks expressly solicited classified information for public release. This included a "Most Wanted Leaks" list, intended by the defendant to "*encourage and cause individuals to illegally obtain and disclose protected information, including classified information to WikiLeaks contrary to law*". On 28 November 2009, 29 November and 8 December 2009, Ms. Manning performed searches which were directly related to material requested on the list. In particular she searched for "retention+of+interrogation+videos."; "detainee+abuse,"; and she ran several searches relating to Guantánamo Bay detainee operations, interrogations, and standard operating procedures. At the time, the "Most Wanted Leaks" list included classified "*Military and Intelligence*" documents, "*Detainee abuse photos withheld by the Obama administration*" and "*Guantánamo Bay operating and interrogation Standard Operating Procedures*". It is alleged that the material she provided to Mr. Assange was consistent with the list.

371. The particulars that the defence allege are wrong or incomplete are as follows:

   a. That the most wanted list is said to have been offline between 28 January 2010 to 16 March 2010, and if Ms. Manning was responding to the list, she must have been doing so from memory;

   b. That the "list" could not be linked to from the WikiLeaks submission page, or could not be navigated to from the Wikileaks site;

   c. That there is no suggestion that Manning ever searched for or accessed the 'list';

   d. That Ms. Manning in an "online confession" claimed an alternative motivation, namely that she was hoping to spark a domestic debate on the role of the military and foreign policy in general. She stated that she had contacted both the Washington Post and New York Times but, after receiving no real response, had visited the Wikileaks

website and, on 3 February 2010, had uploaded the Iraq and Afghanistan war diaries. She then uploaded the Iceland cable, the so-called "collateral murder" video and then began conversing with someone alleged to be Mr. Assange;

e.  That the list was a public collaboration and living document edited by the public;

f.  That the Iraq and Afghan war diaries, the detainee assessment briefs, and the diplomatic cables were never on the list and only the rules of engagement were on the list.

*Discussion*

372. In my judgment, the defence merely seeks to offer an alternative narrative to the allegations in the request and their contentions are matters to be determined at any trial.

373. The prosecution relies on the Most Wanted Leaks list in a much more general way than has been characterised by the defence. As Mr. Kromberg pointed out, the request identifies examples in which Mr. Assange used the list to encourage the theft of data: in 2009 he is alleged to have spoken at the "Hack in the Box Security Conference" and encouraged people to search the list and provide information in response to it; he is alleged to have sought the "Central Intelligence Agency Open Source Center database" under a general category "Bulk Databases" and subsequently to have spoken to Ms. Manning about this database as "*something we want to mine entirely btw*"; it is alleged that Ms. Manning's searches of databases on 28 November 2009, 29 November and 8 December 2009 were consistent with the requests for "*bulk databases and military and intelligence categories*" on the list; and when she uploaded the materials identified in the indictment, it is alleged that she was providing information which was consistent with the list.

374. Some of information which the defence relies on is not relevant to the allegations. For example, it is not alleged that the significant activity reports, the detainee assessment briefs or the diplomatic cables were on the list and their absence from the list has no great significance; and the fact the list was collaborative is not of any great significance because it is not alleged that Mr. Assange drafted the list but that he used it to encourage others to obtain information on it.

375. Other information relied on by the defence is disputed. For example, the defence relies on statements made by Ms. Manning, including her personal statement at the "providence

enquiry" following her guilty pleas during her court martial and an "online confession". As the US points out, her account of her actions is not incontrovertibly true, and will no doubt form part of the defence case at trial, where it can be examined and tested. The proper place for her evidence to be tested is at any trial.

376. The remaining facts relied upon by the defence may assist a court to decide whether the list encouraged Ms. Manning in her activities but their omission cannot be said to be amount to an abuse of this court's process. They amount to the defence rebuttal of the allegations and are matters which can be raised at a trial.

**The encrypted password hash**

377. The defence submits that accessing an FTP user account would not have provided Ms. Manning with more access then she already possessed and it would have been impossible for her to have downloaded any data anonymously from a government database using the account. She had already downloaded significant quantities of classified material from her own computer account. Anonymous access to an FTP user account would not have helped her as the tracking system used to identify computer users of Net Centric and Intelink databases was via IP addresses and not account identities. Other databases required domain accounts and not the local accounts Ms. Manning was discussing.

378. The defence also submits that, without an encryption key, the encrypted hash value which Ms. Manning shared with Mr. Assange was insufficient to be able to crack the password in the way the US government has described. Ms. Manning did not have the system file or the relevant portions of the Systems Account Manager (SAMS) registry file to reconstruct the key. They relied for this submission on the evidence of Patrick Eller, the president and CEO of Metadata Forensics, a company which provides expert forensic evidence and on evidence heard during Ms. Manning's court martial proceedings.

379. The US makes it clear that it does not allege that the purpose of the agreement was to gain anonymous access to the Net Centric Diplomacy database or any particular database. The purpose of the agreement was to facilitate the acquisition and transmission of classified information generally, not to access a particular database or particular cache of documents. The indictment further asserts that, "*had ASSANGE and Manning successfully cracked [the password hash] Manning may have been able to log onto computers under a username that did not belong to her*" and "*[s]uch a measure would*

*have made it more difficult for investigators to identify Manning as the source of disclosures of classified information*". Mr. Kromberg provided an example: army investigators found important forensic evidence on the Bradley-Manning user account on her SIPRNet computer. If she had used an anonymous FTP account for the theft of the data then the investigators might have missed the forensic evidence or if they had found it, they might not have been able to attribute it to Ms. Manning. The anonymous access could have assisted Ms. Manning in preventing investigators from learning of her future activities conducted on her SIPRNet computer. This, he suggested was one way that the hash-cracking agreement may have contributed to the broad criminal purpose alleged in count 18 and there may be others.

*Discussion*

380. Again, in my judgment, the defence merely seeks to offer an alternative narrative to the allegations in the request. The issues they raise are matters to be determined at a trial.

381. The defence has not disputed that Ms. Manning sought anonymous access to an FTP account on her SIPRNet computer or that important forensic evidence was found by army investigators on the FTP user account in her name. In reality it offers an alternative explanation for these facts. It asks the court to conclude that a better and more logical explanation for Ms. Manning's request was that provided by Ms. Manning herself, to install unauthorised programmes to play movies and music. This is exactly the sort of argument that Mr. Assange would be able to ventilate before a jury to determine as part of any trial.

382. In addition, as Mr. Kromberg pointed out, the defence has again mischaracterised the prosecution case. The defence argues that anonymous access to the FTP user account would not have assisted Ms. Manning to gain anonymous access to Net Centric, Intelink databases, Active directory or T drive (which is where the materials identified in the request were stored). However, the US does not allege that the hash-cracking agreement was to gain anonymous access to these databases, or to particular documents held on these databases, but to facilitate Ms. Manning's theft of protected information more generally. The defence submission that she could not have downloaded material from those named sites without being traced has only partial relevance to the allegations.

383. Further the defence submission that it would not have been possible to crack the encrypted password hash is disputed. The US argues, and Mr. Eller accepted, that in 1999 Microsoft's security bulletin MS99-056 showed that there was a vulnerability which would have allowed the password to be cracked from the hash value. Microsoft subsequently created a patch to prevent this. The US submits that there is no evidence that the patch had been applied to Ms. Manning's computer or that Mr. Assange or Ms. Manning knew that it had been applied and that this vulnerability might have made it possible to crack the encrypted password hash. The defence replies that it is absurd to suggest that a flaw from 1999 which had been "patched" by Microsoft immediately to cure the vulnerability nonetheless persisted in Windows XP in 2010.

384. This is a clear example of the defence impermissibly mounting a contentious challenge to the US's evidence. The alleged omission in the request, that it may have been impossible for Ms. Manning to crack the password hash, is not clear and beyond legitimate dispute; the US argues that at the time of the alleged agreement, in March 2010, it may have been possible to have exploited a vulnerability in Microsoft's security and the defence argue that this is an absurd position to take. Whether or not it was possible for Ms. Manning to crack the passcode, and whether she was aware of the security issues, are in my judgment matters for a trial.

385. In any event, a court might decide that the issue has no relevance to the allegations. As Mr. Kromberg pointed out, it is well-settled under US law that impossibility is not a defence to a conspiracy charge (citing *United States v. Jimenez Recio*, 537 U.S. 270, 272, 275 (2003); *United States v. Min,* 704 F.3d 314, 321 (4th Cir. 2013)). It is not a defence to the charges under UK law either.

**The alleged risk to human sources**

386. The defence submits that Wikileaks was in possession of the materials referred to in the indictment for a considerable period before publication and went to extraordinary lengths to publish the materials in a responsible and reacted manner. They submit that the unredacted publication of the diplomatic cables was first undertaken by other internet publishers unconnected to Wikileaks, such as Cryptome and Pirate Bay on 31 August/ 1 September 2011. They submit that, in any event no actual harm occurred.

387. The US submits that the publication of source names by Wikileaks did cause a risk of harm as it was a high-profile website with a wide global reach. It submits that if Mr. Assange disputes that his publication of the unredacted diplomatic cables created a risk to individuals, then he may challenge this at his trial.

388. In relation to the chronology of disclosure the US provides the following timetable taken from the extradition request, the accompanying affidavits, the evidence of the defence witness Professor Grothoff and publicly available material served by the defence:

   a. In the Summer of 2010 David Leigh and the Guardian were given access to the unredacted diplomatic cables by Assange. The cables were in a file on the Wikileaks website. Access to (at least parts of) the unredacted cables was also given to 50 other organisations, according to Wikileaks [Grothoff XX Tr. 21.9.20 pp21-1]

   b. On 28th November 2010 Wikileaks and other media partners released redacted versions of the cables. There is no count on the indictment reflecting this publication.

   c. In November and December 2010 Wikileaks is the subject of online attacks and encourages the process of "mirroring" that is to say the copying of the website and its hosting on numerous servers, to ensure that the website remained available.

   d. On 1st February 2011 David Leigh published his book. Mr. Assange and Wikileaks (in this case through Professor Grothoff) assert that this book published the title of the password to the diplomatic cables file, which could not be changed. .David Leigh denies this (describing Mr. Assange's version of events as "a complete invention") and asserts that he had always been told it was a temporary password. This file existed on numerous mirrored Wikileaks websites held on different servers.

   e. Between 23rd and 30th August 2011 Wikileaks publishes a series of the cables (around 134,000), advertising them via its twitter account including in fully searchable versions [Prof Grothoff XX Tr. 21.9.20 p28 et seq]. Mr. Assange claims that these cables were "unclassified" [defence skeleton §12.69]. The evidence from America is that 140,000 cables have been obtained which were downloaded to the Wikileaks website as of 30th August 2011. These cables are still being reviewed, but numerous cables have been identified which were classified to CONFIDENTIAL or SECRET levels and contained names marked "Strictly Protect". The US has also identified specific classified cables which "contained the unredacted names of individuals who had risked their safety and freedom by providing information to the United States, and who faced a grave risk to their safety and freedom from the disclosure of their names" [Kromberg 6, §4]. Wikileaks advertised the release of these cables and thereafter boasted of releasing them again in "searchable format" [Grothoff XX Tr. 21.9.20 pp29-30]. Professor Grothoff could not say whether the cables contained names marked strictly protect or not [Prof Grothoff XX Tr. 21.9.20 p33(28)].

   f. On 25th August 2011 Der Freitag published an article stating that an encrypted copy of the cables was available on the internet. It did not reveal the location or the means by which the file might be accessed.

   g. On 29th August 2011 Der Speigel published an article stating that the cables were on the internet and that the password had been accidentally revealed by an external contact.

   h. At around 22:00 on 31st August 2011 Nigel Parry tweeted that David Leigh's book contained the password for the file containing the cables [eg Grothoff XX Tr 21.9.20 p39].

   i. At 22:27 GMT on 31st August 2011 Wikileaks posted a tweet identifying that a Guardian journalist had revealed the password to a file containing the cables.

   j. At 23:44 GMT on 31st August 2011 Wikileaks issued an editorial in which they identified Mr. Leigh's book as containing the password to the file and showed readers of the editorial on its twitter

feed which chapter and whereabouts the password could be found. The Wikileaks twitter feed has a far greater reach than Nigel Parry [Professor Grothoff XX Tr. 21.9.20 p42-3]. Wikileaks also calls a "Global Vote" on whether or not to release the entire cache of cables on its own site [Professor Grothoff XX Tr. 21.9.20 p43].

k. Mr. Parry claims in his blog that an internet user named NIM_99 uploaded the cables to the internet shortly before midnight on 31st August to 1st September 2011. However, Professor Grothoff could not find any evidence of this posting using the Wayback Machine [Professor Grothoff XX, p40-41, p55]. There is no evidence (other than Mr. Parry's blog, unsubstantiated by the expert called by the defence) of a posting at this time.

l. On 1st September 2011 at 11:23 GMT a user named "Yoshima" uploaded the cables to the Pirate Bay Website [Professor Grothoff XX Tr. 21.9.20 p41]. This is the earliest that Professor Grothoff can say the cables were "put up" [Professor Grothoff XX Tr. 21.9.20 p44(32-34) ad p45(1-10)]

m. On 1st September 2011 Crytome.org published the cables on the Cryptome website at an unknown time [Grothoff XX Tr. 21.9.20 p 41].

n. At 13:09 GMT on 1st September 2011 a user named "Draheem" posted the cables to the Pirate Bay Website [Professor Grothoff XX Tr. 21.9.20 p41].

o. On 1st September 2011 at either 7.58pm or 5.58pm [depending on time zone] "MRKVA K" tweeted that searchable cables were available at cables.MRKVA.EU [Grotfhoff XX Tr. 21.9.20 at pp35-8]

p. At 01:20 on 2nd September 2011 Wikileaks published the entire cache of cables, labelling it "Cable Bomb" or "Cable Gate 2". Wikileaks mirrored the site to make sure that the cables stayed online [Professor Grothoff XX Tr. 21.9.20 pp43-4]. Professor Grothoff accepted that the Wikileaks twitter account and website had "significant global reach" and that in the immediate aftermath of the publication the website was struggling to deal with the traffic accessing it - indicating that either a vast number of people were trying to access the material on the site, or that it was being made the subject of a DDoS attack in an attempt to render the site inoperable [Professor Grothoff XX Tr. 21.9.20 p44].

q. By the early hours of 2nd September 2011 Wikileaks had published searchable versions of the cables which were attracting significant global interest [Professor Grothoff XX Tr. 21.9.20 p44]. Professor Grothoff did not agree that the Wikileaks posting was in a more searchable format (as indicated in media reports at the time) but he did accept that it made the material "more visible" [Professor Grothoff XX Tr. 21.9.20 p46].

389. The US alleges that even on the evidence provided by the defence, Mr. Assange's purpose in publishing the unredacted cables in the early hours of 2 September 2011 was to prevent Wikileaks from being "scooped" by others who had already published, by using the wider reach and greater presence of Wikileaks, and by actively promoting the material to as wide an audience as possible. It submits that Mr. Assange was aware that when Wikileaks published the cables that their release would put the sources at risk, citing his telephone call to the US government, in the days before he published saying that he feared for the safety of informants. They point out that nevertheless he went on to release the entire cache on the Wikileaks website.

*Discussion*

390. Once again, the defence raises issues which would have to be evaluated and determined at trial rather than at an extradition hearing.

391. First it is not disputed that Wikileaks published a full unredacted version of approximately 250,000 diplomatic cables in the early hours of 2 September 2011, which included the names of human sources. Nor do they dispute that Wikileaks published the significant activity reports for Iraq and Afghanistan in unredacted form on 25 July 2010 and in October 2010.

392. Secondly it is alleged that the release of these materials caused harm to named sources. The request sets out that hundreds of at risk people were identified as at risk of harm, some were relocated, some have "disappeared" (although the United States at this point cannot prove that their disappearance was the result of being outed by WikiLeaks) and some were arrested or investigated. The defence submits that any harm to sources was not caused by Wikileaks, as the information was already in the public domain by the time they published.

393. As I understand the law in the US, in order to establish the publishing counts on the indictment, the prosecution must prove that the materials disclosed were not only classified information but also that they were potentially damaging to the military security of the US (see *Morison* above). The issue of prior publication will go to whether or not publication was potentially damaging.

394. I note in passing that in relation to the OSA 1989 the government considered and rejected a defence of prior publication in the white paper which preceded the Act. It argued that, in certain circumstances, a second or subsequent disclosure might be more harmful, giving the example of the publication of a list of addresses of persons in public life which may capture the interest of terrorist groups more readily than the same information scattered in disparate previous publications. It argued that the offence would not be made out if no further harm is likely to arise from a second disclosure. It seems the requirement under US law, that the disclosure was potentially damaging, would have the same effect.

395. In order to determine the issue, the trial court would examine the impact of the Wikileaks disclosures. The US alleges that the wide reach of Wikileaks and its active promotion of the disclosures of 2 September 2011 was itself potentially damaging to the military

security of the US. If there has been a prior publication of the materials, as the above chronology suggests, a US court will have to decide whether the Wikileaks disclosures nevertheless caused damage. This will be a question of fact to be determined by a jury.

396. The trial court would also examine whether Wikileaks was implicated in the initial publication of the unredacted materials. The defence suggests that David Leigh, a Guardian journalist, inexplicably and for his own reasons, was responsible for the unredacted materials being made publicly available. However, on 25 February 2020, a Guardian newspaper spokesman reported the following denial from Mr. Leigh: "*it's a complete invention that I had anything to do with Julian Assange's own publication decisions. His cause is not helped by people making things up*". If Mr. Assange was responsible for the initial disclosure, this will be relevant to the issue of whether he caused the harm that allegedly flowed from this. This factual dispute will be determined by a jury.

397. In any event, it is alleged that between 23 August and 30 August 2011, long before Cryptome published the unredacted cables, Wikileaks published around 134,000 classified cables marked confidential or secret which also contained names marked "Strictly Protect". It is alleged that cables have been identified from this cache which put named sources at risk. Mr. Kromberg pointed to the fact that a number of major news outlets expressed alarm that these cables revealed the names of sources. For example, the New York Times on 30 August 2011, stated that a sampling of the documents showed that the newly published cables included the names of some people who had spoken confidentially to American diplomats and whose identities were marked in the cables with the warning 'strictly protect'". The defence does not dispute that this early release of cables was made, but it claims they were "unclassified" and disputes that their release caused harm. This would be for any trial court to determine.

398. Thirdly, the defence submits that Mr. Assange took careful steps to redact the cables. They submit that he was in possession of the materials for a considerable period before publication and went to extraordinary length to publish in a responsible and redacted manner.

399. However, the US alleges that some of the evidence presented by the defence demonstrates that Mr. Assange was willing to trust sensitive information to individuals who were not journalists and had no background in dealing with national security

information without any vetting procedure. It alleges, for example, that Professor Slobodo's account (of the non-governmental organisation "Independent Body Count") of the redaction process and his concerns about the flaws in the process, do not support the defence suggestion that extraordinary care was taken. If Mr. Assange was reckless in the way he handled this sensitive information then this may be relevant to whether he was responsible for causing the harm that allegedly flowed from the disclosures. This would be for any trial court to determine.

400. Fourthly, the defence submits that the evidence that harm was caused to the named sources is "*unspecific and unsubstantiated*". However, Mr. Kromberg confirmed that the Brigadier General Robert Carr who oversaw the Information Review Task Force testified at Ms. Manning's court martial that hundreds of names were included in the reports although not all of these names were legitimate intelligence sources committed to operating on behalf of the US. He stated, "*they were relationships of local villagers that were cooperating with patrols and soldiers as they went through as they talked from the police chief to the captain so that they would begin to work together in a security operation*". The defence points out that US government officers gave evidence at Ms. Manning's court martial that the reports did not disclose <u>key</u> human intelligence sources. The US points out that, whether or not the sources were key sources, the names of co-operating locals were nevertheless disclosed. The extent of any harm caused to those named in the materials will be for the trial court to consider.

401. In relation to the significant activity reports, it is alleged that disclosure put the lives of named co-operating individuals at risk. The request provides specific examples of the reports, which name individuals. The Taliban explicitly stated that it was reviewing Wikileaks publications in July 2010 to identify spies whom they could "punish". The US accepts that the Senate Committee on Armed Service stated, "*the review to date has not revealed any sensitive sources and methods compromised by disclosure*". However, it also stated that the documents did contain the names of cooperative Afghan nationals and that the Department took very seriously the Taliban threats recently discussed in the press. The defence submit that a US claim that 300 lives could be endangered by the publication was later shown to be wrong. However, as the US points out, this submission is based on interviews with Mr. Assange himself. The extent of any harm caused by the disclosure of the significant activity reports would be for a trial court to determine.

402. The category of abuse with which *Zakrzewski* is concerned relates to a situation in which the court is presented with a request which is, on the face of it, regular and which cannot be challenged, but which would lead to extradition on facts which are known to be clearly wrong. That is not what has happened here. The request is not based on facts which are clearly wrong. Rather, the defence suggests alternative explanations for the allegations, and raises substantive defences to the charges, often based on evidence which the US disputes. Mr. Assange will suffer no unfairness or prejudice from his extradition to the US where he would be able to argue his case at trial.

**The new allegations and the scope of counts 1 and 2**

403. The defence observes that, on 24 June 2020 the second superseding indictment was returned. The defence submits that arrival of these new allegations has placed it in an impossible position: to address the new allegations, it would have been required to seek an adjournment of the proceedings. It submits that by virtue of the late arrival of the new allegations, the court does not have the information necessary to reach informed answers to various statutory and non-statutory questions including those relating to section 82 (passage of time); section 83A (forum); section 87 (human rights); *Tollman* abuse of process; breach of duty of candour; and *Zakrzewski* abuse. It submits that the court should use its power to excise the new conduct and restrict its consideration to the narrower subset of conduct in the request.

404. The defence sets out the history relevant to this submission: on 24 June 2020 the second superseding indictment added a series of new factual allegations; on 29 July 2020 the US served the new indictment on the court; on 12 August 2020 the US issued a fresh extradition request dated 17 July 2020, founded upon the new indictment; on 21 August 2020, the US served its revised opening note, with an 'addendum' which explained the import of the new indictment; and, on 7 September 2020, the request was executed.

405. The US submits that there is no example in the authorities of the courts excising the conduct from an extradition request where it would otherwise satisfy an Extradition Act and, ordinarily, form the basis of an extradition order. Two cases in which the power to excise was used by the courts are identified. In *Dabas v. Spain* [2007] 2 A.C 31 per Lord Hope at §51:

"…The second observation, which I make with reference to the test of double criminality in section 64(3), is this. A judge may conclude that this test is not satisfied because part of the conduct which is said to constitute the offence mentioned in the Part 1 warrant occurred before it constituted an offence under the law of the relevant part of the United Kingdom if it occurred there. The question is whether in that situation he has no alternative other than to order the person's discharge under section 10(3). In my opinion it would be open to the judge in such circumstances to ask that the scope of the warrant be limited to a period that would enable the test of double criminality to be satisfied. If this is not practicable, it would be open to him to make this clear in the order that he issues when answering the question in section 10(2) in the affirmative. The exercise that was undertaken by your Lordships in Ex p Pinochet Ugarte (No 3) [2000] 1 AC 147, 229–240, shows how far it was possible to go under the pre-existing procedure to avoid the result of having to order the person's discharge in a case where part of the conduct relied on took place during a period when the double criminality test was not satisfied. It can be assumed that the Part 1 procedure was intended to be at least as adaptable in that respect as that which it has replaced…"

406. In *Osunta v. Germany* [2008] 3 W.LR 26 at §22, per Treacy J:

"…It seems to me that the argument that effect should be given to extradition arrangements and that the court should seek to avoid discharging a warrant where serious offences are alleged is a powerful one, as is the need to trust the judicial arrangements in other jurisdictions. If excision is necessary to achieve justice in those circumstances then I find it hard to understand how an excision relating to temporal matters should be acceptable whereas one relating to matters of geography should be unacceptable".

407. The defence complains that the late service of the second superseding indictment has resulted in unfairness in the preparation of its case. Mindful of any potential unfairness flowing from the late service of this amended indictment, on Friday 14 August 2020, I invited the defence to consider applying to adjourn the evidential hearing which was due to commence on 7 September 2020. I gave them the opportunity to consider this invitation over the course of a week but, on 21 August 2020, the defence confirmed that it would not be seeking to adjourn proceedings. No further applications were made between that date and 7 September 2020.

408. In my judgment the appropriate remedy for any unfairness arising from the late indictment would have been to allow the defence sufficient time prepare its case and advance any relevant arguments. That time was offered in August 2020 and declined.

409. I reject the defence submissions concerning staying extradition as an abuse of the process of this court.

## J.  ORDERS

410. I order the discharge of Julian Paul Assange, pursuant to section 91(3) of the EA 2003.

**VANESSA BARAITSER**

**DISTRICT JUDGE (MAGISTRATES' COURTS)**

**4 January 2021**