**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------x

MARGARET RATNER KUNSTLER, DEBORAH       22-Civ-6913 (JGK)
HRBEK, JOHN GOETZ & CHARLES GLASS,

                               **FIRST AMENDED**
                               **COMPLAINT**

                      Plaintiffs,

vs.                                      **JURY TRIAL DEMANDED**

CENTRAL INTELLIGENCE AGENCY, MICHAEL R.
POMPEO, DAVID MORALES GUILLEN
and UNDERCOVER GLOBAL S.L.,

                      Defendants.
--------------------------------------------------------------x

      Plaintiffs Margaret Ratner Kunstler, Deborah Hrbek, John Goetz and Charles Glass

(collectively "Plaintiffs"), through their counsel, The Roth Law Firm, PLLC, for their Complaint

against the Defendants Central Intelligence Agency, Michael Pompeo, David Morales Guillen

and Undercover Global, S.L. (collectively "Defendants") hereby, upon information and belief,

allege as follows:

## PRELIMINARY STATEMENT

      Plaintiffs, lawyers and journalists -- all United States citizens -- (collectively

"Plaintiffs"), commence this action to protect their fundamental constitutional right to be free

from unreasonable searches and seizures in violation of the Fourth Amendment of the

Constitution of the United States.   Specifically, Plaintiffs seek to enjoin Defendants from

utilizing or revealing to any third party the content of materials seized from Plaintiffs in the

course of their visits to Julian Assange while he was a political asylee in the Ecuadorian

Embassy in London and requiring the government to purge all such materials from their files.

Each of the named plaintiffs, and hundreds of others, visited WikiLeaks founder Julian Assange while he was living under political asylum at the Embassy of the government of Ecuador in London, United Kingdom.  Prior to their visits each visitor was required to surrender his or her electronic devices, e.g. smartphones, laptops etc. to employees of Defendant Undercover Global (hereinafter "UC Global").  Unbeknownst to each of those visitors, including Plaintiffs and without their consent, employees of UC Global, acting without the knowledge of the Ecuadorian government, copied the information stored on the devices.  UC Global then provided that information to the Defendant United States Central Intelligence Agency ("CIA") then headed by Defendant Michael Pompeo.  These actions were authorized and approved by Defendant Pompeo.  While the named Plaintiffs initiate this action, the practices complained of violate the rights of well over 100 American citizens who visited Assange at the Ecuadorian Embassy in London, England ("Embassy") during his sanctuary, including attorneys who were then representing him, journalists there to interview him, and even doctors who were then treating him, each of whom have a privileged and confidential connection to the asylee and other clients, sources and patients, some of whose confidential information was stored on their electronic devices.

## THE PARTIES

1.      Plaintiff Margaret Ratner Kunstler is a United States citizen, an attorney who resides in Kings County, State of New York and maintains a law office in the City, County and State of New York.  She is and has been practicing law for over thirty years.  Kunstler visited Assange at the Embassy between in or about January 2017 and in or about March 2018 ("Relevant Time Period").

2.      Plaintiff Deborah Hrbek is a United States citizen, an attorney who resides Queens County and State of New York and maintains a law office in the City, County and State of New York.  She is and has been practicing law for over thirty years. Hrbek visited Assange at the Embassy during the Relevant Time Period.

3.      Plaintiff John Goetz is a United States citizen and a journalist who reports on national security issues.   Goetz resides in Germany. Goetz visited Assange at the Embassy during the Relevant Time Period.

4.      Plaintiff Charles Glass is a United States citizen and a journalist who reports on national security issues.  Glass resides in England. Glass visited Assange at the Embassy during the Relevant Time Period.

5.      Defendant CIA is an agency of the United States government.  It is being sued for injunctive relief only and not money damages.

6.      Defendant Michael R. Pompeo ("Pompeo") is a United States citizen, and, during the Relevant Time Period, was the duly appointed Director of the CIA.  During the Relevant Time Period the CIA, under the leadership of Defendant Pompeo and at his direction, maintained offices in the State of New York and regularly conducted business in the State of New York.

7.      Defendant UC Global is a private security company headquartered in Spain that provided security at the Embassy during the Relevant Time Period.

8.      Defendant David Morales Guillen ("Morales") was the founder and former Chief Executive Officer ("CEO") of UC Global during the Relevant Time Period.

## JURISDICTION AND VENUE

9.      This is an action for monetary and injunctive relief for violations of the Fourth Amendment to the United States Constitution.

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 in that it arises under the Constitution, laws, or treaties of the United States.

11.     With respect to Defendant Central Intelligence Agency, jurisdiction is additionally premised on 5 U.S.C. § 702.

11.     Venue is proper in the United States District Court for the Southern District of New York  pursuant to 28 U.S. Code § 1391 based on the fact that: (a) certain Plaintiffs live in the City of New York and maintain offices within the confines of the Southern District of New York;  (b) both individual Defendants conducted business relating to the matters complained of herein at the CIA office in New York and other locations in this district during the Relevant Time Period; (c) certain facts, events, transactions, discussions or decisions were made relating to this action in this district, and (d) both individual Defendants were acting under color of law.

## STATEMENT OF FACTS

12.     According to its website, WikiLeaks is a "multi-national media organization and library."  It was founded in 2006 by its then Editor-in-Chief, Julian Assange.

13.     WikiLeaks specializes in the analysis and publication of large data bases of censored or otherwise restricted official materials involving war, spying and corruption. Documents published by WikiLeaks are given to that organization by whistleblowers who are often employees or former employees of the agencies and/or entities at issue.

14.     WikiLeaks has published over 10 million documents and associated analyses exposing war crimes, human rights violations, corruption and other government malfeasance around the world.

15.     WikiLeaks has deep ties with mainstream and independent media organizations worldwide and has been the recipient of prestigious awards in the field of journalism.

4

16.     Among its numerous publications have been verified documents detailing atrocities committed by the United States military and other matters. These include:

i.   The 2007 publication of the United States' Army Manual for Guantanamo exposing mistreatment of prisoners held there;

ii.   The 2008 exposure of corruption at Shriners Hospitals for Children;

iii.   The 2010 disclosure of video footage from an Apache helicopter in Iraq showing United States soldiers killing Iraqi civilians;

iv.   The 2010 release of nearly 500,000 documents containing accounts of civilian deaths in the wars in Iraq and Afghanistan;

v.   The 2009 disclosure of a US Air Force Report describing toxic burn pits on military bases that placed the health of United States service people and Iraqi civilians at risk – providing the basis for a long veterans' rights groups' campaign belatedly addressed in the PACT Act of 2022.

17.     Former United States Army Intelligence analyst Chelsea Manning was prosecuted in a military court for sending classified documents to WikiLeaks. (She was sentenced to 35 years in prison but in 2016 was granted clemency by former U.S. President Barack Obama.)  The conditions of her confinement were condemned by a Special Rapporteur's on Torture's Report to the United Nations Human Rights Council.

18.     In 2012 Assange, then residing in London, learned that he was wanted for questioning in Sweden in connection with an unrelated preliminary investigation.

19.     Denied an assurance by Sweden that it would not permit his extradition to the United States and believing that he would be extradited to the U.S. and face charges similar to those lodged against Chelsea Manning if he fell into the hands of UK or Swedish law enforcement, Assange took refuge in the Embassy of the government of Ecuador.  He remained there until April 2019.

20.     In 2017 Donald J. Trump ("Trump") was sworn in as United States President. Trump appointed Defendant Michael Pompeo as Director of the CIA.  Pompeo was confirmed by Congress on January 23, 2017.

21.     In one of his first speeches as CIA Director in April 2017, Defendant Pompeo described what would be his illegal and/or unconstitutional campaign against WikiLeaks, Assange and any of those persons he perceived to be Assange's supporters.

22.     In his opening remarks to that April 2017 speech, Pompeo stated that as CIA Director he would target whistleblowers who exposed clandestine and/or illegal efforts by the United States government aimed at countries perceived to be hostile to U.S. interests.

23.     Defendant Pompeo warned his audience that in his mind the situation is now more dangerous because "the one thing [current] whistleblowers don't need is a publisher," since the internet enables information to be shared instantly.

24.     Pompeo then directly referenced the target of his fury – WikiLeaks.  "It is time to call out WikiLeaks for what it really is," Pompeo stated, "a non-state hostile intelligence service." His knee-jerk prejudice against whistleblowers of all kinds is evident from Pompeo's repeated pejorative statements such as his 2017 statement that "every month they remind people that you can be an intern at the CIA and become a really dynamite whistleblower."

25.     Assange, according to Pompeo, is a "narcissist", "fraud" and a "coward".

26.     At the conclusion of his remarks, Pompeo pledged that his office would embark upon a "long term" campaign against WikiLeaks.  His reference included placing that campaign under the jurisdiction of counterintelligence agencies in order to avoid scrutiny by Congress – Congressional oversight having been skirted as a result of the "non-state hostile intelligence service" designation conferred upon WikiLeaks in Pompeo's speech.

27.     To aid in that campaign, Defendant Pompeo recruited Defendants UC Global and its founder and Chief Executive Officer Morales to illegally obtain confidential information in the possession of the Plaintiffs concerning Assange, his legal cases and the Plaintiffs themselves.

28.     UC Global had been contracted to provide security at Ecuador's London Embassy beginning in 2012.  Its duties included provided security for Julian Assange.

29.     In or about January 2017, Defendant Morales attended the *Shooting, Hunting and Outdoor Show* ("SHOT Convention"), a meeting and sales opportunity for the private security industry held at the Las Vegas Sands Hotel in Las Vegas, Nevada ("LVS"). While at the SHOT Convention, Morales introduced himself as the CEO of UC Global, describing the company as the private security firm that was responsible for security at the Embassy.

30.     Security personnel employed by LVS (which was owned by a prominent American businessman, now deceased) spoke with Morales during the SHOT Convention and recruited Morales and UC Global to conduct surveillance on Assange and his visitors at the Embassy on behalf of the CIA.  Morales agreed.  LVS had cooperated with the CIA on similar matters in the past.

31.     Upon his return to Spain after the SHOT Convention Defendant Morales announced to his employees that the company would now be operating "in the big league" and for the "dark side" with the defendant CIA.  "The Americans," Morales told his employees, would find them lucrative contracts around the world.

32.     According to former UC Global employees the deal included selling information obtained through the illegal surveillance of Assange to the defendant CIA.

33.     This "deal" with Defendant Morales was approved and authorized by Defendant Pompeo.

7

34.     To implement the plan, Morales created an "Operations Unit."  He instructed UC Global's IT engineers to install systems which would significantly improve the quality of surveillance of Assange's daily activities, better record all conversations, and precisely copy and steal the content of electronic devices that third party visitors, including the Plaintiffs, brought into the Embassy.

35.     Despite the fact that Morales reportedly had a poor command of the English language, the written technology instructions given to UC Global employees to permit live streaming and audio associated with the surveillance of the Embassy were in perfect English. Among the technical changes was an external streaming access point so that all of the recordings could be accessed instantly by American Intelligence including the CIA.  The instructions were sent from "The Venetian Hotel," i.e. The Las Vegas Sands.

36.     Beginning in or about January 2017 and continuing until the Ecuadorian government terminated UC Global's contract in or about April 2018, CIA and Defendant Pompeo, acting in his capacity as CIA Director, approved, and UC Global implemented, an extensive surveillance program which: (a) converted video surveillance of Assange to audio-video surveillance by placing hidden microphones on new cameras; (b) placed hidden microphones inside the Embassy and switched out recordings that were downloaded twice-monthly and given to the CIA (c) ensured that the CIA could in real time be able to directly observe and listen to Assange's daily activities at the Embassy; (d) surreptitiously copied and took images of the passports, including pages with stamps and visas, of all visitors; and, as most relevant here, (e) seized, dismantled, imaged, photographed and digitized the computers, laptops, mobile phones, recording devices and other electronics brought into the Embassy by the plaintiffs, including but not limited to IMEI and SIM codes, fronts, backs and insides of visitors'

devices, downloaded stored material (collectively, "Illegally Seized Material"), thereby invading Plaintiffs' privacy without notice, authorization or consent.  United States Intelligence personnel, including personnel of the CIA,  emphasized to defendant UC Global the importance of surveilling and recording Assange's meetings with his American and European attorneys.

37.     The Plaintiffs were subjected to each of the foregoing.  During the Relevant Time Period, at various and separate times, each Plaintiff visited Assange at the Embassy. These visits were legal and permitted by Ecuadorian authorities, taking place under Ecuadorian jurisdiction in the Embassy.

38.     The Plaintiffs were required to leave their devices with the security guard at the Embassy reception desk as a condition of visiting the asylee. Said devices contained, among other things, confidential and privileged information and documents from or about: (a) the Plaintiff journalists' confidential sources; and (b) the Plaintiff attorneys' clients. The information contained on the Plaintiff's devices was copied and, ultimately, given to the CIA.

39.     Further, UC Global, at the direction of, and as agents of, the CIA, recorded conversations between and among Assange and the Plaintiffs herein as well as those of his many other visitors and finally transmitted the fruits of such recordings and the Illegally Seized Material to Morales' CIA handlers in the United States. More specifically, the data collected by UC Global was either: (a) delivered to Las Vegas, Nevada, Washington, D.C. and New York City by David Morales personally; and/or (b) placed on an FTP server at UC Global offices which provided external access to CIA personnel, agents and/or contractors in the United States.

40.     In the three years following the SHOT Convention, Morales traveled to the United States more than sixty times, traveling to New York, Washington D.C. and Las Vegas. There, Morales received instructions from CIA agents and intermediaries from the LVS Security

Department in Washington D.C. metropolitan area, New York City, and in The Venetian Hotel in Las Vegas, which instructions were sent to UC Global personnel from US servers.

41.    Defendant Pompeo was aware of and approved the copying of information contained on Plaintiffs' mobile electronic devices and the surreptitious audio monitoring of their meetings with Assange.  The surveillance of Assange and his visitors was orchestrated by Defendant Pompeo without the permission or knowledge of the Ecuadorian government, which has confirmed it did not order or authorize UC Global to institute enhanced surveillance of Assange.

42.    At all times Morales and UC Global were acting as agents of the Defendants CIA and Pompeo.

43.    At all times herein Defendant Pompeo, as Director of the Central Intelligence Agency, was acting under color of law.

44.    Plaintiffs were unaware that their electronic information was copied and their meetings with Assange recorded and given to the CIA  until in or about October 2019.  On September 26, 2019, *El Pais* reported that the activities of Defendants Morales and UC Global that were the subject of the Spanish criminal case, were conducted in coordination with the CIA ("9/26/19 *El Pais* Article").

45.    The presiding judge in the Spanish criminal case had previously sealed all of the court filings and transcripts in order to keep the matter from public view. In or after October 2019, Plaintiffs learned that they had been subjected to unconstitutional searches and seizures during their visits to Assange when news of the 9/26/19 *El Pais* Article made its way to them. As a result of the sealing order by the presiding Judge, there had been no press reports in the US or

abroad relating to the US government involvement in the surveillance by UC Global prior to the publication of the 9/26/19 *El Pais* Article.

46.     Each Plaintiff's communications, documents and other information, now in the possession of the defendant CIA, were and continue to be protected by various privileges, including but not limited to the attorney-client privilege and First Amendment reporters' privilege and was obtained by the defendants in violation of the Fourth Amendment.

47.     The same enhanced surveillance and seizures used by defendants against the Plaintiffs herein was used to illegally seize confidential, privileged information and documents on the persons of United States citizens including but not limited to: (a) Assange's criminal defense attorneys in the United States who visited the Embassy to advise Assange in connection with an indictment that was later revealed to have been pending before the United States District Court for the Eastern District of Virginia; (b) international human rights attorneys with active cases defending Guantanamo Bay Detention Center detainees and others with open matters against the United States government; (c) national security journalists whose sources might be in jeopardy if exposed; and (d) physicians, including medical professionals who interviewed Assange on numerous occasions as part of a 5-year study into the effects of involuntary detention on physical and mental health.

48.     None of the Plaintiffs would have brought their mobile phones or other electronic devices into the Embassy had they any knowledge that the Embassy security personnel were stealing their confidential information – the Illegally Seized Material - on behalf of the defendant CIA.

49.     Plaintiffs fear that others, including but not limited to clients, friends, family and associates with cease to associate with them now that information about them has been seized,

copied, and provided to the CIA.  Plaintiffs additionally fear that if they visit Assange or speak and act in a manner that the United States government interprets as showing support for Assange, they will be subjected to additional illegal and/or unconstitutional acts by the government.

50.     Said violations of Plaintiffs' constitutional right to be free of unreasonable searches and seizures by the US government has caused Plaintiffs considerable emotional distress and anxiety, arising primarily from uncertainty and concerns about how Defendants and their agents have already and/or may in the future make use of the personal and privileged information in their possession at the time of their visits, and the injury that might be caused to their clients and sources, some of whom were in an adverse relationship with the US government at the time of their confidential information was surreptitiously seized by and/or delivered to agents of the CIA.

51. Plaintiffs have suffered and continue to suffer irreparable harm from the Defendants' actions

52.  Monetary damages alone are insufficient to compensate Plaintiffs for the damages caused by the Defendants' actions.

53.  Defendants were at all times acting under the color of law.

## AS AND FOR A FIRST CAUSE OF ACTION

## VIOLATION OF PLAINTIFF'S FOURTH AMENDMENT RIGHTS

## (DEFENDANTS UC GLOBAL, MORALES GUILLEN AND POMPEO)

54. Plaintiffs incorporate the above paragraphs as if fully restated herein.

55. By authorizing and implementing unlawful surveillance techniques, Defendants UC Global, Morales Guillen and Pompeo violated Plaintiffs' right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment under the color of federal

authority, which is actionable pursuant to *Bivens v. Six Unknown Named Agents,* 402 US 388

(1971) and based upon which Plaintiffs are entitled to money damages.

<u>**AS AND FOR A SECOND CAUSE OF ACTION**</u>

<u>**FOURTH AMENDMENT VIOLATION**</u>

<u>**(DEFENDANT CIA)**</u>

56. Plaintiff's incorporate the above paragraphs as if fully restated herein.

57.  The actions of Defendant CIA in: (i) seizing Plaintiffs' electronic devices, copying

their contents, and maintaining the information obtained from them in their files; and (ii)

monitoring and recording Plaintiffs' visits with Julian Assange, violated Plaintiffs' right to be

free from unreasonable searches as seizures as guaranteed by the Fourth Amendment of the

United States Constitution.

58. Plaintiffs are likely to succeed on the merits of establishing the CIA violated its

Fourth Amendment rights and have no adequate remedy at law.   In addition, Plaintiffs have

suffered and continue suffer irreparable harm including without limitation, by having had, and

continuing to have their privacy violated and their personal files and privileged communications

with their client unlawfully seized, copied and permanently possessed by the CIA. Further, the

equities are balanced  in Plaintiffs' favor because the CIA has no legitimate claim to maintain

possession of Plaintiffs' files unlawfully searched and seized.

59.  As a result of the following, Plaintiffs seek to enjoin the CIA from utilizing in any

way, or revealing to any third party, the content of materials seized from Plaintiffs in the course

of their visits to Julian Assange while he was a political asylee in the Ecuadorian Embassy in

London and an order requiring the CIA to purge and destroy all such materials from their files.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Honorable Court to (1) empanel a jury to hear and decide this matter, award them compensatory and punitive damages for the blatant and baseless violations of their constitutional rights; (2) enjoin each  individual Defendant and their successors in office and the defendant CIA from utilizing or revealing to any third party the content of those private communications seized during their unlawful and unauthorized intrusions into Plaintiffs' electronic equipment and during visits with Julian Assange; (3) require Defendant CIA to purge from its files any such information; and (4) enter any other relief the interests of law and/or equity require, including attorneys' fees and costs arising from prosecution of this litigation.

Dated:  New York, New York
January 27, 2023

THE ROTH LAW FIRM, PLLC

By: _RRoth_____

Richard A. Roth
295 Madison Avenue, 22nd Floor
New York, New York 10017
Tel: (212) 542-8882

*Attorneys for Plaintiffs*