**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARGARET RATNER KUNSTLER,
DEBORAH HRBEK, JOHN GOETZ and
CHARLES GLASS,

No. 22 Civ. 6913 (JGK)

                Plaintiffs,

       v.

CENTRAL INTELLIGENCE AGENCY,
MICHAEL R. POMPEO, DAVID
MORALES GUILLEN and UNDERCOVER
GLOBAL S.L.,

             Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF THE**
**MOTION TO DISMISS OF DEFENDANTS**
**CENTRAL INTELLIGENCE AGENCY AND MICHAEL R. POMPEO**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
86 Chambers Street
New York, New York 10007
Tel. (212) 637-2679
Email Jean-David.Barnea@usdoj.gov

JEAN-DAVID BARNEA
Assistant United States Attorney
    - Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..............................................................................................1

BACKGROUND ...............................................................................................................2

ARGUMENT ....................................................................................................................5

I.   LEGAL STANDARDS FOR MOTIONS TO DISMISS .........................................................5

II.  PLAINTIFFS' CLAIM AGAINST THE CIA SHOULD BE DISMISSED FOR LACK
     OF STANDING ...........................................................................................................6

     A.  Plaintiffs' Alleged Injuries Are Not Sufficiently Imminent, Particularized or Plausible
         to Confer Standing .............................................................................................7

     B.  Plaintiffs' Requested Relief Would Not Redress Their Claimed Injuries ........................10

III. PLAINTIFFS' CLAIMS AGAINST THE FEDERAL DEFENDANTS SHOULD BE
     DISMISSED FOR FAILING TO ADEQUATELY ALLEGE FOURTH AMENDMENT
     VIOLATIONS ............................................................................................................12

     A.  Plaintiffs Do Not Plausibly Allege They Had a Reasonable Expectation of Privacy
         with Respect to Certain Alleged Searches and Seizures .....................................12

         1.  Plaintiffs Had No Reasonable Expectation of Privacy in Their Alleged
             Conversations with Assange .....................................................................13

         2.  Plaintiffs Had No Reasonable Expectation of Privacy in Their Passports and the
             Exteriors of Their Electronic Devices........................................................15

     B.  Plaintiffs Do Not Adequately Allege that the Alleged Searches and Seizures Were
         Unreasonable ...................................................................................................17

         1.  The Incidental Capture of U.S. Citizen Information During Extraterritorial
             Surveillance of Foreign Targets Does Not Violate the Fourth Amendment ..............18

         2.  Plaintiffs Do Not Allege that Any Other Alleged Searches and Seizures Were
             Conducted Without a Warrant or Other Authority .....................................20

     C.  Plaintiffs Do Not Plausibly Allege that the Searches and Seizures Were Controlled
         or Directed by CIA............................................................................................22

IV.  PLAINTIFFS' *BIVENS* CLAIM AGAINST POMPEO SHOULD BE DISMISSED............24

     A.  There Is No *Bivens* Remedy for Claims Involving Intelligence-Gathering Abroad..........24

     B.  Pompeo Is Entitled to Qualified Immunity Because Plaintiffs Have Not Sufficiently
         Alleged His Participation in the Violation of a Clearly Established Constitutional
         Right.................................................................................................................30

CONCLUSION................................................................................................................33

# TABLE OF AUTHORITIES

Page(s)

Cases

*ACLU v. CIA,*
    892 F. Supp. 2d 234 (D.D.C. 2012) ........................................................................... 28

*ACLU v. Dep't of Def.,*
    351 F. Supp. 2d 265 (S.D.N.Y. 2005) ....................................................................... 28

*Ali v. Barr,*
    464 F. Supp. 3d 549 (S.D.N.Y. 2020) ................................................................. 10, 21

*Anderson v. Creighton,*
    483 U.S. 635 (1987) ................................................................................................. 30

*Arar v. Ashcroft,*
    585 F.3d 559 (2d Cir. 2009) ............................................................................... 26, 27

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ......................................................................................... 6, 21, 31

*Bacon v. Phelps,*
    961 F.3d 533 (2d Cir 2020) ...................................................................................... 30

*Banks v. FBI,*
    No. CV 19-9367, 2020 WL 4261198 (D.N.J. July 23, 2020) ............................. 21, 22

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ......................................................................................... 5, 6, 21

*Bivens v. Six Unknown Named Agents,*
    402 U.S. 388 (1971) ................................................................................................... 2

*California v. Ciraolo,*
    476 U.S. 207 (1986) ................................................................................................. 13

*Carpenter v. United States,*
    138 S. Ct. 2206 (2018) ....................................................................................... 13, 15

*Carter v. Healthport Techs., LLC,*
    822 F.3d 47 (2d Cir. 2016) ........................................................................................ 5

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ................................................................................................. 6, 7

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................. 6, 7

*Conyers v. Rossides*,
    558 F.3d 137 (2d Cir. 2009) .......................................................... 5

*Correctional Servs. Corp. v. Malesko*,
    534 U.S. 61 (2001) ................................................................... 25

*Dixon v. von Blanckensee*,
    994 F.3d 95 (2d Cir. 2021) ......................................................... 31

*Dorce v. City of New York*,
    2 F.4th 82 (2d Cir. 2021) ........................................................... 6

*Egbert v. Boule*,
    142 S. Ct. 1793 (2022) ....................................................... *passim*

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ............................................................. 10

*Guan v. Mayorkas*,
    530 F. Supp. 3d 237 (E.D.N.Y. 2021) ........................................ 11

*Hettler v. Entergy Enters., Inc.*,
    15 F. Supp. 3d 447 (S.D.N.Y. 2014) ............................................. 5

*Katz v. United States*,
    389 U.S. 347 (1967) ................................................................. 13

*Kentucky v. Yellen*,
    54 F.4th 325 (6th Cir. 2022) ...................................................... 8

*Laird v. Tatum*,
    408 U.S. 1 (1972) ................................................................... 10

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) .................................................................. 7

*Lynch v. City of New York*,
    952 F.3d 67 (2d Cir. 2020) ......................................................... 2

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000) ....................................................... 5

*Marchant v. De Blasio*,
   No. 20-CV-10544 (VEC), 2021 WL 4199940 (S.D.N.Y. Sept. 15, 2021)................................ 7

*McGowan v. United States*,
   825 F.3d 118 (2d Cir. 2016) ................................................................ 30

*Mercedes-Valdez v. United States*,
   No. 08-CR-1137-1 (RJS), 2016 WL 7448062 (S.D.N.Y. Dec. 23, 2016).............................. 23

*Meshal v. Higgenbotham*,
   804 F.3d 417 (D.C. Cir. 2015)......................................................... 26, 27

*Minneci v. Pollard*,
   565 U.S. 118 (2012) ....................................................................... 25

*Nat. Res. Def. Council, Inc. v. Wheeler*,
   367 F. Supp. 3d 219 (S.D.N.Y. 2019) .................................................... 8

*Nat'l Treas. Emps. Union v. Von Raab*,
   489 U.S. 656 (1989) .................................................................. 17, 21

*Nestlé USA, Inc. v. Doe*,
   593 141 S. Ct. 1931 (2021)............................................................... 25

*Pearson v. Callahan*,
   555 U.S. 223 (2009) ...................................................................... 30

*Pennsylvania v. Mimms*,
   434 U.S. 106 (1977) ...................................................................... 17

*Phillips v. United States*,
   No. 2:19-CV-06338(SVW)(JEM), 2021 WL 2587961 (C.D. Cal. June 22, 2021)............. 10, 11

*Reichle v. Howards*,
   566 U.S. 658 (2012) ...................................................................... 30

*Reid v. City of New York*,
   No. 20 CIV. 9243 (KPF), 2022 WL 2967359 (S.D.N.Y. July 27, 2022)................................ 13

*Riley v. California*,
   573 U.S. 373 (2014) ...................................................................... 15

*Schweiker v. Chilicky*,
   487 U.S. 412 (1988) ...................................................................... 25

*Selvaggio v. Patterson*,
 93 F. Supp. 3d 54 (E.D.N.Y. 2015) ............................................................. 20

*Smith v. Maryland*,
 442 U.S. 735 (1979) ...................................................................... 11, 16

*Susan B. Anthony List v. Driehaus*,
 573 U.S. 149 (2014) ........................................................................... 8

*Tabbaa v. Chertoff*,
 No. 05-CV-582S, 2005 WL 3531828 (W.D.N.Y. Dec. 22, 2005) ........................................... 10

*Talarico v. Port Auth. of N.Y. & N.J.*,
 No. 18-CV-909 (JPO), 2022 WL 540956 (S.D.N.Y. Feb. 23, 2022) ........................................ 13

*Tancredi v. Malfitano*,
 567 F. Supp. 2d 506 (S.D.N.Y. 2008) ........................................................... 13

*Tenet v. Doe*,
 544 U.S. 1 (2005) ........................................................................... 28

*United States v. Bodnar*,
 No. 3:17CR157 (JBA), 2019 WL 582478 (D. Conn. Feb. 13, 2019) ....................................... 16

*United States v. Chandler*,
 56 F.4th 27 (2d Cir. 2022) ................................................................... 12

*United States v. Colon*,
 59 F. Supp. 3d 462 (D. Conn. 2014) ........................................................... 12

*United States v. Gasperini*,
 894 F.3d 482 (2d Cir. 2018) .................................................................. 22

*United States v. Getto*,
 729 F.3d 221 (2d Cir. 2013) ............................................................... 22, 23

*United States v. Gomez*,
 199 F. Supp. 3d 728 (S.D.N.Y. 2016) .......................................................... 16

*United States v. Guzman Loera*,
 24 F.4th 144 (2d Cir. 2022) .................................................................. 16

*United States v. Hasbajrami*,
 945 F.3d 641 (2d Cir. 2019) ............................................................... 18, 19

*United States v. Hunter*,
No. 18-3074-CR, 2022 WL 1166623 (2d Cir. Apr. 20, 2022) ................................. 18

*United States v. Kidd*,
394 F. Supp. 3d 357 (S.D.N.Y. 2019) ................................................ 12

*United States v. Lee*,
359 F.3d 194 (3d Cir. 2004) ............................................................. 15

*United States v. Lee*,
723 F.3d 134 (2d Cir. 2013) ............................................................. 23

*United States v. Lewis*,
No. 21-CR-349 (JSR), 2021 WL 3855873 (S.D.N.Y. Aug. 27, 2021) ..................................... 20

*United States v. Mankani*,
738 F.2d 538 (2d Cir. 1984) ............................................................. 13

*United States v. Miller*,
425 U.S. 435 (1976) .......................................................................... 16

*United States v. One 1986 Mercedes Benz*,
846 F.2d 2 (2d Cir. 1988) .................................................................. 16

*United States v. Patterson*,
25 F.4th 123 (2d Cir. 2022) ............................................................. 17

*United States v. Sanusi*,
813 F. Supp. 149 (E.D.N.Y. 1992) ................................................. 22

*United States v. Segall*,
589 F. Supp. 856 (S.D. Fla. 1984) ................................................. 16

*United States v. Sparks*,
287 F. App'x 918 (2d Cir. 2008) ................................................... 12

*United States v. Toscanino*,
500 F.2d 267 (2d Cir. 1974) ............................................................. 18

*United States v. Verdugo-Urquidez*,
494 U.S. 259 (1990) .......................................................................... 18

*United States v. Wolfson*,
160 F. App'x 95 (2d Cir. 2005) ....................................................... 22

*Ward v. Lee,*
    No. 19-CV-03986 (KAM), 2020 WL 6784195 (E.D.N.Y. Nov. 18, 2020) ............................ 16

*Whiteside v. Hover-Davis, Inc.,*
    995 F.3d 315 (2d Cir. 2021) ........................................................................................ 6

*Wilson v. Libby,*
    535 F.3d 697 (D.C. Cir. 2008) .................................................................................... 27

*Ziglar v. Abbasi,*
    582 U.S. 120 (2017) ....................................................................... 24, 26, 27, 29

### Statutes, Regulations, and Rules

Foreign Intelligence Surveillance Act,
    50 U.S.C. § 1801 *et seq.* ........................................................................................ 20

8 U.S.C. § 1103(a)(2) ............................................................................................... 28

50 U.S.C. § 3517(e)(3) ............................................................................................. 28

50 U.S.C. § 3517(h)(1) ............................................................................................. 28

8 C.F.R. § 287.10(a)-(b) ........................................................................................... 28

Federal Rule of Civil Procedure 12(b)(1) ................................................................. 1

Federal Rule of Civil Procedure 12(b)(6) ................................................................. 1

## PRELIMINARY STATEMENT

Defendants the Central Intelligence Agency ("CIA") and Michael R. Pompeo ("Pompeo"), the former Director of the CIA (together, the "Federal Defendants"), by their attorney Damian Williams, the United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in support of their motion to dismiss the claims against them in the first amended complaint, ECF No. 27 ("Complaint" or "Compl."), filed by plaintiffs Margaret Ratner Kunstler, Deborah Hrbek, John Goetz, and Charles Glass (together "Plaintiffs").  For the reasons stated herein, the Court should dismiss Plaintiffs' claim against the Federal Defendants pursuant to Federal Rule of Civil Procedure 12(b)(1) and (b)(6).

Plaintiffs—attorneys and journalists who are all U.S. citizens—allege they visited Julian Assange, the founder of the website WikiLeaks, at the Ecuadorian Embassy in London, United Kingdom (the "Embassy"), in 2017 and 2018.  They claim that Undercover Global S.L. ("UC Global"), a private Spanish company that provided security at the Embassy, and its founder and former chief executive officer David Morales Guillen ("Morales," and together the "Spanish Defendants"), secretly provided the CIA with detailed information about Assange's visitors, including audio and video feeds of their visits and information copied from electronic devices they left at the Embassy's security desk during the visits.  They assert that, in allegedly requesting and receiving this information, the CIA and Pompeo violated their constitutional rights under the Fourth Amendment.  Yet even assuming the truth of these allegations for purpose of this motion to dismiss, the claims against the CIA and Pompeo must be dismissed.

Plaintiffs' asserted claims against the Federal Defendants are legally and factually deficient in a number of respects.  As an initial matter, Plaintiffs lack standing to pursue their claim for injunctive relief against the CIA because they have not asserted a cognizable injury-in-

fact that is redressable by the relief they seek, and specifically they claim no ongoing or imminent harm from the alleged searches and seizures at issue.  Additionally, Plaintiffs' have failed to state a claim for relief against the Federal Defendants.  Plaintiffs' allegations do not establish they had a reasonable expectation of privacy with respect to certain searches and seizures so as to trigger Fourth Amendment protections.  And Plaintiffs further do not sufficiently allege that any of the searches were unreasonable or unauthorized by a warrant or the like.  And finally, the Fourth Amendment is inapplicable to the acts of non-government actors, especially abroad, unless the actions of those persons are directed and controlled by the Government, which Plaintiffs do not plausibly allege here.

Plaintiffs' claim against Pompeo, brought under the doctrine of *Bivens v. Six Unknown Named Agents*, 402 U.S. 388 (1971), fails for additional reasons as well: there is no established *Bivens* remedy in the context of allegedly gathering foreign intelligence, and this Court should not recognize one here.  Moreover, Pompeo is entitled to qualified immunity because Plaintiffs' allegations of his personal involvement in the alleged searches and seizures are too conclusory to state a violation of their "clearly established" constitutional rights.

The Court should thus dismiss the claims against the Federal Defendants.

## BACKGROUND[1]

Plaintiffs are two attorneys and two journalists, all U.S. citizens, who allege they visited WikiLeaks founder Julian Assange in 2017 and 2018, while he was under political asylum living

---

[1] The Federal Defendants assume the well-pleaded factual allegations in the Complaint are true for the limited purpose of filing the instant motion: to argue that those allegations, even taken as true, are legally insufficient to sustain the claims against them.  *See Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) ("Although allegations that are conclusory are not entitled to be assumed true, when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." (brackets, citation, and internal quotation marks omitted)).  Nothing in this submission should be

in the Ecuadorean Embassy in London.  Compl. ¶¶ 1-4, 37.  Assange sought and was granted

asylum in the Embassy in 2012.  *Id.* ¶¶ 18-19.  According to the complaint, the Embassy retained

UC Global around the same time to provide security, including for Assange, who resided within

the Embassy compound.  *Id.* ¶ 28.  Assange remained in the Embassy until April 2019.  *Id.* ¶ 19.

Plaintiffs assert that Morales attended a convention at the Las Vegas Sands Hotel in Las

Vegas, Nevada, in January 2017, at which hotel security personnel "recruited" him, supposedly

"on behalf of the CIA," to surveil Assange and his visitors.  *Id.* ¶¶ 29-30.  Plaintiffs allege that

Morales told his staff that in exchange for selling the resulting information to the CIA, "[t]he

Americans" would get UC Global "lucrative contracts around the world."  *Id.* ¶¶ 31-32.

According to Plaintiffs, Morales directed UC Global to enhance its surveillance systems

in the Embassy.  *Id.* ¶¶ 34-35.  Specifically, UC Global allegedly placed hidden microphones on

video cameras in Assange's quarters, to which the CIA was given live access so it could observe

his activities in real time; and placed hidden microphones elsewhere inside the Embassy,

downloaded them regularly, and provided the CIA with the recordings.  *Id.* ¶ 36(a)-(c).  UC

Global also supposedly made copies of the passports of visitors to the Embassy.  *Id.* ¶ 36(d).

And UC Global purportedly made digital copies of the electronic devices that visitors brought

into the Embassy when they met with Assange[2]—which Embassy protocols required leaving at

the reception desk—and provided them to the CIA.  *Id.* ¶¶ 34, 36(e), 38.  Plaintiffs further claim

that Morales received several additional sets of (unspecified) instructions from the CIA and its

---

considered an acknowledgement by the Federal Defendants of, or indeed any comment on, the
factual veracity of Plaintiffs' allegations.

[2] Specifically, the Complaint alleges that UC Global "seized, dismantled, imaged, photographed
and digitized the computers, laptops, mobile phones, recording devices and other electronics
brought into the Embassy by the plaintiffs, including but not limited to IMEI [International
Mobile Equipment Identity] and SIM [Subscriber Identity Module] codes, fronts, backs and
insides of visitors' devices, [and] downloaded stored material."  *Id.* ¶ 36(e).

supposed intermediaries at the Las Vegas Sands hotel during his subsequent visits to the United States.  *Id.* ¶ 40.  Plaintiffs assert that UC Global undertook these measures without authorization from the Ecuadorean government, *id.* ¶ 41, which, according to Plaintiffs, terminated UC Global's contract at the Embassy in April 2018, *id.* ¶ 36.

Plaintiffs claim this arrangement was personally approved by Pompeo.  *Id.* ¶¶ 33, 36. They allege conclusorily that Pompeo himself "recruited" the UC Global and Morales "to illegally obtain confidential information in the possession of the Plaintiffs concerning Assange, his legal cases and the Plaintiffs," *id.* ¶ 27, and "orchestrated" the resulting surveillance, *id.* ¶ 41. Plaintiffs also offer their unsupported legal conclusion that the Spanish Defendants were "acting as agents of the . . . CIA and Pompeo" with respect to the actions at issue.  *Id.* ¶ 42.  Plaintiffs further assert, without alleging factual support, that Pompeo "was aware of and approved the copying of information contained on Plaintiffs' mobile electronic devices and the surreptitious audio monitoring of their meetings with Assange."  *Id.* ¶ 41.

Plaintiffs allege that, as a result of these actions, recordings of their meetings with Assange and the contents of their electronic devices were transmitted to the CIA by UC Global. *Id.* ¶¶ 38-39.[3]  They claim that their electronic devices included privileged information about the journalist Plaintiffs' confidential sources and the attorney Plaintiffs' clients, as well as the contents of their conversations with Assange.  *Id.* ¶ 38.  Plaintiffs allege they did not know at the time their information was recorded and transmitted in this fashion—and that they learned about the alleged surveillance by reading about it in a September 2019 article in the Spanish newspaper *El País*.  *Id.* ¶¶ 44-45.

---

[3] Plaintiffs claim that the Spanish Defendants also recorded information relating to visits of non-Plaintiffs, such as Assange's criminal-defense attorneys, attorneys representing Guantanamo Bay Detention Center detainees, other journalists working with confidential sources, and physicians. *Id.* ¶ 47.

Plaintiffs plead two causes of action.  First, they seek money damages under the *Bivens* doctrine from Pompeo (and the Spanish Defendants) for allegedly violating their Fourth Amendment rights.  *Id.* ¶ 55; *but cf. id.* at 14 (wherefore clause asking Court to "enjoin each individual Defendant and their successors in office [*sic*] . . . from utilizing or revealing . . . the content" of the allegedly seized materials).  And second, they allege the CIA violated their Fourth Amendment rights and ask this Court to enjoin the agency "from utilizing in any way, or revealing to any third party, the content" of the information allegedly seized from them during their visits to Assange, and to "requir[e] the CIA to purge and destroy all such materials from [its] files." *Id.* ¶ 59.

## ARGUMENT

### I.   LEGAL STANDARDS FOR MOTIONS TO DISMISS

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "The party invoking the Court's jurisdiction bears the burden of establishing jurisdiction exists." *Hettler v. Entergy Enters., Inc.*, 15 F. Supp. 3d 447, 450 (S.D.N.Y. 2014) (citing *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009)). However, "[w]hen the Rule 12(b)(1) motion is facial, *i.e.*, based solely on the allegations of the complaint . . . [t]he task of the district court is to determine whether the [complaint] alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Carter v. Healthport Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (internal quotation marks and brackets omitted).

To withstand dismissal under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  However, the assumption of truth does not apply to "allegations that amount to mere

'legal conclusions.'"  *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 321 (2d Cir. 2021) (citation

omitted).  While "detailed factual allegations" are not necessary, a pleading must contain more

than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of

action."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## II.     PLAINTIFFS' CLAIM AGAINST THE CIA SHOULD BE DISMISSED FOR LACK OF STANDING

As a threshold matter, Plaintiffs do not have standing to assert their claim for injunctive

relief against the CIA.  "To establish Article III standing, an injury must be concrete,

particularized, and actual or imminent; fairly traceable to the challenged action; and redressable

by a favorable ruling."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal

quotation marks omitted).  The only relief Plaintiffs seek from the CIA are orders prohibiting it

"from utilizing in any way, or revealing to any third party, the content of materials seized" from

them, and "requiring [the agency] to purge and destroy all such materials from [its] files."

Compl. ¶ 59.  But to be entitled to prospective relief, a plaintiff must plausibly allege current or

imminent future injuries that would likely be redressed by the injunction he seeks.  *See City of

Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (plaintiff's standing to seek prospective relief

depends "on whether he [is] likely to suffer future injury" from the alleged conduct).  The

"purpose" of the "imminence" requirement "is to ensure that the alleged injury is not too

speculative for Article III purposes—that the injury is *certainly* impending."  *Clapper*, 568 U.S.

at 409 (emphasis in original; internal quotation marks omitted).  Where "plaintiffs seek

injunctive or declaratory relief, they cannot rely on past injury to satisfy the injury requirement

but must show a likelihood that they will be injured in the future."  *Dorce v. City of New York*, 2

F.4th 82, 95 (2d Cir. 2021) (citing *Lyons*, 461 U.S. at 111) (internal quotation marks and brackets omitted).  "Such an allegation of future injury will be sufficient only if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur."  *Id.* (internal quotation marks omitted).

The only possible injuries Plaintiffs point to are based on entirely speculative and vague conjectures about unspecified future actions the CIA may or may not take with respect to information that has purportedly been in the agency's position for more than five years. Plaintiffs thus cannot show that any injunction issued by the Court would redress an imminent harm.[4]  Accordingly, they have not pleaded facts sufficient to demonstrate that they have standing to pursue their claims for injunctive relief against the CIA.

A.      **Plaintiffs' Alleged Injuries Are Not Sufficiently Imminent, Particularized or Plausible to Confer Standing**

Plaintiffs' alleged injuries are too speculative and generalized to justify the prospective relief they seek.  Plaintiffs claim, for example, that "others," including "clients, friends, family and associates" will "cease to associate with them now that information about them has been seized, copied and provided to the CIA."  Compl. ¶ 49.  But even if this were a cognizable injury, Plaintiffs' alleged fear is wholly speculative and implausible, in that Plaintiffs do not claim anyone has actually refused to associate with them for this reason, or allege facts indicating that anyone will imminently refuse to associate with them because they were supposedly subject to surveillance more than five years ago.  *Cf. Clapper*, 568 U.S. at 415-16 (rejecting standing based

---

[4] Plaintiffs also claim that other U.S. citizens who visited Assange at the Embassy, including other attorneys, journalists, and physicians, were surveilled in a similar manner, *see* Am. Compl. ¶ 47, but Plaintiffs do not purport to sue on behalf of these other persons, nor would they have standing to do so, *see, e.g., Marchant v. De Blasio*, No. 20-CV-10544 (VEC), 2021 WL 4199940, at *4 (S.D.N.Y. Sept. 15, 2021) ("The 'general prohibition on a litigant's raising another person's legal rights' is a core principle of prudential standing." (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014))).

on the attorney plaintiffs' fear that their telephone conversations with clients might be monitored, which made the plaintiffs less willing to communicate with their clients by phone). Indeed, the newspaper article Plaintiffs rely upon as the source of their information regarding this alleged surveillance was published in 2019, *see* Compl. ¶ 44, while the surveillance itself allegedly occurred in 2017 and 2018, *see id.* ¶¶ 1-4, 36-37; thus, if people were going to refuse to associate with Plaintiffs, they presumably would have already done so. To the extent Plaintiffs are alleging an intangible injury to their reputation, it is unclear how any reputational harm could be caused by purportedly clandestine activities, such as those alleged in the Complaint, as Plaintiffs do not allege that the Federal Defendants publicized that Plaintiffs were purportedly the subject of any such actions, made public use of any information regarding Plaintiffs, or have any imminent intention to make such public use of this information in the future. *See Nat. Res. Def. Council, Inc. v. Wheeler*, 367 F. Supp. 3d 219, 231 (S.D.N.Y. 2019) (to maintain standing based upon intangible harm to reputation, plaintiffs must allege with "specificity what sort of actual, tangible harm to their reputations they have suffered or will suffer").

Second, Plaintiffs' alleged "fear that if they visit Assange or speak and act in a manner that the United States government interprets as showing support for Assange, they will be subjected to additional illegal and/or unconstitutional acts by the government," Compl. ¶ 49, is similarly too speculative, implausible, and generalized to confer standing. Plaintiffs have not alleged that they plan to visit Assange again or show support for him soon. *Cf. Kentucky v. Yellen*, 54 F.4th 325, 336 (6th Cir. 2022) (plaintiffs may have standing if they "establish[] (1) an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) that this course of conduct was arguably proscribed by [a government rule], and (3) that if the [plaintiffs] should pursue such a course of conduct, there was a credible threat that [the

government] would [take] action" against them (citing *Susan B. Anthony List v. Driehaus*, 573

U.S. 149, 161-64 (2014))).  Nor do Plaintiffs allege any plausible reason why the Government

would take any steps against them.  The Complaint claims that Assange was the target of

surveillance because of his association with the website WikiLeaks, which had published

classified documents.  *See* Compl. ¶¶ 16-17, 22-26.  But Plaintiffs offer no plausible reason why

the U.S. Government would take steps against other people simply for meeting with Assange or

"show[ing] support" for him.  In sum, Plaintiffs' claim that they may be subjected to unspecified

illegal acts at unspecified future dates by unspecified arms of the Government is far too vague to

support their standing.

        And finally, Plaintiffs claim that they are suffering "considerable emotional distress and

anxiety" from their "concerns about how Defendants and their agents have already and/or may in

the future make use of the personal and privileged information in their possession at the time of

their visits, and the injury that might be caused to their clients and sources, some of whom were

in an adverse relationship with the US government at the time . . . their confidential information

was surreptitiously seized by and/or delivered to agents of the CIA."  *Id.* ¶ 50.  This alleged

injury does not make Plaintiffs' otherwise vague injuries any more concrete.  Rather, Plaintiffs'

characterization of their alleged "emotional distress" merely recasts their speculative "fear,"

"uncertainty[,] and concerns" about the information they claim was taken from them, but does

not support their standing.  *See, e.g.*, *Krausz v. loanDepot.com, LLC,* No. 22 CV 152 (VB), 2022

WL 16960928, at *4 (S.D.N.Y. Nov. 16, 2022) (claim that plaintiff experienced emotional

distress as a result of unspecified "credit denial" is "vague, conclusory, and akin to the injuries

found insufficient by other courts in this Circuit, to confer Article III standing" (internal

quotation marks omitted)).  Moreover, Plaintiffs do not allege that there is an imminent threat

that the Federal Defendants will use information allegedly seized over five years ago to harm

their clients and sources.  Far more specific allegations of injury are needed to establish standing.

**B.      Plaintiffs' Requested Relief Would Not Redress Their Claimed Injuries**

This vagueness permeates Plaintiffs' requested relief as well, and thus the redressability

component of the standing inquiry.  A "plaintiff's remedy must be tailored to redress the

plaintiff's particular injury."  *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *see also Ali v. Barr*,

464 F. Supp. 3d 549, 560 (S.D.N.Y. 2020) ("It is fundamental that injunctive relief should be

narrowly tailored to fit specific legal violations." (internal quotation marks omitted)).  Here,

there is no link between Plaintiffs' alleged injuries and the requested relief, particularly given

Plaintiffs' inability to identify any actual imminent harm they will suffer.

An injunction requiring the destruction of allegedly unlawfully seized information is

appropriate only when a plaintiff can plausibly allege that the relevant information remains in the

Government's possession and that it will cause him concrete negative consequences if it is not

destroyed.  *See Phillips v. United States*, No. 2:19-CV-06338(SVW)(JEM), 2021 WL 2587961,

at *8 (C.D. Cal. June 22, 2021) ("Cases concluding that a plaintiff has standing to seek

expungement have specifically found that the continued existence of a record could adversely

affect the plaintiff in the future." (collecting cases)), *on appeal*, No. 21-55768 (9th Cir. argued

Feb. 9, 2023); *Tabbaa v. Chertoff*, No. 05-CV-582S, 2005 WL 3531828, at *9 (W.D.N.Y. Dec.

22, 2005) (finding standing to seek record expungement where "the government concedes that it

continues to maintain information about Plaintiffs and the 2004 border stop" and "the possibility

exists that Plaintiffs may be subject to heightened scrutiny [in future entries] based on the fact

that they appear in the [relevant] system as prior . . . referrals"), *aff'd*, 509 F.3d 89 (2d Cir.

2007); *see also Laird v. Tatum*, 408 U.S. 1, 13 (1972) (fear of future misuse of information not sufficient to confer standing).[5]

Plaintiffs have not met this standard.  Even accepting as true the allegation that their information was retrieved and transmitted to the CIA in 2017 and 2018, *see* Compl. ¶¶ 37-39, Plaintiffs have not alleged any imminent concrete steps the CIA might take to their (or their clients' or sources') detriment more than five years after the alleged seizure if the information is not now destroyed.  Nor, relatedly, have they explained how expungement would redress their alleged injuries, which relate to whether information about the alleged surveillance would become publicly known or their speculative fears that the surveillance materials could at some point be used against them in an unspecified way.  *Cf., e.g.*, *Phillips*, 2021 WL 2587961, at *10 ("Plaintiffs have not shown that any of their injuries are redressable by expungement.  Plaintiffs have not *explained how any chilling effect is even exacerbated by Defendants' continued retention of records*.  Plaintiffs present no evidence that the retention of records makes it any more likely that they will be investigated in the future." (emphasis added)).  Indeed if, as Plaintiffs posit, the CIA wished to take any action against them or their clients or sources, the Complaint offers no indication as to why the agency has not done so in the intervening years since the alleged actions took place, but is likely to do so imminently at this juncture.

Plaintiffs' claim against the CIA must thus be dismissed for lack of standing.

---

[5] One district court in this Circuit has recently come to a different conclusion.  *See Guan v. Mayorkas*, 530 F. Supp. 3d 237, 262 (E.D.N.Y. 2021) ("CBP's retention of records from the searches itself also constitutes an independent harm.").  But in that case, the plaintiffs had arguably alleged a discrete injury stemming from the Government's retention of the records at issue: the journalist plaintiffs had alleged that the Government had improperly referred them to secondary inspections at border crossings based on the content of their reporting, and that the retained records from such inspections could hinder their future travel.  *See id.* at 260-62.

III.     **PLAINTIFFS' CLAIMS AGAINST THE FEDERAL DEFENDANTS SHOULD BE DISMISSED FOR FAILING TO ADEQUATELY ALLEGE FOURTH AMENDMENT VIOLATIONS**

The Complaint also does not sufficiently allege a violation of Plaintiffs' Fourth Amendment rights, and thus their claims against the Federal Defendants cannot proceed.  The Fourth Amendment prohibits unreasonable searches and searches by the Government.  But for the Amendment to be implicated, a person must have had a "legitimate expectation of privacy" in the place or item that has been searched and/or seized.  *Smith v. Maryland*, 442 U.S. 735, 742 (1979).  Plaintiffs cannot show they had a reasonable expectation of privacy with respect to conversations that took place on the property of a foreign embassy located in a foreign country, or with respect to items they voluntarily surrendered to third parties.  Nor does the Complaint include factual allegations from which a plausible inference could be drawn that any searches that took place were unreasonable or unauthorized.  Indeed, U.S. citizens who communicate with foreign surveillance targets have diminished Fourth Amendment rights that are easily overcome in the alleged circumstances at issue.  And, in any event, the Fourth Amendment further does not apply to searches and seizures by persons or entities who are not part of the U.S. Government except in narrow circumstances not present here.

A.       **Plaintiffs Do Not Plausibly Allege They Had a Reasonable Expectation of Privacy with Respect to Certain Alleged Searches and Seizures**

"The Fourth Amendment protects the right of private citizens to be free from unreasonable government intrusions into areas where they have a legitimate expectation of privacy."  *United States v. Chandler*, 56 F.4th 27, 41 (2d Cir. 2022).  But here, Plaintiffs had no legitimate expectation of privacy with respect to conversations they allegedly had with a notorious wanted fugitive in a foreign embassy, or in the exteriors of items voluntarily relinquished to Embassy staff.

12

1.       **Plaintiffs Had No Reasonable Expectation of Privacy in Their Alleged Conversations with Assange**

In order to claim a Fourth Amendment right against being recorded, a plaintiff must first plausibly assert a reasonable expectation of privacy in the location and circumstances of the recording.  *See United States v. Kidd*, 394 F. Supp. 3d 357, 364 (S.D.N.Y. 2019) (person asserting Fourth Amendment right "'bears the burden of showing that he had a reasonable expectation of privacy' in that information" (quoting *United States v. Sparks*, 287 F. App'x 918, 919 (2d Cir. 2008))).  The Fourth Amendment "appl[ies] only if a [person] has a reasonable expectation of privacy in not having his words or conversation overheard."  *United States v. Colon*, 59 F. Supp. 3d 462, 465 (D. Conn. 2014) (citing *Katz v. United States*, 389 U.S. 347 (1967)); *see United States v. Mazzara*, No. 16 CR. 576 (KBF), 2017 WL 4862793, at *4 (S.D.N.Y. Oct. 27, 2017) (The "'touchstone of Fourth Amendment analysis' [i]s 'whether a person has a 'constitutionally protected reasonable expectation of privacy.'" (quoting *California v. Ciraolo*, 476 U.S. 207, 211 (1986)) (internal quotation marks omitted)).  This is determined using a "'two-part' inquiry: 'first, has the individual manifested a subjective expectation of privacy in the object of the challenged search?  Second, is society willing to recognize that expectation as reasonable?'"  *Id.* (quoting *Ciraolo*, 476 U.S. at 211 (internal quotation marks omitted)).

With regard to whether a person's asserted expectation of privacy is reasonable, courts analyze the relevant circumstances to determine whether a reasonable person would expect privacy.  Courts have thus concluded that a person has no reasonable expectation of privacy against being surreptitiously recorded or filmed on a prison telephone, *see Reid v. City of New York*, No. 20 CIV. 9243 (KPF), 2022 WL 2967359, at *18 (S.D.N.Y. July 27, 2022); in a police station interview room, *United States v. Cook*, No. 20-CR-84-LJV, 2021 WL 6133280, at *7

(W.D.N.Y. Dec. 27, 2021); at the front desk of a police headquarters, *see Tancredi v. Malfitano*, 567 F. Supp. 2d 506, 509-12 (S.D.N.Y. 2008); in a hospital or emergency room, *see Talarico v. Port Auth. of N.Y. & N.J.*, No. 18-CV-909 (JPO), 2022 WL 540956, at *2 (S.D.N.Y. Feb. 23, 2022) (collecting cases); in a hotel room, if the conversation can be overheard from an adjacent room, *see United States v. Mankani*, 738 F.2d 538, 545 (2d Cir. 1984); or in the public street, even if the police surreptitiously mounted a security camera trained on the area just outside the person's residence, *see Mazzara*, 2017 WL 4862793, at *9-12; *see also Carpenter v. United States*, 138 S. Ct. 2206, 2220 (2018) (Supreme Court decision on privacy expectations in mobile-phone location data "do[es] not . . . call into question conventional surveillance techniques and tools, such as security cameras").

Here, Plaintiffs did not have a reasonable expectation of privacy in meeting and talking with Assange at the Embassy under the circumstances alleged.  First of all, with respect to their subjective expectation of privacy, Plaintiffs allege only that they were "unaware . . . their meetings with Assange were recorded and given to the CIA" until they saw the *El País* article. Compl. ¶ 44.  They do not, however, allege specifically that they contemporaneously believed their conversations with Assange were private or what reason they had for such a belief.

Even assuming that Plaintiffs' subjective allegation suffices, their claim fails on objective reasonableness.  Plaintiffs were meeting with Assange—a person who they knew was of interest to law enforcement agencies of more than one country, *see id.* ¶¶ 18-19—in a foreign embassy, a facility that houses ambassadors and other governmental officials, and maintains strict security protocols, *see id.* ¶ 38, located in a foreign country.  They do not allege they were told by any Embassy officials that their meetings with Assange would be private.  Indeed, it would be unreasonable for a person to assume there would be no security cameras or other surveillance

devices in a foreign government embassy, if for no other reason than the operational security of the facility. "[S]ociety has come to accept a significant level of video surveillance. Security cameras are routinely installed in public parks, restaurants, stores, *government buildings*, schools, banks, gas stations, elevators, and all manner of public spaces." *Mazzara*, 2017 WL 4862793, at *11 (emphasis added).

Indeed, according to Plaintiffs' Complaint, Assange's room in the Embassy had been subject to video surveillance even before UC Global was allegedly recruited by the CIA. Compl. ¶ 36(a) (alleging that, at CIA's request, UC Global "*converted* video surveillance of Assange to audio-video surveillance by placing hidden microphones on new cameras" (emphasis added)); *id.* ¶ 34 (alleging that Morales directed UC Global to "significantly *improve* the quality of surveillance of Assange's daily activities, [and] *better* record all [his] conversations" (emphasis added)). Once an area is subject to video surveillance, there is no reasonable incremental expectation of privacy in verbal conversation—not least because some video equipment records sound and even silent video recording may allow speech to be captured through lip-reading. *Cf. United States v. Lee*, 359 F.3d 194, 202 (3d Cir. 2004) ("[T]he Supreme Court has not drawn any distinction between [audio and video surveillance], and we similarly see no constitutionally relevant distinction between [them] in the present context."). Plaintiffs thus lacked a reasonable expectation of privacy in their meetings with Assange, and any recording of such meetings could not violate the Fourth Amendment.

## 2.    Plaintiffs Had No Reasonable Expectation of Privacy in Their Passports and the Exteriors of Their Electronic Devices

Plaintiffs' allegations that UC Global made images of their passports and the exteriors of their electronic devices, Compl. ¶ 36(d), (e), similarly fails to establish a Fourth Amendment violation. Plaintiffs concede that they left their devices with the security guard at the Embassy

reception desk "as a condition of visiting" Assange.  *Id.* ¶ 38.  Other than with respect to the contents of the electronic devices,[6] Plaintiffs lack a reasonable expectation of privacy in items they voluntarily give to third parties.

It is well established that "'a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.'"  *Carpenter*, 138 S. Ct. at 2216 (quoting *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979)).  "That remains true 'even if the information is revealed on the assumption that it will be used only for a limited purpose.'"  *Id.* (quoting *United States v. Miller*, 425 U.S. 435, 443 (1976)); *see also United States v. Guzman Loera*, 24 F.4th 144, 158 (2d Cir. 2022) ("[N]either downloading the FlexiSpy data nor searching the FlexiSpy data violated the Fourth Amendment because [defendant] had no reasonable expectation of privacy after giving access to the data to third parties such as the [confidential source] and co-conspirators.").  The same principle is true with regard to physical items a person voluntarily gives to a third party.  *See, e.g.*, *United States v. Gomez*, 199 F. Supp. 3d 728, 738 (S.D.N.Y. 2016) ("[A] vehicle owner who lends his vehicle to a third-party does not retain a reasonable expectation of privacy in the vehicle." (citing *United States v. One 1986 Mercedes Benz*, 846 F.2d 2, 4 (2d Cir. 1988))), *aff'd*, 751 F. App'x 63 (2d Cir. 2018); *United States v. Bodnar*, No. 3:17CR157 (JBA), 2019 WL 582478, at *5 (D. Conn. Feb. 13, 2019) (defendants had no reasonable expectation of privacy in duffel bags they gave to a third party to transport on a private airplane), *aff'd*, 37 F.4th 833 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 389 (2022).

Having voluntarily turned over their passports and electronic devices to Embassy security guards, Plaintiffs relinquished any reasonable expectation of privacy in those items—with the

---

[6] Typically, a warrant or other legal approval or authorization is required to search the contents of electronic devices.  *See, e.g.*, *Riley v. California*, 573 U.S. 373, 401 (2014) ("[A] warrant is generally required before . . . search[ing] [the contents of a cell phone], even when a cell phone is seized incident to arrest.").

exception of the contents of any devices (as mentioned above).  Thus, courts have concluded that police officers do not violate the Fourth Amendment in examining the exteriors, including behind the battery case, of mobile phones in their possession and noting serial numbers and the like.  *See Ward v. Lee*, No. 19-CV-03986 (KAM), 2020 WL 6784195, at *8 (E.D.N.Y. Nov. 18, 2020) (collecting cases).  And courts have further acknowledged that U.S. passports are the property of the Government, and thus that holders have no reasonable expectation of privacy in their contents.  *See, e.g.*, *United States v. Segall*, 589 F. Supp. 856, 858-59 (S.D. Fla. 1984) ("Where the Government in essence owns the passports, and had the right to subpoena them at any time, society is not prepared to recognize a privacy interest in the passports.").

As a result, there was no search for Fourth Amendment purposes when Plaintiffs' passports and the exteriors of their electronic devices were allegedly inspected or photographed, as they voluntarily turned those items over to Embassy security.

### B.  Plaintiffs Do Not Adequately Allege that the Alleged Searches and Seizures Were Unreasonable

Even to the extent Plaintiffs had legitimate privacy interests, their Fourth Amendment claim would nonetheless fail.  "While 'reasonableness'—the 'touchstone' of Fourth Amendment analysis—generally requires that law enforcement authorities procure a warrant supported by probable cause before [a search or seizure], neither a warrant nor probable cause is 'indispensable' to reasonableness for every seizure."  *United States v. Patterson*, 25 F.4th 123, 135 (2d Cir. 2022) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977), and *Nat'l Treas. Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989)).  To survive a motion to dismiss, Plaintiffs must allege facts sufficient to demonstrate an essential element of a Fourth Amendment claim: that the alleged searches and seizures were unreasonable.  They have failed to do so.  Even if Plaintiffs had alleged a sufficient role for U.S. Government in the alleged

searches and seizures such that the Fourth Amendment applied at all, *but see infra* Point III.C, Plaintiffs do not allege, for example, that any of the actions in question were taken without a warrant or other legal authority.  And indeed, many of their factual allegations simply describe actions which, if taken by the Government, would be reasonable as a matter of law, without the need for a warrant or other legal authorization.  Accordingly, although Plaintiffs label the alleged searches and seizures as "unlawful" or "unconstitutional," they have not alleged facts sufficient to establish a Fourth Amendment violation.

> **1.    The Incidental Capture of U.S. Citizen Information During Extraterritorial Surveillance of Foreign Targets Does Not Violate the Fourth Amendment**

As described in the Complaint, the supposed surveillance and recording of Plaintiffs' meetings with Assange would not have violated the Fourth Amendment (even if they had a reasonable expectation of privacy), regardless of whether a warrant or other legal authorization had been obtained.  "[T]he Fourth Amendment does not apply to extraterritorial actions by [U.S. authorities], . . . where the '[the target] was a [foreign] citizen and resident . . . with no voluntary attachment to the United States, and the place searched was located [abroad].'"  *United States v. Hasbajrami*, 945 F.3d 641, 662 (2d Cir. 2019) (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 274-75 (1990)); *see also United States v. Hunter*, No. 18-3074-CR, 2022 WL 1166623, at *2 (2d Cir. Apr. 20, 2022) ("The Fourth Amendment 'has extraterritorial application to the conduct abroad of federal agents *directed against* United States citizens' . . . .") (quoting *United States v. Toscanino*, 500 F.2d 267, 280-81 (2d Cir. 1974) (emphasis added)), *cert. granted sub nom. Samia v. United States*, 143 S. Ct. 542 (2022).

The Second Circuit recently concluded that where U.S. authorities legally engaged in warrantless surveillance of emails of a targeted foreign terrorist, the Fourth Amendment did not require a warrant to capture his communications with a U.S. citizen.  *See Hasbajrami*, 945 F.3d

at 667-68 ("[T]he initial targeting of individuals without ties to the United States and located abroad is lawful; there is no need for a warrant in order to collect incidental communications by United States persons to and from those individuals; and both the collection of such communications and the dissemination of information from such collection about potential criminal actions within the country to domestic law enforcement are reasonable under the Fourth Amendment."). The circuit court further found that the incidental capture of communications of U.S. citizens also satisfied the Fourth Amendment's reasonableness standard so long as the surveillance of the foreign national was not itself "unreasonable" or "indiscriminate." *Id.* at 667 (concluding that, because the Government had reasonably and not indiscriminately targeted a foreign terrorist with whom the United States citizen had communicated, the incidental capture of the communications of United States persons did not violate the Fourth Amendment).

Taking the allegations of the Complaint as true, it is clear that federal authorities would not have needed a warrant to permissibly conduct surveillance of their conversations with Assange. Plaintiffs allege that Assange, a foreign citizen, rather than the Plaintiffs, was the target of the audio and video surveillance in question, which took place outside the United States, at the Embassy in London. *See, e.g.*, Compl. ¶ 36(a), (c). Plaintiffs do not claim that the CIA or anyone else had any interest in them (or any other U.S. citizens), except inasmuch as they chose to meet with Assange at the Embassy during the relevant period. Thus, by their own admission, the U.S. citizen Plaintiffs would only have been "incidentally" captured in any surveillance recordings. Moreover, there is no plausible argument that it would be unreasonable or indiscriminate for the Government to surveil Assange, who oversaw WikiLeaks' publication of large amounts of U.S. national security information. *See id.* ¶¶ 12-19.[7] Thus, any alleged

---

[7] A criminal complaint against Assange was filed in late 2017 in the Eastern District of Virginia, which was originally sealed to facilitate his requested extradition to the United States. *See*

surveillance of Assange that incidentally captured his conversations with U.S. citizens such as Plaintiffs would not violate the Fourth Amendment as a matter of law.

### 2. Plaintiffs Do Not Allege that Any Other Alleged Searches and Seizures Were Conducted Without a Warrant or Other Authority

As for the remaining alleged searches and seizures, Plaintiffs repeatedly claim that they were "illegal" or "unconstitutional." *See id.* ¶¶ 27, 32, 36, 39, 45, 48. But the Complaint alleges no *facts* to suggest their proposed conclusion that these actions—if they took place—were unreasonable or not authorized by warrant or otherwise. This is a fatal defect.

It is axiomatic that the Government may legally, with necessary approvals, warrants or authorizations, in appropriate circumstances—but without its targets' knowledge or consent— use surreptitious recording devices, *see, e.g.*, *Mazzara*, 2017 WL 4862793, at *9-12 (surveillance cameras); photograph physical items, *see, e.g.*, *Selvaggio v. Patterson*, 93 F. Supp. 3d 54, 61 n.7 (E.D.N.Y. 2015) (police may "photograph objects in their plain view"); and access and download contents of electronic devices, *see, e.g.*, *United States v. Lewis*, No. 21-CR-349 (JSR), 2021 WL 3855873, at *4 (S.D.N.Y. Aug. 27, 2021) (seizure of phone "did not infringe her reasonable expectation of privacy in the data held on the device, since these data were only accessed after the Government complied with the Fourth Amendment's full scope of procedural protections.").[8] Accordingly, for Plaintiffs to adequately allege a Fourth Amendment violation

---

*United States v. Assange*, No. 18 Crim. 111, ECF Nos. 1, 2, 6 (E.D. Va. filed Dec. 21, 2017). Assange was indicted in early 2018, with superseding indictments in 2019 and 2020, for federal crimes including conspiracy to commit computer intrusion, conspiracy to obtain and disclose national defense information, and disclosure of national defense information. *Id.* ECF Nos. 8, 31, 44.

[8] For example, Congress has enacted the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 *et seq.*, which—in certain circumstances, and with necessary approvals—permits the government to direct certain collection techniques against U.S. persons to acquire foreign intelligence information.

with respect to the alleged seizures, Plaintiffs must explicitly allege that these actions were done without such legal authorization.  Their failure to do so requires dismissal of their claims.

Plaintiffs' conclusory allegations that the searches and seizures were "unlawful" or "unconstitutional" do not save the Complaint.  The Supreme Court considered precisely these type of conclusory allegations in *Twombly* and *Iqbal* and held that they were insufficient to state a claim to relief.  In *Twombly*, the Supreme Court evaluated the sufficiency of a complaint alleging price-fixing in violation of the antitrust laws, which requires competitors to have actually conspired to raise their prices in tandem.  *See Twombly*, 550 U.S. at 556-57.  But the plaintiffs had alleged only that the competitors had engaged in "parallel conduct" without alleging the existence of an agreement.  *See id.* at 564-65; *see also id.* at 564 ("Although in form a few stray statements [in the complaint] speak directly of agreement, on fair reading these are merely legal conclusions resting on the prior allegations.").  The Court concluded this was insufficient to survive a motion to dismiss, as the complaint did not include "allegations plausibly suggesting (not merely consistent with) agreement."  *Id.* at 556-57; *see id.* at 554 ("The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.").  Similarly, in the *Iqbal* case, a Muslim plaintiff alleged he was subject to unconstitutionally discriminatory mistreatment in federal prison when he was arrested after the 9/11 attacks.  *See id.* at 667-68.  The Court concluded that the plaintiff's allegations of the Director and Attorney General's scienter were conclusory and could not survive a motion to dismiss.  *Id.* at 680-81.

A recent decision from a New Jersey district court illustrates this principle with similar allegations to this case.  *See Banks v. FBI*, No. CV 19-9367, 2020 WL 4261198, at *2 (D.N.J. July 23, 2020).  The court in that case concluded: "Assuming that Plaintiff is correct and that she is under surveillance [by the FBI], she does not clearly allege that *unlawful* surveillance is occurring.  While Plaintiff states in the [complaint] that the surveillance is 'illegal,' that characterization on its own is conclusory, lacking any specific factual allegations to support it.  Therefore, Plaintiff fails to plausibly state a claim against Defendants." *Id.* (emphasis in original)).  That analysis applies with equal force here.

### C.   Plaintiffs Do Not Plausibly Allege that the Searches and Seizures Were Controlled or Directed by CIA

Furthermore, the Fourth Amendment does not apply to the actions of purely private parties.  *See, e.g.*, *United States v. Sanusi*, 813 F. Supp. 149, 156 (E.D.N.Y. 1992) ("The Fourth Amendment does not control the conduct of a private actor . . . .").  It is only when the "private actors act as agents or instruments of the government" that the protections of the Fourth Amendment apply.  *United States v. Wolfson*, 160 F. App'x 95, 97 (2d Cir. 2005).  In the instant case, the actions at issue were allegedly taken by the security apparatus of a foreign embassy abroad.  In the analogous context of foreign law-enforcement acting outside the United States, the Second Circuit has determined that such officials will not be considered agents of the United States unless U.S. officials "play some role in *controlling or directing* the[ir] conduct." *United States v. Getto*, 729 F.3d 221, 230 (2d Cir. 2013) (emphasis added).  Applying that standard here, Plaintiffs have not plausibly alleged a sufficient role for the CIA in directing or controlling the searches and seizures supposedly conducted by UC Global so as to implicate the Fourth Amendment.

The standard for attributing the actions of foreign law enforcement to the United States is a strict one.  It is not sufficient, for example, that "American law enforcement agents requested assistance" from a foreign police force "and shared the results of their preliminary investigation" with it, or that the foreign police "would not have investigated defendant but for the [United States'] request."  *Id.* at 231-32; *accord United States v. Gasperini*, 894 F.3d 482, 489 (2d Cir. 2018) ("Beyond alleging that the search was conducted at the request of the U.S. government, however, [defendant] does not argue that Italian officials were controlled by American law enforcement agents.  A mere request is not sufficient to show control.").  It is further insufficient that a foreign police force gave their American counterparts access to a "live feed" so they could "view surveillance footage in real time."  *Getto*, 729 F.3d at 231 (internal quotation marks omitted); *see id.* at 232.  Nor indeed is it relevant whether foreign officials violated their own laws in conducting the searches at issue unless the U.S. authorities were made "aware of that fact."  *Mercedes-Valdez v. United States*, No. 08-CR-1137-1 (RJS), 2016 WL 7448062, at *6 (S.D.N.Y. Dec. 23, 2016); *accord United States v. Lee*, 723 F.3d 134, 142 (2d Cir. 2013) (this rule "do[es] not suggest, much less require, that the government or the District Court had a duty to review the legality, under Jamaican law, of the applications for surveillance authority considered by Jamaican courts"); *United States v. Vilar*, No. S3:05-CR-621 (KMK), 2007 WL 1075041, at *58 (S.D.N.Y. Apr. 4, 2007).  From these cases, it is clear that the Fourth Amendment applies only when the U.S. government exercised specific control and direction over the method and manner in which the operations were conducted, rather than simply acting in concert with, or obtaining the benefits of, cooperation with the foreign actors.

Here, like in the cases cited above, the Complaint does not allege sufficient facts suggesting the CIA controlled and directed the Spanish Defendants' actions at issue.  Plaintiffs

allege generally that Morales came to an understanding with the security staff of the Las Vegas
Sands Hotel, which "had cooperated with the CIA on similar matters in the past," to "conduct
surveillance on Assange and his visitors at the Embassy on behalf of the CIA."  Compl. ¶ 30.
But they do not allege specifically what the CIA purportedly requested or instructed, or what
specific control or direction the agency exercised over UC Global's implementation of this
supposed agreement.  Instead, they make conclusory allegations that the steps taken by Morales
or UC Global were "authorized" or "approved" or "orchestrated" by the CIA or Pompeo, *id.*
¶¶ 33, 36, 41, without sufficient factual content to determine whether the CIA exercised the
requisite level of direction over the manner in which the supposed searches and seizures were
performed.

       The Fourth Amendment is thus inapplicable to the alleged actions at issue because they
were conducted by foreign persons who are not plausibly alleged to have acted under the control
and direction of U.S. authorities.

## IV.    PLAINTIFFS' *BIVENS* CLAIM AGAINST POMPEO SHOULD BE DISMISSED

       Plaintiffs' claims against Pompeo must be dismissed for additional reasons.  There is no
recognized *Bivens* remedy in the circumstances alleged in the Complaint, and this Court should
not recognize one here.  Moreover, Pompeo is entitled to qualified immunity because Plaintiffs'
allegations of his personal involvement in the alleged searches and seizures are too conclusory to
state a violation of a clearly established constitutional right.

### A.    There Is No *Bivens* Remedy for Claims Involving Intelligence-Gathering Abroad

       The Supreme Court has defined a narrow set of circumstances in which *Bivens* claims
may be brought.  *See Egbert v. Boule*, 142 S. Ct. 1793, 1797 (2022); *Ziglar v. Abbasi*, 582 U.S.
120, 135-37 (2017).  To determine whether a *Bivens* claim in a particular case should be

recognized, the Court has prescribed a two-step inquiry, which asks whether the proposed claim involves an extension of the doctrine into a "new *Bivens* context" that is "meaningfully different from the three cases in which the Court has implied a damages action," and if so, whether "special factors indicat[e] that the Judiciary is at least arguably less equipped that Congress to weigh the costs and benefits of allowing a damages action to proceed." *Egbert*, 142 S. Ct. at 1797-98 (internal quotation marks omitted).  Stated another way, the court must "ask whether there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy at all." *Id*. at 1809 (internal quotation marks omitted); *see also id.* at 1806 n.3 (noting that "recognizing a *Bivens* cause of action is an extraordinary act that places great stress on the separation of powers" (internal quotation marks omitted)).  Finally, courts must consider whether Congress has created any alternative remedial schemes that would address the type of wrongdoing alleged.  *Nestlé USA*, *Inc. v. Doe*, 593 141 S. Ct. 1931 (2021).  The Court has declined to recognize additional causes of action "in all but the most unusual circumstances," as Congress is generally "better suited" to weigh economic concerns, administrative costs, and the impact suits will have on governmental operations.  *Egbert*, 142 S. Ct. at 1803, 1805; *see also id.* ("If there is even a single 'reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy." (internal quotation marks omitted)).

The Complaint here alleges violations of the Fourth Amendment's protection against unreasonable search and seizure, Compl. ¶ 55, which is a recognized *Bivens* violation, *see Egbert*, 142 S. Ct. at 1802.  However, the original *Bivens* case recognized a "cause of action under the Fourth Amendment against federal agents who had allegedly manacled the plaintiff and threatened his family while arresting him for narcotics violations." *Id.* (internal quotation

marks omitted).  Plaintiffs' claim here plainly arises in a different context and special factors counsel against extending the remedy into this area.

A new context for purposes of this inquiry includes "a new category of defendants." *Id.* Thus, for example, the Supreme Court has precluded *Bivens* suits against Border Patrol agents because their function "'unquestionably has national security implications.'" *Id.* at 1804 (quoting *Hernández v. Mesa*, 140 S. Ct. 735, 747 (2020)); *see also Schweiker v. Chilicky*, 487 U.S. 412, 421 (1988) (refusing to extend *Bivens* to claims against Social Security Administration employees who allegedly violated due process in handling benefits applications).[9]  Here, the individual defendant is the former Director of the CIA, who is undoubtedly in a different category than the law-enforcement agents in the original *Bivens* case, and whose role also unquestionably has national security implications.  Relatedly, the factual context of Plaintiffs' complaint is far from the alleged improper use of force by law-enforcement agents in the United States: it concerns the alleged collection of intelligence abroad by the CIA.  *Cf., e.g.*, *Meshal v. Higgenbotham*, 804 F.3d 417, 424-25 (D.C. Cir. 2015) ("To our knowledge, no court has previously extended *Bivens* to cases involving either the extraterritorial application of constitutional protections or in the national security domain, let alone a case implicating both— another signal that this context is a novel one." (footnotes omitted)); *Arar v. Ashcroft*, 585 F.3d 559, 574-75 (2d Cir. 2009) ("It is a substantial understatement to say that one must hesitate before extending *Bivens* into . . . matters that directly affect significant diplomatic and national

---

[9] As potentially relevant to the Spanish Defendants, the Supreme Court has also refused to extend *Bivens* to claims against private individuals or entities, including those alleged to be operating under contract with, or in collaboration with, federal agencies.  *See Minneci v. Pollard*, 565 U.S. 118 (2012) (no *Bivens* claim against employees of privately operated federal prison); *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) (no *Bivens* claim against private corporation operating federal halfway house).

security concerns.").  This Court must thus consider whether any "special factors" associated
with this new context weigh against extending the *Bivens* remedy to it.

They clearly do.  Indeed, the *Egbert* Court squarely held that "[b]ecause matters
intimately related to foreign policy and national security are rarely proper subjects for judicial
intervention, we reaffirm that a *Bivens* cause of action may not lie where . . . national security is
at issue."  142 S. Ct. at 1804-05 (citation, brackets, and internal quotation marks omitted).  Such
judicial deference in light of national security issues is justified in part by the separation of
powers.  "National-security policy is the prerogative of the Congress and President.  Judicial
inquiry into the national-security realm raises concerns for the separation of powers in trenching
on matters committed to the other branches.  These concerns are even more pronounced when
the judicial inquiry comes in the context of a claim seeking money damages rather than a claim
seeking injunctive or other equitable relief."  *Abbasi*, 582 U.S. at 142 (citations and internal
quotation marks omitted).  Courts have thus precluded on this ground *Bivens* claims against
Border Patrol agents operating at or near the U.S. border, *see Egbert*, 142 S. Ct. at 1804-06;
*Hernández*, 140 S. Ct. at 739-40; Department of Justice and federal prison officials relating to
the conditions of confinement of illegal aliens detained shortly after the September 11 attacks,
*see Abbasi*, 582 U.S. at 140-46; and FBI agents and others who allegedly detained, interrogated,
and threatened to torture a U.S. citizen abroad, *see Meshal*, 804 F.3d at 419, 422-29.

Indeed, allegations relating to intelligence-gathering by the CIA or other intelligence
agencies would seem to counsel even more hesitation than some other national-security-related
contexts.  *Cf. Wilson v. Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008) (dismissing *Bivens* claim by
CIA employee in part because it "would inevitably require an inquiry into classified information
that may undermine ongoing covert operations," and courts "must hesitate before we allow a

27

judicial inquiry into these allegations that implicate the job risks and responsibilities of covert CIA agents" (internal quotation marks omitted)); *Arar* 585 F.3d at 578-79 ("[T]here is further reason to hesitate [in recognizing a *Bivens* remedy] where . . . the challenged government policies are the subject of classified communications: a possibility that such suits will make the government 'vulnerable to . . . lawsuits brought to induce the [government] to settle a case (or prevent its filing) out of fear that any effort to litigate the action would reveal classified information that may undermine ongoing covert operations,' or otherwise compromise foreign policy efforts. . . .  [T]his dynamic inheres in any case where there is a risk that a defendant might disclose classified information in the course of a trial." (quoting *Tenet v. Doe*, 544 U.S. 1, 11 (2005) (some internal quotation marks omitted)).  Such matters can touch upon extremely sensitive matters involving relationships with foreign countries where intelligence is being collected and the clandestine nature of certain operatives and sources, and may implicate the Government's general practice of not publicly disclosing or even acknowledging the vast majority of such operations.

As discussed above, another factor the Supreme Court has identified that counsels against a judicially created cause of action is when Congress has enacted any relevant "alternative remedial structure."  *Egbert*, 142 S. Ct. at 1804 (internal quotation marks omitted).  Such a remedial structure is sufficient if it includes "safeguards to prevent constitutional violations from recurring," even if the plaintiff "is not entitled to participate and has no right to judicial review of an adverse determination," and even if it "do[es] not provide complete relief" to the plaintiff.  *Id.* at 1804, 1806 (brackets and internal quotation marks omitted).  The principal question in this regard is whether a court, "rather than the political branches, is better equipped to decide whether existing remedies should be augmented by the creation of a new judicial remedy."  *Id.* at 1804

(internal quotation marks omitted).  Thus, it was sufficient in the *Egbert* case that U.S. Customs and Border Patrol is "statutorily obligated to 'control, direc[t], and supervis[e] . . . all employees,'" and "must investigate 'alleged violations of the standards for enforcement activities' and accept grievances from 'any persons wishing to lodge a complaint.'"  *Id.* (quoting 8 U.S.C. § 1103(a)(2) and 8 C.F.R. § 287.10(a)-(b)) (brackets omitted).

Here, similarly, Congress has created the CIA's Office of Inspector General ("OIG"), which is statutorily authorized to "receive and investigate complaints or information *from any person* concerning the existence of an activity constituting a violation of laws, rules, or regulations, or mismanagement, gross waste of funds, abuse of authority, or a substantial and specific danger to the public health and safety."  50 U.S.C. § 3517(e)(3) (emphasis added).  The CIA is required to include "on the homepage of [its] publicly accessible website information relating to the Office of the Inspector General including methods to contact the Inspector General."  *Id.* § 3517(h)(1); *see also* CIA, *Organization—Office of Inspector General*, https://www.cia.gov/about/organization/inspector-general/ (last visited Feb. 8, 2023) (listing mailing address for OIG).  And indeed, CIA's OIG investigates and reports on allegedly improper acts by CIA personnel.  *See, e.g.*, *ACLU v. CIA*, 892 F. Supp. 2d 234, 239 (D.D.C. 2012) (discussing OIG reports on the treatment of detainees, the use of certain interrogation techniques at an overseas CIA detention facility, the non-registration of certain detainees, overseas CIA detention facilities, and CIA counterterrorism operations); *ACLU v. Dep't of Def.*, 351 F. Supp. 2d 265, 268 (S.D.N.Y. 2005) ("[O]n May 11, 2004, the CIA's Office of Inspector General . . . commenced a criminal investigation of allegations of impropriety in Iraq." (internal quotation marks omitted)).

In addition, the availability of a claim against the agency itself—as Plaintiffs have

brought and discussed above—is a further potential alternative remedy counseling against

extending the *Bivens* remedy here, even if (for the reasons explained above) Plaintiffs have not

adequately pled their constitutional claim in this case.  *See Abbasi*, 137 S. Ct. at 1865 ("[T]he

existence of alternative remedies usually precludes a court from authorizing a *Bivens* action.

And there might have been alternative remedies available here . . . .").  This factor thus further

counsels against extending *Bivens* to the allegations in this case.

In sum, Plaintiffs' allegations unquestionably would extend *Bivens* relief into a new

context, and the relevant factors not only "counsel hesitation" against such an extension but

definitively foreclose it.  Plaintiffs' claim against Pompeo, as with "most every case" brought

under *Bivens*, should thus be dismissed.  *See Egbert*, 142 S. Ct. at 1803.

### B.   Pompeo Is Entitled to Qualified Immunity Because Plaintiffs Have Not Sufficiently Alleged His Participation in the Violation of a Clearly Established Constitutional Right

Finally, even if Plaintiffs had a cognizable *Bivens* claim, the claim against Pompeo would

have to be dismissed because he is entitled to qualified immunity.  "'Qualified immunity shields

government officials from civil damages liability unless the official violated a statutory or

constitutional right that was clearly established at the time of the challenged conduct.'"  *Bacon v.

Phelps*, 961 F.3d 533, 542 (2d Cir 2020) (quoting *Reichle v. Howards*, 566 U.S. 658, 664

(2012)).  The qualified immunity analysis requires courts to ask two questions: "first, whether

the plaintiff [adequately alleged] that his constitutional rights were violated, and second, whether

the right at issue was 'clearly established' at the time of the alleged violation."  *Id.* (quoting

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  A right is "clearly established" if its contours

are "'sufficiently clear that a reasonable official would understand that what he is doing violates

that right.'"  *McGowan v. United States*, 825 F.3d 118, 124 (2d Cir. 2016) (quoting *Anderson v.*

*Creighton*, 483 U.S. 635, 640 (1987)).  "[I]f the complaint does not allege a cognizable federal claim, the defendant is entitled to have his qualified-immunity motion granted promptly as a matter of law."  *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (internal quotation marks omitted)).

As to the first prong, as discussed above, *see* Point III, Plaintiffs have not alleged any actual violation of their Fourth Amendment rights, for several reasons.  Moreover, Plaintiffs' allegations of Pompeo's personal involvement in the alleged searches and seizures are too conclusory to survive a motion to dismiss.  *See Iqbal*, 556 U.S. at 680-81.  In *Iqbal*, the plaintiff was required to plead that each defendant acted with discriminatory purpose—that they "adopted and implemented the detention policies at issue not for a neutral, investigative reason but for the purpose of discriminating on account of race, religion, or national origin."  *Id.* at 677.  The Supreme Court rejected the plaintiff's argument that the FBI Director and Attorney General could be liable under a theory of "supervisory liability," as such liability would be inconsistent with the personal liability of a *Bivens* defendant.  *Id.*  The Court concluded that the plaintiff's scienter allegations for these officials were insufficient to survive a motion to dismiss, as they merely parroted the relevant legal standard.  *Id.* at 680-81 (allegations that the defendants "knew of, condoned, and willfully and maliciously agreed to subject [plaintiff]" to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest," and that the Attorney General was the "principal architect" of this invidious policy, and the Director was "instrumental" in adopting and executing it were conclusory).

The same can be said for Plaintiffs' allegations against Pompeo.  The Complaint alleges as follows: Soon after becoming Director of the CIA, Pompeo allegedly gave a speech during

which he expressed negative views of WikiLeaks and Assange, and pledged that the CIA would target them. Compl. ¶¶ 21-26. The Complaint asserts that Pompeo "recruited" the Spanish Defendants to surveil Assange and his visitors, *id.* ¶ 27, and "orchestrated" the searches and seizures at issue, *id.* ¶ 41, but does not support those characterizations with factual content. Nor do Plaintiffs' factual allegations support their conclusory assertion that "[a]t all times Morales and UC Global were acting as agents of the Defendants CIA and Pompeo." *Id.* ¶ 42. Plaintiffs further allege, without elaboration, that Pompeo "approved and authorized" the alleged "deal" between Morales and the CIA, *id.* ¶ 33, and that Pompeo "approved" the supposed searches and seizures conducted by UC Global, *id.* ¶ 36; *see also id.* ¶ 41 (Pompeo "was aware of and approved" actions at issue). Like the allegations in *Iqbal* that the Attorney General was the "principal architect" of the challenged policy and the FBI Director was "instrumental" in adopting and executing it, these allegations are insufficient as a matter of law to state a *Bivens* claim against Pompeo—even if such a claim were available.

With respect to the second prong of the qualified immunity analysis—requiring that the constitutional rights at issue were "clearly established" at the time of the alleged violation— while the Fourth Amendment principles discussed above are relatively well-settled, the numerous legal deficiencies in Plaintiffs' claims and the ample legal authority cited herein foreclose any conclusion that Pompeo violated their clearly established constitutional rights. The claim against Pompeo must thus further be dismissed on the basis of qualified immunity.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss Plaintiffs' claims against the CIA and

Pompeo.

Dated: New York, New York
       March 20, 2023

                                        DAMIAN WILLIAMS
                                        United States Attorney for the
                                        Southern District of New York

                          By:     __s/Jean-David Barnea_____
                                        JEAN-DAVID BARNEA
                                        Assistant United States Attorney
                                        86 Chambers Street, 3rd Floor
                                        New York, NY 10007
                                        Tel. (212) 637-2679
                                        Email Jean-David.Barnea@usdoj.gov

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel hereby certifies that this brief complies with the word limits and formatting rules in Section II.D of this Court's Individual Practices, as amended by the Court's order of March 16, 2023.  ECF No. 33.  As measured by the word processing system used to prepare this brief, there are 10,441 words in this brief.

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:      s/Jean-David Barnea
JEAN-DAVID BARNEA
Assistant United States Attorney