**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARGARET RATNER KUNSTLER,
DEBORAH HRBEK, JOHN GOETZ and
CHARLES GLASS,

               Plaintiffs,

       v.

CENTRAL INTELLIGENCE AGENCY,
MICHAEL R. POMPEO, DAVID
MORALES GUILLEN and UNDERCOVER
GLOBAL S.L.,

               Defendants.

No. 22 Civ. 6913 (JGK)

 

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**THE MOTION TO DISMISS OF DEFENDANTS**
**CENTRAL INTELLIGENCE AGENCY AND MICHAEL R. POMPEO**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
86 Chambers Street
New York, New York 10007
Tel. (212) 637-2679
Email Jean-David.Barnea@usdoj.gov

JEAN-DAVID BARNEA
Assistant United States Attorney
   - Of Counsel -

## TABLE OF CONTENTS

ARGUMENT ............................................................................................................1

I.   PLAINTIFFS LACK STANDING FOR THEIR CLAIM AGAINST THE CIA ...................1

II.  PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED FOURTH AMENDMENT
     VIOLATIONS ..............................................................................................3

     A.  Plaintiffs Cannot Plausibly Allege They Had a Reasonable Expectation of Privacy
         with Respect to Their Discussions in the Embassy ..............................................3

     B.  Plaintiffs Cannot Plausibly Allege They Had a Reasonable Expectation of Privacy
         with Respect to Items Voluntarily Turned Over to Third Parties.......................................7

     C.  Plaintiffs Do Not Adequately Allege that Any Purported Extraterritorial Surveillance
         of Their Meetings with Assange Would Have Been Unreasonable ...................................8

     D.  Plaintiffs Do Not Adequately Allege that the Alleged Searches and Seizures of Their
         Electronics Were Unauthorized ..........................................................................12

     E.  Plaintiffs Do Not Plausibly Allege that the Searches and Seizures Were Controlled
         or Directed by CIA...........................................................................................14

III. PLAINTIFFS HAVE NO VALID *BIVENS* CLAIM AGAINST POMPEO ...........................15

     A.  There Is No *Bivens* Remedy for Plaintiffs' Claims Against Pompeo...............................15

     B.  Even If a *Bivens* Claim Were Available, Pompeo Would Be Entitled to Qualified
         Immunity.........................................................................................................18

IV.  PLAINTIFFS SHOULD NOT BE PERMITTED TO FURTHER AMEND THEIR
     COMPLAINT ................................................................................................20

CONCLUSION.......................................................................................................22

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ACLU v. Clapper*,
  785 F.3d 787 (2d Cir. 2015) ............................................................................... 2

*Ali v. Barr*,
  464 F. Supp. 3d 549 (S.D.N.Y. 2020) ................................................................. 1

*Application of J.W. Schonfeld, Ltd.*,
  460 F. Supp. 332 (E.D. Va. 1978) ...................................................................... 12

*Ashcroft v. Iqbal*,
  556 U.S. 675 (2009) ...................................................................................... 13, 19

*Banks v. FBI*,
  No. CV-19-9367, 2020 WL 4261198 (D.N.J. July 23, 2020) ............................... 13

*Bardak v. Ocwen Loan Servicing, LLC*,
  No. 8:19-CV-1111-24TGW, 2020 WL 5104523 (M.D. Fla. Aug. 12, 2020) ......... 19

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................... 13

*Bivens v. Six Unknown Named Agents*,
  403 U.S. 388 (1971) ...................................................................................... 15, 8

*California v. Ciraolo*,
  476 U.S. 207 (1986) ........................................................................................... 4

*Carlson v. Green*,
  446 U.S. 14 (1980) ............................................................................................ 15

*Carpenter v. United States*,
  138 S. Ct. 2206 (2018) ....................................................................................... 7

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ............................................................................................. 3

*Coleman v. Johansene*,
  No. 2:19-CV-10572, 2019 WL 2929098 (E.D. Mich. July 8, 2019) .................... 13

*Davis v. Passman*,
  442 U.S. 228 (1979) ........................................................................................... 15

*Egbert v. Boule*,
  142 S. Ct. 1793 (2022) ............................................................................ 15, 16, 17

*F5 Cap. v. Pappas*,
  856 F.3d 61 (2d Cir. 2017) ............................................................................ 20, 21

*Guan v. Mayorkas*,
    530 F. Supp. 3d 237 (E.D.N.Y. 2021) ................................................................. 3

*Hernández v. Mesa*,
    140 S. Ct. 735 (2020) ...................................................................................... 16

*In re Clinton*,
    973 F.3d 106 (D.C. Cir. 2020) ......................................................................... 18

*In re Terrorist Bombings of U.S. Embassies in E. Afr.*,
    552 F.3d 157 (2d Cir. 2008) .............................................................................. 8

*Janfeshan v. CBP*,
    No. 16 Civ. 6915 (ARR)(LB), 2017 WL 3972461 (E.D.N.Y. Aug. 21, 2017) ...... 3

*Katz v. United States*,
    389 U.S. 347 (1967) ......................................................................................... 3

*Knaus v. Town of Ledgeview*,
    No. 10-C-502, 2010 WL 2640272 (E.D. Wis. June 24, 2010) ........................... 13

*Lewis v. Oklahoma*,
    304 F. Supp. 116 (W.D. Okla. 1969) ................................................................ 13

*Newberry v. Cnty. of San Bernardino*,
    750 F. App'x 534 (9th Cir. 2018) ..................................................................... 12

*Penn v. N.Y. Methodist Hosp.*,
    158 F. Supp. 3d 177 (S.D.N.Y. 2016) ................................................................ 8

*Phillips v. United States*,
    No. 2:19-CV-06338 (SVW)(JEM), 2021 WL 2587961 (C.D. Cal. June 22, 2021) ... 2

*Riley v. California*,
    573 U.S. 373 (2014) ......................................................................................... 7

*Rodriguez v. City of Springfield*,
    127 F.R.D. 426 (D. Mass. 1989) ...................................................................... 12

*Sayles v. United States*,
    No. CIV. 12-1644, 2013 WL 4523593 (W.D. Pa. Aug. 27, 2013) ..................... 13

*Smith v. Maryland*,
    442 U.S. 735 (1979) ......................................................................................... 7

*Talarico v. Port Auth. of N.Y. & N.J.*,
    No. 18-CV-909 (JPO), 2022 WL 540956 (S.D.N.Y. Feb. 23, 2022) ............... 5, 6

*Tancredi v. Malfitano*,
    567 F. Supp. 2d 506 (S.D.N.Y. 2008) ................................................................ 4

*United States v. Chandler*,
  56 F.4th 27 (2d Cir. 2022) ................................................................................ 3

*United States v. Colon*,
  59 F. Supp. 3d 462 (D. Conn. 2014) ................................................................ 3

*United States v. Cook*,
  No. 20-CR-84-LJV, 2021 WL 6133280 (W.D.N.Y. Dec. 27, 2021) ..................... 5

*United States v. Getto*,
  729 F.3d 221 (2d Cir. 2013) ...................................................................... 14, 15

*United States v. Guzman Loera*,
  24 F.4th 144 (2d Cir. 2022) ............................................................................. 7

*United States v. Hasbajrami*,
  945 F.3d 641 (2d Cir. 2019) .................................................................. 10, 11, 9

*United States v. Mazzara*,
  No. 16 CR. 576 (KBF), 2017 WL 4862793 (S.D.N.Y. Oct. 27, 2017) ................. 4

*United States v. Miller*,
  425 U.S. 435 (1976) ......................................................................................... 7

*United States v. Mohamud*,
  843 F.3d 420 (9th Cir. 2016) ..................................................................... 11, 9

*United States v. Muhtorov*,
  20 F.4th 558 (10th Cir. 2021) ........................................................................ 11

*Wikimedia Found. v. NSA*,
  857 F.3d 193 (4th Cir. 2017) ........................................................................... 2

*Ziglar v. Abbasi*,
  582 U.S. 120 (2017) ....................................................................................... 15

## Statutes and Rules

50 U.S.C. § 3517 ................................................................................... 18, 19

Fed. R. Civ. P. 15(a) ................................................................................. 20

## Other Sources

Ctr. for Strategic & Int'l Studies,
  *Transcript: A Discussion on National Security with CIA Director Mike Pompeo*
  (Apr. 13, 2017), https://www.csis.org/analysis/discussion-national-security-cia-
  director-mike-pompeo........................................................................................ 19

Defendants the Central Intelligence Agency and Michael R. Pompeo, the former Director of the CIA, by their attorney Damian Williams, the United States Attorney for the Southern District of New York, respectfully submit this reply memorandum of law in further support of their motion to dismiss the amended complaint in this case, ECF No. 35 ("Mot."), and in response to Plaintiffs' opposition thereto, ECF No. 38 ("Opp.").[1]  For the reasons stated herein and in the opening brief, the Court should dismiss Plaintiffs' claim against the Federal Defendants—and deny Plaintiffs' request to further amend their complaint as futile.

## ARGUMENT

## I.     PLAINTIFFS LACK STANDING FOR THEIR CLAIM AGAINST THE CIA

As explained in the Federal Defendants' opening brief, Plaintiffs do not have standing to bring their constitutional claim against the CIA because their alleged injuries are too speculative and not imminent or particularized, and because the relief they seek would not redress those injuries.  Mot. at 6-11.  In their opposition, Plaintiffs argue that the alleged seizures at issue constitute injuries sufficient to support standing.  Opp. at 3-8.  This is incorrect.  While constitutional violations can be an injury-in-fact for certain standing inquiries, Plaintiffs here seek forward-looking injunctive relief from the CIA.  Accordingly, they must allege imminent *future* injuries that would be remedied by the requested injunction.  *See Ali v. Barr*, 464 F. Supp. 3d 549, 560 (S.D.N.Y. 2020) ("It is fundamental that injunctive relief should be narrowly tailored to fit specific legal violations." (internal quotation marks omitted)).  It is here that Plaintiffs' standing allegations fail.

Plaintiffs rely on inapposite cases where courts have permitted parties to seek injunctive relief to stop *ongoing* allegedly unconstitutional government data-collection efforts that

---

[1] This memorandum uses capitalized terms defined in the Federal Defendants' opening brief.

intercepted their communications.  In one such case, which Plaintiffs incorrectly view as "dispositive," Opp. at 5, the program at issue "collect[ed] in bulk *on an ongoing daily basis* the metadata associated with telephone calls made by and to Americans, and aggregate[d] those metadata into a repository or data bank that can later be queried"; whenever the Government "querie[d] [the] database, its computers search[ed] *all* of the material stored in the database"— including the plaintiffs' telephone metadata—"in order to identify records that match the search term." *ACLU v. Clapper*, 785 F.3d 787, 792, 802 (2d Cir. 2015) (emphasis added and internal quotation marks omitted).  Similarly, the Fourth Circuit concluded that a plaintiff "pleaded an actual and *ongoing* injury" when it challenged a surveillance program in which it alleged that the NSA "copies substantially all international text-based communications . . . flowing across certain high-capacity [internet] cables" and "retains and with few restrictions analyzes all communications that contain selectors associated with its targets." *Wikimedia Found. v. NSA*, 857 F.3d 193, 203, 211 (4th Cir. 2017) (internal quotation marks and brackets omitted; emphasis added).

Here, in contrast, the alleged searches and seizures occurred more than five years ago, and are not claimed to be ongoing. Compl. ¶¶ 1-4, 36.  Nor have Plaintiffs plausibly alleged any imminent future use by the CIA of the information allegedly taken from them.  Plaintiffs are thus forced to argue that the CIA's mere retention of the allegedly seized data, without more, is sufficient to confer standing.  Yet a recent California case correctly concluded that plaintiffs lack standing to seek expungement of seized information unless they specifically and credibly allege how "the continued existence of [the] record could adversely affect [them] in the future." *Phillips v. United States*, No. 2:19-CV-06338(SVW)(JEM), 2021 WL 2587961, at *8 (C.D. Cal. June 22, 2021) (collecting cases), *on appeal*, No. 21-55768 (9th Cir. argued Feb. 9, 2023).

Plaintiffs cite two Eastern District of New York cases for the proposition that the government's mere "retention of [previously seized] information itself constitutes an injury *regardless of its [continuing] effect on Plaintiffs*." *Guan v. Mayorkas*, 530 F. Supp. 3d 237, 262 (E.D.N.Y. 2021) (emphasis added); *see also Janfeshan v. CBP*, No. 16 Civ. 6915(ARR)(LB), 2017 WL 3972461, at *6-7 (E.D.N.Y. Aug. 21, 2017).  But those decisions are in considerable tension with the Supreme Court's admonition that a plaintiff's standing to seek prospective relief depends "on whether he [is] likely to suffer future injury" from the alleged conduct, *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983), and are not binding on this Court.

This Court should thus dismiss Plaintiffs' claims against the CIA for lack of standing.

## II.   PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED FOURTH AMENDMENT VIOLATIONS

In addition, all of the claims asserted in the complaint, whether for prospective relief against the CIA or for monetary damages from Pompeo, suffer from the same defect: Plaintiffs have failed to adequately plead violations of the Fourth Amendment.

### A.    Plaintiffs Cannot Plausibly Allege They Had a Reasonable Expectation of Privacy with Respect to Their Discussions in the Embassy

As explained in the opening brief, Mot. at 13-17, the Fourth Amendment only "protects the right of private citizens to be free from unreasonable government intrusions *into areas where they have a legitimate expectation of privacy*." *United States v. Chandler*, 56 F.4th 27, 41 (2d Cir. 2022) (emphasis added).  Plaintiffs argue they could not have reasonably expected that their conversations with Assange in the Ecuadorean Embassy in London might be surreptitiously surveilled *by the U.S. government*.  Opp. at 9-11.  But that is a strawman.

The Fourth Amendment "appl[ies] only if a [person] has a reasonable expectation of privacy in not having his words or conversation overheard." *United States v. Colon*, 59 F. Supp. 3d 462, 465 (D. Conn. 2014) (citing *Katz v. United States*, 389 U.S. 347 (1967)).  This is

3

determined using a "'two-part' inquiry: 'first, has the individual manifested a subjective expectation of privacy in the object of the challenged search?  Second, is society willing to recognize that expectation as reasonable?'"  *United States v. Mazzara*, No. 16 CR. 576 (KBF), 2017 WL 4862793, at *4 (S.D.N.Y. Oct. 27, 2017) (quoting *California v. Ciraolo*, 476 U.S. 207, 211 (1986)) (internal quotation marks omitted)).

Plaintiffs' concession that it is a "reasonable expectation that there may be security cameras in a foreign embassy," Opp. at 11 (internal quotation marks omitted), effectively ends the inquiry.  The reasonably likely presence of security cameras in the Embassy—irrespective of who might have been viewing them or for what purpose—means that Plaintiffs had no reasonable expectation of privacy in their conversations with Assange.  As noted in the opening brief, courts have concluded there is no reasonable expectation of privacy for conversations in a variety of public or semipublic locations—or locations where the speakers are guests or that are controlled by independent actors or authorities.  Mot. at 13-14.  These locations include police station interview rooms and front desks, hospitals, and public streets—even when the surveillance itself is surreptitious.

For example, in one case, a court concluded that police officers had no reasonable expectation of privacy when their department allegedly "surreptitiously altered the Department's 911 communications system so as to automatically audio record the conversations of any person at the front desk area in Department Headquarters," and recorded conversations that took place when no other persons were physically present nearby and thus the officers believed they were speaking privately.  *Tancredi v. Malfitano*, 567 F. Supp. 2d 506, 507, 509-12 (S.D.N.Y. 2008).  Similarly, another court concluded that two arrestees speaking to each other in an interrogation room (without police officers present) had no expectation of privacy, because "one would expect

4

police interview rooms to be equipped with cameras and microphones," and so "[i]t is difficult to fathom a place where an objective expectation of privacy would be less." *United States v. Cook*, No. 20-CR-84-LJV, 2021 WL 6133280, at *7 (W.D.N.Y. Dec. 27, 2021); *see also id.* at *8 (a person might have an expectation of privacy in an interview room if given explicit assurances of privacy); *Talarico v. Port Auth. of N.Y. & N.J.*, No. 18-CV-909(JPO), 2022 WL 540956, at *1 (S.D.N.Y. Feb. 23, 2022) (no reasonable expectation of privacy in nurse's office in government medical facility, in which "security camera" was "clandestinely" installed, because in such facilities, medical staff regularly enter rooms to provide treatment), *aff'd*, No. 22-0593-CV, 2023 WL 2703625 (2d Cir. Mar. 30, 2023).

While Plaintiffs argue that foreign embassies are unlike police stations and the like, Opp. at 11 & n.6, they are similar in relevant ways. They are both facilities controlled by government agencies in which security and related considerations all but ensure some type of surveillance mechanism. In these types of locations, a person has a reasonable expectation of privacy only if he is given an explicit assurance—such as when a police station provides a private room for arrestees to speak with their attorneys. Otherwise, even if a person incorrectly believes subjectively that his conversations are private, that belief is not reasonable for Fourth Amendment purposes. A facility controlled by a foreign government, on foreign soil, with a known security apparatus, is not the type of location where society recognizes a legitimate expectation of privacy.[2]

---

[2] There are no factual disputes, as Plaintiffs suggest, that would require discovery on this point. Opp. at 10. The Federal Defendants' argument is based on Plaintiffs' own allegations and the general understanding, which they confirm, that facilities like foreign embassies are likely to contain security cameras or other surveillance mechanisms, which may or may not be visible to visitors.

Plaintiffs also claim that they "reasonably expected that the U.S. government would not invade attorney-client meetings." Opp. at 10. This argument misses the mark—in addition to the misguided notion that it is privacy as against the U.S. government as opposed to privacy from all outsiders that is the relevant question. Although two of the Plaintiffs are practicing attorneys, they do not allege that they were *Assange*'s attorneys. Compl. ¶ 1 (Plaintiff Kunstler is a practicing attorney who "visited Assange at the Embassy between in or about January 2017 and in or about March 2018"); *id.* ¶ 2 (similar for plaintiff Hrbek); *see also id.* ¶ 47 (referring to "Assange's criminal defense attorneys in the United States" as in a category of persons other than Plaintiffs). Further, even if some of the Plaintiffs had an attorney-client relationship with Assange, there is no special Fourth Amendment protection for attorney-client conversations. Rather, it is because of the importance of confidentiality in their relationship that attorneys and their clients generally seek out private places where they are unlikely to be overheard to have privileged conversations.

Plaintiffs further argue that at time of their alleged conversations with Assange, the fact of his criminal indictment had not yet been made public. Opp. at 12-13. They thus claim they were not on notice that the U.S. government might be surveilling Assange (and their conversations with him). *Id.* But while a reasonable expectation of privacy might be defeated by circumstances that would lead a person to believe his interlocutor was under surveillance, that is not the basis for the Federal Defendants' argument here. In any event, given the high-profile nature of Assange's activities in publishing U.S. national security information on Wikileaks, and the international legal wrangling about his fate, it would indeed have been reasonable to believe that Assange was subject to some government surveillance at that time. In fact, Plaintiffs claim that some of Assange's visitors during the same period were "Assange's criminal defense

attorneys in the United States who visited the Embassy to advise Assange in connection with an indictment that was later revealed to have been pending," Compl. ¶ 47, suggesting that at least Assange knew at the time of his potential legal troubles.

Ultimately, Plaintiffs had no reasonable expectation of privacy in their conversations in a foreign embassy in which they neither sought nor received any assurances of privacy—even if they did not reasonably believe that the U.S. government specifically would be, as they allege, surveilling those conversations.

### B.   Plaintiffs Cannot Plausibly Allege They Had a Reasonable Expectation of Privacy with Respect to Items Voluntarily Turned Over to Third Parties

Plaintiffs acknowledge that they handed over their passports and electronic devices to Embassy security staff before seeing Assange.  Compl. ¶ 38.  With the exception of the contents of their electronic devices, Mot. at 16 n.6 (citing *Riley v. California*, 573 U.S. 373, 401 (2014)), this act relinquished any reasonable expectation of privacy in these items, even if the security staff further distributed images of the items to others in the Ecuadorean or U.S. governments (or to anyone else).

As set forth in the Government's opening brief, *id.* at 16-17, "'a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.'"  *Carpenter v. United States*, 138 S. Ct. 2206, 2216 (2018) (quoting *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979)).  "That remains true 'even if the information is revealed on the assumption that it will be used only for a limited purpose.'"  *Id.* (quoting *United States v. Miller*, 425 U.S. 435, 443 (1976)); *see also United States v. Guzman Loera*, 24 F.4th 144, 158 (2d Cir. 2022) (no reasonable expectation of privacy in information defendant shared with a person he did not know was a confidential government informant, which was in turn shared with law enforcement).

Plaintiffs make no attempt to distinguish the long line of precedents cited by the

Government.  Nor do they argue that they had a reasonable expectation of privacy in their

passports or the exteriors of their electronic devices, once those items were turned over

voluntarily to the Embassy security staff.  Accordingly, any Fourth Amendment claims based on

the alleged transmission of this information to the CIA should be dismissed.[3]

### C.   Plaintiffs Do Not Adequately Allege that Any Purported Extraterritorial Surveillance of Their Meetings with Assange Would Have Been Unreasonable

Even assuming the reasonable expectation of privacy requirement had been met, as

explained in the Government's motion to dismiss, a seizure must also be unreasonable to violate

the Fourth Amendment.  Mot. at 17-22; *see also In re Terrorist Bombings of U.S. Embassies in

E. Afr.*, 552 F.3d 157, 171 (2d Cir. 2008) (holding that "the Fourth Amendment's Warrant

Clause has no extraterritorial application and that foreign searches of U.S. citizens conducted by

U.S. agents are subject only to the Fourth Amendment's requirement of reasonableness").  Yet

Plaintiffs have not alleged facts to suggest that the purported extraterritorial surveillance of

Assange and recording of his meetings was unreasonable.  Specifically, the opening brief

explained that it would have been reasonable for the U.S. government to surveil an alleged

---

[3] Plaintiffs argue that the Federal Defendants waived certain arguments by not presenting them in their pre-motion letter to the Court.  *See* Opp. at 14 n.10, 17 n.13.  This argument is misplaced. The pre-motion letter addressed Plaintiffs' original complaint, which purported to bring a claim against the CIA under the doctrine of *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).  ECF No. 1, ¶ 51.  The Federal Defendants explained that a federal agency cannot be a *Bivens* defendant and further argued that Plaintiffs' underlying factual allegations "do not establish a violation of the Fourth Amendment."  ECF No. 23 at 2-3.  In response, Plaintiffs amended their complaint to state a claim against the CIA arising directly under the Fourth Amendment.  Compl. ¶¶ 57-59.  The Federal Defendants thus proceeded in their motion to dismiss to explain why the relevant allegations do not establish a Fourth Amendment violation. In any event, pre-motion letters are not binding, and parties do not waive arguments not raised in them.  *See Penn v. N.Y. Methodist Hosp.*, 158 F. Supp. 3d 177, 182 n.2 (S.D.N.Y. 2016) (collecting cases).

foreign criminal such as Assange.  Mot. at 18 (citing *United States v. Hasbajrami*, 945 F.3d 641, 667-78 (2d Cir. 2019)).  And if the surveillance of Assange was reasonable, then the incidental capture of his communications with American citizens does not violate the Fourth Amendment. *Id.*; *see also United States v. Mohamud*, 843 F.3d 420, 440-41 (9th Cir. 2016) ("[W]hen surveillance is lawful in the first place—whether it is the domestic surveillance of U.S. persons pursuant to a warrant, or the warrantless surveillance of non-U.S. persons who are abroad—the incidental interception of non-targeted U.S. persons' communications with the targeted persons is also lawful." (internal quotation marks omitted)).

Plaintiffs do not contend that any surveillance of Assange himself was unreasonable. Rather, they argue only that the alleged recording of their conversations with Assange was not "incidental" at all, in that the CIA had allegedly expressed a specific interest in his meetings with "American attorneys."  Opp. at 16-17 (citing Compl. ¶ 36).  Yet the complaint read in its totality negates the argument that it was the visitors, rather than Assange, who were the target of the purported surveillance.  The complaint is replete with allegations that the purported surveillance operation was aimed at Assange: that Pompeo was engaged in a "long term" campaign against Wikileaks, Compl. ¶ 26; that UC Global was recruited to "conduct surveillance on Assange and his visitors at the Embassy," *id.* ¶ 30; that UC Global employees indicated that they were contracted to sell "information obtained through the illegal surveillance of Assange to the defendant CIA," *id.* ¶ 32, and that UC Global implemented an extensive surveillance mechanism at the Embassy designed to surveil Assange in real time and provide the recordings to the CIA, *id.* ¶ 36.  Thus, according to the complaint, the CIA was given access to Assange's meetings with *all* persons regardless of their nationalities or professions.

There are no allegations that any of the Plaintiffs were the subjects of surveillance of their conversations separate from their visits with Assange, or that, prior to their visits with Assange, the CIA was aware of Plaintiffs' identities and that any surveillance of Assange was a pretext to collect their communications.  *See Hasbajrami*, 945 F.3d at 665 ("Hasbajrami argues that the surveillance cannot be properly considered 'incidental' where the government can or even does expect to collect conversations with people with ties to the United States or located within its borders. . . .  There is no contention here that the . . . surveillance was undertaken as a pretext to collect the communications of Hasbajrami, or of any other identified United States person . . . .  That the overall practice of surveilling foreigners abroad of interest to the legitimate purpose of gathering foreign intelligence information may predictably lead to the interception of communications with United States persons no more invalidates that practice, or requires the government to cease its surveillance of the target until a warrant is obtained, than the general foreseeability of intercepting communications with previously unknown co-conspirators undermines the inadvertent overhear doctrine in ordinary domestic criminal wiretapping.").  The complaint thus makes clear that Assange's visitors were only incidentally (allegedly) recorded.[4]

Plaintiffs nonetheless argue that, to the extent that capturing Assange's communications with American citizens generally, or lawyers specifically, was one of the goals of the CIA's purported surveillance operation, the recording of their conversations cannot be considered "incidental."  Opp. at 16-17.  Yet courts have rejected the argument that a capture is not "incidental" within the meaning of the Fourth Amendment analysis simply "because the

---

[4] The complaint does not even support the notion that the CIA had expressed a particular interest in the Plaintiffs' communications.  Only two of the four plaintiffs are attorneys; the other two are journalists.  Compl. ¶¶ 3-4.  And the complaint alleges only that the CIA "emphasized to defendant UC Global the importance of surveilling and recording Assange's meetings with *his* American and European attorneys."  *Id.* ¶ 36 (emphasis added).  But as discussed above, *supra* at 6, Plaintiffs nowhere have alleged that they represented Assange.

monitoring of communications between foreign targets and U.S. persons was specifically contemplated and to some degree desired." *Mohamud*, 843 F.3d at 440; *see also United States v. Muhtorov*, 20 F.4th 558, 598-99 (10th Cir. 2021).  It is similarly irrelevant that "Plaintiffs provided their passports identifying themselves as Americans" prior to their meeting with Assange.  Opp. at 16.  *Hasbajrami* rejected the argument that extraterritorial surveillance activities of a foreign national must cease simply because the target begins communicating with an American citizen.  945 F.3d at 667 ("The logic of this conclusion is [cl]ear and compelling.  If it is reasonable—and indeed necessary to the national security—for intelligence agencies to monitor the communications of suspected foreign terrorists abroad, the need to keep track of the potential threat from abroad does not lessen because some of the suspect's contacts turn out to be American nationals . . . .").

Plaintiffs further misapprehend the holding in *Hasbajrami* when they argue it was limited to instances where the intercepted communications "on their face contain evidence of criminal activity."  Opp. at 16 (quoting *Hasbajrami*, 945 F.3d at 663-64).  The quoted portion of the opinion merely describes the "incidental overhear" doctrine—which holds that a "separate warrant" is not required when domestic law enforcement officers collect conversations evidencing illegal activity by a non-targeted person pursuant to a lawful wiretap—which was one of several doctrines that informed the Second Circuit's ultimate decision in that case. *Hasbajrami*, 945 F.3d at 664 ("Combining these two Fourth Amendment principles [e.g., the "incidental overhear" doctrine and the inapplicability of the Warrant Requirement to surveillance of citizens abroad], the government may lawfully collect, without a warrant and pursuant to Section 702 [of FISA], the e-mails of foreign individuals located abroad who reasonably appear to constitute a potential threat to the United States and, once it is lawfully collecting those e-

mails, it does not need to seek a warrant, supported by probable cause, to continue to collect e-mails between that person and other individuals once it is learned that some of those individuals are United States citizens or lawful permanent residents, or are located in the United States."). The conditions under which a "separate warrant" may be required for incidental collection of information of criminal activity during domestic law enforcement surveillance are irrelevant here, however, as *Hasbajrami* made clear that "the Warrant Clause of the Fourth Amendment does not apply to the surveillance of United States citizens abroad." *Id.* at 663.

### D. Plaintiffs Do Not Adequately Allege that the Alleged Searches and Seizures of Their Electronics Were Unauthorized

The Federal Defendants have argued that Plaintiffs' allegation of the illegality of the alleged search and seizure of their electronic devices is conclusory. Mot. at 20-22. Plaintiffs respond by improperly attempting to shift the pleading burden to the Federal Defendants. Opp. at 14-15 (citing Compl. ¶ 36). Specifically, they argue that their mere labeling of the information allegedly provided to the CIA as "Illegally Seized Material," Compl. ¶ 36, requires the Federal Defendants to affirmatively plead whether they had a warrant or other authorization for the alleged searches at issue, Opp. at 15. But that puts the cart before the horse. Plaintiffs' complaint offers no factual allegations to support their proposed legal conclusion that any searches were conducted without proper authorization. While Plaintiffs explicitly allege that the *Ecuadorean government* had not authorized the Spanish Defendants' actions, Compl. ¶ 36, they make no similar factual allegations about the U.S. government. This omission is fatal.[5]

---

[5] Plaintiffs argue that "the existence of a lawfully executed search warrant is an affirmative defense," and thus they were not required to plead any facts in support of their claim that the alleged searches and seizures were illegal. Opp. at 14-15. But none of the cases they cite stand for the proposition that a plaintiff may conclusorily aver that a search was illegal and thereby meet their burden to plausibly allege a Fourth Amendment violation. *See Application of J.W. Schonfeld, Ltd.*, 460 F. Supp. 332, 334, 339 n.12 (E.D. Va. 1978) (plaintiff alleged officers exceeded scope of warrant in their search as well as challenged the warrant itself); *Rodriguez v.*

Plaintiffs vainly attempt to distinguish the two Supreme Court cases which make clear that a plaintiff must plausibly plead a full set of facts that, if proven, would entitle him to prevail on his claims.  Opp. at 17 (citing *Ashcroft v. Iqbal*, 556 U.S. 675 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).  As the *Twombly* Court held, in the context of a plaintiff who alleged price-fixing (which requires an agreement among competitors): "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy, *and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality*."  550 U.S. at 556-57.  Similarly here, Plaintiffs' conclusory labeling as "illegal" of an alleged undercover CIA intelligence-gathering operation that is claimed to have been personally authorized by the Director of the CIA—when, as explained in the opening brief, such surveillance would be legal if appropriate authorizations or warrants were obtained, Mot. at 20-21—"does not supply facts adequate to show illegality," 550 U.S. at 557; *see Banks v. FBI*, No. CV-19-9367, 2020 WL 4261198, at *2 (D.N.J. July 23, 2020) ("While Plaintiff states in the [complaint] that the surveillance is 'illegal,' that characterization on its own is conclusory, lacking any specific factual allegations to support it.").[6]

---

*City of Springfield*, 127 F.R.D. 426, 427-30, 432 (D. Mass. 1989) (plaintiff alleged search was unreasonable because warrant contained allegedly false information supplied by informant and thus it had issued without probable cause); *see also Newberry v. Cnty. of San Bernardino*, 750 F. App'x 534, 536 n.2 (9th Cir. 2018) (observing (in dicta) that "reasonable reliance on a warrant is an affirmative defense to Fourth Amendment liability premised on the objective reasonableness of officers' conduct; it does not . . . foreclose the possibility of a Fourth Amendment violation [by the municipality] which is premised on the reasonableness, in Fourth Amendment terms, of the search to which a person was subject").

[6] *Cf. Knaus v. Town of Ledgeview*, No. 10-C-502, 2010 WL 2640272, at *3 (E.D. Wis. June 24, 2010) (plaintiff alleged that county officers entered his home "with an illegal warrant": "But [he] has not supplied a copy of the warrant with his complaint, nor has he explained why the warrant is illegal.  His conclusory assertion that it was illegal is not sufficient in light of *Iqbal*."); *Coleman v. Johansene*, No. 2:19-CV-10572, 2019 WL 2929098, at *3 (E.D. Mich. July 8, 2019) ("Plaintiff offered no facts or argument in his complaints establishing that the seizure or arrest

E.     **Plaintiffs Do Not Plausibly Allege that the Searches and Seizures Were Controlled or Directed by CIA**

Finally, Plaintiffs' constitutional claims cannot proceed because their complaint does not sufficiently allege that the CIA controlled or directed the actions of the Spanish Defendants who purportedly conducted the alleged searches and seizures at issue.  *See* Mot. at 22-24.  As explained previously, a search conducted by foreign actors will implicate the Fourth Amendment only if U.S. officials "play some role in *controlling or directing* the[ir] conduct."  *United States v. Getto*, 729 F.3d 221, 230 (2d Cir. 2013) (emphasis added).  And the case law makes clear that the extent of the control or direction must be significant.  *See* Mot. at 23 (summarizing cases holding that requests by U.S. officials for searches to be conducted or sharing the fruits of searches with U.S. officials, even in real time, are insufficient to indicate control or direction for this purpose).

Plaintiffs respond by summarizing allegations in the complaint that fall far short of the necessary standard.  Opp. at 18-19.  While some of these allegations assert that the Spanish Defendants acted "at the direction of, and as agents of, the CIA," Compl. ¶ 39, these are conclusory labels not backed by factual allegations.  The factual allegations themselves merely describe an indirect request by the CIA for certain information followed by the provision of technological assistance to aid in the collection of that information.  *E.g.*, *id.* ¶¶ 29-30, 35-36. This level of alleged cooperation between foreign actors and U.S. officials does not satisfy the relevant standard.  The Fourth Amendment thus does not apply to the alleged searches and

was illegal.  Plaintiff's conclusory allegations that he was arrested without a warrant or probable cause are insufficient to state a claim for relief . . . ."); *Sayles v. United States*, No. CIV. 12-1644, 2013 WL 4523593, at *12 (W.D. Pa. Aug. 27, 2013) ("Petitioner asserts in conclusory terms that illegal wiretaps were placed on his phone, illegal search warrants were issued, and his car was never searched in his presence."); *Lewis v. Oklahoma*, 304 F. Supp. 116, 123 (W.D. Okla. 1969) ("The bare conclusory allegation of an illegal arrest, as made herein by Petitioner, is legally insufficient to warrant relief.").

seizures because they were conducted by foreign persons who are not plausibly alleged to have acted under the control and direction of U.S. authorities.

## III.   PLAINTIFFS HAVE NO VALID *BIVENS* CLAIM AGAINST POMPEO

Despite clear recent statements from the Supreme Court substantially limiting the *Bivens* doctrine, Mot. at 24-30, Plaintiffs, relying largely on case law that predates these decisions, maintain that their *Bivens* claim against Pompeo can survive dismissal, Opp. at 19-22.  Plaintiffs further claim that Pompeo would not be entitled to qualified immunity if the claim against him could proceed, *id.* at 27-29, even though their allegations of his personal involvement in the alleged searches and seizures consists almost entirely of conclusory statements, Mot. at 30-32. Plaintiffs' arguments must be rejected in full, and their claim against Pompeo dismissed.

### A.      There Is No *Bivens* Remedy for Plaintiffs' Claims Against Pompeo

In recent years, the Supreme Court has substantially narrowed the *Bivens* doctrine and all but limited its application to the parameters of the three cases in which that Court has found such a remedy.  *See Egbert v. Boule*, 142 S. Ct. 1793, 1797 (2022); *Ziglar v. Abbasi*, 582 U.S. 120, 135-37 (2017).  Those circumstances are alleged violations of the Fourth Amendment by federal law enforcement officers who entered an apartment to effectuate an arrest on narcotics charges without a warrant, conducted a warrantless search of the apartment, and, in the course of the arrest, allegedly used unreasonable force, *see Bivens*, 403 U.S. at 394-97; claims of sex discrimination by congressional employees in violation of the Fifth Amendment's Due Process Clause, *see Davis v. Passman*, 442 U.S. 228, 243-45 (1979); and claims by inmates in federal prisons of inadequate medical treatment in violation of the Eighth Amendment, *see Carlson v. Green*, 446 U.S. 14, 19-23 (1980).  The Court has rejected every proposed expansion of the doctrine beyond those three sets of circumstances.  *Egbert*, 142 S. Ct. at 1802.

Plaintiffs' conclusory assertion that "[t]he instant case does not present a new context" because it "alleges a violation of the Fourth Amendment and illegal seizure of property," Opp. at 22, is demonstrably incorrect.  First, the Supreme Court has never recognized a *Bivens* claim for the "illegal seizure of property," so that alone is a new context.  More fundamentally, Plaintiffs' argument that, because their claims arise under the Fourth Amendment they do not present a new context, ignores controlling Supreme Court precedent.  The Court has made clear that "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized."  *Hernández v. Mesa*, 140 S. Ct. 735, 743 (2020).   Indeed, the Supreme Court has rejected two *Bivens* claims for alleged Fourth Amendment violations (the alleged use of excessive force) committed by Border Patrol agents because their work at or near the border implicates national security and foreign policy.  *See id.* at 739-40; *Egbert*, 142 S. Ct. at 1804-06; *see also id.* at 1803 (emphasizing that "a new category of defendants" is a factor counseling hesitation against extending a *Bivens* remedy).  The Court instead analyzed the distinctions in the factual circumstances in which the claims arose.  *See Hernández*, 140 S. Ct. at 743-44 (there is a "world of difference between" an "unconstitutional arrest and search carried out in New York City," like in the *Bivens* case, and "petitioners' cross-border shooting claims").

Similarly here, although an unlawful search is the type of Fourth Amendment violation recognized in the original *Bivens* case, the identity of the individual defendant—the former CIA Director—unquestionably implicates national security and foreign policy, even more so than do Border Patrol agents.  And the facts of this case, involving an alleged surveillance operation by an intelligence agency at a foreign embassy located abroad, are far afield from the narcotics arrest in *Bivens*.  Indeed, the Court has instructed more generally that "[b]ecause matters

16

intimately related to foreign policy and national security are rarely proper subjects for judicial intervention, . . . a *Bivens* cause of action may not lie where . . . national security is at issue." *Egbert*, 142 S. Ct. at 1804-05 (internal quotation marks and brackets omitted). Plaintiffs disingenuously claim not to understand why national security or foreign policy would be implicated by their allegation that the Director of the CIA directed U.S. counterintelligence agents to surreptitiously partner with a Spanish private security company servicing Ecuador's embassy to the United Kingdom—without the knowledge or authorization of Ecuador's government—to spy on an Australian asylee who illegally published U.S. national security documents and his visitors from various countries. Opp. at 23. But it is hard to imagine a scenario that would implicate more national security and foreign policy concerns than these allegations.[7]

Plaintiffs also ignore the Supreme Court's instruction that, where Congress has created *any* remedial structure for the alleged constitutional violation, courts should not imply a *Bivens* remedy. *See* Mot. at 25-26. A legislative remedy is sufficient if it includes "safeguards to prevent constitutional violations from recurring," even if the plaintiff "is not entitled to participate and has no right to judicial review of an adverse determination," and regardless of whether it "do[es] not provide complete relief" to the plaintiff. *Egbert*, 142 S. Ct. at 1804, 1806 (brackets and internal quotation marks omitted). The remedy created by Congress for allegedly unconstitutional acts by CIA employees is investigation by the agency's Office of Inspector General; Plaintiffs may also, as they have done here, sue the agency itself for allegedly violating the Constitution. *See* Mot. at 29. That neither of these options entitles Plaintiffs to monetary "compensation," Opp. at 25, does not matter. *See Egbert*, 142 S. Ct. at 1806-07 (agency

---

[7] Relatedly, as noted in the opening brief, clandestine intelligence-gathering is itself a particularly sensitive area of government operations. *See* Mot. at 27-28.

administrative grievance structure that does not award monetary damages to victims forestalled *Bivens* remedy).[8]

In sum, there is no *Bivens* remedy available for Plaintiffs' allegations, and their claim against Pompeo must be dismissed.

**B.     Even If a *Bivens* Claim Were Available, Pompeo Would Be Entitled to Qualified Immunity**

Finally, any *Bivens* claim against Pompeo, if it were available, would have to be dismissed under the doctrine of qualified immunity for two important reasons.  First, as explained in detail above and in the opening brief, Plaintiffs' rights under the Fourth Amendment were not violated.  And second, Plaintiffs have not adequately alleged Pompeo's personal involvement in the actions at issue.  Plaintiffs summarize the allegations that specifically mention Pompeo, Opp. at 27-28, but this simply highlights the inadequacy of their pleading.  The specific references to Pompeo's role in the alleged surveillance are all conclusory or fact-less: Plaintiffs first allege that Pompeo "recruited" the Spanish Defendants to surveil Assange and his visitors, Compl. ¶ 27, but then describe the alleged recruitment effort as being led by employees of a Las Vegas hotel who approached Morales, supposedly "on behalf of the CIA," *id.* ¶¶ 28-30—without indicating any specific role for Pompeo.  Other references to Pompeo claim that he "approved and authorized" or "was aware of and approved" the alleged surveillance at issue, *id.* ¶¶ 33, 41, but Plaintiffs provide no factual backup for these statements.  Finally, the complaint

---

[8] Plaintiffs' concern that the CIA's Office of Inspector General could not be trusted to fairly investigate their allegations given that office's working relationship with CIA leadership and the Department of Justice are similarly misplaced.  Opp. at 26.  Agency inspectors general investigate claims against senior agency officials, which is why they are statutorily independent. *Cf., e.g.*, *In re Clinton*, 973 F.3d 106, 110 (D.C. Cir. 2020) (describing investigation by, among other offices, the State Department's Inspector General, of former Secretary of State Hillary Clinton's use of a private email server); *see also* 50 U.S.C. § 3517(b) (detailing various mechanisms by which Congress ensured that the CIA Inspector General has independent authority to conduct investigations).

includes legal conclusions about Pompeo's alleged role, such as that the Spanish Defendants were "[a]t all times . . . acting as agents of the Defendants CIA and Pompeo."  *Id.* ¶ 42.  The only factual discussion of Pompeo in the complaint describes a speech he gave in April 2017, in which he described Wikileaks as a "non-state hostile intelligence service," and supposedly promised that the CIA would engage in a counterintelligence campaign against it.  *Id.* ¶ 26.  But this statement, even if credited,[9] does not indicate that Pompeo would personally direct the CIA to surveil and record Assange and his visitors at the Embassy.

Plaintiffs' allegations here thus fail for the same reason that did the allegations in *Iqbal*, in which the Supreme Court rejected the notion that a *Bivens* defendant could be held liable under a theory of "supervisory liability."  556 U.S. at 677.  In *Iqbal*, the plaintiff alleged that senior Department of Justice officials "knew of, condoned, and willfully and maliciously agreed to subject [him]" to harsh conditions of confinement "as a matter of policy," and specifically that the Attorney General was the "principal architect" of this invidious policy, and the Director of the FBI was "instrumental" in adopting and executing it.  *Id.* at 680-81.  These allegations of these officials' personal involvement, the Supreme Court held, were too conclusory to survive a motion to dismiss.  *See id.* at 681.  The allegations in this case are just as conclusory.

---

[9] Plaintiffs' summary differs in significant detail on this point from the published transcript of Pompeo's remarks.  *See* Ctr. for Strategic & Int'l Studies, *Transcript: A Discussion on National Security with CIA Director Mike Pompeo* (Apr. 13, 2017), https://www.csis.org/analysis/discussion-national-security-cia-director-mike-pompeo.  As this speech was incorporated by reference into the complaint, the Court need not credit Plaintiffs' characterization of the speech over the actual text of the transcript.  *See, e.g.*, *Bardak v. Ocwen Loan Servicing, LLC*, No. 8:19-CV-1111-24TGW, 2020 WL 5104523, at *1 n.2 (M.D. Fla. Aug. 12, 2020) ("The Court can consider the content of documents attached to or incorporated by reference in a complaint and need not credit allegations that are inconsistent with those documents.").

IV.    **PLAINTIFFS SHOULD NOT BE PERMITTED TO FURTHER AMEND THEIR COMPLAINT**

Lastly, in light of the numerous factual and legal deficiencies in their (already amended) complaint, Plaintiffs seek leave to amend their complaint again in an attempt to overcome those deficiencies.  Opp. at 30-36.  This request should be denied because it would not cure the fatal problems with the pleading, and the amendment would thus be futile.  While courts ordinarily freely grant plaintiffs leave to amend their complaints under Fed. R. Civ. P. 15(a), "[a] proposed amendment to a complaint is futile when it could not withstand a motion to dismiss." *F5 Cap. v. Pappas*, 856 F.3d 61, 89 (2d Cir. 2017) (internal quotation marks omitted).  Although Plaintiffs have not submitted a proposed second amended complaint, their description makes clear that it could not survive dismissal on the bases described in the instant motion to dismiss.

Plaintiffs indicate that their proposed new complaint would provide additional factual detail regarding the CIA's alleged control and direction over the Spanish Defendants, Opp. at 30—presumably attempting to overcome the strict limitations on the application of the Fourth Amendment to the acts of foreign parties.  But their proposed new allegations do not successfully clear this hurdle; and even if they did, the various other bases for dismissal identified in the motion to dismiss independently require dismissal of their claims.

Much of the new information duplicates or adds irrelevant detail to allegations Plaintiffs already made.  *See* Opp. at 31-32 (describing organization and naming of videos on Morales's laptop in folder called "CIA" and email in which he claims to be working for an "American client").  They also discuss a plan by the Ecuadoreans to move Assange out of the Embassy with a diplomatic passport that the U.S. government allegedly foiled as a result of real-time access to Assange's meetings.  *See id.* at 32-34.  But Plaintiffs already alleged that the Spanish Defendants shared real-time audio with the CIA.  Compl. ¶ 36.  These additional allegations would not be

relevant to whether the alleged surveillance was "controlled or directed" by the CIA or simply provided to the CIA at its request.

Finally, Plaintiffs concoct a story out of an incident recounted in Pompeo's recent memoir, in which he discusses reading an unclassified document relating to the law about extrajudicial killings in December 2017. Mot. at 34. Noting that the plan for Assange to leave the Embassy took place at approximately the same time, Plaintiffs leap to the unsupported conclusion that Pompeo may have been "possibly contemplating the murder of Julian Assange." *Id.* at 33-34. Even aside from the fact that this is nothing more than sheer speculation, nothing about this story affects whether Plaintiffs' Fourth Amendment rights were violated by alleged searches and seizures when they visited Assange at the Embassy—the only relevant question in this case.

Ultimately, while more newspaper articles and other materials have appeared since Plaintiffs filed their amended complaint that discuss the alleged surveillance of Assange, the contents of these materials—if included in a proposed second amended complaint—would not overcome the legal deficiencies of the current amended complaint. Thus, Plaintiffs' proposed amended pleading would be futile, and the Court should not grant them leave to file it.

## CONCLUSION

For the foregoing reasons and those in the Federal Defendants' opening brief, the Court should dismiss Plaintiffs' claims against the CIA and Pompeo.

Dated:  New York, New York
        June 29, 2023

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:     ___s/Jean-David Barnea_____
        JEAN-DAVID BARNEA
        Assistant United States Attorney
        86 Chambers Street, 3rd Floor
        New York, NY 10007
        Tel. (212) 637-2679
        Email Jean-David.Barnea@usdoj.gov

## CERTIFICATE OF COMPLIANCE

The undersigned counsel hereby certifies that this brief complies with the word limits and formatting rules in Section II.D of this Court's Individual Practices, as amended by the Court's order of March 16, 2023.  ECF No. 33.  As measured by the word processing system used to prepare this brief, there are 6,983 words in this brief.

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:      s/Jean-David Barnea
JEAN-DAVID BARNEA
Assistant United States Attorney