NBG3KUNM

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  KUNSTLER, et al.,

4                    Plaintiffs,            New York, N.Y.

5             v.                            22 Civ. 6913 (JGK)

6  CENTRAL INTELLIGENCE AGENCY,
   et al.,
7
                   Defendant.
8
   ------------------------------x        Motion
9
                                          November 16, 2023
10                                         2:30 p.m.

11  Before:

12                    HON. JOHN G. KOELTL,

13                                         District Judge

14

15                        APPEARANCES

16

17
    THE ROTH LAW FIRM, PLLC
18       Attorneys for Plaintiffs
    BY:  BRIAN S. LEVENSON
19        RICHARD A. ROTH
          ROBERT BOYLE
20
    DAMIAN WILLIAMS
21       United States Attorney for the
         Southern District of New York
22  JEAN-DAVID BARNEA
         Assistant United States Attorney
23

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

NBG3KUNM

1           THE DEPUTY CLERK:  Will all parties please state who

2     they are for the record.

3           MR. LEVENSON:  Good afternoon, your Honor.  This is

4     Brian Levenson from The Roth Law Firm for the plaintiffs.  I'm

5     joined by Richard Roth of The Roth law Firm, and Robert Boyle,

6     of counsel to The Roth Law Firm.

7           MR. BARNEA:  Good afternoon, your Honor.  This is J.D.

8     Barnea from the U.S. Attorney's Office for the federal

9     defendants.

10          THE COURT:  All right.  This is a motion to dismiss so

11    I'll listen to argument.  Mr. Barnea.

12          MR. BARNEA:  Should I do it from here, your Honor, or

13    at the podium?

14          THE COURT:  Whatever you wish.  Whatever is more

15    convenient.

16          MR. BARNEA:  Thank you, your Honor.  As a tall person,

17    it is nice to have a little bit of a taller desk.

18          May it please the Court, your Honor, I would like to

19    focus the federal defendants' presentation today on a few key

20    arguments.

21          THE COURT:  Before you do that, could I make sure that

22    I understand some things at the outset.

23          There are claims against former Director Pompeo, as

24    well as against the government.  The claim or claims against

25    Mr. Pompeo are solely for damages under *Bivens*, and the claim

NBG3KUNM

1    against the defendant is for injunctive relief.

2                  MR. LEVENSON:  Yes, that's correct, your Honor.

3                  THE COURT:  Fine.

4                  Second thing, at the outset, the government's

5    arguments for dismissal against Mr. Pompeo are 12(b)(6)

6    arguments.  There is no *Bivens* claim.  Even if there were a

7    *Bivens* claim, there is qualified immunity.  There is no

8    standing argument with respect to Mr. Pompeo, and no other

9    12(b)(1) argument.

10                 MR. BARNEA:  That's correct, your Honor.

11                 THE COURT:  I ask that because I have to decide

12   12(b)(1) first.  There is the standing argument against the

13   claim against the government, so with that, at least having

14   clarified things for me, go ahead.

15                 MR. BARNEA:  Thank you, your Honor.

16                 So as I said, I'd like to focus the federal

17   defendants' presentation today on a few key arguments,

18   standing, as you just mentioned, the applicability of the

19   Fourth Amendment to the searches and seizures at issue, the

20   Fourth Amendment's reasonable expectation of privacy, and the

21   plaintiffs' *Bivens* claim against Mr. Pompeo.

22                 On standing, plaintiffs' claim seeking injunctive

23   relief against the CIA cannot go forward because they allege no

24   ongoing or imminent injury.

25                 Plaintiffs claim that the CIA was involved in searches

NBG3KUNM

1    and seizures that supposedly took place in 2017 and 2018 and

2    that, to their knowledge, nothing has happened to the seized or

3    recorded information in the intervening seven or eight years.

4    They do not allege that the CIA or anyone else has done

5    anything with the information since that time or imminently

6    plans to.

7              Even accepting plaintiffs' allegations as true,

8    whatever information was seized from them could easily be

9    sitting at the bottom of a file cabinet, entirely forgotten.

10   That is not enough to allege an ongoing or imminent future

11   injury as required by Article III.  Even if the plaintiffs had

12   standing to bring their claim, they cannot allege a Fourth

13   Amendment violation.

14             THE COURT:  By the way, they do allege an ongoing

15   concern that the information that's been seized can be

16   disseminated, and they want the return of the information now,

17   right?  What controlling cases do you think stand for the

18   proposition that that's insufficient for standing?

19             MR. BARNEA:  Well, again, the bedrock Article III

20   requirement for standing for seeking injunctive relief, forward

21   looking relief, is an ongoing or imminent injury.

22             Here, they hypothesize someone might do something with

23   their information, but they don't have any reasonable claims of

24   anyone imminently planning to do anything with that

25   information.

NBG3KUNM

```
1          THE COURT:  My question really is what case or cases
2  comparable do you rely on for that are proposition?  That the
3  government, having allegedly taken information, and still
4  keeping that information with the possibility that the
5  information can then be disseminated, and a party says you have
6  my information, I want it back.  Your continuing detention of
7  the information is harmful.
8          What case or cases with that fact pattern do you think
9  are most persuasive?  I know the general rubrics of standing.
10  Trust me.
11          MR. BARNEA:  Of course.
12          THE COURT:  But what case or cases do you think are
13  comparable?
14          MR. BARNEA:  Well, I think the Phillips case from the
15  Ninth Circuit is useful, in that their information was
16  allegedly procured in violation of the Constitution and,
17  granted, in different circumstances than what we're talking
18  about here.  And the court noted that in order for a plaintiff
19  to seek expungement of that information, the plaintiff has to
20  allege a potential future harm or imminent future harm that
21  they expected the government to use this information in some
22  way, so they could seek injunctive relief.
23          Again, it is clear that a person experiencing what
24  they allege to be a Fourth Amendment violation is an injury,
25  but it is a question as to whether it is ongoing or future
```

NBG3KUNM

1   imminent injury, as opposed to simply a past injury.

2           There is no case that we have that's on directly on

3   point to a one-time event that occurred many years with

4   apparently nothing having happened in the interim.

5           The cases that plaintiffs rely on, for example, *ACLU*

6   *v. Clapper*, is very much the opposite.  The Second Circuit's

7   decision there involved an ongoing program in which every day,

8   the government was receiving telephone metadata including

9   all -- all Americans' telephone metadata, including necessarily

10  the plaintiffs, and was consistently querying that information

11  was necessarily involved as the court found looking through the

12  database in which the plaintiffs' data was contained.  And so

13  that, there, I don't think there is any question that there is

14  an ongoing injury that the court could find standing for the

15  plaintiffs to challenge.

16          But, I don't know how *ACLU v. Clapper* would have come

17  out if the plaintiffs there had alleged a single incident of

18  information being taken years ago, yet they are seeking forward

19  looking injunctive relief.

20          THE COURT:  *ACLU v. Clapper* talked about not only the

21  collection of the information, but the maintenance in the

22  government's database.

23          MR. BARNEA:  Right, and again, maintenance there I

24  think is different from what we are talking about the

25  allegations in this case.  In that case, the maintenance was an

NBG3KUNM

1    actively used and regularly accessed database that was, as

2    described in the Second Circuit's opinion, one that the

3    government regularly looked at and necessarily, by consistently

4    examining that database, was sort of necessarily looking

5    through, among other many other records, the plaintiffs' own

6    records.

7              So it wasn't simply that it existed at the bottom of a

8    file cabinet somewhere.  It was that it was maintained and in

9    active use by the government over time.

10              THE COURT:  Okay.  Go ahead.

11              MR. BARNEA:  Even if the plaintiffs had standing to

12    bring their claim, they cannot allege a Fourth Amendment

13    violation, because the Fourth Amendment is not applicable to

14    the alleged conduct at issue.  In order for the Fourth

15    Amendment to apply to the conduct of foreign persons, the U.S.

16    government must play a sufficient role in controlling or

17    directing those foreign persons' actions.

18              Here, plaintiffs have not alleged sufficient facts

19    that, if proven, would establish that the CIA controlled or

20    directed the Spanish defendants.  Plaintiffs assert that the

21    Spanish defendants were approached by intermediaries,

22    supposedly on behalf of the CIA, to conduct surveillance on

23    Assange and his visitors.  They claim that the CIA provided

24    some technical assistance in implementing that surveillance,

25    and they claim that the CIA promised contracts or remuneration

NBG3KUNM

1    in exchange for the provision of that information.

2              None of those allegations, even assuming their truth,

3    establish that the CIA controlled or directed the actions of

4    the Spanish defendants.

5              The Second Circuit has already has articulated and

6    applied the relevant standard in several cases involving U.S.

7    government requests for information from foreign police forces

8    and never found it to be satisfied.  Those cases include the

9    *Lee, Getto*, and *Gasperini* cases.

10             The fact that the U.S. government requested

11   information from a foreign police force is not sufficient to

12   implicate control or direction by the U.S. government, nor is

13   it enough if a foreign police shares the results of the search

14   with the United States government, including through a live

15   video feed.  The court has further concluded that the U.S.

16   government's provision of money, equipment, and training --

17             THE COURT:  The contemporaneous monitoring was done

18   from the United States, wasn't it?

19             MR. BARNEA:  In which case?  In the *Getto* case?

20             THE COURT:  No, no, in this case allegedly.

21             MR. BARNEA:  I don't think they specified the

22   location, but I imagine that is what they're claiming.  I

23   believe that would be the same also in the *Getto* case.

24             THE COURT:  So, U.S. agents were monitoring the feed

25   in the United States, and that's not sufficient involvement by

NBG3KUNM

1    the government?

2              MR. BARNEA:  The question is not -- the relevant test

3    is not involvement by the government, but control and direction

4    over the foreign actor by the U.S. government.

5              So, the question is were the people who were doing the

6    actual searches and seizures abroad controlled and directed by

7    the U.S. government in the relevant sense in order to implicate

8    the Fourth Amendment.  And I was simply going over the various

9    ways that the court has found do not satisfy that standard,

10   including the U.S. government's provision of money, equipment,

11   and training to the foreign police force, which also does not

12   implicate the U.S. government in their actions, as well as the

13   fact that the search by the foreign government was at the

14   request of the U.S. government or that the results of the

15   search or a live feed of whatever it was, was provided to the

16   U.S. government.

17             THE COURT:  Why isn't there at least an issue of fact

18   as to what the involvement of the government was?

19             MR. BARNEA:  Well, this is not a question of fact.  We

20   are saying that if you look at the allegations in the

21   plaintiffs' complaint of the CIA's involvement here, it does

22   not rise to the level that would satisfy the standard.  So

23   we're not questioning for this purpose what those allegations

24   are or the truthfulness of the allegations.  The question is

25   have they alleged a sufficient role for the CIA that would

NBG3KUNM

1    demonstrate that the CIA, assuming those allegations were

2    ultimately proven true, controlled and directed the actions of,

3    here, the Spanish defendants.

4            And in our view, as a matter of law, those allegations

5    are insufficient, because they have not established that the

6    CIA controlled and directed.  They have established that the

7    CIA may have asked for information and may have provided

8    technological assistance and may have offered something in

9    return if the information was provided.  But in our view, that

10   simply is not control and direction.

11       THE COURT:  Why isn't it at least direction?  Is it

12   sufficient for direction without control?

13       MR. BARNEA:  Well, the Second Circuit uses the sort of

14   combined phrase "control and direction," and I have to say that

15   given that the Second Circuit has never found this standard to

16   be satisfied, nor have I found any District Court cases that

17   have found it to be satisfied, it is hard to identify exactly

18   what circumstances would satisfy the standard.

19           We can all hypothesize when, if someone was literally

20   essentially working as a contractor for a federal agency or

21   something like that, you might conclude it was satisfied.  But

22   it's hard to say exactly how the Second Circuit or when the

23   Second Circuit would find the standard to be satisfied, given

24   that we have never seen a case where it was.

25       THE COURT:  Okay.

NBG3KUNM

1          MR. BARNEA:  Even if the Fourth Amendment applied,

2     plaintiffs cannot claim a Fourth Amendment violation with

3     respect to plaintiffs' alleged conversations with Assange at

4     the embassy, their passports and the exteriors of their

5     electronic devices, because they did not have a reasonable

6     expectation of privacy.

7          The Fourth Amendment's protections only apply when a

8     person reasonably believes that their conversations are private

9     from others, or that no one else has access to the items at

10    issue.

11         As explained in our briefs, courts have repeatedly

12    held that, because government buildings and the like so

13    commonly have security cameras and other surveillance equipment

14    in them, both visible and invisible to visitors, there is no

15    reasonable expectation of privacy in such a facility, unless

16    the person is given explicit assurances of privacy.

17         Thus, for example, in a police station, courts have

18    held there is no reasonable expectation of privacy in any part

19    of the building, even when there are no other people around,

20    and when there are no visible cameras or microphones, except

21    when the person is told that a particular place is private.

22    Like the rooms where arrestees are told they can meet with

23    their lawyers confidentially.

24         Similarly, plaintiffs concede it is reasonable to

25    assume there is some surveillance cameras and the like in a

NBG3KUNM

foreign embassy.  That defeats their claim since they do not

allege that anyone at the embassy told them they would be able

to have private unmonitored conversations with Assange.

Plaintiffs' argument they didn't know their

information would be shared with the CIA specifically is a red

herring.  The relevant question is not whether plaintiff had a

reasonable expectation that their information would not be

shared with the U.S. government.  Rather, it is whether they

had a reasonable expectation that their communication was

private, and that no other people could have been listening to

it, regardless of who those other people might have been or the

purpose for which they might have been listening.

This is why no one has a reasonable expectation of

privacy in a conversation taking place in Penn Station, even if

they didn't know that an undercover officer was eavesdropping

on them.

As for their passports and the exteriors of their

electronic devices, the law is clear that simply turning them

over to the embassy's security desk eliminates their

expectation of privacy in those items.  This is so regardless

of whether they knew or had reason to believe that the security

desk might further share these items with anyone else.

As a related point, even if they had a reasonable

expectation of privacy, plaintiffs' communications with Assange

would not violate the Fourth Amendment, because any

1    surveillance of such communications would have been reasonable.

2    As the Second and Ninth Circuits have explained, the Fourth

3    Amendment doesn't apply at all to searches of foreign citizens

4    outside the United States.  And as long as the search -- as

5    long as the search of such a foreigner abroad is generally

6    reasonable, then it does not violate the Fourth Amendment for

7    the U.S. government to capture the foreigner's communications

8    with U.S. persons.  No warrant or other approval is needed for

9    the U.S. government to monitor a foreign person's

10   communications, even when those communications are with U.S.

11   persons.  As long as the U.S. government is legitimately

12   monitoring the foreign person's communications, and not using

13   that as a pretext to monitor the U.S. person's communications,

14   this does not violate the Fourth Amendment.

15        Here, Assange was a foreign citizen located outside

16   the United States, so the Fourth Amendment doesn't apply to any

17   surveillance of him.  He was also being investigated at the

18   time for various criminal acts, so any surveillance of him

19   would have been reasonable.  It follows that if such

20   surveillance captured his communications with U.S. persons,

21   that would not run afoul of the Fourth Amendment.

22        As for plaintiffs' *Bivens* --

23        THE COURT:  But you take us up to the point where the

24   plaintiffs allege that the contents of their electronic devices

25   were seized.  And you don't seem to dispute in your papers that

NBG3KUNM

1    a warrant would be necessary to seize the contents of the

2    electronic devices.

3            MR. BARNEA:  I don't believe that a warrant is ever

4    required outside the United States.  The Second Circuit has

5    held that the warrant requirement of the Fourth Amendment only

6    applies within the United States.

7            THE COURT:  What case is that?

8            MR. BARNEA:  The Bombing in East Africa -- I'm sorry.

9    U.S. Embassy Bombings in East Africa, among others, have held

10   that the warrant requirement specifically of the Fourth

11   Amendment does not apply extraterritorially.  There is

12   nonetheless a reasonable requirement that applies from the

13   Fourth Amendment to surveillance by the U.S. government of U.S.

14   persons abroad.

15           THE COURT:  No, no, no.  We're talking about the

16   plaintiffs' allegation that their electronic -- they left their

17   electronic devices as well as passports, and that the outside

18   were copied.  And you said no expectation of privacy with

19   respect to that.

20           And then there is the section that deals with the fact

21   that the plaintiffs allege that the contents were copied.  And

22   the only response that I saw in your papers was not no warrant

23   is required outside the United States.  You assume that a

24   warrant is required for the contents of Americans' electronic

25   devices that are left at the embassy abroad.  But you say the

NBG3KUNM

1      plaintiffs haven't alleged that no warrant was obtained.

2              MR. BARNEA:  That's not precisely what we argued, but

3      if I am allowed to clarify.

4              THE COURT:  Sure.

5              MR. BARNEA:  This may be of limited importance given

6      what I am going to say.  But, I don't think that we ever

7      conceded that -- I mean, to be clear, the warrant requirement

8      of the Fourth Amendment does not apply abroad.  I think our

9      argument on this point was that when the plaintiffs say that

10     the search was illegal, that is simply a conclusory statement.

11     They have not alleged in what way it is illegal.  And we gave

12     examples of domestic cases where there were more specific

13     allegations of whether a warrant was required or a warrant was

14     obtained improperly.

15             In any event we actually, we rereviewed the

16     plaintiffs' opposition brief, and in a footnote they mentioned

17     a potential amendment that they might seek to make of their

18     complaint in this regard, which we had missed before, because

19     it was sort of buried in a footnote.  But if they had made that

20     kind of an allegation, I'm not sure we would have made a

21     similar argument having to do with what they viewed as the lack

22     of need for a warrant or the unreasonableness of the search,

23     and so that potentially could cure that particular objection,

24     that particular aspect of our motion.

25             THE COURT:  I frankly don't understand what you just

NBG3KUNM

1    said.

2            MR. BARNEA:  Okay.  I'm happy to answer any questions

3    about it.

4            THE COURT:  So let's take it from the top so to speak.

5            I had thought your brief did not dispute that a

6    warrant is required for the contents of electronic

7    communications.  And certainly there is case law in the United

8    States that stands for that proposition.  You need a warrant in

9    order for the government to seize the contents of a phone.

10           MR. BARNEA:  Right.  In the United States, the

11   government needs a warrant to seize the contents of a phone.

12           THE COURT:  And I read your papers as saying the

13   plaintiffs haven't alleged in their papers that no warrant was

14   obtained in this case.  And therefore, they have failed to

15   state a claim for a violation of the Fourth Amendment.  And

16   that's the way in which I read your papers.

17           You're telling me, no, that's not what you said.  I'll

18   go back and read your papers with much more care.  They were

19   read with care initially.

20           MR. BARNEA:  No doubt, your Honor.

21           THE COURT:  That of course raises the next question,

22   which is the government should know whether a warrant was

23   obtained or not.  What you're telling me now is, I think, the

24   implication of what you're telling me is of course there was no

25   warrant.  No warrants are required to seize the contents of a

NBG3KUNM

1   phone from an American citizen abroad.

2           MR. BARNEA:  So, allow me to try to clarify my

3   statement, and I apologize if I wasn't clear earlier.

4           The constitutional warrant requirement of the Fourth

5   Amendment does not apply outside the United States.  So, as a

6   result of the Constitution, no warrants are required for any

7   searches that occur outside the territory of the United States.

8   There are certain statutory provisions that may --

9           THE COURT:  Okay.  Let's pause there.  And you rely on

10  East Asia Bombings?

11          MR. BARNEA:  East Africa Embassy Bombings sets out

12  relatively clearly.  I think other cases, *Hasbajrami*.

13          THE COURT:  Did you cite East Africa Bombings?

14          MR. BARNEA:  It is cited in one of our briefs.

15          THE COURT:  No, in your initial brief.

16          MR. BARNEA:  I'm trying to remember what brief we

17  cited it in.

18          THE COURT:  It doesn't appear in your table of --

19          MR. BARNEA:  It's in re -- let me find it.

20          THE COURT:  If it's In re East Africa Bombings, it's

21  not in your initial brief.

22          MR. BARNEA:  It might be in the reply brief then.

23          THE COURT:  Okay.

24          MR. BARNEA:  *In re Terrorist Bombings of U.S. Embassy*

25  *in East Africa* cited on page 8 of our reply brief.

NBG3KUNM

1          THE COURT:  So, you say no warrant was required.

2          MR. BARNEA:  Here it is on page 8 of our reply brief.

3    This is a Second Circuit case from 2008, holding that the

4    Fourth Amendment's warrant clause has no territorial

5    application and that foreign searches of U.S. citizens

6    conducted by U.S. agents are subject only to the Fourth

7    Amendment's requirement of reasonableness.

8          THE COURT:  So, in your initial brief you argued, I

9    thought, again, I'll go over it, that the plaintiffs failed to

10   argue that there was no warrant for the seizure of the contents

11   of the cell phones.

12         Did I misread that argument?

13         MR. BARNEA:  We argued that they simply posited that

14   the search was illegal, but did not specify in what way it was

15   illegal, such as, for example, if they thought a warrant was

16   required, to explain what warrant might have been required, and

17   why it wasn't obtained or how it was obtained improperly.

18         So the perhaps that's why our brief was confusing for

19   your Honor, and I apologize for saying that.

20         THE COURT:  That certainly does suggest that the

21   problem with their complaint was the failure to allege that a

22   warrant was obtained.  So, but your argument is no warrant was

23   required.

24         MR. BARNEA:  No warrant was required by the

25   Constitution.

NBG3KUNM

1      THE COURT:  So, can I take it from your argument that

2   the government concedes that there was no warrant that was

3   obtained, because no warrant was required?

4      MR. BARNEA:  Again, certain statutes may require

5   warrants in certain circumstances, even if the Constitution

6   doesn't mandate it.

7      We neither concede nor have any statement about

8   whether any warrant was needed or was obtained in this case,

9   because of course none of the facts of this case we are having

10  any factual comment on them.

11      I think our point was meant to be, and again, this is

12  not a point that we think we need to pursue much given the

13  statement that we saw about a potential amended allegation that

14  the plaintiffs might make in this regard.

15      But our point was simply that by claiming that the

16  search was illegal without explaining why it was illegal, the

17  plaintiffs had not -- were making a conclusory statement

18  without actually justifying the pleading that they were trying

19  to make.

20      THE COURT:  Here's my problem with that argument.  The

21  government knows whether a warrant was obtained or not

22  obtained.  If the government knows that there was no warrant,

23  then I wonder whether in good faith the government can make the

24  argument that ah-ha you haven't alleged that no warrant was

25  obtained, when the government knows as a matter of fact that no

NBG3KUNM

1   warrant was obtained.

2                MR. BARNEA:  Again, we're not here to -- I'm not at

3   liberty to comment about whether a warrant was required or was

4   obtained, whether it was required by statute or by the

5   Constitution or something else.

6                THE COURT:  But, here's --

7                MR. BARNEA:  Again, we never --

8                THE COURT:  Hold on.

9                MR. BARNEA:  Sorry.

10               THE COURT:  Here's my problem with making that

11   argument, just to be clear.  It's not clear to me whether the

12   government can argue in good faith, without any explanation,

13   with respect to some of the defenses that the government

14   sometimes raises, that it is a matter of national security

15   simply to say we cannot affirm or deny whether there was a CIA

16   offices in that particular country.

17               When the government tells me in this case that simply

18   that they haven't alleged that there was no warrant, when the

19   government knows full well whether there was a warrant or not,

20   seems to me stretching the bounds of good faith.  I mean, it

21   doesn't seem that that's an argument that the government could

22   make when the government knows full well that hypothetically

23   there was no warrant because it's not required under the

24   Constitution.  Putting aside for a moment whether it was

25   required under any statute.  Do you follow at least my --

NBG3KUNM

1          MR. BARNEA:  I understand.  And again, this is not an

2     argument that we're pressing in light of a -- or that we think

3     that this argument may well be solved by a statement in their

4     opposition brief that we initially overlooked, so this is not

5     an argument that we're pursuing.  But in --

6          THE COURT:  What's the statement that you overlooked

7     and that I may have overlooked also?

8          MR. BARNEA:  Page 14, footnote 10 of the opposition

9     brief.

10          THE COURT:  One of my favorite footnotes.

11          MR. BARNEA:  Which has to do first with about whether

12     or not we had raised certain issues in our premotion letter,

13     and later on in the same footnote, they proposed how they might

14     have amended their complaint to deal with this particular

15     argument, and they assert that this argument could have easily

16     been corrected in the first amended complaint as there was no

17     search warrant in existence -- I'm sorry.

18          THE COURT:  I see it.

19          MR. BARNEA:  That the plaintiffs were aware of no

20     basis for obtaining a search warrant for plaintiffs.

21          Again, without a statement -- it is a little

22     complicated, but in any event, our argument was not based on

23     specifically whether a search warrant specifically was

24     available, but rather whether there was any basis to the

25     allegation of the search being illegal.  Our objection was

NBG3KUNM

1    simply to the legal conclusion of the search having been

2    illegal, without any explanation as to why they concluded that

3    the search was illegal.

4              THE COURT:  So, assume that the plaintiffs now say

5    that there was no search warrant.  And the response is?  Hasn't

6    been briefed.

7              MR. BARNEA:  Well, again, if they said something along

8    the lines of we are not aware of any search warrant, and in any

9    event, the search that was conducted was not reasonable, and in

10   our view, that would cure the pleading defect that we

11   identified and would allow that particular claim to survive.

12   Assuming that the Fourth Amendment applied and they had

13   standing to bring it, which of course there are objections to

14   that particular claim.

15             THE COURT:  All the plaintiff has to do to make this

16   claim survive is to allege that there was no search warrant,

17   and a search warrant was required to make the search

18   reasonable.

19             MR. BARNEA:  Well --

20             THE COURT:  You say if the plaintiff had only said

21   that, this claim proceeds.

22             MR. BARNEA:  No.  I said if they had standing, and if

23   the Fourth Amendment applied at all, which in our view it does

24   not, because the search at issue was conducted by a foreign

25   actor who was not controlled and directed by the CIA.

NBG3KUNM

1          But if the plaintiff can overcome those two issues,

2     and the only issue was whether they had adequately pleaded a

3     Fourth Amendment violation with regard to someone taking their

4     cell phones, then, in our view, an allegation that they are not

5     aware of any search warrant being obtained, they are not aware

6     of -- and in their view, the search was unreasonable, either

7     because of an absence of a search warrant or for other

8     circumstances, that may well cure the particular pleading

9     sufficiency that we identified in our brief.  We would have to

10    study precisely what they would allege in that regard.  This is

11    why we think it would be relatively easy to overcome that

12    particular argument, which is why I wasn't planning to focus on

13    it today.

14          THE COURT:  I'm sorry, you think it would be

15    relatively easy to overcome that argument?

16          MR. BARNEA:  We think that if they made that type of

17    an allegation, it would resolve that particular aspect of our

18    motion to dismiss, in all likelihood.  Which is why we are not

19    focusing on that aspect of our motion to dismiss.

20          THE COURT:  Well, there is a fully briefed motion.  It

21    includes an argument that the plaintiffs have no claim with

22    respect to the seizure of the contents of their electronic

23    devices abroad.  And you argued that that claim falls in part

24    because they haven't alleged the absence of a warrant.

25          MR. BARNEA:  No.  All they had alleged, all they

NBG3KUNM

1   allege in their complaint is that someone took their phone and

2   it was, quote, illegal.  That was all they alleged.

3          So, what we point out was, by simply labeling

4   something illegal, that is a conclusory statement.  They

5   haven't explained why it is illegal.  And now, in this footnote

6   they have demonstrated what it is they might argue or how they

7   might plead more specifically why it was illegal, and I was

8   trying to explain to the Court why, in our view, if they were

9   to amend their complaint along these lines, that may well

10  resolve the concern that we had raised.

11         It was simply about the conclusory nature of the label

12  "illegal" being applied to something, without any explanation

13  as to what about the search was illegal or why it was illegal.

14         THE COURT:  Okay.  I'll revisit this of course with

15  the plaintiffs in a moment, but it would seem to me

16  unnecessarily wasteful to tell the plaintiffs file a motion to

17  dismiss, denied, or granted, with leave for the plaintiff to

18  file an amended complaint which includes more specific

19  allegations with respect to the seizure of the contents of the

20  electronic devices.

21         I mean, there is a fully briefed motion that should be

22  decided, and for the reasons that I've suggested, I didn't find

23  the briefing very clear on that.

24         MR. BARNEA:  Apologies, your Honor.

25         THE COURT:  No, no, never apologize.  It would seem to

NBG3KUNM

1    me that plaintiffs could simply file an amendment to the

2    complaint with respect to their specific claims with respect to

3    the seizure of the contents of the electronic devices.  And the

4    government would have the opportunity to file a motion directed

5    to that amendment, and the plaintiffs could respond, the

6    government could reply, rather than repleading the entire

7    motion.

8            MR. BARNEA:  Your Honor, we don't think that the Court

9    is even going to have to reach those issues necessarily, given

10   our fundamental standing and inapplicability of the Fourth

11   Amendment.  But if the Court wishes for us to examine a

12   proposed new pleading, we're happy to do so.  And as I've

13   already said, it seems likely that they would be able to

14   satisfy us in this regard.  So, this may be not much of an

15   exercise at all.

16           THE COURT:  Okay.  Go ahead.  You may have just been

17   about concluded.

18           MR. BARNEA:  Yes, well, I was just getting to the

19   *Bivens* point.  Let me find my notes.

20           THE COURT:  I fully appreciate that this is a new area

21   for *Bivens*, that it's never been applied in the context of

22   national security and abroad.  And that there are reasons to

23   believe that Congress wouldn't believe that a *Bivens* remedy

24   would be appropriate under the circumstances of this case,

25   given the administrative remedies that are available.

NBG3KUNM

```
 1              MR. BARNEA:  Precisely.  That is exactly our argument.
 2      That this is not an area in which any Court could reasonably
 3      conclude that Congress wanted the judiciary to create a remedy,
 4      as opposed to limiting itself to the remedies Congress itself
 5      has created, which include this very lawsuit against the CIA,
 6      options to complain to the CIA's Office of Inspector General
 7      and the like, which are very similar to the types of alternate
 8      remedies that the Supreme Court has recognized as sufficient
 9      alternate remedies in other proposed *Bivens* cases, and rejected
10      the *Bivens* remedy.
11              So, seems like our argument is relatively
12      straightforward in that regard.  So, those are the only points
13      I wanted to make.  I'm happy to answer any further questions
14      that your Honor might have about our arguments.
15              THE COURT:  No.  You weren't going to touch on
16      qualified immunity?  I know the argument of qualified immunity.
17              MR. BARNEA:  I am happy to summarize it for the Court.
18              THE COURT:  No.
19              MR. BARNEA:  I had selected a few of our arguments I
20      wanted to highlight in the argument today.
21              THE COURT:  I'm familiar with the qualified immunity
22      argument.
23              MR. BARNEA:  And at bottom, we are talking about
24      whether there is sufficient allegations of Mr. Pompeo's
25      personal involvement in the alleged acts, and we simply think
```

NBG3KUNM

1   an examination of the complaint, putting aside conclusory

2   statements of Mr. Pompeo approving things or directing things

3   which have been held in other cases to not be sufficient, are

4   simply not sufficient to implicate him personally.  So

5   therefore, even if there were a *Bivens* remedy, he would be

6   entitled to qualified immunity for lack of personal

7   participation.

8            THE COURT:  Okay.  Thank you.

9            MR. BARNEA:  Thank you, your Honor.

10           THE COURT:  Plaintiffs.

11           MR. LEVENSON:  Good afternoon, your Honor.  This is

12   Brian Levenson for the plaintiffs.

13           There is no doubt that the plaintiffs have standing to

14   pursue this case under settled Second Circuit law, notably the

15   *ACLU v. Clapper*.  The Second Circuit has held that the

16   collection, maintenance, and retention of seized information in

17   a government database is sufficient for standing to pursue a

18   claim.  Whether or not that claim ultimately prevails is

19   different than whether or not the plaintiffs have standing to

20   pursue it.

21           The government relies on *Phillips*, which is a Ninth

22   Circuit case and not binding on this Court.  Further, *Phillips*

23   is easily distinguishable on many grounds, including the

24   plaintiffs in that case were migrants as part of a caravan

25   coming to the United States who do not enjoy Fourth Amendment

NBG3KUNM

rights, the information in the government database was

independently created by the government, it was not seized from

any of the plaintiffs in that case, and the plaintiffs migrants

wanted the destruction of that information that was

independently collected and gathered by the government.

        This case has no resemblance, even if it was

controlling.  These are U.S. citizens, protected by the Fourth

Amendment, even abroad.  And the government, without a warrant,

though it may not have been specifically pled in the complaint,

it was pled without authorization, unconstitutionally and

illegally, seized not only the content of their electronic

devices, laptops, cell phones, but also recorded private

conversations between the plaintiffs and Julian Assange, the

plaintiffs being lawyers and journalists.

        There is case law, including cases cited by the

government, that there is a higher expectation of privacy with

respect to attorney-client communications.  The plaintiffs had

no idea that their cell phones and laptops would be searched at

an embassy in London.

        And further, the government has raised the argument

that they should assume there is some level of lack of privacy.

But that's not what's required.  Absolute privacy, absolute

solitude is not the standard.  It is reasonable.  Was it

reasonable.  They would not have brought electronic devices

carrying every bit of their lives with them or engaged in those

NBG3KUNM

1   conversations in that room had there been any expectation that

2   the CIA was listening.

3           THE COURT:  Could we divide all of that up.

4           MR. LEVENSON:  Okay.

5           THE COURT:  There are arguments with respect to what

6   you can expect reasonably with respect to surveillance at an

7   embassy abroad.  But, you've mixed up, if you will, in the same

8   sentence, the surveillance that occurred abroad, and the search

9   of the contents of their electronic devices that include lots

10  of things that went beyond simply the surveillance at the

11  embassy.

12          And the government initially said you didn't specify

13  how that search of the electronic devices was unreasonable or

14  without a warrant.  And when you go back and forth from the

15  footnotes and listening to the government today, if you made a

16  few more allegations with respect to the seizure of the

17  contents of the electronic devices, the government has

18  indicated that, at least as I understood it, that part of the

19  specific argument that related to the seizure of the contents

20  of the electronic devices would fall out.

21          What I was trying to say to the government was, there

22  should be a simple way for the plaintiff to add some additional

23  allegations to the complaint to which the government might not

24  have the same additional argument that it had raised to the

25  seizure of the contents of the electronic devices, and we can

NBG3KUNM

```
 1   move on without having a whole new briefing of the entire
 2   motion.
 3           I mean, I can accept a letter which, you know, amends
 4   the allegations in the complaint, and a government response as
 5   to what the argument, if any, is with respect to that amended
 6   allegation, and decide the entire motion without having leave
 7   to file an amended complaint, deny the initial motion as moot
 8   because there is an amended complaint.
 9           Doesn't that make sense to you?
10           MR. LEVENSON:  Yes, it does, your Honor.  That's what
11   we proposed in footnote 10, to the extent this was really an
12   issue.
13           THE COURT:  Okay.  So, what do you propose
14   specifically?
15           MR. LEVENSON:  Yes, a letter amendment.  We could
16   just -- without amending the entire complaint, we can amend a
17   specific paragraph or just include additional allegations
18   sufficient to show that the search and seizure was unreasonable
19   and without a warrant to satisfy the government.
20           THE COURT:  The search and seizure of the contents of
21   the electronic devices.
22           MR. LEVENSON:  Yes, your Honor.
23           THE COURT:  And you would file that letter amendment
24   soon?
25           MR. LEVENSON:  Within a week, your Honor.
```

NBG3KUNM

1    Thanksgiving eve.

2              THE COURT:  Next week is Thanksgiving.  So you can

3    take two weeks.

4              MR. LEVENSON:  Thank you, your Honor.

5              THE COURT:  And the government can file its response

6    December 8th.

7              MR. BARNEA:  Thank you, your Honor.

8              THE COURT:  And if there is any reply, December 13.

9    Okay?

10             MR. LEVENSON:  Yes, your Honor.  Thank you.

11             THE COURT:  Great.  So, go ahead.

12             MR. LEVENSON:  So that tables the standing issue for

13   now as I take it.

14             With respect to the government's issues with a lack of

15   specificity in allegations of direct and control, the complaint

16   provides every piece of information about the government's

17   direction and control, including who, what, where, when, how,

18   and why.

19             It occurred at the SHOT convention in Las Vegas,

20   between the Las Vegas Assange security team at the direction of

21   the CIA recruiting U.C. Global and Morales, who already had the

22   contract for private security at the Ecuadorian embassy in

23   London.  And the purpose was, we allege, a personal vendetta

24   between the director of the CIA, Mike Pompeo, against Julian

25   Assange.

NBG3KUNM

1        Mr. Pompeo in his first speech said that was his top

2   priority, that was what he addressed, is Mr. Assange was a

3   non-state hostile foreign actor, and WikiLeaks the same, and he

4   wanted to crush them more or less.

5        He goes on in his memoir containing additional

6   allegations against Mr. Assange that is not in the complaint,

7   that was published after, but that is the why, and the how is

8   the most specific thing.  That the CIA provided software,

9   written in English, to U.C. Global, the security company who

10  had the embassy contract, about how to install real live time

11  feed surveillance of Mr. Assange at the direction, approval,

12  and authorization of Mike Pompeo.

13        It is unclear what more the plaintiffs could have

14  alleged when we don't know the ins and outs of the secret

15  clandestine attempt to surveil not only Mr. Assange, but anyone

16  who comes in contact with him, whether it is a journalist, a

17  lawyer, a doctor, who the complaint alleges were the targets of

18  this.  And it was not a one-time thing.  It was ongoing.  The

19  complaint identifies over 100 Americans visited Mr. Assange at

20  the embassy, including actress Pamela Anderson who it later

21  came out that video of Ms. Pamela Anderson with Julian Assange

22  in this conference room was on David Morales's laptop in a

23  folder marked CIA.

24        Again, that information was published after the

25  complaint, but it's included in our briefing, because it

NBG3KUNM

1    certainly connects the plausibility that Mr. Pompeo and the CIA

2    were at the direction and control -- were directing and

3    controlling the security team at the embassy, U.C. Global, that

4    they reported, and they were in fact, they're on payroll.  This

5    was paid for.

6          The government made the argument, oh, there is no

7    problem if foreign governments want to share information.  This

8    was not a foreign government.  This was a private security

9    contract.  These are not government actors.  These are regular

10   people who have a security contract at a London embassy.  This

11   is not information sharing among nations.  This is private

12   actors on the payroll, bought and paid for by the CIA.

13   Recruited by Mike Pompeo and under his supervision.  The CIA

14   directed and controlled this operation.

15         The clincher, the plausible, undeniable, is also in

16   our brief at the very end, through reporting that came out

17   again after the complaint, was that the U.S. government within

18   hours disrupted a conversation between Mr. Assange and the

19   Ecuadorian government that would provide him diplomatic status,

20   within hours it was disrupted.  That could only be done with

21   real live time feed of that room and what was being discussed,

22   and it certainly makes clear it is not information sharing

23   between foreign government.  This is was the Ecuadorian

24   government that was being spied on.  And this was done by

25   private actors, David Morales and U.C. Global.

NBG3KUNM

1          So again, this is not a request for information from a

2     foreign government; it is not sharing by a foreign government.

3          With respect to reasonable expectation of privacy, I

4     started to address this, and your Honor was correct that I

5     should break it out.  But *Riley v. California*, the U.S. Supreme

6     Court case from 2014, makes clear in fact the "With respect to

7     cell phones, get a warrant."

8          THE COURT:  Right.  That's with respect to the

9     contents of the cell phone.

10          MR. LEVENSON:  Yes.  That is the allegation in the

11     complaint.

12          THE COURT:  No, no question.  The complaint alleges

13     that the content of the electronic devices were in fact seized.

14          MR. LEVENSON:  Yes.

15          THE COURT:  And that a warrant is required under

16     *Riley*.  There is the separate argument, because you also say

17     there was a Fourth Amendment violation because the materials

18     that the plaintiffs left at the desk, including their

19     passports, were also copied, and that that was a violation of

20     the Fourth Amendment.

21          MR. LEVENSON:  The inclusion of the allegation

22     regarding passports was not an allegation of violating the

23     Fourth Amendment.  That was an allegation to show that the CIA

24     was on notice these were American citizens.

25          THE COURT:  Oh.

NBG3KUNM

1          MR. LEVENSON:  At the time that they entered the

2     embassy.

3          THE COURT:  So there is no allegation that the copying

4     of the materials that were left when the plaintiffs entered the

5     embassy was a violation of the Fourth Amendment.

6          MR. LEVENSON:  Not the passport, your Honor.  I want

7     to distinguish it from the electronic devices.  It is a totally

8     separate issue, which that is a violation of the Fourth

9     Amendment.

10          THE COURT:  The contents of the electronic devices.

11          MR. LEVENSON:  Yes.

12          THE COURT:  Not the outside of the electronic devices.

13          MR. LEVENSON:  We are not alleging a Fourth Amendment

14     violation based on taking a picture of the outside of a

15     passport or a phone or a laptop.

16          THE COURT:  Okay.

17          MR. LEVENSON:  That is a tremendous fact in this case

18     that the search, that the seizure, were separated in time and

19     space, where they checked -- just as I came into the building

20     today and had to check my phone, the government knows who I am,

21     if I provided my passport, they know that I am an American

22     citizen, they have my phone, and *Riley* makes that off limits.

23     That's off limits.

24          THE COURT:  I know that's the content of the phone.  I

25     got it.

NBG3KUNM

1          MR. LEVENSON:  I don't want to belabor the point, yes.

2          THE COURT:  You also argue, I think, that the

3     surveillance of the meetings with Assange was also a Fourth

4     Amendment violation.

5          MR. LEVENSON:  Yes, that's what I was going to.  That

6     is a Fourth Amendment violation, because at the moment where

7     the plaintiffs checked into the embassy and checked their

8     devices, and provided their passport, the government in real

9     time knew these were American citizens about to enter the room,

10    the room is separated, they went in the room, and now they're

11    surveilling U.S. citizens without a warrant or without any

12    reason.  There is no reasonableness.  These are not criminals,

13    these are lawyers, doctors, physicians, journalists.

14         THE COURT:  Is there any comparable case that says

15    there is a Fourth Amendment expectation of reasonable

16    expectation of privacy in a foreign embassy for an American

17    citizen who has a conversation in a foreign embassy?  Any sort

18    of comparable case?

19         MR. LEVENSON:  Your Honor, there is no case like this.

20    I'm not even going to analogize any other case.  There are many

21    prison cases cited by the government, and we are just

22    dumbfounded by the comparison.  This is not a prison.  He is a

23    free person.  Prisoners have no liberties, and of course there

24    is no reasonable expectation of privacy in a prison.  These are

25    lawyers going to see a client at an embassy.

NBG3KUNM

| | |
|---|---|
| 1 | THE COURT:  The argument can certainly be made that |
| 2 | when people go into a foreign embassy, they would expect that |
| 3 | there is security in the embassy that would cover surveillance |
| 4 | in the same way that when you enter a courthouse, you can |
| 5 | expect there is surveillance. |
| 6 | MR. LEVENSON:  Yes, of courses there is surveillance, |
| 7 | of course there are video cameras to keep track of who is in |
| 8 | the elevator and the hallway and in case something happens.  Of |
| 9 | course, many buildings have surveillance.  Any building would |
| 10 | have surveillance. |
| 11 | But this is different.  This is a private meeting in a |
| 12 | separate room.  These are not the public areas of that |
| 13 | building.  These are not common areas.  These are private |
| 14 | areas.  And they're there to see a client or a source for an |
| 15 | article.  There is a reasonable expectation that under these |
| 16 | circumstances, where they've identified themselves as Americans |
| 17 | from the get-go, that they are not going to be surveilled by |
| 18 | the CIA. |
| 19 | THE COURT:  Why? |
| 20 | MR. LEVENSON:  Because they've identified themselves |
| 21 | as American citizens. |
| 22 | THE COURT:  So? |
| 23 | MR. LEVENSON:  The government is relying -- telephone |
| 24 | wiretap cases involving terrorists.  This is not a terrorist. |
| 25 | This is not someone who called terrorists and was accidently |

NBG3KUNM

1   picked up and, oh my God, that is an American citizen, what do

2   we do?  It's okay, it is incidental overhear doctrine.

3         That's not what this is.  It is separated.  I am an

4   American citizen, I am going in that room to talk to that

5   person, I have a reasonable expectation that the government is

6   not listening.

7         THE COURT:  There is no allegation in the complaint

8   that when the plaintiffs go into the foreign embassy they say,

9   we want a private room in order to be able to talk to this

10  person.  These are going to be confidential discussions, we

11  don't want anyone listening.  Got it?

12        Would a foreign embassy be expected to say, oh sure.

13  come on in, we'll give you a safe room.

14        MR. LEVENSON:  No, that's not a reasonable

15  conversation.  The extent of -- let me find the case.  *Mankani*,

16  Second Circuit, 1984, the Fourth Amendment protects

17  conversations that cannot be heard except by means of

18  artificial enhancement, which is what this is.  Tiny

19  microphones bugged on fire extinguishers, special devices put

20  on windows to obscure outside noises.  That is the only way

21  these conversations could be heard.  And that is what the

22  Fourth Amendment protects.

23        THE COURT:  I assume *Mankani* is not in the context of

24  a foreign embassy abroad.

25        MR. LEVENSON:  No.  We were unable to find any case

NBG3KUNM

1    involving any foreign embassy.  Any embassy.

2              THE COURT:  Okay.

3              MR. LEVENSON:  To be candid.

4              One thing I wanted to go back just to clarify about

5    plaintiffs' allegations concerning the copying of materials.

6    There is an allegation that the government dismantled a cell

7    phone and took a picture of something called an IMEI card on

8    the inside of the phone that permits the government

9    extraordinary amounts of information with that code.  We do

10   allege that that's part of our claim for a Fourth Amendment

11   violation.  That is on the inside of the phone, not the

12   outside.

13             THE COURT:  Okay.

14             MR. LEVENSON:  Finally --

15             THE COURT:  The main argument with respect to the

16   individual liability.

17             MR. LEVENSON:  Yes, *Bivens*, yes.

18             THE COURT:  Right.

19             MR. LEVENSON:  Yes, your Honor.  We believe that this

20   is a *Bivens* claim.  While *Bivens* was a search of a person in

21   their own home who is handcuffed and was permitted to sue for

22   damages, we believe this is worse.  This is not just a search

23   of a home.  This a search of a phone.  A phone has

24   extraordinary amounts of information not available in a home.

25   I don't need to tell you, your Honor, what could be on a phone.

NBG3KUNM

1   GPS tracking location, health, medical records, client

2   documents, client information, journalistic sources, personal

3   pictures -- compromising pictures, in fact -- e-mails, personal

4   text messages.  This is so far beyond the search of a phone.

5   *Riley v. California* made it clear that the phone is not -- is

6   off limits in this context.  That was in 2014.  These searches

7   occurred after.  It was no doubt what the law was at the time

8   that these searches happened.  *Bivens* was a Fourth Amendment

9   case as is this.

10          THE COURT:  But all of that would appear to go to

11  whether there was a Fourth Amendment violation, and whether

12  perhaps there was qualified immunity after *Riley*, rather than

13  to the analysis of *Bivens*, which is whether the application of

14  the Fourth Amendment to a new circumstance that has not been

15  recognized by the Supreme Court.  This is a long way away from

16  *Bivens* itself.  And there are only three cases where the

17  Supreme Court has said, yes, that's a *Bivens* claim.  We'll

18  recognize it.  And the kinds of distinction that the Supreme

19  Court has drawn with respect to whether *Bivens* should be

20  extended to a new situation would seem to argue that it

21  shouldn't be extended here.

22          Your turn.

23          MR. LEVENSON:  Sure.  It's true there are only three

24  instances, three cases where the Court applies *Bivens*.  That is

25  a case-by-case analysis.  As I tried to argue, this is worse.

NBG3KUNM

1    This is so much worse.  *Bivens* is a man in his home.  Whatever

2    is in his home, is in his home.  A phone has the data,

3    sensitive data, sensitive messages that may not be kept in a

4    home.  It's a different circumstance only that rather than

5    occur in a home, it occurred in an embassy.

6         We fail to see how that's the line to be drawn as far

7    as whether this is a different context.  It is the conduct that

8    is the same.  It is an unreasonable extreme action taken by the

9    government at the direction of Mike Pompeo, and he is not

10   entitled to qualified immunity because *Riley v. California* made

11   it clear.

12        THE COURT:  Separate argument from *Bivens*.  Qualified

13   immunity, separate argument from *Bivens*.

14        MR. LEVENSON:  Okay.

15        THE COURT:  National security, broad.

16        MR. LEVENSON:  There is no national security

17   implications with Ms. Hrbek or Ms. Kunstler.  These are U.S.

18   citizens who are lawyers, who had long distinguished careers

19   representing clients either in entertainment transactions,

20   litigations, sometimes civil rights cases, journalists.  These

21   are not terrorists.  These are not terrorists.  There is no

22   immediate harm to the country.  These are not people crashing

23   the border.  These are people going to see a client or

24   journalistic source in a room, with a reasonable expectation of

25   privacy.  That's all this is.  They are not terrorists, they're

NBG3KUNM

1  not on any watch lists, they are not on a no fly list.  They

2  are just people, your Honor.

3      THE COURT:  No one has suggested that they are.  The

4  national security interests are from Mr. Assange, whether those

5  are correct or not, they are asserted.  Right?

6      MR. LEVENSON:  He is not the plaintiff in this case,

7  your Honor.  His phone was not downloaded and searched.  He was

8  not going to visit someone and have his conversations -- and

9  that's what I was getting at earlier.  To the extent, putting

10  Mr. Assange aside, which you can, because at the moment they

11  walked in the door, they had done nothing other than they

12  announced their intent to visit him.  Fellow journalist, a

13  client.  And that is it.

14      THE COURT:  Okay.

15      MR. LEVENSON:  Thank you, your Honor.

16      THE COURT:  Thank you.

17      Anything further?

18      MR. BARNEA:  Thank you.  I wanted to say a couple more

19  things about whether the plaintiffs had a reasonable

20  expectation of privacy in a foreign embassy.

21      Of course we also haven't been able to find any cases

22  specifically taking place in foreign embassies, since I guess

23  nobody has filed such a case that's been published on Westlaw

24  so far.  However, there are plenty of cases, and we cite a lot

25  of them in our brief, that talk about different kinds of

NBG3KUNM

circumstances in which someone does not have a reasonable

expectation of privacy and why.  And I wanted to just go over

briefly some of those.

It is right that a couple of them have to do with

jails, but I think a better analogy is police stations.  So,

for example, there's a case involving the front desk of a

police station in which you have a circumstance where, when no

one else was present, two police officers had a conversation,

and they claim that the police department they worked for

placed a secret microphone under the desk and was recording

their conversations, and they sued.  And the Court concluded

that they had no reasonable expectation of privacy because they

were in a police building, and it is an area that is open to

the public, and people come by, and it is not reasonable for

them to have an expectation of privacy in those circumstances.

Another case where the defendant was the Port

Authority was people were in a medical facility, no one else

was in the office with them, in the nurse office with them, the

nurse was not there.  They thought they were having a private

conversation.  They did not know there was a secret camera

installed in the room.  And the Court held that they did not

have a reasonable expectation of privacy, because they were in

a medical facility, and people were going in and out of the

room, and people -- and this is not the type of a location

where people can expect to have privacy.  Even though, as far

NBG3KUNM

1    as the people themselves were concerned, they were by

2    themselves, and they didn't see any surveillance equipment.

3            So the question is not did someone know that they were

4    being surveilled.  The question is are you in a place where you

5    have sufficient assurances of privacy, either because you are

6    in your own home or in a private space that either you or the

7    person you are speaking to controls, or are you in a public

8    place or a government facility or some other facility that you

9    don't control.  As your Honor suggested, this courthouse, there

10   are probably lots of security cameras all over the courthouse,

11   and therefore, unless you are put in a room where someone from

12   the court tells you, this is a private room where you can have

13   a conversation with your client, I don't think that anyone can

14   have a reasonable expectation of privacy outside of that

15   location.

16           Again, same thing happens in all sorts of government

17   facilities.  It's true many of these cases have to do with

18   police departments, because that is a more frequent occurrence.

19   But the analogy to an embassy is very clear.

20           And your Honor, so for that reason, we believe there

21   was no reasonable expectation of privacy with regard to those

22   communications.

23           And just as a very small last point, about these IMEI

24   numbers on the phones.  It's true that -- I'm certainly not a

25   cell phone expert, but it's true that these are numbers that

NBG3KUNM

1  are written sort of on a phone, but they are not the electronic

2  contents of the phone.  But there are several cases, we cite a

3  few of them, that say that by giving your phone to someone

4  else, you have relinquished your expectation of privacy,

5  including in this IMEI number that is inscribed on your phone,

6  but is not part of the electronic contents of your phone.

7       THE COURT:  I had taken the plaintiffs' argument to be

8  that they're claiming protection for the inside of the phone,

9  and they're referring to a card inside the phone.

10      MR. BARNEA:  It is a physical card that is inserted

11  into the phone.  So it is inside physically, but it is not the

12  electronic contents of the phone.  So the Supreme Court's

13  prohibition on requirement of a warrant is to what is on your

14  phone.  Your e-mails, your photographs, your files.

15      THE COURT:  What is accessible from the inside of the

16  phone?

17      MR. BARNEA:  What is accessible electronically on the

18  phone as opposed to the physical structure of the phone.

19  Serial numbers, little cards that are inside your phone that

20  may be what help your phone access cell phone service and the

21  like, those are not included within the Supreme Court's

22  admonition.

23      THE COURT:  So SIM cards.

24      MR. BARNEA:  Precisely.

25      THE COURT:  Are not.

NBG3KUNM

1          MR. BARNEA:  The information that you can see on the

2     SIM card.  If the government were to download the contents your

3     SIM card, that would be different.  But if the government were

4     to simply open up the SIM card slot and take a picture of it

5     and take down the SIM card number, that is not something that

6     requires a warrant, if you've voluntarily provided that phone

7     to the government or to somebody else.  That's the distinction.

8          THE COURT:  What cases do you rely on for that?

9          MR. BARNEA:  I thought you might ask that.

10          It is on page 17 of our opening brief.  *Ward v. Lee*

11     from the Eastern District of New York is a case that collects

12     several cases about this.

13          THE COURT:  Okay.  Thank you.

14          MR. BARNEA:  Thank you, your Honor.

15          THE COURT:  I'll take the motion under advisement, and

16     I look forward to the letter with the amendment and the

17     response and the reply.  Thank you, all.

18          MR. LEVENSON:  Thank you, your Honor.

19          THE COURT:  I appreciated the briefs and the argument.

20          (Adjourned)

21

22

23

24

25