UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————

MARGARET RATNER KUNSTLER, ET AL.,

                Plaintiffs,          22-cv-6913 (JGK)

      - against -           MEMORANDUM OPINION
                                  AND ORDER

CENTRAL INTELLIGENCE AGENCY, ET AL.,

                Defendants.
————————————————————————

JOHN G. KOELTL, District Judge:

The plaintiffs -- Margaret Ratner Kunstler, Deborah Hrbek, John Goetz, and Charles Glass -- brought this action against the Central Intelligence Agency ("CIA") and Michael R. Pompeo (collectively, "the Government"), as well as David Morales Guillen and Undercover Global S.L.,[1] asserting claims for money damages and injunctive relief. The plaintiffs allege that the Government surveilled them and copied their information while they visited WikiLeaks founder Julian Assange at the Ecuadorean Embassy in London, in violation of their constitutional rights. The Government now moves to dismiss the plaintiffs' amended complaint, ECF No. 27 ("Am. Compl."), against the Government pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the following reasons, the motion to dismiss is **granted in part** and **denied in part**.

---

[1] Clerk's certificates of default were entered against Undercover Global S.L. and David Morales Guillen. See ECF Nos. 50, 62.

**I.**

Unless otherwise indicated, the following facts are taken
from the amended complaint and are accepted as true for purposes
of deciding this motion.

Plaintiffs Margaret Ratner Kunstler and Deborah Hrbek are
attorneys who maintain law offices in the City, County, and
State of New York, and have been practicing law for over thirty
years. Am. Compl. ¶¶ 1-2. Plaintiffs John Goetz and Charles
Glass are journalists who report on national security issues and
reside in Germany and England, respectively. Id. ¶¶ 3-4. All of
the plaintiffs are United States citizens who visited Julian
Assange at the Ecuadorean Embassy in London between in or about
January 2017 and in or about March 2018 (the "relevant time
period"). Id. ¶¶ 1-4, 19.

Julian Assange is the founder and was previously the
Editor-in-Chief of WikiLeaks, a "multi-national media
organization and library." Id. ¶ 12. WikiLeaks "has published
over 10 million documents and associated analyses" of "censored
or otherwise restricted official materials involving war, spying
and corruption[,] . . . often [given to WikiLeaks by] employees
or former employees of the agencies and/or entities at issue."
Id. ¶¶ 13-14. In 2012, Assange, believing that he would be
extradited to the United States and face charges, took refuge in
the Ecuadorean Embassy in London until April 2019. Id. ¶¶ 18-19.

During the relevant time period, Defendant Michael Pompeo was the Director of the CIA. Id. ¶ 20. In April 2017, in one of his first speeches as CIA Director, Pompeo announced that "as CIA Director he would target whistleblowers who exposed clandestine and/or illegal efforts by the United States government aimed at countries perceived to be hostile to U.S. interests." Id. ¶ 22. Pompeo "call[ed] out WikiLeaks" as "a non-state hostile intelligence service" and called Assange a "narcissist[,]" "fraud[,]" and a "coward[.]" Id. ¶¶ 24-25. To conclude his remarks, Pompeo "pledged that his office would embark upon a 'long term' campaign against WikiLeaks." Id. ¶ 26.

The plaintiffs allege that, during the relevant time period, Pompeo recruited UC Global and its founder and Chief Executive Officer David Morales Guillen ("Morales") -- who were contracted to provide security for Assange at the Ecuadorean Embassy -- to "obtain confidential information in the possession of the Plaintiffs concerning Assange, his legal cases and the Plaintiffs themselves." Id. ¶¶ 27-28. In particular, the plaintiffs allege that Morales was recruited to conduct surveillance on Assange and his visitors on behalf of the CIA and that this recruitment occurred at a January 2017 private security industry convention at the Las Vegas Sands Hotel in Las Vegas, Nevada. Id. ¶¶ 29-30. The plaintiffs allege that Pompeo approved and authorized this arrangement. Id. ¶ 33.

The plaintiffs further allege that, to implement the agreement with the CIA, Morales created an operations unit, improved UC Global's systems, and set up live streaming from the United States so that surveillance could be accessed instantly by the CIA. Id. ¶ 34. Then, beginning in or around January 2012 until the Ecuadorean government terminated UC Global's contract in or around April 2018, Morales, UC Global, Pompeo, and the CIA allegedly:

> (a) converted video surveillance of Assange to audio-video surveillance by placing hidden microphones on new cameras; (b) placed hidden microphones inside the Embassy and switched out recordings that were downloaded twice-monthly and given to the CIA (c) ensured that the CIA could in real time be able to directly observe and listen to Assange's daily activities at the Embassy; (d) . . . copied and took images of the passports, including pages with stamps and visas, of all visitors; and, as most relevant here, (e) seized, dismantled, imaged, photographed and digitized the computers, laptops, mobile phones, recording devices and other electronics brought into the Embassy by the plaintiffs, including but not limited to IMEI and SIM codes, fronts, backs and insides of visitors' devices, [and] downloaded stored material

Id. ¶ 36. This data collected by UC Global was either personally delivered to Las Vegas; Washington, D.C.; and New York City by Morales (who traveled to these locations more than sixty times in the three years following the Las Vegas convention) or placed on a server that provided external access to the CIA. Id. ¶¶ 39-40.

During the relevant time period, each of the plaintiffs visited Assange at the Embassy with permission from Ecuadorean authorities. Id. ¶ 37. They were "required to leave their devices" -- containing allegedly "confidential and privileged information and documents from or about . . . confidential sources[] and . . . clients" -- "with the security guard at the Embassy reception desk[.]" Id. ¶ 38. The plaintiffs allege that they were unaware that their electronic information was copied and their meetings with Assange recorded and given to the CIA until in or about October 2019, after documents in a Spanish criminal case against Morales and UC Global were unsealed and reported on by the press. Id. ¶¶ 44-45. They also allege that they would not have brought their electronic devices into the Embassy had they known that their information was being copied and given to the CIA. Id. ¶ 48.

The plaintiffs now assert "fear that others, including but not limited to clients, friends, family and associates" will "cease to associate with them now that information about them has been seized, copied, and provided to the CIA" and "fear that if they visit Assange or speak and act in a manner that the United States government interprets as showing support for Assange, they will be subjected to" similar surveillance in the future. Id. ¶ 49. They also cite to "considerable emotional distress and anxiety, arising primarily from uncertainty . . .

about how Defendants and their agents have already and/or may in the future make use of the personal and privileged information" and "the injury that might be caused to their clients and sources[.]" Id. ¶¶ 50-51.

The plaintiffs now allege that, "[b]y authorizing and implementing unlawful surveillance techniques, Defendant[] . . . Pompeo violated Plaintiffs' right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment under the color of federal authority," and "[t]he actions of Defendant CIA in: (i) seizing Plaintiffs' electronic devices, copying their contents, and maintaining the information obtained from them in their files; and (ii) monitoring and recording Plaintiffs' visits with Julian Assange, violated Plaintiffs' right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment of the United States Constitution." Id. ¶¶ 55, 57. As a result, the plaintiffs seek money damages against Defendant Pompeo (as well as the other individual defendants who are not movants on this motion); an injunction against the CIA from "utilizing in any way, or revealing to any third party, the content of materials seized from Plaintiffs[;] . . . and an order requiring the CIA to purge and destroy all such materials from their files." Id. ¶¶ 55, 59.

**II.**

The Government moves to dismiss the plaintiffs' claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

To prevail against a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of proving the Court's jurisdiction by a preponderance of the evidence. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).[2] In considering such a motion, the Court generally must accept the material factual allegations in the complaint as true. See J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004). However, the Court does not draw all reasonable inferences in the plaintiff's favor. Id. Indeed, where jurisdictional facts are disputed, the Court has the power and the obligation to consider matters outside the pleadings to determine whether jurisdiction exists. See Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986). In so doing, the Court is guided by that body of decisional law that has developed under Rule 56. See id.

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept the allegations in the complaint as true and draw all reasonable inferences in the

---

[2] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

plaintiff's favor. <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." <u>Goldman v. Belden</u>, 754 F.2d 1059, 1067 (2d Cir. 1985). To survive a motion to dismiss, the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." <u>Id.</u>

When presented with a motion under both Rule 12(b)(1) to dismiss for lack of subject matter jurisdiction and Rule 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted, the Court should consider the jurisdictional challenge to a given claim first. <u>See</u> <u>Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n</u>, 896 F.2d 674, 678 (2d Cir. 1990).

**III.**

In this case, the Government argues that the plaintiffs'
claim for damages against Pompeo fails to state a claim under
Bivens and its progeny, and that the plaintiffs' claim for
injunctive relief against the CIA should be dismissed for lack
of standing and for failure to state a claim. The Court addresses
these issues in turn.

**A. Bivens Claim Against Defendant Pompeo**

The Government asserts that the plaintiffs' claim presents
a new Bivens context and that special factors preclude a Bivens
remedy in this case. The Court agrees.

The Supreme Court has established and recently upheld a
two-part test to determine whether a court may consider a Bivens
claim. First, courts must determine whether the claim arises in
a "new context" from the three Bivens claims previously
recognized by the Supreme Court. Egbert v. Boule, 596 U.S. 482,
490-91 (2022) (citing Carlson v. Green, 446 U.S. 14 (1980);
Davis v. Passman, 442 U.S. 228 (1979); Bivens v. Six Unknown
Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971)).
If the context is not new, the claim may proceed. However, if
the context is new, courts, in a second step, must consider
whether there are any "special factors counselling hesitation"
against extending Bivens to that context. Ziglar v. Abbasi, 582
U.S. 120, 136 (2017) (quoting Carlson, 446 U.S. at 18). "If

9

there is even a single reason to pause before applying <u>Bivens</u> in a new context, a court may not recognize a <u>Bivens</u> remedy." <u>Egbert</u>, 596 U.S. at 492 (quoting <u>Hernández v. Mesa</u>, 589 U.S. --, 140 S. Ct. 735, 743 (2020)). This inquiry arises out of the importance of upholding the separation of powers and deference to Congress's preeminent authority to determine by legislation whether a remedy should be created for the alleged unconstitutional conduct asserted. <u>See</u> <u>id.</u>; <u>see also</u> <u>Ziglar</u>, 582 U.S. at 135-36.

The plaintiffs' claim clearly arises in a "new context" under the first part of the test. What constitutes a "new context" is exceedingly broad; "even a modest extension [of <u>Bivens</u>] is still an extension." <u>Ziglar</u>, 582 U.S. at 147. "If the case is different in a meaningful way from previous <u>Bivens</u> cases decided by [the Supreme] Court, then the context is new." <u>Id.</u> at 139. The Supreme Court in <u>Egbert</u>, relying on <u>Correctional Servs. Corp. v. Malesko</u>, 534 U.S. 61, 68 (2001), explicitly noted that a case that involves a "new category of defendants" is an example of a "new context" for a <u>Bivens</u> claim. <u>Egbert</u>, 596 U.S. at 492. This case clearly involves a "new category of defendant." The relevant defendant is the Director of the CIA. Am. Compl. ¶ 20. As a presidential appointee confirmed by Congress, <u>id.</u>, Defendant Pompeo is in a different category of defendant from a law enforcement agent of the Federal Bureau of

10

Narcotics, see Bivens, 403 U.S. at 388. Accordingly, the plaintiffs in this case seek to extend Bivens to a new category of defendant and therefore a new context. Moreover, the Supreme Court has never extended Bivens to conduct that occurred abroad.

Turning to the second part of the test, the plaintiffs' claim also involves a "special factor counselling hesitation" against extending Bivens. Claims that arise in a new context are not necessarily precluded unless there are "special factors counselling hesitation" against extending Bivens to that context. Ziglar, 582 U.S. at 136. As with the "new context" test, what constitutes a "special factor" is interpreted broadly. See Egbert, 596 U.S. at 496 ("A court inevitably will impair governmental interests, and thereby frustrate Congress' policymaking role, if it applies the special factors analysis at such a narrow level of generality."). Where there is even the "potential" that "judicial intrusion into a given field might be harmful" courts cannot permit Bivens claims to proceed. Id. As the Supreme Court has made clear in recent years, one clear "special factor" is national security. Id. at 494 ("[A] Bivens cause of action may not lie where . . . national security is at issue."); see also Hernández, 140 S. Ct. at 746–47.

This case involves national security. Indeed, according to the plaintiffs' pleadings, two of the plaintiffs are journalists who report on "national security issues[,]" and the seized

information pertained to "national security . . . sources [who] might be in jeopardy if exposed." Am. Compl. ¶¶ 3-4, 47. Furthermore, during the relevant time period, Defendant Pompeo was the Director of the CIA, and that position is indisputably relevant to the issue of national security. See id. ¶ 22 (referencing an "April 2017 speech" made by Pompeo "as CIA Director" addressing "efforts by the United States government aimed at countries perceived to be hostile to U.S. interests"). Therefore, in addition to seeking to extend Bivens to a new context, the plaintiffs' claim raises a special factor counselling hesitation against extending Bivens.

The plaintiffs argue that the Court should nevertheless consider the Bivens claim because the alternative Congressional remedy available to them is inadequate. However, this argument is unavailing. The Egbert Court explained that "[s]o long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a Bivens remedy[,] even if a court independently concludes that the Government's procedures are not as effective as an individual damages remedy." 596 U.S. at 498. In this case, the CIA has an Office of Inspector General ("OIG") that "receive[s] and investigate[s] complaints or information from any person concerning the existence of an activity constituting a violation

12

of laws, rules, or regulations" 50 U.S.C. § 3517(e)(3); see also
Defs.' Mot. to Dismiss at 29, ECF No. 34. The OIG is a
"safeguard[] to prevent constitutional violations from
recurring." Egbert, 596 U.S. at 498. As a result, the
plaintiffs' argument that the CIA's OIG "provides no remedy for
Plaintiffs[,]" Pls.' Opp'n at 25, ECF No. 38, is unavailing. The
plaintiffs' argument that the CIA's OIG "cannot . . .
successfully remed[y]" violations because "OIG . . . works
directly with CIA leadership[,]" id. at 25-26, is also
unpersuasive. The Supreme Court found the Border Patrol's
internal grievance process -- which does not appear to be
conducted by a separate entity such as the OIG -- to be an
adequate alternative remedy. Egbert, 596 U.S. at 497-98.

Accordingly, the Government's motion to dismiss the
plaintiffs' first cause of action -- their Bivens claim against
Defendant Pompeo -- is **granted.** Because there is no Bivens claim
against Defendant Pompeo, it is unnecessary to reach the other
arguments for dismissal of the claim against Defendant Pompeo,
including qualified immunity.

### B. Claim for Injunctive Relief Against Defendant CIA

### 1. Standing

With respect to the plaintiffs' claim for injunctive relief
against the CIA, the Government initially argues that the
plaintiffs lack standing.

13

Article III standing requires that the plaintiff demonstrate that (1) the plaintiff has suffered an "injury in fact" that is "concrete and particularized" as well as "actual or imminent," rather than "conjectural or hypothetical;" and (2) the injury is "fairly traceable" to the challenged conduct; and (3) it is likely, rather than "merely speculative," that the injury will be redressed by a favorable decision. Lerman v. Bd. of Elections, 232 F.3d 135, 142 (2d Cir. 2000) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)). The "standing inquiry [is] especially rigorous when reaching the merits of a dispute [on] whether an action taken by one of the other two branches of the Federal Government was unconstitutional and in cases in which the Judiciary has been requested to review actions of the political branches in the fields of intelligence gathering and foreign affairs." ACLU v. Clapper, 785 F.3d 787, 800 (2d Cir. 2015) ("Clapper").

The Clapper decision makes it clear that the plaintiffs in this case have standing. In Clapper, the plaintiffs challenged the legality of the bulk telephone metadata collection program under which the National Security Agency ("NSA") collects in bulk on an ongoing daily basis the metadata associated with telephone calls made by and to Americans and aggregates those metadata into a repository that can later be queried. The Court of Appeals for the Second Circuit in that case rejected an

14

argument that the plaintiffs lacked standing to challenge that program. Id. at 801. The Government in this case argues that the "[p]laintiffs' alleged injuries are too speculative and generalized" because "[p]laintiffs do not allege that there is an imminent threat that the Federal Defendants will use information allegedly seized over five years ago to harm their clients and sources[,]" Defs.' Mot. to Dismiss at 9-10. Similarly, the Government in Clapper argued that the plaintiffs "lack standing because they have not demonstrated that any of the metadata associated with them have been or will be actually reviewed by the government, and have not otherwise identified an injury that is sufficiently concrete or imminent to confer standing." 785 F.3d at 800. The Court of Appeals held that "the government's argument misapprehends what is required to establish standing in a case such as this one." Id. at 801. "Whether or not [the plaintiff's Fourth Amendment] claims prevail on the merits, [the plaintiffs] surely have standing to allege injury from the collection, and maintenance in a government database, of records relating to them." Id. This is because "[a] violation of the Fourth Amendment is fully accomplished at the time of an unreasonable governmental intrusion." Id. (citing United States v. Verdugo-Urquidez, 494 U.S. 259, 264 (1990)) "If the telephone metadata program is unlawful, [the plaintiffs] have suffered a concrete and

particularized injury fairly traceable to the challenged program and redressable by a favorable ruling." Id.

In this case, the plaintiffs need not allege, as the Government argues, that the Government will imminently use their information collected at the Ecuadorean Embassy in London. The Fourth Amendment violation that the plaintiffs allege occurred when the plaintiffs visited Assange at the Embassy and the Government allegedly searched their electronic devices and seized data from the devices. Am. Compl. ¶ 57. If the Government's search (of their conversations and electronic devices) and seizure (of the contents of their electronic devices) were unlawful, the plaintiffs have suffered a concrete and particularized injury fairly traceable to the challenged program and redressable by a favorable ruling. See Clapper, 785 F.3d at 801; see also Janfeshan v. U.S. Customs & Border Prot., No. 16-cv-6915, 2017 WL 3972461, at *7 (E.D.N.Y. Aug. 21, 2017) (holding that, to find standing, the court "need not conclude that Janfeshan has established that a future search of his phone is certainly impending[;] [r]ather, Janfeshan has adequately alleged an injury in fact based on the ongoing effects of the previous search").

The Government argues that Clapper is distinguishable because the program at issue in Clapper was ongoing, whereas "the alleged searches and seizures [in this case] occurred more

16

than five years ago, and are not claimed to be ongoing." Defs.'
Reply at 2, ECF No. 42. However, drawing this distinction
misreads the holding in Clapper. Standing arose when the alleged
constitutional violation occurred and does not rely on a showing
that the Government will use the information collected during
the contested search and seizure. See Clapper, 785 F.3d at 801.

Accordingly, the plaintiffs have standing to bring their
claims against the CIA.[3]

## 2. Surveillance of the Plaintiffs' Conversations with Assange

The Court now turns to whether the plaintiffs have stated
plausible claims against the CIA. First, the Government contends
that the plaintiffs' claim against the CIA for surveilling their
conversations with Assange fails because the plaintiffs did not
have a reasonable expectation of privacy in those conversations
under the Fourth Amendment.

The Fourth Amendment protects the "right of the people to
be secure in their persons, houses, papers, and effects, against

---

[3] The Government cites to a case from the Central District of California to
argue that "[a]n injunction requiring the destruction of allegedly unlawfully
seized information is appropriate only when a plaintiff can plausibly allege
that the relevant information remains in the Government's possession and that
it will cause him concrete negative consequences if it is not destroyed."
Defs.' Mot. to Dismiss at 10-11, ECF No. 34 (citing Phillips v. United
States, No. 19-cv-6338, 2021 WL 2587961, at *8 (C.D. Cal. June 22, 2021)).
That case is distinguishable in that the "[p]laintiffs . . . ha[d] not
argued, or pointed to evidence [on a motion for summary judgment], suggesting
that Defendants collected records about them that are so sensitive that their
retention alone constitutes a continuing injury or produces a chilling effect
on their First Amendment-protected activity." Phillips, 2021 WL 2587961, at
*10. In this case, the plaintiffs seek injunctive relief to remedy a Fourth
Amendment violation, not a First Amendment violation. In any event, the
Phillips decision is not binding on this Court.

unreasonable searches and seizures." U.S. Const. amend. IV. "The touchstone of Fourth Amendment analysis is whether a person has a constitutionally protected reasonable expectation of privacy." California v. Ciraolo, 476 U.S. 207, 211 (1986) (citing Katz v. United States, 389 U.S. 347, 360 (1967)); see also Carpenter v. United States, 585 U.S. --, 138 S. Ct. 2206, 2219 (2018)) (finding that, "when the Government accessed [cell-site location information] from . . . wireless carriers, it invaded Carpenter's reasonable expectation of privacy in the whole of his physical movements."). Whether an individual has a reasonable expectation of privacy hinges on whether (1) the plaintiff "exhibited an actual (subjective) expectation of privacy" and (2) if the person's subjective expectation was "one that society is prepared to recognize as reasonable." Talarico v. Port Auth. of New York & New Jersey, No. 18-cv-909, 2022 WL 540956, at *2 (S.D.N.Y. Feb. 23, 2022) (citing United States v. Knotts, 460 U.S. 276, 281 (1983)), aff'd, No. 22-cv-0593, 2023 WL 2703625 (2d Cir. Mar. 30, 2023).

In this case, the plaintiffs did not exhibit an actual, subjective expectation of privacy in their conversations with Assange. The plaintiffs' complaint demonstrates that they knew Assange was surveilled even before the CIA's alleged involvement. The plaintiffs allege that, after contracting with the CIA, Morales sought to "significantly improve the quality of

18

surveillance of Assange's daily activities" and "better record
all conversations[.]" Am. Compl. ¶ 34 (emphasis added). The
plaintiffs' complaint details a public speech that Defendant
Pompeo gave towards the beginning of the relevant time period,
where Pompeo announced "a long term [counterintelligence]
campaign against WikiLeaks." Id. ¶¶ 21-26. Moreover, while the
plaintiffs allege that they would not "have brought their mobile
phones or other electronic devices into the Embassy had they any
knowledge that the Embassy security personnel were [seizing]
their . . . information[,]" id. ¶ 48, they notably do not allege
that they would not have met with Assange had they known their
conversations would be surveilled. Indeed, the plaintiffs do not
appear to contest that they were aware that there were security
devices at the Ecuadorean Embassy for the protection of Embassy
personnel and visitors -- only that they did not expect that
their conversations would be overheard and recorded by the CIA.
Pls.' Opp'n at 11-12. But the knowledge that their conversations
could be overheard by security personnel at the Embassy
indicates that they could not have expected that their
conversations with Assange would be private.

    In any event, an expectation of privacy in conversations
with Assange at the Ecuadorean Embassy in London would not be
recognized as reasonable by society. "[S]ociety has come to
accept a significant level of video surveillance . . . in . . .

government buildings . . . and all manner of public spaces."
United States v. Mazzara, No. 16-cr-576, 2017 WL 4862793, at *11
(S.D.N.Y. Oct. 27, 2017). "It is simply unreasonable for any
person to believe that their public conduct, as it might be and
often is recorded by one of those security cameras, nonetheless
should remain private from observation." Id.

To the extent that the plaintiffs specifically take issue
with the conversion of video security footage to audio
recordings,[4] that does not affect the outcome of the Court's
analysis. The Court of Appeals for the Second Circuit -- along
with the other courts of appeals that have considered the issue
-- explicitly struck down an "attempt[] to carve a
constitutional distinction between video and audio recordings."
United States v. Davis, 326 F.3d 361, 366 (2d Cir. 2003); see
also United States v. Brathwaite, 458 F.3d 376, 380 (5th Cir.
2006) ("[W]e are unable to find a constitutionally relevant
difference between audio and video surveillance[.]").

Accordingly, the Government's motion to dismiss the
plaintiffs' claim against the CIA with regard to the
surveillance of their conversations with Assange is **granted.**

---

[4] The plaintiffs allege that Morales and UC Global "converted video
surveillance of Assange to audio-video surveillance by placing hidden
microphones on new cameras[.]" Am. Compl. ¶ 36.

### 3. Photographs of Passports and Devices

Similarly, the Government argues that the plaintiffs' claim against the CIA for photographing their passports and devices must fail because the plaintiffs did not have a reasonable expectation of privacy in their passports or the appearance of their devices.[5]

"[A] person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." Smith v. Maryland, 442 U.S. 735, 743–44 (1979). That remains true "even if the information is revealed on the assumption that it will be used only for a limited purpose." United States v. Miller, 425 U.S. 435, 443 (1976). "As a result, the Government is typically free to obtain such information from the recipient without triggering Fourth Amendment protections." Carpenter, 138 S. Ct. at 2216. The Supreme Court has found that, where an individual voluntarily conveys information in the normal course of the information receiver's business, that person assumes the

---

[5] The plaintiffs raised for the first time at oral argument that photos of the International Mobile Equipment Identity ("IMEI") codes of the plaintiffs' mobile phones may deserve a higher level of protection than photos of the plaintiffs' mobile phones that do not include the IMEI number. Tr. at 39, ECF No. 73-1. The plaintiffs argue that the IMEI number for a phone is included inside the cover of the phone. The plaintiffs do not cite to any authority to support the proposition that the IMEI number is entitled to a heightened level of privacy protection. The Government cites to a case from the Eastern District of New York for the proposition that IMEI codes do not deserve increased protection even though they appear inside the cover of a phone. Tr. at 44-46; see also Defs.' Mot. to Dismiss at 17 (citing Ward v. Lee, No. 19-cv-3986, 2020 WL 6784195, at *8 (E.D.N.Y. Nov. 18, 2020) (collecting cases)). If the plaintiffs contend that their Fourth Amendment rights were infringed by the copying of IMEI numbers, they can raise the argument in an amended complaint.

risk that the information may be conveyed to the Government. See, e.g., Smith, 442 U.S. at 742 (holding that people do not have a reasonable expectation of privacy in the phone numbers they dial); Miller, 425 U.S. at 440 (holding that people do not have a reasonable expectation of privacy in bank records).

In this case, the plaintiffs "le[ft] their devices with the security guard at the Embassy reception desk[,]" and there is no suggestion that they did so involuntarily. Am. Compl. ¶ 38. In so doing, the plaintiffs voluntarily conveyed information about the outward appearance of their devices to Embassy security in the normal course of business -- that is, keeping the Embassy secure -- and assumed the risk that the information may be conveyed to the Government.

The plaintiffs also alleged in their complaint that UC Global implemented an extensive surveillance program that "surreptitiously copied and took images of the passports, including pages with stamps and visas, of all visitors . . . ." Id. ¶ 36. However, in their specific claim for injunctive relief against the CIA, the plaintiffs refer to the actions of the CIA in (i) seizing the plaintiffs' electronic devices, copying their contents and maintaining the information and (ii) monitoring and recording the plaintiffs' visits with Assange. Id. ¶ 57. The plaintiffs do not specifically claim that the plaintiffs' Fourth Amendment rights were violated when the contents of their

passports were copied, and, in any event, the plaintiffs had no
reasonable expectation of privacy in the content of their
passports. They voluntarily disclosed the passports to the
security personnel at the Embassy as they would voluntarily do
at airports around the world. See, e.g., United States v.
Segall, 589 F. Supp. 856, 858 (S.D. Fla. 1984). Accordingly, the
Government's motion to dismiss the plaintiffs' claim against the
CIA with regard to the photographs of their passports and
devices is **granted**.

**4. Copying of the Contents of the Plaintiffs' Electronic Devices**

Finally, as to the copying of the plaintiffs' electronic
information, the Government first argues that the plaintiffs
insufficiently alleged that Morales and UC Global were acting as
agents of Pompeo and the CIA. However, the plaintiffs made
sufficient allegations that Pompeo and the CIA, through Morales
and UC Global, infringed upon their constitutionally protected
expectation of privacy. Whether Morales and UC Global were
indeed acting as agents of Pompeo and the CIA is a question of
fact that cannot be decided on a motion to dismiss.

Rather, on a motion to dismiss, the Court must consider
whether the plaintiffs' complaint "contain[s] sufficient factual
matter . . . to state a claim for relief that is plausible on
its face" and "allows the court to draw the reasonable inference
that the defendant is liable for the misconduct alleged." Iqbal,

556 U.S. at 678. In this case, the misconduct alleged is a
violation of the plaintiffs' reasonable expectation of privacy
in the contents of their electronic devices under the Fourth
Amendment. The Government concedes that the plaintiffs had a
right to privacy in the contents of their electronic devices.
See Defs.' Mot. to Dismiss at 16 n.6 (citing Riley v.
California, 573 U.S. 373, 401 (2014) ("[A] warrant is generally
required before . . . search[ing] [the contents of a cell
phone], even when a cell phone is seized incident to arrest.")).

The plaintiffs' complaint contains sufficient allegations
that the CIA and Pompeo, through Morales and UC Global, violated
their reasonable expectation of privacy in the contents of their
electronic devices. In an April 2017 speech, Pompeo "pledged
that his office would embark upon a 'long term' campaign against
WikiLeaks." Am. Compl. ¶ 26. The plaintiffs allege that Pompeo
and the CIA recruited Morales to conduct surveillance on Assange
and his visitors at a January 2017 private security industry
convention at the Las Vegas Sands Hotel in Las Vegas, Nevada.
Id. ¶¶ 29-30, 33. Shortly after returning from the Las Vegas
convention, Morales created an operations unit and improved UC
Global's systems to implement the alleged agreement with the
CIA. Id. ¶¶ 34-35. Copying the contents of the plaintiffs'
electronic devices was part of this alleged agreement. Id. ¶¶
34, 41, 57. Additionally, the plaintiffs allege that the data

collected by UC Global was either personally delivered to Las
Vegas; Washington, D.C.; and New York City by Morales (who
traveled to these locations more than sixty times in the three
years following the Las Vegas convention) or placed on a server
that provided external access to the CIA. Id. ¶¶ 39-40.

The Government also initially argued that the plaintiffs
failed to allege that the seizure of the contents of their
electronic devices was not conducted pursuant to a warrant. See
Defs.' Mot. to Dismiss at 20-22. At oral argument, the
Government conceded that the plaintiffs could amend their
complaint to allege the absence of a warrant and that such an
amendment would overcome the Government's argument. See Tr. at
22, 23, ECF No. 73-1. As a result, the Court provided the
plaintiffs the opportunity to file a letter amending the
complaint. ECF No. 72. The plaintiffs then filed a letter
amending the complaint by pleading in a new paragraph 36A that
"[u]pon information and belief, Defendants' search and seizure
of the contents of Plaintiffs' electronic devices was conducted
without a warrant. . . ." Pls.' Letter, ECF No. 73. The
plaintiffs' application to add paragraph 36A is granted. The
Government responded to confirm that "the proposed amendment
resolves . . . the Federal Defendants' argument[] in its motion
to dismiss[] that plaintiffs' allegation of the illegality of

the claimed searches of their electronic devices is conclusory."
ECF No. 74.

Therefore, the Government relies only on its arguments that
the plaintiffs lacked standing to sue the CIA for injunctive
relief and that the plaintiffs allegedly failed to demonstrate
that the CIA controlled and directed the actions of the foreign
persons who allegedly conducted the searches. Id. The Court has
already rejected those arguments. Accordingly, the Government's
motion to dismiss the plaintiffs' claim against the CIA with
regard to the seizure of the contents of the plaintiffs'
electronic devices is **denied.**

**CONCLUSION**

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, the defendant's motion to dismiss the plaintiffs' amended complaint is **granted in part** and **denied in part**. The Clerk is directed to close ECF No. 34.[6]

**SO ORDERED.**

Dated:    **New York, New York**
          **December 19, 2023**

                                        **John G. Koeltl**
                           **United States District Judge**

---

[6] The plaintiffs had sought an opportunity to amend their complaint. It is unclear in view of the Court's disposition whether the plaintiffs still seek an opportunity to amend their complaint. If the plaintiffs seek to amend their complaint yet again, they should make an appropriate motion within fourteen days of the date of this Opinion explaining why any further amended complaint would cure any defects in the current complaint.