PRIVILEGED AND CONFIDENTIAL – WITNESS 2

Affidavit presented before notary public

I have made this affidavit so that it can be presented before the judiciary. I intend that my explanation of facts be put before the authorities and I understand that it may contain activities that are considered to be illicit. I never participated in illicit acts, nor did I intend to participate in such acts nor was I aware of them. That is why, despite being subjected to a confidentiality agreement, I am now putting these facts before the justice system. However, as a prior necessity I require the status of a protected witness, given that with this information, as well as the documentation that I am providing, my family and I will be put at risk.

I have decided to communicate this information as a result of recent events, specifically the detention of Mr. Assange and the revelation of a criminal prosecution in the United States against him resulting in an extradition process that is currently underway. When this information came to light I realised that the facts that I shall relate in this document make sense, and this is the reason why, now that I am aware of the relevance of these facts, I have decided to make Mr Assange's defence attorneys aware of them so that they can be used in a legal context in whichever manner is most appropriate.

I joined the company UC Global in  2015. The sole administrator and director of UC Global has always been David Morales.

I remember that after David Morales had returned from the United States, at a meeting with the rest of the staff he affirmed that we were moving into "the premier league". After this I became aware that David Morales was making regular trips to the United States, the context of which my boss, David Morales, repeated to his having "gone to the dark side". I also recall Morales's wife's social media recording the recurring trips to the United States, specifically to New York and Washington, via her Instagram account (with the profile @moda_koko), which prompted ongoing commentary from staff that Mr Morales could be cooperating with US authorities.

On 24 January 2017, once Donald Trump had acceded to the presidency of the United States, David Morales sent a message over Telegram in which he wrote, "Well, I want you to be alert because I am informed that we are being vetted, so everything that is confidential should be encrypted […] That's what I'm being told. Everything relates to the UK issue. I am not worried about it, just be alert […] The people vetting are our friends in the USA". At the time I didn't understand why Morales was asking me to be careful, but over time this message made more sense. I possess these messages as evidence.

I remember that Sheldon Adelson himself – who is on the public record as being very close to President Donald Trump—increased his ties with UC Global because at one point David Morales was personally put in charge of the security of the magnate and his children when they visited Europe, in their Summer trips to Nice and Ibiza.

I also recall that once Donald Trump won the elections, at the end of 2016, the collection of information intensified as Morales became more obsessed with obtaining as much information as possible. Hence, I recall that between June and July 2017, I was summoned by David Morales to form a task force of workers at our headquarters in Jerez. The purpose of this unit was to execute, from a technical perspective, the capture, systematization and processing of information collected at the embassy that David Morales requested. So, I was tasked with executing David Morales's orders, with the technical means that existed in the embassy and additional measures that were installed by order of Morales, in addition to the information gathered by the UC Global employees who were physically present in the diplomatic mission. This unit also had to travel to London every month to collect information.

Coinciding with the new procedure to obtain information to meet the escalating needs of Morales, which coincided with Trump's accession to the US presidency, David Morales indicated to the task force, of which I was a member, that the contract with Ecuador required that the cameras had to be changed every three years. This made no sense to me because the contract had been in force for longer than three years and the clause had not been fulfilled to date, although I was not aware of the clause, I considered that its existence was not a reasonable justification. The circuit that was in operation at the time consisted of CCTV security cameras, which obviously did not record sound, were sufficient to provide physical security against intrusion inside the building. As evidence of this, I provide a message from 10 May 2017 in which a report is required concerning the cameras in the embassy.

David Morales asked me explicitly – in my role as a member of the task force – to contact providers that sell security cameras with sophisticated audio recording capabilities. He even indicated that insofar as possible, the cameras should not show that they are recording sound, or at least that the appearance of the cameras should not show that they are recording sound. Because of this, and in accordance with the orders of David Morales, who claimed that all of this was necessary to fulfil the contract, I sought providers for these types of cameras, insisting in, to the extent possible, concealing audio-recording capabilities.

In early December 2017, I was instructed by David Morales to travel with a colleague to install the new security cameras. I carried out the new installation over the course of several days. I was instructed by Morales not to share information about the specifications of the recording system, and if asked to deny that the cameras were recording audio. I was told that it was imperative that these instructions be carried out as they came, supposedly, from the highest spheres. In fact, I was asked on several occasions by Mr. Assange and the Political Counsellor Maria Eugenia whether the new cameras recorded sound, to which I replied that they did not, as my boss had instructed me to do. Thus, from that moment on the cameras began to record sound regularly, so every meeting that the asylee held was captured. At our offices in UC Global it was mentioned that the cameras had been paid for twice, by Ecuador and the United States, although I have no documentary evidence to corroborate this assertion.

To prove the fact of the installation I have numerous photos of the installation of the new camera system, as well as copies of recordings that were made by the cameras which show that they were recording sound.

Around June 2017, while I was sourcing providers for the new camera equipment, David Morales instructed that the cameras should allow streaming capabilities so that "our friends in the United States", as Morales explicitly put it, would be able to gain access to the interior of the embassy in real time. This request alarmed me greatly, and in order to impede the request, I claimed that remote access via streaming the camera circuit was not technically achievable. David Morales continued to insist that we must proceed to open the circuit "for the Americans", and soon after Morales emailed me a Powerpoint document. This document was in English and contained instructions in minute detail of how to capacitate the system for remote access via streaming. Obviously, Morales did not have such technical knowledge, so the document must have been supplied by a third party. I suspect that it could have been US intelligence, given that it was in English. Once more, I refused, this time alleging that it was manifestly illegal, and therefore could not be a requirement of the contract, while also attempting to persuade Morales as a means of dissuading him that this would clearly be discovered by Mr. Assange, as I knew that this argument would restrain Morales. I did this because I did not want to collaborate in an illegal act of this magnitude.

In addition to this, around January 2018 David Morales asked me to travel to London to install microphones in the embassy. I asked him if it was legal, Morales responded that he was the boss that the responsibility fell on him as he was the one with knowledge of the contract and who was responsible for the security. Morales instructed me to place a microphone in the meeting room, placed in the PVC holder of the fire extinguisher in the meeting room, where it was glued to a magnet and then concealed at the base of the PVC plastic.

Further to this, David Morales asked me to install a another microphone, in the toilet at the end of the embassy, a place that had become strategic because Mr. Assange, who suspected that he was the subject of espionage, maintained many of his meetings there in order to preserve confidentiality. I also challenged Morales on this instruction, to which Morales responded that he was the boss and the person who knew the elements of security that had to be installed in order to fulfil the contract. I used a nearby socket to conceal a microphone in a cable in the toilet in the back of the embassy.

As evidence of this I possess the microphone that was installed in the meeting room. In respect of the microphone that was installed in the toilet, this was never removed, and may still be there. I also have several recordings captured by the microphones, the recordings show that the microphones recorded continuously. Furthermore, I also possess photos of the fire extinguisher from the meeting room of the embassy which carried the magnetized microphone concealed by the PVC base in which it was placed. I also have numerous pictures of the ladies' bathroom, which were taken in order to determine which elements could be used to place a microphone.

When I returned in January 2018, David Morales commented openly that "our American friends" had asked him to install microphones throughout the embassy, but they asked him to carry out this task himself, without anyone's help. This is when I realised that the two microphones that had been installed already had been deployed as part of Morales' dealings with US intelligence and that he had deceived me in order to have me install them. Specifically, Morales told several staff, among them myself, that he intended to place the microphones in all the fire extinguishers in the embassy (attached with a magnet to the PVC base of the fire extinguishers) the reasoning of which was that, given that fire extinguishers were needed in each of the rooms of the embassy, this way one could be introduced in the room occupied by the asylee, Mr. Assange, which would allow the entire embassy to be bugged. Once again, I challenged Morales on the legality of these measures and I tried to dissuade Morales indicating that, in addition to it being completely illegal, installing microphones at this scale would be discovered for sure, to attempt to dissuade him from carrying out such a crazy act. As a result, and as far as I am aware, this plan was not executed.

David Morales indicated that the purpose of installing the microphones, as per the request of the United States, was for the microphones and cameras which were situated in places like the meeting room to record the meetings that Assange has with his visitors, but especially those of his defence attorneys and, very specifically, the coordinator of his legal defence Baltasar Garzon. Morales subsequently stated that gathering information on Garzon should be prioritised, the security guards at the embassy were requested to search for evidence of travels to Argentina and Russia in Garzon's passport pages, which were photographed.

David Morales also indicated that the aim was that the surveillance, control of information and recordings should focus on the meetings of the asylee, especially those in which he was meeting with his lawyers, who were priority targets, so the security personnel that were physically deployed in the embassy were specifically asked to monitor these meetings of Assange with his lawyers, as this was required by our "US friends". Morales always ended these instructions commenting that he was the only one who had full knowledge of the contract and who knew the measures that were necessary to take in order to fulfil it.

When I travelled to install the cameras in December 2017, David Morales asked me to take pictures of the base, profile, and height of various decorative objects in the meeting room. Thus, following Morales' instruction, without knowing what the purpose was, I took these photos. When I returned to Jerez, once I was in the UC Global headquarters, David Morales revealed that he was going to have them copied in Spain so that microphones could be concealed inside them, which I once again forcefully challenged. As far as I am aware, these measures were not taken either.

To prove the above, I have a number of photos decorative objects that were in the meeting room which David Morales intended to replicate in order to insert said microphones.

I am aware that at one point David Morales asked the security personnel employed by UC Global who were deployed inside the embassy to obtain Mr. Assange's fingerprints. As far as I am aware,

4

his fingerprints were obtained from his imprint on a glass used by Mr. Assange. The information relating to the asylee's fingerprints were then handed to David Morales. I am also aware that the security personnel at the embassy stole documentation from Mr. Assange. A calligraphic analysis was commissioned which David Morales also obtained. It is clear to me that both the fingerprints and the calligraphic report must have been requests from US intelligence to David Morales.

In the same trip in December 2017 in which I installed the new cameras, David Morales asked me to steal a nappy of a baby which, according to the company's security personnel deployed at the embassy, regularly visited Mr. Assange. Morales stated that I had to steal the nappy in order to establish whether the baby was a child of the asylee's. On this occasion, Morales expressly stated that "the Americans" were the ones who wanted to establish paternity. Confronted with this situation, when I arrived in London, rather than execute what had been asked of me by Morales, I approached the mother of the infant outside the embassy and indicated that she should not bring the child into the embassy because there was a plan to steal the baby's nappies to establish whether the child was Julian Assange's.

At another point, in January 2018, David Morales told me that for my next visit to the embassy of Ecuador in London I should place certain stickers on all the external windows of the embassy. Specifically, he requested that I place them in the top left corner of all the windows. The stickers were rather rigid. They indicated that CCTV was in operation. I found this strange, because there had been a closed-circuit system for several years, and it didn't make sense to now have to advertise this on the windows of the embassy. Nonetheless, during my visit to London I placed the stickers that had been supplied in the upper left-hand corner of the windows of the embassy, following the instructions of David Morales. When I returned to Jerez, Morales explained that "our American friends" had laser microphones outside the embassy, which were directional and pointed at the windows and extracted noise, allowing them to capture all conversations. However, as David Morales stated openly, due to the fact that Mr. Assange used a white noise machine (to make it difficult to obtain sound recordings) which produced a vibration in the window that stopped the sound being extracted via the laser microphone which US intelligence had installed outside. Thus, Morales had revealed when I returned that those stickers, which had been supplied by "our American friends", having been placed in the upper left-hand side of each of the windows, eliminated the vibration allowing the laser microphones to point to the stickers to extract conversations. I confronted Morales for not having indicated the purpose of placing the stickers.

In addition to the above, I have knowledge of the fact that David Morales had received explicit requests for information, which stated on several occasions that these requests came from the US, in the form of a list of targets which were communicated via email, telephone and verbally. The security personnel deployed in the embassy were instructed to pay special attention to these targets. Among them, special attention had to be given to Mr. Assange's lawyers. The security personnel had to write detailed profiles of these targets, photographing their documentation, the electronic equipment that had to be left at the entrance of the embassy, and as far as possible, the visitors' conversations with the asylee listened to. In some cases, this involved following them, tracking their every move and carrying out detailed reports of each of the visits of these targets which had to be immediately sent back to the headquarters of UC Global in Jerez.

As evidence of the above I have several emails in which the targets to be followed are details, pictures from the company of these targets, the register and daily reports that were carried out and photos of the equipment of the targets which were handed to security personnel when visitors entered the embassy, which was stipulated as a requirement of the security protocol.

Specifically, I recall that during the initial months of 2016 during one of my first visits to the embassy of Ecuador in London, one of the members of UC Global who was deployed in the embassy showed me an iPad of one of the lawyers, who at the time was meeting with Mr. Assange and who had left this equipment with the guard upon entering the embassy, which had many messages and emails in the home screen. I do not remember the name of that lawyer, but I know he spoke English and that later, after seeing a number of pictures, I believe with 99% certainty is a man by the name of Guy Goodwin Gill. I remember that after this, once I had returned to Jerez, I was told that the contents of the iPad had been copied.

On a different occasion, I recall having seen reports that had been sent from the embassy in which UC Global security personnel deployed there had opened a suitcase of Andy Muller and photographed all his electronic equipment. Andy Muller is a personal friend of Assange, an IT specialist and a freelance journalist for various publications and he had left his belongings in the entrance, fulfilling the requirements of the security protocols. Muller was one of the targets that David Morales had instructed had to be prioritised, on behalf of US intelligence.

As evidence of this, I have several photos of the belongings of Muller, which were included in one of the security reports.

I also have to indicate that at one point, at the end of 2017, the company learned Mr. Assange would receive a diplomatic passport from Ecuadorian authorities, with the aim of leaving the embassy to transit to a third state. I recall that the security personnel of UC Global deployed at the embassy were closely monitoring the then Consul of Ecuador, Fidel Narvaez, who was in charge of the relevant documentation with which he entered and exited the embassy.

I also recall David Morales saying in the office that the Americans were very nervous about a Californian politician who was going to the embassy of Ecuador in London to meet with Mr. Assange. According to Morales, the Americans had asked Morales to personally control and monitor absolutely everything that had to do with that visit. Thus, from the company headquarters in Jerez, I recall that Morales gave an explicit order to the security personnel to record everything that occurred during that visit.

I recall that at the end of November 2017, David Morales told the company workers that the Americans were very happy with the information that we had supplied, but that they would need more. To this end, Morales spoke about the possibility of entering the legal offices of ILOCAD, the law firm which is headed by Baltasar Garzon in Madrid, given that Mr. Garzon coordinated the legal

defence of Julian Assange. This would allow us to obtain information concerning Mr. Assange for the Americans. Two weeks after this conversation, the national media reported that men in balaclavas had entered Garzon's law offices. I recall that the news was shared amongst the employees in the Jerez office, and we speculated whether this could have to do with what our boss, David Morales had suggested.

All the requests of surveillance, following and capturing communications in relation to Baltasar Garzon, came from the Americans, according to David Morales. Garzon was a primary objective because of the fact that he was Julian Assange's defence attorney.

I recall that on one occasion, in Jerez de la Frontera, at the UC Global headquarters, around December 2017, David said that the Americans were desperate and that they had even suggested that more extreme measures should be employed against the "guest" to put an end to the situation of Assange's permanence in the embassy. Specifically, the suggestion that the door of the embassy could be left open, which would allow the argument that this had been an accidental mistake, which would allow persons to enter from outside the embassy and kidnap the asylee; even the possibility of poisoning Mr. Assange was discussed, all of these suggestions Morales said were under consideration during his dealing with his contacts in the United States. Obviously, we employees were shocked at these suggestions and commented amongst ourselves that the course that Morales had embarked on was beginning to become dangerous.

Morales also instructed that Baltasar Garzon should be followed, as per the instructions of his contacts in the United States, as Morales had received information that Mr. Garzon would be meeting with the former president of Ecuador, Rafael Correa. I recall seeing photographs of Garzon from the operation to follow him, instructed by Morales.

As evidence of this, I possess numerous photos taken with a mobile phone of Mr. Garzon when he collected the former president of Ecuador, Rafael Correa, from Madrid Barajas airport, as well as pictures of the home of Baltasar Garzon, Julian Assange's lawyer.

As I have explained already, it was obvious that all this escalated after mid-2017, coinciding with Donald Trump's accession to the presidency. All the documentation obtained through the espionage deployed by Morales against the asylee was transmitted to the United States through two channels. Firstly, the daily reports by the security personnel of the embassy, the profiles of the targets, the identity documents of the visitors and other information that had been obtained through the embassy, was copied onto servers which the US had remote access to. Secondly, the recordings of the cameras with sound that were installed in the embassy were saved onto hard drives that were extracted every 15 days, together with the recordings from the microphones, these were then personally transported by David Morales on his regular trips to the United States.

In respect of the servers, David Morales requested that an FTP server be installed for remote access and external transfer accessible via a username and password. I personally installed the FTP server and I was able to confirm that the server was indeed accessed remotely from the United States, IP addresses were recorded as a result, which I still have in my possession. This FTP Server stored the daily security reports that UC Global employees deployed at the embassy carried out, which surveilled Mr. Assange in detail, as well as his visitors, and the targets, including all the relevant information such as their identity documents. I recall that at first, these daily reports, which were stored in the FTP server were signed by the security personnel using their respective pseudonyms but that at one point David Morales told me that he had been told that these should be signed with the real name and surname of the employee, although I did not understand why there was this need. Later on, David Morales asked for this FTP Server to be replaced by an online web database, which could be accessed remotely via username and password.

As evidence of the above, I have the IP addresses that were registered in the FTP Server registry from the United States, and many of the security reports stored that had been provided by the UC Global employees deployed at the embassy. I also have the identity documents which were included in the profiles contained in the server. I also have the email in which David Morales asks that special attention be paid to a set of objectives that would have been identified by the Americans, among whom are his lawyers.

Furthermore, the recordings of the security cameras which by now were recording sound, as well as the recordings from the microphones, were managed in person. I was instructed by David Morales to travel to the embassy of Ecuador in London every 15 days to change the hard drives of the camera servers. I had to go every fortnight because after 15 days, the system began to overwrite itself, given that the storage had a 15 day maximum storage capacity. I have to emphasise that David Morales always required me to take the original recordings from the cameras, never copies, I assume as a requirement by the Americans. In fact, on a couple of occasions, Ecuadorian authorities requested a recording which meant that David Morales had to travel to the United States to ask for the original recordings. Thus, the recordings from the security cameras and of the microphones, once they reached Jerez, were then taken personally by David Morales to the United States in regular trips, in which Morales often travelled with his wife, through whose social media profile (@modas_koko) their regular trips can be observed. Furthermore, while Mr. Morales was in meetings with his contact in the United States, he would write to us employees in chat groups, on Signal, Telegram or Therman, in which he asked for further details about certain visits or details about the recordings, saying that "our American friends are asking me to be more specific on…", given that Morales didn't know about the details to the same level as the employees. Although these chat groups were configured to auto-destruct, at some point I did screen captures in order to remind myself of instructions, so as a result I still have some of those in which it is clear that David Morales was communicating while he was in meetings handing over the material.

As evidence of this, I have screenshots of the chats, as related above. I also have emails which contain some of these instructions.

8

David Morales wrote in his emails that SENAIN was investigating him due to his travels to the United States, he also asked for the composition of the walls of the embassy, and even said that nobody could learn about his relationship with the Americans.

As evidence of this, I possess emails with the abovementioned comments.

A further relevant element is that the headquarters of UC Global in Jerez received Gabriela Paliz Jerez on a monthly basis. She was the person responsible for security in the embassy of Ecuador in London, and is an Ecuadorian functionary. When she visited UC Global in Jerez she was always accompanied by her husband, whose name I do not know. All the employees were aware of these visits given that they witnessed the couple appear on a monthly basis to meet with David Morales. It was said in the office that it was fundamental for David Morales to keep the embassy contract, probably not so much for the amount paid by Ecuador per se, but rather for the possibility of incrementing profits via his relationship with the United States. It was discussed among the employees that David Morales would have been paying 20,000 euro a month to the person who was in charge of embassy security to avoid their making negative reports about UC Global, as such reports would put the contract at risk. The person in charge of security would travel with her husband in order to divide the cash payment of EURO 10,000 each in order to avoid problems when going through customs at the airport, as was commented onn the company.

During those months, between mid-2017 and mid-2018 (when the contract with UC Global came to an end), David Morales displayed a noticeable increment in his assets. He acquired a new home, the value of which I do not know but I estimate could cost approximately EURO 1 million. He also acquired high-end vehicles. In the company, it was said that he was paid EURO 200,000 a month by the United States. During those months, the employees speculated that he might be storing the money he had received illegally in bank entities in Gibraltar. In fact, we observed that David Morales often travelled to Gibraltar, which is relatively close to Jerez and which is considered by the Spanish jurisdiction to be a tax haven because it typically does not cooperate in identifying assets. On one occasion at our office headquarters, a client of UC Global, whose name I do not know, commented in front of me that David Morales was "tight-fisted", because Morales had tried to "launder EURO 70,000 in Gibraltar", and that to carry out this operation "Morales had been asked for a 10% commission in Gibraltar to launder it and Morales had refused".

Finally, I recall that at the end of 2018 there was a request to the company by ILOCAD SL, Baltasar Garzon's law firm, requesting on behalf of Mr. Assange on the basis of the new EU General Data Protection Regulation that the company inform what material it possessed relating to Mr. Assange, given that some images had been leaked to various media organisations like The Guardian. At that point, Morales proceeded to remove all the material from "Operation Hotel" (the name that was given to the security contract of the embassy) as well as all the material relating to the "guest" (the codename for the asylee). According to some workers in the company, the material was stored by Morales in his two homes in Jerez, or the home of his father-in-law in Rota, according to what was being said in the company.

9