```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────────

MARGARET RATNER KUNSTLER, ET AL.,
                    Plaintiffs,           22-cv-6913 (JGK)

     - against -                          MEMORANDUM OPINION
                                          AND ORDER
CENTRAL INTELLIGENCE AGENCY, ET
AL.,
                    Defendants.
───────────────────────────────────
```

**JOHN G. KOELTL, District Judge:**

The plaintiffs-Margaret Ratner Kunstler, Deborah Hrbek, John Goetz, and Charles Glass-brought this action against the Central Intelligence Agency ("CIA") and Michael R. Pompeo ("Pompeo"), (collectively, "the Government"), David Morales Guillen ("Morales") and Undercover Global S.L. ("UC Global"), alleging in relevant part that the Government copied the contents of the plaintiffs' electronic devices when the plaintiffs visited WikiLeaks founder Julian Assange ("Assange") at the Ecuadorian Embassy in London. The plaintiffs allege that the defendants thereby violated the plaintiffs' Fourth Amendment rights. The Government now asserts the state secrets privilege and moves to dismiss the plaintiffs' only remaining claim. For the following reasons, the motion to dismiss is **granted**.

I.

Unless otherwise indicated, the following facts are taken from the Amended Complaint and are accepted as true for the purposes of deciding this motion. The Court also assumes

familiarity with the Court's prior decision granting in part and denying in part the defendants' motion to dismiss, including that decision's extensive description of the facts and procedural history of this case. See Kunstler v. CIA, No. 22-cv-6913, 2023 WL 8776339 (S.D.N.Y. Dec. 19, 2023).

The plaintiffs allege that, between January 2017 and March 2018, Pompeo and the CIA recruited UC Global and its founder and Chief Executive Morales—who were contracted to provide security for Assange at the Ecuadorian Embassy—to "obtain confidential information in the possession of the [p]laintiffs concerning Assange, his legal cases and the [p]laintiffs themselves." Am. Compl. ¶¶ 1, 27-28, ECF No. 27.[1] In particular, the plaintiffs allege that Morales was recruited to conduct surveillance on Assange and his visitors on behalf of the CIA. Id. ¶¶ 29-30.

During the relevant time period, each of the plaintiffs visited Assange at the Embassy with permission from the Ecuadorean authorities. Id. ¶ 37. During these visits, the plaintiffs were required to leave their electronic devices with the security guard at the Embassy reception desk. Id. ¶ 38. The plaintiffs allege that the CIA and Pompeo approved, and UC

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, omissions, emphasis, quotation marks, and citations in quoted text.

Global implemented, an extensive surveillance program that, as most relevant to this motion,

> seized, dismantled, imaged, photographed and digitized the computers, laptops, mobile phones, recording devices and other electronics brought into the Embassy by the plaintiffs, including but not limited to IMEI and SIM codes, fronts, backs and insides of visitors' devices, [and] downloaded stored material.

Id. ¶ 36.

The CIA and Pompeo moved to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). See ECF No. 34. The Court dismissed all but one of the plaintiffs' claims, concluding that the plaintiffs could not pursue a Bivens action against Pompeo, and that the plaintiffs lacked a reasonable expectation of privacy in their conversations with Assange and in their passports. See Kunstler, 2023 WL 8776339, at *5, *7-8. The Court declined to dismiss the plaintiffs' final claim—that copying the contents of the plaintiffs' electronic devices violated the plaintiffs' Fourth Amendment rights. See id. at *8-9. Accordingly, the only remaining claim in this case is for injunctive relief against the CIA relating to the alleged seizure of the contents of the plaintiffs' electronic devices.[2]

---

[2] Defendants Morales and UC Global have not appeared in this action and Clerks' Certificates of Default were entered against each of them. See ECF Nos. 50, 62.

The Government now asserts the state secrets privilege and moves to dismiss the remaining claim on the grounds that continuation of this litigation "would be inimical to national security." Zuckerbraun v. Gen. Dynamics Corp., 935 F.2d 544, 546 (2d Cir. 1991). The Government also invokes the CIA's statutory privileges pursuant to the National Security Act of 1947, 50 U.S.C. § 3024(i)(1), and the Central Intelligence Agency Act of 1949, 50 U.S.C. § 3507, to the prevent the unauthorized disclosure of intelligence sources, methods, and activities.

In support of the Government's motion, then-CIA director William J. Burns ("Burns") filed a declaration ("Public Burns Decl."), formally asserting the state secrets privilege on the grounds that "either admitting or denying that CIA has information implicated by the remaining allegations in the Amended Complaint reasonably could be expected to cause serious— and in some cases, exceptionally grave—damage to the national security of the United States." Public Burns Decl. ¶ 9, ECF No. 87. Director Burns further affirmed that he did not "assert the privilege to conceal violations of law, inefficiency, or administrative error; to prevent embarrassment to a person, organization, or agency; or to prevent or delay the release of information that does not require protection in the interest of national security." Id. ¶ 12.

Burns determined that the complete factual basis for the assertion of the state secrets privilege and the statutory privileges could not be set forth on the public record and so "separately submitted a classified in camera, ex parte declaration for the Court's review that more fully defines the scope of information herein described and explains the harm to national security that reasonably could be expected to result from the unauthorized disclosure of such classified information." Id. ¶¶ 9, 11. The Court has reviewed the Government's in camera, ex parte declaration as well as the classified supporting memorandum.

**I.**

The state secrets privilege is a "common law evidentiary rule that allows the government to withhold information from discovery when disclosure would be inimical to national security." Zuckerbraun, 935 F.2d at 546; see also United States v. Reynolds, 345 U.S. 1, 7–11 (1953) (first recognizing the state secrets privilege). The privilege should not be invoked lightly. See Reynolds, 345 U.S. at 7. However, once successfully invoked, "the state secrets privilege is absolute. No competing public or private interest can be advanced to compel disclosure

of information found to be protected by a claim of privilege." Ellsberg v. Mitchell, 709 F.2d 51, 57 (D.C. Cir. 1983).

The Second Circuit Court of Appeals applies a three-step inquiry to evaluate assertions of the state secrets privilege. First, courts must determine whether the Government has satisfied the privilege's procedural prerequisites. Doe v. CIA, 576 F.3d 95, 104 (2d Cir. 2009). Second, courts must evaluate the validity of the assertion of privilege. See id. Third, courts must "address the effect of an invocation of the privilege," on the survival of the plaintiff's claims. Id. The Court will now address each of those elements in turn.

**A.**

First, to invoke the privilege, the Government must satisfy certain procedural requirements. In particular, "the Government must submit to the court a formal claim of privilege." United States v. Zubaydah, 595 U.S. 195, 205 (2022). Only the Government may invoke the privilege, and the privilege must be asserted "by the head of the department with control over the matter in question after personal consideration by that officer." Zuckerbraun, 935 F.2d at 546; see also Reynolds, 345 U.S. at 7-8.

In this case, the Government has satisfied the procedural prerequisites to the invocation of the state secrets privilege. In his public declaration dated March 27, 2024, Burns—then the

6

"head of the department with control over the matter in question"—formally invoked the privilege on behalf of the Government, after personal consideration of the matter. See Zuckerbraun, 935 F.2d at 546; Public Burns Decl. ¶¶ 6-8.[3]

**B.**

Second, the district court must "assess the validity of the claim of privilege, satisfying itself that there is a reasonable danger that disclosure of the particular facts in litigation will jeopardize national security." Zuckerbraun, 935 F.2d at 546-47. The district court must determine for itself whether the claim of privilege is appropriate and "[j]udicial control over the evidence in a case cannot be abdicated to the caprice of executive officers." Reynolds, 345 U.S. at 9-10. However, courts should also "exercise the traditional reluctance to intrude upon the authority of the Executive in military and national security affairs." Zubaydah, 595 U.S. at 205.

The Supreme Court has adopted a sliding scale to evaluate "how far the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate." Id.

---

[3] Director Burns asserted the state secrets privilege as then-director of the CIA in his unclassified declaration dated March 27, 2024, supported by his classified, ex parte declaration. That a new director of the CIA has since been sworn in does not affect the validity of the invocation of the state secrets privilege or the cogency of the justification provided by the then-director of the CIA.

7

(quoting Reynolds, 345 U.S. at 11). Where the party seeking disclosure of ostensibly privileged information makes a strong showing of necessity, "the claim of privilege should not be lightly accepted." Id. By contrast, "where necessity is dubious, a formal claim of privilege, demonstrating a reasonable possibility of harm to national security, will have to prevail." Id. Nevertheless, "even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake." Id.

In this case, the Government has satisfied its burden to show that the privilege applies. Contrary to the plaintiffs' assertion, the Government applies the correct standard in its public declaration and avers that "there is a reasonable danger that disclosure of the particular facts in litigation will jeopardize national security." Zuckerbraun, 935 F.2d at 547; see Public Burns Decl. ¶ 9 (asserting that "either admitting or denying that CIA has information implicated by the remaining allegations . . . reasonably could be expected to cause serious—and in some cases, exceptionally grave—damage to the national security of the United States" (emphasis added)).

The Government has also adequately supported its invocation of the state secrets privilege in its public and sealed declarations. In his public declaration, Director Burns swears that "the complete factual bases for my privilege assertions

8

cannot be set forth on the public record without confirming or denying whether CIA has information relating to this matter and thereby risking the very harm to U.S. national security that I seek to protect." Public Burns Decl. ¶ 9. Accordingly, the Government filed a classified declaration supporting the public declaration's assertions in detail. The Court has reviewed the classified declaration and determined that it compellingly substantiates the public declaration.

As the Government contends, its classified declaration details why requiring the CIA to confirm or deny whether it has any information relating to the remaining claim could reasonably threaten national security. See Gov't Reply Mem. at 3, ECF No. 92. The Government persuasively argues that requiring the CIA to acknowledge whether or not it took certain intelligence gathering activities in a foreign embassy could have serious national security repercussions for the United States, even though Assange no longer lives at the Embassy and UC Global no longer provides security there. Id. at 3; Zubaydah, 595 U.S. at 205, 207-08. This conclusion is entitled to significant deference from the Court. See Zubaydah, 595 U.S. at 205 (cautioning that courts should "exercise the traditional reluctance to intrude upon the authority of the Executive in military and national security affairs").

In response, the plaintiffs contend that the state secrets privilege does not apply because the allegations in the Amended Complaint have been discussed in the media and by foreign courts. Thus, according to the plaintiffs, those allegations are no longer "secret." However, the Supreme Court has held that "sometimes information that has entered the public domain may nonetheless fall within the scope of the state secrets privilege." Id. at 207.

For example, in Zubaydah, a detainee and his attorney sought to subpoena two former CIA contractors to obtain information regarding the detainee's treatment at a CIA detention site, allegedly located in Poland. Id. at 198-99. Certain publicly available sources—including a European Court of Human Rights decision—concluded or speculated that the detention site was in Poland. Id. at 200-01. However, neither the CIA nor Poland had ever confirmed those allegations. The Supreme Court determined that the state secrets privilege applied, reasoning that "[c]onfirmation by . . . an insider is different in kind from speculation in the press or even by foreign courts because it leaves virtually no doubt as to the veracity of the information that has been confirmed." Id. at 208; cf. Wilson v. CIA, 586 F.3d 171, 186 (2d Cir. 2009) (finding "a critical difference between official and unofficial disclosures of information classified by the CIA").

10

Similarly, in a First Amendment case considering whether the CIA could prevent the publication of certain book passages containing classified information that arguably had already been disclosed, the Second Circuit Court of Appeals concluded that the classified information had not been officially disclosed and held that:

> [T]he law will not infer official disclosure of information classified by the CIA from (1) widespread public discussion of a classified matter; (2) statements made by a person not authorized to speak for the Agency; or (3) release of information by another agency, or even by Congress.

Wilson, 586 F.3d at 186-87. Although the standard applicable to the state secrets privilege may differ somewhat, this holding provides guidance in determining whether ostensibly privileged information has been confirmed by an insider, thereby leaving "virtually no doubt as to the veracity of the information that has been confirmed." See Zubaydah, 595 U.S. at 208.

To support their contention that the events underlying this case have been publicly disclosed, the plaintiffs point to a decision by the High Court of Justice, King's Bench Division, Divisional Court (the "U.K. Court"), that described the testimony of two anonymous witnesses allegedly formerly employed by UC Global. See Quille Decl., Ex. 4 ¶¶ 70-71, ECF No. 91. One of those witnesses submitted an affidavit asserting that UC Global illicitly copied the contents of a visiting lawyer's

11

iPad—but not specifically alleging that UC Global did so at the CIA's behest. Id., Ex. 3 at 6.[4] The plaintiffs also cite to a German television interview in which an attorney for UC Global asserted that Morales had worked with a U.S. intelligence service—but did not refer to the CIA by name or address the allegations that the plaintiffs' electronic devices were copied. See Who Spied on Julian Assange, https://www.youtube.com/watch?v=qfWoIAsIn6Y (last visited February 13, 2025). Neither of these statements constitutes an acknowledgment by the CIA of the plaintiffs' remaining claim that the CIA directed UC Global to copy the contents of the plaintiffs' electronic devices.

Indeed, the CIA has never officially acknowledged whether it possesses information relating to the plaintiffs' remaining claim and has maintained throughout this litigation that "confirming or denying whether the CIA has any information relating to [the] [p]laintiffs' remaining claim would be harmful." Gov't Mem. at 10, ECF No. 86. Although the U.K. Court discussed certain events underlying the allegations in the Amended Complaint, "speculation . . . by foreign courts" "is different in kind" from confirmation by an insider. See

---

[4] The other witness's testimony did not address the facts underlying the plaintiffs' only remaining claim—that copying the contents of the plaintiffs' electronic devices violated the plaintiffs' Fourth Amendment rights. See Quille Decl., Ex. 4 ¶ 70.

12

Zubaydah, 595 U.S. at 208. Similarly, an interview given by a private individual, "not authorized to speak for the [CIA]," does not constitute confirmation by an insider of the underlying events alleged in this action. See Wilson, 586 F.3d at 186.

The plaintiffs also contend that the allegations in the Amended Complaint only involve the CIA's relationship with UC Global—a private company-and not the CIA's relationships with foreign nations. However, the plaintiffs' argument is rank speculation. It is reasonably refuted by the public Burns declaration, which asserts that, "either affirming or denying that CIA has information implicated by the remaining allegations in the Amended Complaint reasonably could be expected to cause serious—and in some cases, exceptionally grave—damage to the national security of the United States." Public Burns Decl. ¶ 9. This conclusion is further supported by the classified ex parte declaration. Evaluation of the gravity of the threat to national security falls squarely within the expertise of the director of the CIA. See El-Masri v. United States, 479 F.3d 296, 305 (4th Cir. 2007) ("The executive branch's expertise in predicting the potential consequences of intelligence disclosures is particularly important given the sophisticated nature of modern intelligence analysis . . . ."); Sterling v. Tenet, 416 F.3d 338, 347 (4th Cir. 2005) (concluding that "[o]nly the Director

[of the CIA] has the expertise to attest" to broader national security implications).

In sum, the Government has validly asserted the state secrets privilege.

### C.

Finally, after the court determines that the state secrets privilege applies, it "must then address the effect of an invocation of the privilege, in light of the exclusion of the evidence, on the plaintiff's claim or defendant's defense." Doe v. CIA, 576 F.3d at 104. "In some cases, the effect of an invocation of the privilege may be so drastic as to require dismissal." Zuckerbraun, 935 F.2d at 547. For example, "if proper assertion of the privilege precludes access to evidence necessary for the plaintiff to state a prima facie claim, dismissal is appropriate." Id. Additionally, "if the court determines that the privilege so hampers the defendant in establishing a valid defense that the trier is likely to reach an erroneous conclusion, then dismissal is also proper." Id. By contrast, if the plaintiff "has sufficient admissible evidence to enable a factfinder to decide in its favor without resort to the privileged material," then the case may proceed. Farnsworth Cannon, Inc. v. Grimes, 635 F.2d 268, 271 (4th Cir. 1980).

In this case, the state secrets privilege requires dismissal of the plaintiffs' sole remaining claim. Contrary to

the plaintiffs' assertion, there is no feasible way to segregate nonprivileged information in this case. The subject matter of this litigation—whether or not the CIA engaged in the conduct alleged in the plaintiffs' remaining claim—is subject to the state secrets privilege in its entirety. Any answer to the allegations in the Amended Complaint would reveal privileged information. Thus, the plaintiffs cannot state a prima facie claim. Moreover, because the defendants can neither confirm nor deny any of the allegations in the Amended Complaint, they cannot mount a valid defense.

The plaintiff's final claim is therefore **dismissed** pursuant to the state secrets privilege. The Court need not address the Government's invocation of the CIA's statutory privileges pursuant to the National Security Act of 1947 and the Central Intelligence Agency Act of 1949.

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed, those arguments are either moot or without merit. For the foregoing reasons, the Government's motion to dismiss the plaintiffs' sole remaining

claim against the CIA is **granted**. The Clerk is directed to close ECF No. 85.

**SO ORDERED.**
**Dated:**   **New York, New York**
         **February 14, 2025**

_____
John G. Koeltl
**United States District Judge**